# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AMRO ELANSARI | : |
| **PLAINTIFF** | : |
| **VS.** | : CASE NO: |
| **MAITE RAGAZZO (INDIVIDUAL CAPACITY),** | : |
| **15TH JUDICIAL DISTRICT, CHESTER COUNTY** | : |
| **DEFENDANT** | : |

## COMPLAINT AT LAW AND IN EQUITY

AND NOW, comes the Plaintiff, Amro Elansari, by and through himself, *pro se*, to file the instant complaint at law and in equity and in support thereof avers as follows:

1. In 2016, Pennsylvania legalized medical cannabis and in 2018 they began issuing medical cannabis cards as prescribed under PA law and as guaranteed protection under the Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, 113 Stat. 13 §537 (2019) which prohibits federal government from taking actions against states for implementing their own cannabis laws.

2. In 2018 - Plaintiff on probation for a pot charge - was told by P.O. Maite Ragazzo "we no care what the law is - we gonna do what we want" - meaning - they (probation) didn't care whether or not the pot cards were coming out - they were still going to drug test and fail people for pot no matter what.

3. Plaintiff - as a result of this overt act of civil rights deprivation - paid to move to Philadelphia and had the address approved by probation in Centre County where probation originated.

4. In 2020, the PA Supreme Court - receiving a case of probation officers doing the same thing - issued a decision (attached) indicating why **it is not permissible for probation officers to dictate who uses what and when - that is for the PA Department of Health / Legislature**.

5. By acting as they have, Maite Ragazzo and the probation department of the 15th judicial district violated the equal protection rights of the Plaintiff guaranteed under the 14th Amendment of the U.S. Constitution. Therefore, Plaintiff has legal grounds to bring action against the Defendants in this matter pursuant to 42 U.S.C. § 1983 and other laws such as tort claims.

6. When the Plaintiff filed an action to recover compensatory damages for the move - the Judge was furious instead that the Plaintiff had 'outsmarted the system' so to speak - and to report this to Centre County probation immediately (**retaliate against the Plaintiff claiming a right and a constitutionally protected interest based on a protected class**).

7. The Judge, Judge Daniel J. Maisano - at the hearing on 12/22/2020 at 10:00 a.m. stated - "do you think you're a lawyer?" and when the Plaintiff responded "no - (they) were just reading the law as it was (in the Department of Justice manual enclosed)" the Judge said "well you're acting like it" -

8. "I'm going to call Centre County Probation -" hearing on 12/22/2020 at 10:00 a.m

9. "I'm going to write Centre County Probation a letter - " hearing on 12/22/2020 at 10:00 a.m

10. "I'm not even.. I'm just upset. I'm entering judgment in favor of Defendant - you (Plaintiff) *defrauded* the Court system (by moving to Philadelphia and having it approved) - hearing on 12/22/2020 at 10:00 a.m

11. "I'm going to suggest you (Centre County Probation) contact the Detectives or someone and (do something) (to retaliate against Plaintiff for bringing his civil rights claims).

12. Plaintiff worries unjust retaliation based on a protected constitutional right - equal protection for prescription medication the same as any other - and seeks a protective order in addition to damages arising out of the aforementioned set of conduct as prescribed under law as indicated in the U.S. Department of Justice manual enclosed herein.

## JURISDICTION AND VENUE

13. Jurisdiction in the instant matter exists pursuant to 42 U.S.C. §1983 Civil Action for

Deprivation of Rights as well as any and all laws and regulations such as tort claims act and laws

that prohibit against retaliation specifically such as the Pennsylvania Human Relations Act

(PHRA). This Court has supplemental jurisdiction over state law claims.

14. Venue is proper in the instant district because the violation complained of has taken place in

the instant district.

## PARTIES

15. PLAINTIFF - Amro Elansari - with a business address of 901 West Chester Pike, West

Chester PA 19382.

16. DEFENDANTS - Maite Ragazzo (Individual Capacity) and the 15th Judicial District of Pennsylvania, Chester County - located at 201 Market Street, Suite 2100, West Chester PA 19382.

## STATEMENT OF FACT

17. The Plaintiff hereby references and incorporates Paragraph 1 through 16 as if though fully set forth herein.

18. The Plaintiff was placed on probation in Centre County PA for a pot charge despite their position that the law is a violation of the U.S. Constitution - 14th Amendment and the claim is still pending to this date in a §1983 petition filed in the Commonwealth Court on 12/21/2020.

19. The probation was transferred to Chester County where the Plaintiff is from and lived with their parents until 2018 when P.O. Ragazzo informed Plaintiff that "they were just gonna do what they want" with the pot cards and fail people for pot.

20. So the Plaintiff has acquired and address in Philadelphia and has reported to Philadelphia probation ever since after the address was approved by Centre County Probation.

21. 2 years later, the PA Supreme Court issues the decision enclosed - of a probation department choosing to fail people for cannabis despite the legislature passing the medical cannabis law and the PA Department of Health issuing cannabis cards.

22. Instead of respecting this change of law and the rights of the Plaintiff to be treated equally under the law, the probation departments were wrongfully failing people for cannabis even if they had a pot card - despite not doing the same when people were prescribed other medications. The PA Supreme Court ruled that this was impermissible.

23. The Plaintiff filed for a civil action against Maite Ragazzo and 15th Judicial District in small claims pursuant to the Department of Justice Probation Officer Litigation manual enclosed and

pled all of the elements and points pertaining to the claim - to no avail. And then - even worse - the judge instructed the opposing side to retaliate against me by representing my response to my rights being violated as defrauding the Court and to instead issue for me to be investigated and acted against.

24. Plaintiff avers this to be retaliation for standing up for a federally protected right - to which the Plaintiff files the instant litigation.

25. In addition to seeking compensatory and punitive damages - the Plaintiff also seeks a protective order prohibiting the Defendants from retaliation against the Plaintiff for their rights averred herein in the manner described above.

26. Plaintiff avers they are entitled to this relief as a matter of law.

### COUNT I: CIVIL ACTION FOR DEPRIVATION OF RIGHTS
### PURSUANT TO 42 U.S.C. §1983

27. The Plaintiff hereby references and incorporates Paragraph 1 through 16 as if though fully set forth herein.

28. The Plaintiff avers the conduct of Defendants - "we no care what the law is - we gonna do what we want" (not respecting the medical cannabis card issued by law - to be a civil rights deprivation under color of law sufficient enough to establish a §1983 claim pursuant to the attached US Department of Justice §1983 litigation manual Pages 24-40.

29. The Supreme Court of Pennsylvania affirmed this in June 2020 in Gaas vs. 52nd Judicial District, Lebanon County (2020) attached herein as well.

30. As a result, the conduct described here is in fact a §1983 violation - unequal treatment under color of the law - to which the Plaintiff is entitled to compensatory and punitive damages as described in the US Department of Justice §1983 litigation manual Pages 24-40.

## COUNT II: RETALIATION

## PURSUANT TO THE PENNSYLVANIA HUMAN RELATIONS ACT (PHRA)

31. The Plaintiff hereby references and incorporates Paragraph 1 through 16 as if though fully set forth herein.

32. The Defendants were directly instructed by the Judge in the small claims to retaliate against the Plaintiff by issuing proceedings against them for their circumventing the civil rights violation in the instant matter.

33. Plaintiff is at risk of retaliation for standing up for a federally protected right and therefore requests a protective order be issued in their favor.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff respectfully requests that the following relief be issued in favor of

the Plaintiff:

1.  DECLARATORY JUDGMENT - in favor of Plaintiff

2.  COMPENSATORY JUDGMENT - in favor of Plaintiff

3.  PUNITIVE DAMAGES - in an amount to be determined at trial

4.  PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

Respectfully Submitted,



Dated: December 22, 2020                              Amro Elansari

                                                     Liberty And Justice For All

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **AMRO ELANSARI** | : |
| **PLAINTIFF** | : |
| **VS.** | : CASE NO: |
| **MAITE RAGAZZO, 15TH JUDICIAL DISTRICT** | : |
| **FOR CHESTER COUNTY, PENNSYLVANIA** | : |
| **DEFENDANT** | : |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that service has been made on the following individuals via first class mail on this following 21th date of December, 2020:

Defendant Counsel

Dated: December 22, 2020                    Respectfully Submitted,



Dated: December 22, 2020                    _____
                                            Amro Elansari
                                            Liberty And Justice For All

[J-42-2020]
IN THE SUPREME COURT OF PENNSYLVANIA
MIDDLE DISTRICT

SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.

| | | |
|---|---|---|
| MELISSA GASS, ASHLEY BENNETT, AND ANDREW KOCH, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | : : : : : | No. 118 MM 2019 Appeal from the Extraordinary Jurisdiction granted for this case which concerns a challenge to a policy (the |
| Petitioners | : : : : | Policy) prohibiting the use of medical marijuana by individuals under the supervision of the Lebanon County |
| v. | : : | Probation Services |
| | : : | ARGUED:  May 19, 2020 |
| 52nd JUDICIAL DISTRICT, LEBANON COUNTY, | : : : : | |
| Respondent | : | |

**_OPINION_**

**CHIEF JUSTICE SAYLOR**                                    **DECIDED: June 18, 2020**

This matter concerns a challenge to a local judicial district's policy prohibiting the use of medical marijuana by individuals under court supervision, such as probationers.

In 2016, the Pennsylvania General Assembly enacted the Medical Marijuana Act.[1]  In a declaration of policy, it recognized that "[s]cientific evidence suggests that medical marijuana is one potential therapy that may mitigate suffering in some patients and also enhance quality of life."   35 P.S. §10231.102(1).   The Legislature then

---

[1] Act of April 17, 2016, P.L. 84, No. 16 (codified at 35 P.S. §§10231.101-10231.2110) (the "MMA" or the "Act").

announced its intention to provide a temporary program of access balancing patient needs with safety considerations. *See id.* §10231.102(3)(i), (4).

Under the Act, "[n]otwithstanding any provision of law to the contrary, use or possession of medical marijuana as set forth in [the] act is lawful within this Commonwealth." *Id.* §10231.303(a). Relevantly, medical marijuana may only be dispensed, however, to patients who receive certifications from qualified physicians and possess a valid identification card issued by the Pennsylvania Department of Health. *See id.* §10231.303(b)(1)(i).[2] A "patient" is a Pennsylvania resident who has an enumerated serious medical condition and has met specified requirements for certification. *Id.* §10231.103. Notably, there are many other regulatory requirements and restrictions imposed throughout the Act. *See* Class Action Petition for Review Addressed to the Court's Original Jurisdiction, 118 MM 2019 (Pa.), at ¶¶37-63 (summarizing the MMA's regulatory prescriptions).

And of particular relevance here, the MMA contains an immunity provision protecting patients from government sanctions. *See* 35 P.S. §10231.2103(a). Per the statute, no such individual "shall be subject to arrest, prosecution or penalty in any manner, or denied any right or privilege, . . . solely for lawful use of medical marijuana . . . or for any other action taken in accordance with this act." *Id.*

In September 2019, the 52nd Judicial District -- comprised of the Lebanon County Court of Common Pleas (the "District") -- announced a "Medical Marijuana Policy" under the issuing authority of the president judge. *See* Lebanon County Probation Services Policy Nos. 5.1-2019 & 7.4-2019 (Sept. 1, 2019) (the "Policy"). Centrally, the Policy prohibits "the active use of medical marijuana, regardless of

---

[2] Parenthetically, the statute also allows for dispensation to qualified caregivers. *See id.* §10231.303(b)(1)(ii).

whether the defendant has a medical marijuana card, while the defendant is under supervision by the Lebanon County Probation Services Department." *Id.* at 2. The following explanation was provided:

> The medical marijuana card [issued under the MMA] is *not a prescription* for medication, but rather a recommendation by a physician as to a form of treatment. Medical marijuana has not been approved as a MAT (medically assisted treatment) by the FDA (Food and Drug Administration). The use of medical marijuana may have benefits for some medical conditions and under certain circumstances may be helpful. Individuals, however, who are involved in substance abuse and issues surrounding addiction which may have played a part in the defendant's criminal violations of law, must be dealt with in a humane but effective manner so the defendant can be rehabilitated . . . .
>
> Under the Federal Controlled Substances Act (CSA) of 1970, marijuana is classified as a Schedule I substance. By definition under the law, Schedule I drugs have a high potential for abuse and dependency, with no recognized medical use or value. Any marijuana possession, cultivation, or use is a federal crime, subjecting a defendant to fines, prison time, or both. Since marijuana use (medical or recreational) is deemed illegal under Federal law, [and] the Court and the Probation Department should not knowingly allow violations of law to occur, the prohibition against such use is required.

*Id.* at 1 (emphasis in original).[3]  As originally stated, the Policy contained no exceptions.

Petitioners are individuals under the supervision of the probation agency in Lebanon County. Represented by the American Civil Liberties Union, they filed a petition in the Commonwealth Court's original jurisdiction challenging the validity of the Policy, particularly in light of the MMA's facial applicability to persons under court

---

[3] The federal Controlled Substances Act of 170, Pub. L. No. 91-513, 84 Stat. 1242, is codified, as amended, at Sections 801 through 971 of Title 21 the United States Code. *See* 21 U.S.C. §§801-971.

supervision, as well as on account of the enactment's immunity provision.  Petitioners included class-action allegations and sought declaratory and injunctive relief confirming that the Act prohibits the District from penalizing medical marijuana patients who comply with state law -- including those under court supervision -- and restraining enforcement or implementation of the Policy.

Petitioners alleged that each suffers from serious and debilitating medical conditions.  After unsuccessful treatments with other therapies, Petitioners averred, they secured lawful authorization, per the MMA, to use medical marijuana.  Further, the petition asserted that:

> [m]ore than sixty people with serious medical issues in Lebanon County must now decide whether to discontinue their lawful use of a medical treatment that safely and effectively alleviates their serious medical conditions, or risk revocation of their probation and possible incarceration.  It is a choice between risking severe health consequences and going to jail.

Class Action Petition, 118 MM 2019 (Pa.), at ¶2.  Petitioners also stressed the lack of any exceptions.

Separately, Petitioners filed an application for special relief in the nature of a preliminary injunction.  Soon thereafter, the Commonwealth Court proceeded, *sua sponte*, to transfer the case to this Court, concluding that it lacked jurisdiction to grant the requested relief.  The District then filed its response in this Court opposing preliminary injunctive relief.  It claimed, among other things, that Petitioners were unlikely to prevail on the merits, arguing, *inter alia*, that the General Assembly didn't intend the MMA to override the courts' ability to supervise probationers and parolees.

Moreover, the District asserted that its probation services office had experienced disruptions and persistent difficulties when supervising probationers and parolees using medical marijuana.  In this vein, the District elaborated as follows:

> For instance, some individuals under court supervision with medical marijuana prescriptions are unable to identify the health condition that led to the medical marijuana prescription. The Office also found a significant amount of individuals under supervision, who possess a medical marijuana card, that have a history of marijuana abuse and/or their underlying charges are related to the unlawful possession of marijuana. Additionally, drug testing for illicit use of marijuana is also rendered meaningless if an individual has a prescription for the legal use of medical marijuana as the laboratory is unable to discern between legal and illegal strands of marijuana.

Answer to Petitioners' Application for Special Relief in the Nature of a Preliminary Injunction, 118 MM 2019 (Pa.), at 2 (internal citations omitted). The District also maintained that it would be harmed if the Policy were to be restrained, particularly since some drug treatment programs refuse to accept individuals who are using medical marijuana.

Additionally, the District suggested that an October 7, 2019 revision to the Policy dissipates any concern of harm to the affected individuals, since per the amendment individuals aggrieved by the Policy may benefit from an exemption in the event they prove, at a hearing, the "medical necessity" for their ongoing use of medical marijuana.[4] *See, e.g.*, Answer to Petitioners' Application for Special Relief in the Nature of a Preliminary Injunction, 118 MM 2019 (Pa.), at 6-7 (positing that the Policy "carefully

---

[4] The revised version of the Policy provides that:

> Any person on supervision who believes they are aggrieved by this policy may petition the Court for a full and fair hearing to determine whether they should be excused from its application to them. At that hearing, the Petitioner will bear the burden of establishing to the Court the medical necessity of their ongoing use of medical marijuana.

Brief for Respondent at 17 (quoting Lebanon County Probation Services Policy Nos. 5.1-2019 & 7.4-2019 (rev. Oct. 7, 2019)).

balances the need to rehabilitate offenders against the need for medical marijuana and gives individual consideration for the Petitioners' specific circumstances."). According to the District, this hearing would "[o]perationally" be part of a parole or probation revocation proceeding. *Id.* at 4.

The District further noted that the use of medical marijuana conflicts with the general conditions of probation and parole in Lebanon County, which require compliance with all state *and federal* criminal laws and prohibit the possession and use of alcohol and "any legal or illegal mind/mood altering chemical/substance." *Id.* at 3. The District attested that it has been the general experience that requiring adherence to such general conditions assists with rehabilitation and reduces the risk of recidivism.

Ultimately, although the transfer by the Commonwealth Court was improvident, this Court elected to exercise its extraordinary King's Bench jurisdiction to consider the petition. We found that the case implicates substantial legal questions concerning matters of public importance, particularly in light of the allegation that other judicial districts have adopted, or are considering adopting, similar limitations on the use of medical marijuana. The Order also stayed any enforcement or implementation of the Policy pending further order and directed the Prothonotary to establish a briefing schedule and list the case for oral argument. *See* Order, 118 MM 2019 (Pa. Oct. 30, 2019).

While there are many underlying factual matters alluded to in the petition for review, we view the central question -- namely, whether the Policy offends the MMA -- as a legal one that may be decided without the need for fact-finding.

As a threshold matter, the parties dispute the appropriate framing of the question presented. Petitioners, for their part, advance the issue of whether the Policy violates the immunity provision of the MMA. The District, on the other hand, restates the

question presented as follows:  "May a judicial district inquire into the nature of medical marijuana use by a probationer?"  Brief for Respondent at 5.  Along these lines, the District pervasively asserts that Petitioners seek "absolute immunity" and an "all-encompassing right to medical marijuana that cannot be questioned."  *Id.* at 11, 22; *see also id.* at 6 (claiming that Petitioners ask this Court to "declare that simply having a medical marijuana card shuts down any judicial inquiry" and "excuses [Petitioners] from judicial oversight"); *accord id.* at 7, 10-11, 15-16, 18, 25-26, 35, 39-40, 42-43, 46.

To the extent that we would consider the issue on the terms stated by the District, there would simply be no dispute, since Petitioners freely acknowledge that they must comply with the MMA or risk sanctions.  *See, e.g.*, Class Action Petition, 118 MM 2019 (Pa.), at ¶¶37-63.  And they agree that the District, through its judges and probation officers, may make reasonable inquiries to ensure their use of medical marijuana is lawful.  *See, e.g.*, Reply Brief for Petitioners at 1, 3.  We will therefore consider the issue presented entirely on the terms framed by Petitioners.

Petitioners stress that the General Assembly made a policy decision, in the MMA, to legalize the use of medical marijuana in the Commonwealth with the aim of providing an effective treatment for patients with serious medical conditions.  *See, e.g.*, Brief for Petitioners at 22 ("Allowing courts to create additional hoops that patients must jump through to avail themselves of the benefits of the MMA would usurp the will of the legislature and open the door to additional judicially created prerequisites to patients' eligibility under the Act.").  Drawing support from decisions of the highest courts of other states, they also find the conflict between the Policy and the Act's explicit immunity provision to be manifest and disabling, relative to the Policy's viability.  *See, e.g.*, *Reed-Kaliher v. Hoggatt*, 347 P.3d 136, 139 (Ariz. 2015) (invalidating a probation condition restricting the use of medical marijuana); *State v. Nelson*, 195 P.3d 826, 833 (Mont.

2008) (holding that the state's medical marijuana law "simply does not give sentencing judges the authority to limit the privilege of medical use of marijuana while under state supervision").

With reference to the federal Controlled Substances Act, Petitioners assert that federal law has no bearing on the Policy's validity, since the District has no legal basis to require that medical marijuana patients comply with federal prohibitions where the Pennsylvania General Assembly has specifically displaced the prior state-law analogue. According to Petitioners, reliance on federal law to supersede the MMA would undermine Pennsylvania's sovereignty. *See* Brief for Petitioners at 10-11 ("The Commonwealth has sovereign authority to allow its residents to use marijuana to treat certain serious medical conditions without fear of arrest, prosecution, or the denial of any right or benefit *by the state.*" (emphasis in original); *id.* at 11 ("That medical marijuana remains illegal under federal law neither compels nor authorizes the courts of this Commonwealth to ignore the will of the state legislature in favor of enforcing federal law.").[5]

The District, on the other hand, maintains that the Policy is grounded in salutary rehabilitative aims, as it meshes with its general conditions of probation, which both prohibit probationers from using alcohol, narcotics, and legal and illegal mind- and/or mood-altering chemical substances and require adherence to state and federal law. The District also reiterates its assertion that use of medical marijuana by probationers has fostered management difficulties in the administration of probation and substantially limits avenues for drug treatment. Centrally, the District maintains that, in enacting the

---

[5] Petitioners' position is supported by *amici*, Society of Cannabis Clinicians, Association of Cannabis Specialists, Drug Policy Alliance, and Americans for Safe Access Foundation, which credit Petitioners' legal arguments and offer additional policy support.

MMA, the General Assembly did not intend to limit the courts' traditional ability to supervise probationers.

With regard to the decisions from other jurisdictions, the District envisions many distinguishing factors.  Chiefly, the District emphasizes that Pennsylvania is the only state, among those referenced, in which the immunity provision of a medical marijuana statute restrains punishment or denial of privileges "solely for" use of medical marijuana. 35 P.S. §10231.2103(a).  Because Petitioners are not just alleged "patients" but also probationers under court supervision, it is the District's position that they are not being subject to restrictions on their use of medical marijuana *solely* because they are patients.  *Accord* Brief for Respondent at 15 ("Section 2103(a)'s failure to contemplate every particular situation in the life of a 'patient' that might cause friction with the MMA does not support a blanket prohibition against judicial scrutiny of medical marijuana.").

The District further observes that Section 2103(a) shields medical marijuana users from "arrest" and "prosecution," positing that these terms demonstrate an intention to address events occurring *prior to* adjudication and sentencing by the judiciary.  Under the principle of statutory construction known as *ejusdem generis*, the District posits, the ensuing catchall phrase -- "or penalty in any manner" -- must be interpreted consistent with the preceding words "arrest" and "prosecution."  *See* 1 Pa.C.S. §1903(b).

In Pennsylvania, the District explains, sentencing courts and the Board of Probation and Parole always have enjoyed broad authority to ensure that probation serves effectively to rehabilitate offenders and protect the public.  According to the District, the Policy strikes a reasonable balance between these objectives and Petitioners' asserted right of access to medical marijuana.  *See* Brief for Respondent at 27 ("The Judicial District's Medical Marijuana Policy is entirely consistent with the

legitimate aims of probation and does not unnecessarily restrict any fundamental right of Petitioners."). Ultimately, the District asks this Court to lift the stay restraining implementation of the Policy and permit Petitioners to secure a hearing and create a "developed record that fully accounts for Petitioners' individual situations and their need for rehabilitation." *Id.* at 8-9.

In assessing whether the Policy conflicts with the immunity provision of the MMA, we view the issue as one of statutory construction. We will therefore apply conventional interpretive principles, as discussed throughout this Court's decisions. *See, e.g.*, *Norfolk S. Ry. Co. v. PUC*, 621 Pa. 312, 328, 77 A.3d 619, 629 (2013). The essential review encompasses close adherence to terms of a statute that are plain and resort to other approaches of discernment only in the presence of ambiguity or inexplicitness. *See id.* Where ambiguity or inexplicitness exists, the Court may afford weight to other considerations, including the object to be attained by the statute under consideration, the consequences of a particular interpretation, and contextual considerations. *See id.*; *see also Schock v. City of Lebanon*, ___ Pa. ___, ___, 210 A.3d 945, 955-59 (2019) (highlighting the role of contextual considerations in the construction of ambiguous statutes). *See generally* 1 Pa.C.S. §§ 1921-1939.

There is no disagreement that Petitioners are eligible to be "patients" under the MMA, who are entitled to the immunity from penalty and cannot be denied of any right or privilege solely for lawful use of medical marijuana. *See* 35 P.S. §10231.2103(a). Responding to the District's argument, however, that Petitioners do not qualify for immunity since the Policy turns on an additional factor -- namely, Petitioners' status as probationers -- we find that this circumstance implicates a material ambiguity.

On the one hand, the District argues, colorably, that the integral involvement of court supervision means that any punishment or denial of the privilege of probation

occurring under the Policy is not "solely for" a petitioner's medical marijuana use.  *Id.*  Conversely, as Petitioners contend, given that probation is the privilege in issue, revocation on account of otherwise lawful medical marijuana use can be viewed as punishment, or the denial of the privilege of probation, solely on account of such use.

Significantly, in various respects and measures, the MMA accords specific treatment to criminal offenders.  For example, under Section 614 of the Act, individuals who have been convicted of drug offenses cannot be affiliated with a medical marijuana dispensary or grower/processor.  *See* 35 P.S. §10231.614.  Similarly, those convicted of certain drug offenses within a prescribed window of time are ineligible to serve as "caregivers" (*i.e.*, those designated by patients to deliver medical marijuana).  *See id.* §10231.502(b).  Furthermore, in Section 1309, the General Assembly prohibited the use of medical marijuana in any correctional institution, including one "which houses inmates serving a portion of their sentences on parole or other community correction program."  *Id.* §10231.1309(2).

Notably, individuals in each of these categories, who are subject to the above constraints, can nonetheless qualify as "patients" who are otherwise eligible to use medical marijuana outside the restricted parameters.  *Accord Reed-Kaliher*, 347 P.3d at 139 (observing that the state medical marijuana law "does not deny even those convicted of violent crimes or drug offenses (so long as they are not incarcerated) access to medical marijuana if it could alleviate severe or chronic pain or debilitating medical conditions").  And, to the degree that they satisfy the Act's threshold requirements and obtain medical marijuana cards, each is entitled to the immunity afforded under Section 2103(a).  *Accord id.*; *see also U.S. v. Jackson*, 388 F. Supp. 3d 505, 513 (E.D. Pa. 2019) ("The Medical Marijuana Act carves out some exceptions, such as prohibiting the use of medical marijuana in prisons, but it contains no exception

for individuals on probation or parole or under supervision.  Without any such provision, the Court concludes that the Act applies to those individuals just as it applies to any other person." (citation omitted)).

Section 1309(a) is particularly significant, in our judgment, since the Legislature considered persons under court supervision and chose to impose constraints only upon a specific subcategory (those physically present in a correctional institution).  *See* 35 P.S. §10231.1309(2).  As Petitioners persuasively assert, had the General Assembly intended broader limitations, it would have been a straightforward matter for it to have said this.[6]

We also respectfully differ with the District's position that it may rely on its general conditions of probation to make discretionary determinations about probationers' use of medical marijuana, beyond making inquires to determine whether the usage is lawful under the MMA.  Although the District highlights that the general conditions' restrictions on alcohol and mind- and/or mood-altering drugs go hand in hand, the Legislature has not implemented a remedial scheme authorizing the use of alcohol for treatment of serious medical conditions.  *Accord Nelson*, 195 P.3d at 832 ("When a qualifying patient uses medical marijuana in accordance with the MMA, he is

---

[6] The District's reliance on the *ejusdem generis* principle to suggest that immunity should apply only to pre-adjudicative measures has lesser force, in our view, in light of the overarching policies underlying the Act.  The General Assembly likely chose the terms "arrest" and "prosecution" precisely because these are types of actions that lead to punishment or the denial of privilege.  Viewed as such, a probation revocation hearing is of the same character.

In this respect, and more broadly, we also credit an argument by Petitioners that the Act is remedial in nature, and thus, should be accorded a liberal construction.  S*ee* 1 Pa.C.S. §1928(c).

receiving lawful medical treatment.  In this context, medical marijuana is most properly viewed as a prescription drug." (citation omitted)).

As to the general conditions' prohibition against violations of federal law, while possession and use of marijuana remains illegal under federal law even for medical purposes, Petitioners correctly observe that the federal Controlled Substances Act does not (and could not) require states to enforce it.  *See* Brief for Petitioners at 34 (citing *Printz v. U.S.*, 521 U.S. 898, 935, 117 S. Ct. 2365, 2384 (1997) ("Congress cannot compel the States to enact or enforce a federal regulatory program.")); *see also Ter Beek v. City of Wyoming*, 846 N.W.2d 531, 538 (Mich. 2014) (applying the *Printz* rationale to conclude that a state can both comply with the federal Controlled Substances Act and authorize the use of medical marijuana law as a matter of state law).  Moreover, through a continuing series of appropriations enactments since 2014, Congress has prohibited the United States Department of Justice from utilizing allocated funds to prevent states from "implementing their own laws that authorize the use, distribution, possession, or cultivation of medical marijuana."  *Jackson*, 388 F. Supp. 3d at 509 (quoting Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, 133 Stat. 13 §537 (2019)).

Congress's approach evinces a respect for the core principle of federalism recognizing dual sovereignty between the tiers of government.  *See United States v. Davis*, 906 F.2d 829, 832 (2d Cir. 1990) ("The states and the national government are distinct political communities, drawing their separate sovereign power from different sources, each from the organic law that established it. Each has the power, inherent in any sovereign, independently to determine what shall be an offense against its authority and to punish such offenses.").  In enacting the MMA, the Pennsylvania Legislature proceeded pursuant to its independent power to define state criminal law and promote

the health and welfare of the citizenry.  *See Whalen v. Roe,* 429 U.S. 589, 603 n.30, 97 S. Ct. 869, 878 n.30 (1977) (citing, *inter alia*, *Robinson v. California,* 370 U.S. 660, 664-65, 82 S. Ct. 1417, 1419-20 (1962)).  While the circumstances are certainly uneasy -- since possession and use of medical marijuana remains a federal crime -- we find that the District cannot require state-level adherence to the federal prohibition, where the General Assembly has specifically undertaken to legalize the use of medical marijuana for enumerated therapeutic purposes.

We are cognizant of the District's concerns that medical marijuana use by probationers may, in fact, cause difficulties with court supervision and treatment.  As we have observed previously: "The concern that unintended consequences may unfold are prevalent relative to the promulgation of experimental, remedial legislation[.]"  *Williams v. City of Phila.*, 647 Pa. 126, 150, 188 A.3d 421, 436 (2018).  Nevertheless, "[w]here the language of the governing statute is clear (or clear enough), . . . the solution is legislative -- and not judicial -- adjustment."  *Id.* at 150-51, 188 A.3d at 436.

Along these lines, the Supreme Court of Montana has aptly observed that, "whether or not medical marijuana is ultimately a good idea is not the issue" before the courts.  *Nelson*, 195 P.3d at 833.  Rather, in Pennsylvania, as elsewhere, the political branch has decided to permit patients -- including probationers -- to use medical marijuana for specified, serious medical conditions, upon a physician's certification.  The Policy, both in its original and amended forms, fails to afford sufficient recognition to the status of a probationer holding a valid medical marijuana card as a patient, entitled to immunity from punishment, or the denial of any privilege, solely for lawful use.  *See* 35 P.S. §10231.2103(a).

As discussed in connection with our clarification of the question presented, this case does not merely concern an effort on the part of the District (or its judges or

probation officials) to reasonably inquire into the lawfulness of a probationer's use of medical marijuana. Rather, both the original and amended Policies are constructed upon a presumption that any and all use is impermissible. In terms of the amended Policy, the Court deems the affordance of a hearing -- in which probationers bear the burden of overcoming this presumption by proving medical necessity and lawfulness of use -- to be an insufficient countermeasure to the Policy's foundationally inappropriate presumption.

Certainly, judges and probation officials may make reasonable inquiries into the lawfulness of a probationer's use of medical marijuana. In this regard, the District's repeated assertions that it is rendered powerless to do so in absence of the Policy, *see, e.g.*, Brief for Respondent at 6, are not well taken. For example, the Act itself establishes a system whereby the validity of a medical marijuana card can be verified through the Department of Health. *See* 35 P.S. §10231.301(a)(4)(ii) (requiring the Department of Health to maintain a statewide database enabling it to establish the authenticity of identification cards).

Consistent with our interpretation of the MMA, however, judges and/or probation officers should have some substantial reason to believe that a particular use is unlawful under the Act before haling a probationer into court. Although ensuring strict adherence to the MMA by those possessing a valid medical marijuana card may be difficult, the alternative selected by the District of diluting the immunity afforded to probationer-patients by the Act is simply not a viable option.

The petition for declaratory and injunctive relief is GRANTED. For the reasons stated above, the Policy as stated in its original and amended forms is deemed to be

contrary to the immunity accorded by Pennsylvania's Medical Marijuana Act, and as such, the Policy shall not be enforced.

Nothing in this Opinion restrains judges and probation officials supervising probationers and others from making reasonable inquiries into whether the use of marijuana by a person under court supervision is lawful under the Act. And nothing impedes a revocation hearing or other lawful form of redress, where there is reasonable cause to believe that a probationer or other person under court supervision has possessed or used marijuana in a manner that has not been made lawful by the enactment.

The request for class-action treatment is dismissed as moot.

Justices Baer, Todd, Donohue, Dougherty, Wecht and Mundy join the opinion.

If you have issues viewing or accessing this file contact us at NCJRS.gov.

**U.S. Department of Justice   National Institute of Corrections**

# Potential Liabilities
# of Probation and
# Parole Officers

## Revised Edition



**August 1985**

99952

**U.S. Department of Justice**
**National Institute of Justice**

This document has been reproduced exactly as received from the
person or organization originating it. Points of view or opinions stated
in this document are those of the authors and do not necessarily
represent the official position or policies of the National Institute of
Justice.

Permission to reproduce this copyrighted material has been
granted by

~~Public Domain/National Institute of~~
~~Corrections/US Department of Justice~~

to the National Criminal Justice Reference Service (NCJRS).

Further reproduction outside of the NCJRS system requires permis-
sion of the copyright owner.

. POTENTIAL LIABILITIES OF PROBATION AND PAROLE OFFICERS

Revised Edition

by

Rolando V. del Carmen, LL.M., J.S.D.

The Criminal Justice Center
Sam Houston State University

Edited by
Melvin T. Axilbund, J.D.

March 1982

Revised August 1985

This document was prepared originally under Grant Number BZ-5
from the National Institute of Corrections, U.S. Department of
Justice.  It was revised through additional funding from the
National Institute of Corrections, under category C-ADM-85-008.
Points of view and opinions stated in this document are those of
the author and do not necessarily represent the official position
or policies of the National Institute of Corrections or the U.S.
Department of Justice.

## PROJECT STAFF FOR THE REVISED EDITION

Rolando V. del Carmen, Project Director
Professor of Criminal Justice
Sam Houston State University

Eve Trook-White, Chief Legal Researcher
Doctoral Fellow
Sam Houston State University

## PROJECT STAFF FOR THE FIRST EDITION

Stephen W. Coates, Legal Research Coordinator
Doctoral Fellow
Sam Houston State University

Carol M. Veneziano, Project Manager
Doctoral Fellow
Sam Houston State University

Rodney J. Henningsen, Survey Analysis Specialist
Associate Professor of Criminal Justice
Sam Houston State University

### LAW RESEARCHERS
### FOR THE FIRST EDITION

John Bleckman                      Michelle Polmanteer
Sharon Cook                        Brent Richbrook
Lloyd Corpening                    Scott Weber
   (Law Students, University of Houston Law School)

### BOARD OF CONSULTANTS
### FOR THE FIRST EDITION

Paul A. Chernoff                   Arnold J. Hopkins
Justice                            Director
District Court of Newton           Division of Parole
West Newton,                       and Probation
Massachusetts                      State of Maryland

Richard Crane                      Richard E. Longfellow
Chief Legal Counsel                Deputy Commissioner
Department of Corrections          Probation Division
State of Louisiana                 State of Georgia

Frank R. Hellum                    Charles E. Walker, Jr.
Research Center West               General Counsel
National Council on                Board of Pardons
Crime and Delinquency              and Paroles
                                   State of Texas

## FOREWORD

In 1982, the National Institute of Corrections published the first comprehensive overview of potential legal liabilities that can confront probation and parole officers as the result of their decisionmaking and work with offenders. The initial report addressed the primary areas of litigation against probation and parole officers and administrators; relevant caselaw; and the various forms of liability, immunity, confidentiality, good faith, and indemnity.

The initial publication generated high interest among probation and parole practitioners and, for that reason, the Institute contracted with the original author to update the material in light of more recent cases. The Institute has also developed a training program regarding legal liabilities of probation and parole officers, which is presented through its National Academy of Corrections.

As with the first edition of this report, it must be emphasized that this revised edition was prepared for a national audience; the reader must obtain specific guidance from his/her state or local jurisdiction.

Raymond C. Brown, Director
National Institute of Corrections
September 1985

### PREFACE

The first edition of this manual was published in March 1982.  Since then, many changes have taken place in probation and parole law.  This revised edition updates and modifies the manual to reflect recent court decisions and developments, rearranges topics to ensure a more logical progression, and includes three new chapters of current and nationwide concern.

This revised edition is current as of August 1, 1985. Modifications include an expansion of chapters, the division of chapters into four parts (Introduction, Overview of Legal Liabilities, Specific Areas of Liability, and Conclusion), and a resequencing of chapters such that the Overview of Legal Liabilities part (Chapters III-VI) now precedes Specific Areas of Liability (Chapters VII-XIV).  This resequencing gives the reader a generic insight into legal liabilities before focusing on specific liability concerns.  Chapter VI (Legal Representation and Indemnification) is an expanded version of a segment of Chapter XI in the first edition; Chapter XIII (Liabilities of Agency Supervisors) and Chapter XIV (Liability for Private Programs and Community Service Work) are new chapters that discuss topics of ever-increasing litigation and growing importance for criminal justice personnel.

For reasons of convenience, the term "probation/parole officer" is used throughout the manual instead of "probation and/or parole officer."  Similarly, "he" is used rather than the more accurate "he or she."

The chief legal researcher for this revision was Eve Trook-White, currently a doctoral fellow in the Ph.D. program at the Criminal Justice Center, who finished her law degree in California and is licensed to practice law in Hawaii and Texas.

This manual is concerned mainly with the potential legal liabilities of probation/parole officers.  It is not meant to be a sourcebook for probation and parole law.  A more comprehensive discussion of the various facets of probation and parole law may be found in <u>The Law of Probation and Parole</u>, by Neil P. Cohen and James J. Gobert (Shepard's McGraw-Hill, 1983).

Variation abounds in probation and parole law among different jurisdictions.  An advice in the first edition is therefore reiterated here for manual users.  That advice says:

This manual was written to provide general information. It is not designed to give authoritative legal advice on specific problems.  Probation/parole officers are strongly urged to seek prompt advice and counsel from legal advisors if faced with specific legal questions.

v

It is hoped that this revised edition is an improved version of the original and will be even more useful for probation/parole personnel of all levels.

Rolando V. del Carmen
Huntsville, Texas

August 1, 1985

SUMMARY OF CHAPTER CONTENTS

## PART ONE - INTRODUCTION

NCJRS

CHAPTER I      -  PRELIMINARY CONSIDERATIONS

CHAPTER II     -  COURTS AND BASIC LEGAL CONCEPTS

DEC 9 1985

ACQUISITIONS

## PART TWO - OVERVIEW OF LEGAL LIABILITIES

CHAPTER III    -  AN OVERVIEW OF FEDERAL AND STATE LIABILITIES

CHAPTER IV     -  CIVIL LIABILITY UNDER 42 UNITED STATES CODE,
                  SECTION 1983:  CIVIL RIGHTS CASES

CHAPTER V      -  LIABILITY UNDER STATE LAW:  STATE TORT LAW AND
                  NEGLIGENCE CASES

CHAPTER VI     -  LEGAL REPRESENTATION AND INDEMNIFICATION

## PART THREE - SPECIFIC AREAS OF LIABILITY

CHAPTER VII    -  PRE-SENTENCE/PRE-PAROLE INVESTIGATIONS AND REPORTS

CHAPTER VIII   -  THE PAROLE RELEASE HEARING AND LIABILITY OF
                  PAROLE BOARD MEMBERS FOR RELEASE

CHAPTER IX     -  CONDITIONS

CHAPTER X      -  MODIFICATION OF CONDITIONS AND CHANGES IN STATUS

CHAPTER XI     -  SUPERVISION

CHAPTER XII    -  REVOCATION

CHAPTER XIII   -  LIABILITIES OF AGENCY SUPERVISORS

CHAPTER XIV    -  LIABILITY FOR PRIVATE PROGRAMS AND COMMUNITY
                  SERVICE WORK

## PART FOUR - CONCLUSION

CHAPTER XV     -  TRENDS, GENERAL ADVICE, AND QUESTIONS

DETAILED TABLE OF CONTENTS

FOREWORD . . . . . . . . . . . . . . . . . . . . . . iii

PREFACE . . . . . . . . . . . . . . . . . . . . . . . v

### PART ONE — INTRODUCTION

CHAPTER I — PRELIMINARY CONSIDERATIONS . . . . . . . . . . . 1

   THE NEED FOR THIS MANUAL . . . . . . . . . . . . . . . 1

   CORRECTIONS LAW — A BRIEF BACKGROUND . . . . . . . . 2

   ORGANIZATION OF PROBATION AND PAROLE AGENCIES . . . . . 3

   SUMMARY . . . . . . . . . . . . . . . . . . . . . . 4

   NOTES . . . . . . . . . . . . . . . . . . . . . . . 5

CHAPTER II — COURTS AND BASIC LEGAL CONCEPTS . . . . . . . 6

   COURTS . . . . . . . . . . . . . . . . . . . . . . 6

      The Federal Court System . . . . . . . . . . . . 6
      State Court Systems . . . . . . . . . . . . . . 7

   THE APPEAL PROCESS . . . . . . . . . . . . . . . . . 7

   THE EFFECT OF JUDICIAL DECISIONS . . . . . . . . . . . 8

   BASIC LEGAL CONCEPTS . . . . . . . . . . . . . . . . 10

      Civil v. Criminal Cases . . . . . . . . . . . . 10
      Criminal Conviction v. Civil Liability . . . . . . 11
         Type of Penalty . . . . . . . . . . . . . 11
         Collateral Effects . . . . . . . . . . . . 11
         Evidentiary Effects . . . . . . . . . . . . 11
      Federal v. State Jurisdiction . . . . . . . . . 12
      Jurisdiction v. Venue . . . . . . . . . . . . 12
      Statutory Law v. Administrative Law . . . . . . 13
      State Tort Law v. Section 1983 . . . . . . . . 13
      Absolute v. Qualified Immunity . . . . . . . . 14
      Basic Constitutional Rights . . . . . . . . . 15

   SUMMARY . . . . . . . . . . . . . . . . . . . . . . 16

   NOTES . . . . . . . . . . . . . . . . . . . . . . . 17

viii

CONTENTS (Continued)

### PART TWO — OVERVIEW OF LEGAL LIABILITIES

CHAPTER III — AN OVERVIEW OF FEDERAL AND STATE LIABILITIES . 18

   FEDERAL LAW . . . . . . . . . . . . . . . . . . . . 19

      Civil Liabilities . . . . . . . . . . . . . . 19

         Title 42 of the U.S. Code, Section 1983 —
         Civil Action for Deprivation of Civil
         Rights . . . . . . . . . . . . . . . . . 19
         Title 42 of the U.S. Code, Section 1985 —
         Civil Action for Conspiracy . . . . . . . 20
         Title 42 of the U.S. Code, Section 1981 —
         Equal Rights Under the Law . . . . . . . 20

      Criminal Liabilities . . . . . . . . . . . . . 21

         Title 18 of the U.S. Code, Section 242 —
         Criminal Liability for Deprivation of
         Civil Rights . . . . . . . . . . . . . . 21
         Title 18 of the U.S. Code, Section 241 —
         Criminal Liability for Conspiracy to
         Deprive A Person of Rights . . . . . . . 21
         Title 18 of the U.S. Code, Section 245 —
         Federally Protected Activities . . . . . . 22

   STATE LAW . . . . . . . . . . . . . . . . . . . . . 23

      Civil Liability Under State Tort Law . . . . . . 23
      Criminal Liability Under State Law . . . . . . . 23

   DAMAGES AWARDED IN CIVIL ACTIONS . . . . . . . . . . 24

      Actual or Compensatory Damages . . . . . . . . 24
      Cary v. Piphus . . . . . . . . . . . . . . . 24
      Nominal Damages . . . . . . . . . . . . . . 24
      Punitive or Exemplary Damages . . . . . . . . 24
      Attorney's Fees . . . . . . . . . . . . . . 24

   SUMMARY . . . . . . . . . . . . . . . . . . . . . . 24

   NOTES . . . . . . . . . . . . . . . . . . . . . . . 26

CHAPTER IV — CIVIL LIABILITY UNDER 42 UNITED STATES CODE
     SECTION 1983:  CIVIL RIGHTS CASES . . . . . . . 27

   HISTORY . . . . . . . . . . . . . . . . . . . . . . 28

   WHY SECTION 1983 SUITS HAVE INCREASED DRAMATICALLY . . 28

ix

CONTENTS (Continued)

CHAPTER IV (Continued)

    BASIC ELEMENTS OF A SECTION 1983 SUIT . . . . . . . . . 29

        The Defendant Must be a Natural Person or a
        Local Government . . . . . . . . . . . . . . . . . 29
        The Defendant Must be Acting Under "Color of
        State Law" . . . . . . . . . . . . . . . . . . . . 30
        The Violation Must be of a Constitutional or a
        Federally Protected Right . . . . . . . . . . . . 31
        The Violation Must Reach Constitutional Level . . 31

    DEFENSES IN SECTION 1983 SUITS . . . . . . . . . . . . 32

        General . . . . . . . . . . . . . . . . . . . . . 32
        The Immunity Defense . . . . . . . . . . . . . . . 32
            Governmental Immunity . . . . . . . . . . . 32
            Official Immunity . . . . . . . . . . . . . 33
                Absolute Immunity . . . . . . . . . . 34
                Qualified Immunity . . . . . . . . . . 34
                Quasi-Judicial Immunity. . . . . . . . 35
        The Good Faith Defense . . . . . . . . . . . . . . 36
        Other Good Faith Concerns . . . . . . . . . . . . 41

    SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . 42

    NOTES . . . . . . . . . . . . . . . . . . . . . . . . . 43

CHAPTER V - LIABILITY UNDER STATE LAW:  STATE TORT LAW AND
              NEGLIGENCE CASES . . . . . . . . . . . . . . . 46

    STATE TORT LAW . . . . . . . . . . . . . . . . . . . . 46

        Definition . . . . . . . . . . . . . . . . . . . . 46
        Torts to Bodily Integrity . . . . . . . . . . . . 47
        Torts to Non-Physical Interests . . . . . . . . . 48
        Defenses Against Tort Actions . . . . . . . . . . 49

    NEGLIGENCE . . . . . . . . . . . . . . . . . . . . . . 49

        Source of Liability in Tort Cases . . . . . . . . 51

    POSSIBLE PARTIES DEFENDANT IN TORT CASES . . . . . . . 52

        Government Agency as Defendant . . . . . . . . . . 52
        Individual Officers as Defendant . . . . . . . . . 52
        Liability of Probation/Parole Field Officers . . . 52

    SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . 53

    NOTES . . . . . . . . . . . . . . . . . . . . . . . . . 54

CONTENTS (Continued)

CHAPTER VI - LEGAL REPRESENTATION AND INDEMNIFICATION . . . 55

    LEGAL REPRESENTATION . . . . . . . . . . . . . . . . . 55

        Civil Liability Cases . . . . . . . . . . . . . . 55
        Criminal Liability Cases . . . . . . . . . . . . . 57

    INDEMNIFICATION IN CASE OF LIABILITY . . . . . . . . . . 57

    ATTORNEY'S FEES IN SECTION 1983 CASES . . . . . . . . . 59

    INSURANCE . . . . . . . . . . . . . . . . . . . . . . . 61

    UPDATE - 1982 SURVEY ON REPRESENTATION AND
    INDEMNIFICATION . . . . . . . . . . . . . . . . . . . . 63

    SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . 64

    NOTES . . . . . . . . . . . . . . . . . . . . . . . . . 65


PART THREE - SPECIFIC AREAS OF LIABILITY


CHAPTER VII - PRE-SENTENCE/PRE-PAROLE INVESTIGATIONS
             AND REPORTS . . . . . . . . . . . . . . . . . . 67

    PROBATION PRE-SENTENCE REPORTS . . . . . . . . . . . . 67

        Contents . . . . . . . . . . . . . . . . . . . . . 67
            General . . . . . . . . . . . . . . . . . . . 68
            Hearsay . . . . . . . . . . . . . . . . . . 68
            Confrontation and Cross-Examination . . . . . 68
            Criminal Record . . . . . . . . . . . . . . . 68
            Suppressed Evidence . . . . . . . . . . . . . 68
        Disclosure . . . . . . . . . . . . . . . . . . . . 69

    PAROLE INVESTIGATION AND REPORT ISSUES . . . . . . . . 71

        Federal Prisoner File Access . . . . . . . . . . . 72
        State Prisoner File Access . . . . . . . . . . . . 72
            The Greenholtz Case-Does Due Process Apply? . 72
            Does Due Process Embrace File Access? . . . . 73

    RIGHT TO NOTICE OF A PAROLE HEARING . . . . . . . . . . 74

    SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . 74

    NOTES . . . . . . . . . . . . . . . . . . . . . . . . . 76

CONTENTS (Continued)

**CHAPTER VIII — THE PAROLE RELEASE HEARING AND LIABILITY OF PAROLE BOARD MEMBERS FOR RELEASE** . . . . .    80

THE PAROLE RELEASE HEARING . . . . . . . . . . . . . .    80

    Right to Counsel . . . . . . . . . . . . . . . .    80
        Federal . . . . . . . . . . . . . . . . . .    80
        State . . . . . . . . . . . . . . . . . . .    80
    Release Criteria . . . . . . . . . . . . . . . .    81
        Federal . . . . . . . . . . . . . . . . . .    81
        State . . . . . . . . . . . . . . . . . . .    81
    Explanation for Denial of Parole . . . . . . . .    83
        Administrative Procedures Act (APA) . . . . .    83
            Federal . . . . . . . . . . . . . . .    83
            State . . . . . . . . . . . . . . . .    84
        Due Process Analysis — State Application . .    84

LIABILITY OF PAROLE BOARD MEMBERS FOR RELEASE . . . . .    84

        Legislative Remedy . . . . . . . . . . . . .    89

LIABILITY TO THE INMATE OR PAROLEE — FUNDAMENTAL RIGHTS . . . . . . . . . . . . . . . . .    90

LIABILITY TO THE INMATE OR PAROLEE — PROCEDURAL RIGHTS . . . . . . . . . . . . . . . . .    91

SUMMARY . . . . . . . . . . . . . . . . . . . . . . .    92

NOTES . . . . . . . . . . . . . . . . . . . . . . . .    94


**CHAPTER IX — CONDITIONS** . . . . . . . . . . . . . .    97

CONDITIONS IN GENERAL . . . . . . . . . . . . . . . .    98

CONDITIONS IMPINGING ON FUNDAMENTAL RIGHTS . . . . . .    99

    Free Speech and Assembly . . . . . . . . . . . .    99
    Other Fundamental Rights . . . . . . . . . . . .    101
        Association . . . . . . . . . . . . . . . .    101
        Religion . . . . . . . . . . . . . . . . .    101
        Privacy . . . . . . . . . . . . . . . . . .    102
        Procreation . . . . . . . . . . . . . . . .    102
        Travel . . . . . . . . . . . . . . . . . .    102
        Self-Incrimination . . . . . . . . . . . .    102

VAGUENESS AS A LIMITATION . . . . . . . . . . . . . .    104

REASONABLENESS AS A LIMITATION . . . . . . . . . . . .    104

CONTENTS (Continued)

**CHAPTER IX** (Continued)

    EXPLANATION OF CONDITIONS . . . . . . . . . . . .    104

    WORK AS A CONDITION — PAID OR VOLUNTEER . . . . . . .    105

    SUMMARY . . . . . . . . . . . . . . . . . . . . . .    106

    NOTES . . . . . . . . . . . . . . . . . . . . . . .    107


**CHAPTER X — MODIFICATION OF CONDITIONS AND CHANGES IN STATUS** . . . . . . . . . . . . . . . . .    110

    MODIFICATION . . . . . . . . . . . . . . . . . . .    110

    RESCISSION . . . . . . . . . . . . . . . . . . . .    111

    EXTENSION . . . . . . . . . . . . . . . . . . . .    113

    TERMINATION . . . . . . . . . . . . . . . . . . .    114

    SUMMARY . . . . . . . . . . . . . . . . . . . . .    114

    NOTES . . . . . . . . . . . . . . . . . . . . . .    116


**CHAPTER XI — SUPERVISION** . . . . . . . . . . . . .    118

    DUTY TO THE CLIENT NOT TO DISCLOSE INFORMATION . . . .    118

    LIABILITY FOR FAILURE TO DISCLOSE CLIENT BACKGROUND INFORMATION TO THIRD PARTIES . . . . . . . . . . . .    120

        Parole Officers . . . . . . . . . . . . . . .    120
        Probation Officers . . . . . . . . . . . . .    122
        The Liability Trigger — Special Relationships . .    122
        Reasonably Foreseeable Risk . . . . . . . . .    122

    OTHER SUPERVISION ERRORS . . . . . . . . . . . . .    124

    IS THERE AN ENFORCEABLE RIGHT TO SUPERVISION? . . . . .    126

    SEARCH AND SEIZURE . . . . . . . . . . . . . . . .    126

        History . . . . . . . . . . . . . . . . . . .    126
        Validity of Waiver Conditions . . . . . . . . .    127
        Warrantless Searches Absent Waiver Conditions . .    128
        Fourth Amendment Fully Applicable . . . . .    128
        Probable Cause Not Required for Offender Search . . . . . . . . . . . . . . . . . .    129

CONTENTS (Continued)

**CHAPTER XI** (Continued)

Some Reason, But Not Probable Cause,
Required . . . . . . . . . . . . . . . . 129
Reasonable Basis Variations . . . . . . . . 129

VIOLATIONS - REPORTING . . . . . . . . . . . . . 130

COLLECTIONS - RESTITUTION . . . . . . . . . . . . 131

GENERAL SUPERVISORY LIABILITY . . . . . . . . . . 132

SHOULD THE PROBATION OFFICER HAVE GIVEN PROBATIONER
THE MIRANDA WARNINGS WHEN ASKING QUESTIONS? . . . . 132

SUMMARY . . . . . . . . . . . . . . . . . . . . 134

NOTES . . . . . . . . . . . . . . . . . . . . . 135

**CHAPTER XII - REVOCATION** . . . . . . . . . . . . . 138

MORRISSEY V. BREWER . . . . . . . . . . . . . . 138

The Factual Setting . . . . . . . . . . . . 138
The Reasoning of the Court . . . . . . . . . 139
The Holding of the Court . . . . . . . . . . 139
Preliminary Hearing . . . . . . . . . . . 139
Revocation Hearing . . . . . . . . . . . . 140

JUDICIAL GLOSS . . . . . . . . . . . . . . . . 141

Preliminary Hearing Issues . . . . . . . . . 141
Location . . . . . . . . . . . . . . . . 141
Promptness . . . . . . . . . . . . . . . 141
Form of Notice . . . . . . . . . . . . . 142
Impartial Hearing Officer . . . . . . . . 142
Revocation Hearing Issues . . . . . . . . . 142
Notice of Hearing . . . . . . . . . . . . 142
Disclosure of Evidence . . . . . . . . . 142
Confrontation and Cross-Examination . . . 142
Hearsay Admissibility . . . . . . . . . . 143

OTHER ISSUES . . . . . . . . . . . . . . . . . 144

Standard of Proof . . . . . . . . . . . . . 144
Nature of Proof Required . . . . . . . . . . 144
Limitations on Testimony . . . . . . . . . . 146
The Exclusionary Rule . . . . . . . . . . . 146

CONTENTS (Continued)

**CHAPTER XII** (Continued)

RECENT SUPREME COURT DECISIONS . . . . . . . . . . . 148

Equal Protection and Revocation:  Bearden v.
Georgia . . . . . . . . . . . . . . . . . . 148
Interrogations and Miranda:  Prior to Minnesota v.
Murphy . . . . . . . . . . . . . . . . . . 149
Interrogations and Miranda:  The Effect of
Minnesota v. Murphy . . . . . . . . . . . . 151
Due Process and Probation Revocation:  Black v.
Romano . . . . . . . . . . . . . . . . . . 152
Recent Judicial Findings of Liability . . . . . 153

EXTRADITION . . . . . . . . . . . . . . . . . . 153

SUMMARY . . . . . . . . . . . . . . . . . . . . 155

NOTES . . . . . . . . . . . . . . . . . . . . . 156

**CHAPTER XIII - LIABILITIES OF AGENCY SUPERVISORS** . . . . . 160

CATEGORIES OF SUPERVISORY LAWSUITS . . . . . . . . . 161

LIABILITY UNDER STATE LAW . . . . . . . . . . . . . 161

Negligence of Supervisors - Liability to Clients . 161
Negligent Failure to Train . . . . . . . . 162
Negligent Hiring . . . . . . . . . . . . . 165
Negligent Assignment . . . . . . . . . . . 165
Negligent Failure to Supervise . . . . . . 166
Negligent Failure to Direct . . . . . . . . 167
Negligent Entrustment . . . . . . . . . . . 167
Negligent Retention . . . . . . . . . . . . 168
Negligence of Supervisors - Liability to
Subordinates . . . . . . . . . . . . . . . . 169
Direct Liability . . . . . . . . . . . . . 169
General Basis for Discipline . . . . . . 170
Homosexual Activities of Employees . . . 170
Political Activities of Employees . . . . 171
Sexual Harassment of Employees . . . . . 171
Vicarious Liability . . . . . . . . . . . . 172

LIABILITY UNDER FEDERAL LAW . . . . . . . . . . . . 172

To Clients . . . . . . . . . . . . . . . . . 172
Direct Liability . . . . . . . . . . . . . 172
Vicarious Liability . . . . . . . . . . . . 173
To Subordinates . . . . . . . . . . . . . . 174
Direct Liability . . . . . . . . . . . . . 174
Vicarious Liability . . . . . . . . . . . . 175

CONTENTS (Continued)

**CHAPTER XIII** (Continued)

    AGENCY REPRESENTATION AND LIABILITY FOR ACTS OF
      SUPERVISORS . . . . . . . . . . . . . . . . . . . . . 176

    SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . 177

    NOTES . . . . . . . . . . . . . . . . . . . . . . . . . 179

**CHAPTER XIV - LIABILITY FOR PRIVATE PROGRAMS AND COMMUNITY**
        **SERVICE WORK** . . . . . . . . . . . . . . . . . . 183

    LIABILITY UNDER SECTION 1983 OF PRIVATE PROGRAMS . . . 183

    OTHER LIABILITY ISSUES . . . . . . . . . . . . . . . . 184

        Government Liability and Responsibility Tests . . 184
        Liability of Officer or Agency for Use of
          Community Volunteers . . . . . . . . . . . . . 186

    OFFICER OR AGENCY LIABILITY FOR INJURIES CAUSED BY
      PAROLEES OR PROBATIONERS ENGAGED IN COMMUNITY
      SERVICE WORK . . . . . . . . . . . . . . . . . . . 187

    SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . 188

    NOTES . . . . . . . . . . . . . . . . . . . . . . . . . 189

**PART FOUR - CONCLUSION**

**CHAPTER XV - TRENDS, GENERAL ADVICE, AND QUESTIONS** . . . . . 190

    TRENDS . . . . . . . . . . . . . . . . . . . . . . . . 190

    GENERAL ADVICE . . . . . . . . . . . . . . . . . . . . 190

    SPECIFIC CONCERNS . . . . . . . . . . . . . . . . . . . 192

        Legal Representation . . . . . . . . . . . . . . 192
        Indemnification . . . . . . . . . . . . . . . . 192
        Professional Insurance . . . . . . . . . . . . . 193
        Immunity Statute . . . . . . . . . . . . . . . . 194
        Source of Authoritative Information . . . . . . . 194

    IMPORTANT QUESTIONS . . . . . . . . . . . . . . . . . . 195

**APPENDIX**

**GLOSSARY** . . . . . . . . . . . . . . . . . . . . . . . . . 199

**PART ONE - INTRODUCTION**

**CHAPTER I - PRELIMINARY CONSIDERATIONS**

**CHAPTER II - COURTS AND BASIC LEGAL CONCEPTS**

CHAPTER I

PRELIMINARY CONSIDERATIONS

## THE NEED FOR THIS MANUAL

We live in an increasingly litigious society.  One result is more suits against government agencies and public officials.  The largest target is the federal government, which was sued more than 30,000 times in 1980; the plantiffs in those actions asked for damages in excess of $4.3 billion.[1]  Add to this the comparable suits filed in state courts, and the full magnitude of the trend and the problems it presents become clear.  As one writer put it, "If we wanted a new national motto, summing up the great national pastime, we could put it in two words:  'Sue 'em.'"[2]

Of particular interest to the readers of this manual is the frequency with which prisoners try to use the courts to enforce rights they believe they have.  In 1979, there were 11,195 state prisoner civil rights suits filed in federal courts.  The comparable figure in 1972 was 3,348.  Just this one type of suit grew 334 percent in seven years.  The total number of prisoner petitions* filed in 1979 was 23,001, representing almost 15 percent of all civil cases filed in federal courts that year.[3]  In 1982 prisoners filed a total of 24,975 petitions, a 5.8 percent increase over the previous year.  The number keeps increasing.  It is statistically true that few of these cases ever proceed to trial and fewer still are won by the plaintiff.  But that is hardly reassuring to the officer who must worry about legal representation and possible liability.  The cost in time and resources can be enormous even if the suit is ultimately dismissed.

When this manual was first published in March 1982, only a few probation/parole officers had been involved personally in civil or criminal cases that put their professional conduct in issue.  Since then the number has increased dramatically.  Although no reliable or official figures are available, it is safe to say that currently the number is in the hundreds, or perhaps thousands.

Lawsuits of the type to be considered here stem from allegations of nonperformance and improper performance of official duties and responsibilities.  The manual examines mainly the concerns of probation/parole officers that appear to offer the most fertile grounds for litigation.  It is written primarily for

---

*This category included habeas corpus petitions.

probation/parole officers (including supervisors and administrative officials), but may also be of interest to lawyers and judges. While the manual is directed at an audience that does not have extensive legal training, the footnotes have been conformed to the most widely recognized legal system of citation.

## CORRECTIONS LAW - A BRIEF BACKGROUND

The legal environment in which probation/parole officers work developed from the spate of cases filed by prisoners against institutional correctional officials for alleged violations of constitutional rights. For decades, the courts had adhered to a "hands-off" policy with respect to prisoners' claims. The prevalent attitude was well-stated in a widely quoted case:

> The prisoner has, as a consequence of his crime, not only forfeited his liberty, but all his personal rights except those which the law in its humanity accords to him. He is, for the time being, the slave of the state.[4]

In essence, this doctrine meant that unless the facts of the case presented a serious constitutional question under the Eighth Amendment prohibition against cruel and unusual punishment, the courts would not interfere with prison administration. Prison administrators consequently exercised wide discretion, subject to minimal court supervision for violations of basic rights. Several reasons were given to justify the adoption of the "hands-off" doctrine in the last century. In the first place, courts were loath to second-guess decisions made by prison administrators. Judges realized that prison administration was not within their area of expertise. Secondly, judges were reluctant to breach the traditional separation of powers between the judicial and executive branches of government. There was also the attitude that since inmates had violated the law, they fully deserved the treatment they were getting. Society wanted retribution and judges were hesitant to control the way societal preferences were to be carried out.

Significant erosion of the "hands-off" doctrine began during the 1960's, contemporaneously with the due process and equal protection revolutions instigated by the United States Supreme Court under Chief Justice Earl Warren. The courts gradually rejected their reluctant stance in favor of judicial intervention in matters affecting an increasing number of fundamental constitutional rights. A new philosophy emerged that stated that "prisoners retain all the rights of free citizens except those on which restriction is necessary to assure their orderly confinement or to provide reasonable protection for the rights and physical safety of all members of the prison community."[5] This change in attitude gave rise to a virtual flood of cases filed by prisoners all over the country, seeking identification and protection of rights to which they were entitled while incarcerated. The courts shifted from a "hands-off" to a "hands-on" attitude, bringing on the "open door" era in corrections law.

The procedural cornerstone for much of the law that has since been developed was laid in the 1961 Supreme Court case of Monroe v. Pape.[6] In that case, which arose from police conduct, the Court decided that a Reconstruction Era federal law -- the Civil Rights Act of 1871 -- could be used by persons seeking monetary damage and injunctions against state officers accused of abuses of individual rights. (That law is now Section 1983 of Title 42 of the United States Code, and cases that arise under it often are called Section 1983 cases.) Monroe opened the door to the federal courthouse to prisoners, among others, and greatly expanded the remedies available for the redress of grievances. The rights and interests now recognized as enforceable or protectible have been developed in the recent cases that individuals and groups of plaintiffs have brought through that open door.

The success prisoners had in civil rights cases spilled over into all areas of the criminal justice system. In the last few years there has been a tremendous upsurge in the number of lawsuits filed against police officers for alleged violations of civil rights. For a while, probation/parole officers were insulated from this trend. During the past few years, however, several courts have held probation/parole officers or boards liable for what they did or did not do in violation of the rights of probationers, parolees, or third parties. Now, an increasing number of suits are being filed against probation/parole officers, seeking to hold them accountable for their acts. This trend is predicted to continue at an even faster pace in the immediate future.

## ORGANIZATION OF PROBATION AND PAROLE AGENCIES

A wide variety of organizational patterns can be found in probation and parole systems in the United States.[7] These variations include differences in the branches and levels of government in which these systems are structurally located.

Probation/parole offices may be classified according to levels of governmental control (state only, local only, or combined state-local), and branches of government (executive only, judicial only, or combined executive-judicial). These classifications are mentioned because of their potential implications in liability suits. As discussed in Chapter IV, state governments enjoy sovereign immunity unless waived. This means that unless waived, state governments and their agencies cannot be sued. This immunity, however, does not extend to state employees sued in their individual capacity. This immunity is a state privilege. Local governments and agencies can be sued in federal court together with local employees.

As discussed in Chapter IV, judicial officials (judges and prosecutors) enjoy absolute immunity, whereas executive officials enjoy only qualified immunity. Most parole officers belong to the executive department, but probation officers in many places are

hired or fired by the judge.  While a few courts have extended absolute immunity to probation officers when following the orders of a judge, most courts continue to treat probation officers as employees of the executive department despite their judicial connection.

## SUMMARY

This manual is necessary because American society has become litigation prone.  The number of cases filed against personnel of the criminal justice system has increased tremendously in recent years.  There was a time when the courts adopted a "hands off" attitude towards cases filed by the various "consumers" of criminal justice.  Those days are long gone, giving way to an "open door" judicial policy on cases filed against criminal justice personnel.  That policy is here to stay.

For a while, probation/parole officers were insulated from this litigation trend.  During the past few years, however, many cases have been filed against officers and supervisors -- seeking to hold them accountable for what they may or may not have done. It therefore behooves probation/parole personnel to be familiar with basic concepts in legal liabilities if they hope to protect themselves against possible lawsuits.  Judicial officers (judges and prosecutors) are vested with absolute immunity, but probation/parole officers enjoy only qualified immunity. Moreover, while state agencies generally enjoy immunity from lawsuits (unless waived), state officers do not share this immunity.  Probation/parole officers, therefore, whether they be state or local employees, are susceptible to liability lawsuits in whatever they do.

## NOTES

### CHAPTER I

1.  Houston Chronicle, January 11, 1981, at 18.

2.  Id.

3.  Federal Judicial Center Prisoner Civil Rights Committee, Recommended Procedures for Handling Prisoner Civil Rights Cases in the Federal Courts VIII N.2, 8 (1980).

4.  Ruffin v. Commonwealth, 62 Va. (21 Grat.) 790, 796 (1871).

5.  American Bar Association Joint Committee on the Legal Status of Prisoners, Standards Relating to the Legal Status of Prisoners, 14 Am. Crim. L. Rev. 377, 387 (Tentative Draft 1977) (Standard 1.1).

6.  365 United States 167 (1961).

7.  For a detailed discussion, see United States Department of Justice, Law Enforcement Assistance Administration, State and Local Probation and Parole Systems (1978).

## CHAPTER II

### COURTS AND BASIC LEGAL CONCEPTS

About half of the cases cited in this manual were decided by federal courts, including a handful by the Supreme Court. Most of the rest of the cases are state supreme court decisions. The initial sections of this Chapter highlight the relative significance of each type of case to the individual probation/parole officer. The concluding section presents some legal concepts and terms that will be encountered throughout the manual.

#### COURTS

A quick examination of any telephone directory will reveal a nearly bewildering array of courts. No matter where the reader is within the United States, he is within the territorial or geographic jurisdiction of at least one state court and one federal district court. Space and function limitations do not permit us to explain the specific power of each of the many types of courts to pass upon the actions of probation/parole officers. However, an outline of state and federal court systems can be presented.

#### The Federal Court System[1]

There are three layers to the federal system of courts of general jurisdiction. At the top of the hierarchy is the Supreme Court of the United States. Except for a few situations in which cases can be heard originally by the Supreme Court, it is exclusively an appellate or reviewing court. The Supreme Court is composed of nine Justices, who hear and decide all cases as one body (en banc).

At the base of the federal system are 94 district courts. Each state has at least one federal district court; no federal court district crosses state lines. Most districts have more than one active federal district judge. Collectively, there are 516 active authorized district judges.

As an adjunct of the district courts, Congress created the United States magistrate system to afford workload relief to the district judges. Magistrates have limited powers, and many are connected with the preliminary stages of criminal cases, such as issuing search and arrest warrants, holding bail hearings, and conducting preliminary hearings. Of special relevance here is the fact that, in some federal districts, magistrates are called upon to make a preliminary assessment of the merit of Section 1983 cases.

The United States Courts of Appeals occupy the middle rank of the federal court system. Each of the 12 courts of appeals serves a designated multi-state territory, except for the Court of Appeals for the District of Columbia. The size of the bench

in each appellate "circuit" varies; altogether, the courts of appeals are authorized to have 132 active circuit judges. Most court of appeals cases are decided by "panels" of at least three judges. (Panels may include district judges and circuit judges who are not on the court's active roster.) When court of appeals panels reach different conclusions on points of law, and in other circumstances, these courts also function en banc.

#### State Court Systems[2]

If examined in any degree of detail, the court systems of the 50 states and the District of Columbia appear to be highly idiosyncratic. Fortunately, the state systems are enough like each other and the federal court system to make quick summary possible.

A supreme court is at the pinnacle of each state's system. Texas and Oklahoma have specialized supreme courts; in each, there is one court of last resort for civil cases and a different one for criminal cases. In Maryland and New York, the highest court is called the court of appeals.

The states call their general jurisdiction trial courts by many different names; sometimes more than one name is used in a state. Circuit court, district court, and superior court are the most popular choices. Most states have an even lower level of original jurisdiction courts, to which have been applied a greater variety of names. Courts at this level have limited and/or specialized jurisdiction. In many cases, they are courts not of record. Typically, the procedures in such courts are less formal than those observed in the courts of general jurisdiction.

A majority of states have a layer of appellate courts below the supreme court.

#### THE APPEAL PROCESS

With rare exceptions, cases enter the federal and state judicial systems at the trial level. At that level, a jury -- or the judge in cases being heard without a jury -- determines the facts of the case based on the evidence presented. By applying the facts to the settled, applicable law, the judge or jury determines the outcome of the suit.

It is axiomatic that every case has a winner and a loser. A party seeks review, and possible reversal, of an unfavorable judgment by appealing it up the judicial hierarchy. In states without an intermediate appellate court, all appeals are heard by the supreme court. Courts of appeal do not hear further evidence; generally, they do not re-evaluate the evidence presented in the trial court. Their function is to determine errors of law and give a remedy for prejudicial but not harmless errors.

A large majority of the cases filed in any court system are finally decided at the lowest level. Appeal is more a potential than an actual part of the usual case. Of those cases appealed, most are found to have been rightly decided at the level below, or otherwise not subject to reversal.

The dual court systems -- federal and state -- merge at the Supreme Court of the United States. Because the supremacy clause of the Constitution makes the Constitution the "supreme Law of the Land," and because the Supreme Court decides the meaning of the Constitution, that body can review state supreme court decisions insofar as they pass on claims or defenses founded on the Constitution or laws enacted under its authority. Conversely, the Supreme Court will not disturb a state decision that it finds was based on adequate state law grounds.

Two other consequences flowing from the supremacy clause must be mentioned. First, state courts may not decide a case contrary to the Constitution; the clause specifically requires state court judges to observe the Constitution, and they take an oath to do so. Second, unless precluded by a federal law from doing so, claims arising under federal law may be heard in state as well as federal courts; state courts have concurrent jurisdiction over most federal causes of action, including Section 1983 cases. This has proved to be of limited practical significance, however, because most plaintiffs have preferred to have federal courts hear their federal claims. (In certain, limited circumstances, federal courts have been authorized by Congress to hear cases originally brought in state court.)

The reader should also be aware of the concept of precedent. While the immediate function of every judicial decision is to settle the rights of the parties before it, a secondary function is to forecast how subsequent, similar cases will be decided so that other persons can conform their conduct to the demands of the law. This predictive aspect is the precedential value of a case. As a result of the hierarchical structure of court systems, the precedential value of a case -- and often its persuasiveness -- varies directly with the level of the court that decided it. The Supreme Court of the United States hands down the decisions of greatest future significance; trial courts render decisions that have comparatively slight utility as precedent.

From these facts and principles, it is possible to distill guidelines concerning the relevance of the court decisions cited in this Manual, or found elsewhere, to the individual reader.

## THE EFFECT OF JUDICIAL DECISIONS

The jurisdiction of every American court is limited in some way. One type of limitation is territorial or geographic. In a strict sense, therefore, each judicial decision is authoritative and has precedential value only within the geographic limits of

the area in which the deciding court is authorized to function. Hence:

- United States Supreme Court decisions on questions of federal law and the Constitution are binding on all American courts because the whole country is under its jurisdiction.

- Federal court of appeals decisions on such issues are the last word within the circuit if there is no Supreme Court action. The First Circuit Court of Appeals, for example, settles federal issues for Maine, Massachusetts, New Hampshire, Rhode Island, and Puerto Rico, the areas to which its jurisdiction is limited.

- When a district court encompasses an entire state, as is the case in Maine, its assessment of federal law (again barring appellate action) produces a uniform rule within the state. In a state like Wisconsin, however, where there are multiple districts, there can be divergent rules.

The same process operates in the state court systems. There is one regard, however, in which state supreme court decisions are recognized as extending beyond state borders. Since the Constitution declares the sovereignty of the states within the areas reserved for state control, the court of last resort of each state is the final arbiter of issues of purely local law. The meaning that the Supreme Court of California gives to a state statute, for example, will be respected even by the United States Supreme Court as authoritative.

The existence of dual court systems, state and federal, and the limited jurisdictional reach of the vast majority of courts make it practically inevitable that the courts will render conflicting decisions on a single point of law. A core function of the appellate process is to provide a forum for resolving these conflicts. Indeed, the existence of a conflict in the law is a strong argument for securing appellate review of an unfavorable decision.

But an unresolved conflict is just that -- unresolved -- and each competing decision remains effective within the jurisdiction of the court that decided it. As this manual illustrates, there are few Supreme Court cases on probation and parole issues, and other courts are in conflict on some points. The individual reader should take particular note of the rule in effect for the area in which he works, if one is given.

The reader should be most interested in the local rule for two reasons. First, under the concept of stare decisis, courts decide new cases in accordance with prior cases -- with precedent. The locally effective rule can be expected to define

the conduct standards to which the probation/parole officer will be held if he becomes a defendant. Second, if there is a change in the law, as sometimes occurs, proof that the defendant was acting within the law will go far toward establishing a good faith defense, if that is applicable.

The reader cannot, however, safely ignore decisions from other jurisdictions. Again, there are two reasons. First, there may be no settled law on an issue in his area. When that issue is presented    a local court initially -- a case of first impression -- the loc    federal or state court will probably decide it on the basis of    a dominant or "better" rule being applied elsewhere.

The second reason requires recognition that the law is not stagnant but evolving. Over a period of time, trends develop in the law. When a particular court senses that its prior decisions on a point are no longer in the mainstream, it may give consideration to revising its holdings. The decisions reported here may enable the reader to spot a trend and anticipate what local courts may be doing in the future.

## BASIC LEGAL CONCEPTS

Knowledge of some legal concepts and terminology is necessary for an understanding of the legal responsibilities and liabilities of probation/parole officers. A basic collection of these concepts is contained in the Glosssary of Legal Terms, the Appendix to the manual. Some points need to be discussed more extensively here to enable the reader to get the most out of the succeeding chapters.

## Civil v. Criminal Cases

All litigation falls into one of two broad categories, civil or criminal. A probation/parole officer could face either a civil or a criminal suit as a result of his work.

If the government charges that he is a wrongdoer because he violated some criminal law, the probation/parole officer will become the accused -- the defendant -- in a criminal case. It will then be the government's responsibility to prove "beyond a reasonable doubt" that: (1) a crime has been committed; and (2) the defendant committed it. If the government does not carry its burden of persuasion in the trial court, the case will normally end when the trier of fact returns a verdict of "not guilty." The government's right of appeal in criminal cases is quite restricted.

The person, if any, whose injury gives rise to the criminal charge is known as the complainant. Complainants are not formal parties in criminal cases and usually have no role other than as witnesses.

On the other hand, no civil case can be instituted other than by the person or entity (or a proper representative) claiming to have been injured in some way by the action or inaction of another person. The party going forward is the plaintiff, and the party complained against is the defendant. In most civil suits, the plaintiff seeks to recover money from the defendant as damages for the harm done. In another large group of civil cases, the plaintiff seeks an injunction, an order from the court requiring the defendant in the future to behave in a specified way.

The civil case plaintiff must prove that: (1) the defendant owed him some legal or contractual duty or obligation; and (2) some breach of duty by the defendant resulted in harm to the plaintiff. The nature and magnitude of the duty, the breach, and the harm will be considered in determining the type and size or scope of the remedy to be given the plaintiff. In order for the plaintiff to prevail, he need only prove his case by a "preponderance of the evidence." This is a much lighter burden of persuasion than in criminal cases; the evidence need only show that it is more likely than not that the defendant breached some duty, causing harm. Civil plaintiffs and defendants have equal rights of appeal.

## Criminal Conviction v. Civil Liability

Conviction in a criminal case is a much more serious matter than being found civilly liable. In addition to the opprobrium that the criminal defendant may suffer as a result of conviction, these differences should be noted.

Type of Penalty. Monetary penalties are possible in either type of case: damages in a civil action, a fine in a criminal case. Additionally, probation, incarceration, and alternative community service may be imposed on the defendant upon conviction.

Collateral Effects.[3] Criminal conviction carries with it civil disabilities, meaning that the convicted person may be barred by state or federal statute from exercising certain rights during and even after service of the sentence. Such divested rights usually include the right to vote, to be a member of a jury, to be a guardian, to hold public office, and to obtain certain types of employment. If the offense of which the defendant is convicted is a felony, in some jurisdictions that conviction constitutes grounds for divorce. Civil liability carries no such disabilities; hence its effect is not far-reaching.

Evidentiary Effects. Conviction in a criminal case may be introduced as evidence in a subsequent civil case arising out of the same incident, but a judgment of civil liability cannot be used as evidence in a subsequent criminal case.

For example, X, a probation officer, pleads guilty to a criminal charge of unlawful search and seizure of a probationer's apartment. That guilty plea may be used as evidence later in a

state tort liability case that the probationer may bring against
X. This is because the amount of evidence needed to convict in
criminal cases is "beyond reasonable doubt," which is much higher
in degree of certainty than the mere "preponderance of evidence"
needed in civil cases.

On the other hand, if X is found civilly liable, the finding
cannot be introduced in evidence in a subsequent criminal case
against X arising out of the same act.

## Federal v. State Jurisdiction

Suppose a probationer or parolee wants to file a civil case
against a probation/parole officer. How is he or his lawyer to
know whether the case should be filed in a state or a federal
court? The answer is that it normally depends on the law being
invoked. If the case alleges a violation of federal law, it is
filed in a federal court; if the alleged violation is of a right
or interest created by state law, it is filed in a state court.
The chapters on legal liabilities talk about the two types of
civil cases for damages usually brought against probation/parole
officers. These are:

- Tort Cases -- usually filed in state courts based on
  state tort law.

- Section 1983 (civil rights) Cases -- usually filed
  in federal courts because the basis is an alleged
  violation of Title 42, Section 1983 of the United
  States Code.

In criminal cases, the same basic rule applies. If an act is
a violation of federal law, the federal government must prose-
cute. Conversely, if the act is a violation of state law, the
state will prosecute in a state court.

However, if the act violates both federal and state criminal
laws (such as when a probation/parole officer illegally arrests a
probationer or parolee), both governments may prosecute. There is
no double jeopardy because of the "dual sovereignty" doctrine,
which says that states and the federal government are both sover-
eign entities and, therefore, may prosecute the same act sepa-
rately. This does not usually happen in fact because federal or
state prosecutors as a matter of policy generally disfavor subse-
quent prosecutions if they are satisfied with the results in the
first case. Successive prosecutions, however, are constitutional
and have been resorted to in a number of cases.

## Jurisdiction v. Venue

The meaning of these terms can be confusing. Jurisdiction
refers to the power of a court to hear a case. A court's
jurisdiction is defined by the totality of the law that creates
the court and limits its powers; the parties to litigation can-
not invest the court with jurisdiction it does not possess. Defects
in the subject matter jurisdiction of a court cannot be waived by
the parties and can be raised at any stage of litigation, includ-
ing on appeal. The court can raise the question of its jurisdic-
tion on its own motion -- sua sponte. In order to render a valid
judgment against a person, a court must also have jurisdiction
over that person. Defects in obtaining personal jurisdiction,
however, can be waived by the defendant's voluntary act, or by
operation of law as when the defendant fails to assert his rights
in a timely or proper manner.

The concept of venue is place oriented. It flows from the
policy of the law to have cases tried in the locale where they
arose, where a party resides, or where another consideration makes
it reasonable. Legislation establishes mandatory venue for some
types of cases and preferred venue for others. But, within a
court system, venue may be proper in any court with subject matter
jurisdiction and jurisdiction over the defendant. Venue defects
are almost always waived by the defendant's failure to object
promptly.

An example of the interplay of these concepts may help make
them clear. Texas law requires that felonies be prosecuted in the
state district courts and in no other type of court. Another law
provides, in general, that felonies be prosecuted in the county
where the offense occurred. The first of these provisions is
jurisdictional, while the second deals with venue.

## Statutory Law v. Administrative Law

Statutory law is law passed by the state or federal legis-
lature (such as a state tort law or Section 1983), while adminis-
trative law refers to rules and regulations promulgated by govern-
mental agencies such as probation and parole offices. Once
properly promulgated, these rules and regulations have the force
and effect of statutory law and are binding on that agency, its
officers, and third parties dealing with them unless and until
declared illegal or unconstitutional by the courts. The same is
true, although to a lesser extent, with agency policies, guide-
lines, and administrative directives. Failure to follow agency
regulations or guidelines may lead to administrative action and,
in some cases, civil liability. Conversely, compliance with
agency regulation usually establishes good faith or reasonableness
of an officer's action, hence negating liability.

## State Tort Law v. Section 1983

A tort is civilly wrongful conduct that causes injury to the
person or property of another, in violation of a duty imposed by
law. The great bulk of tort law is made in the courts rather than
in the legislature. In the states, the usual legislative role is
to provide the judicial framework for tort litigation. Substan-
tive tort law was inherited with the bulk of the English common
law, and courts have been refining and modernizing it since. In

Texas, for example, no statute defines the elements of a civil assault, although laws do identify the courts authorized to hear assault cases and limit the time within which the cases must be filed. Some specific torts, however, are legislatively created, such as the wrongful death action.

The federal pattern, in general, differs from the state pattern. Tortious conduct normally must be defined by Congress in order to be actionable in federal courts. (When federal district courts hear tort cases -- automobile negligence cases are the most common -- they apply state tort law in determining the rights of the parties.) Section 1983 is, in essence, one statutorily created federal tort. In Section 1983 of Title 42 of the United States Code, Congress authorized suits for damages (and other relief) by any person deprived of rights given by the Constitution or federal law. The action lies against any person (and sub-state units of government) -- usually a government employee -- who acts under color of law, i.e., who has apparent official authority for his conduct. The frequency with which Section 1983 has been used has made it a major concern for probation/parole officers.

Because of the dual sovereignty doctrine, the same act, such as the groundless arrest of a parolee, might be a state tort -- such as false arrest/imprisonment -- and a Section 1983 violation. Two suits might result. Both of these potential sources of civil liability are treated separately in subsequent chapters.

## Absolute v. Qualified Immunity

Both absolute and qualified immunity are defenses in civil litigation. They differ in the degree of protection they afford and by whom they may be asserted. The proper assertion of absolute immunity normally will derail a case at the beginning, while qualified immunity may not.

Legislators, judges, and prosecutors may assert the absolute immunity defense concerning their official duties in those positions. While "absolute" technically may be a misnomer, it is close enough to be apt. The officer seeking to claim absolute immunity must establish his official position and that the action complained of was legislative, judicial, or prosecutorial, as the case may be.

Qualified immunity is the term applied to the protection that other public officials obtain upon showing that the questioned conduct involved considerable judgment and discretion and was within their official duties. Qualified immunity has sometimes been recognized as an adequate defense even when the conduct was ministerial (no individual choice in the manner of performance of some duty) if the defendant can prove his good faith.

It is the policy of the law that each person should be held accountable for the consequences of his acts. Immunity defenses conflict with this philosophical bent and, therefore, are not

favored by the courts. This is evident in the hesitancy with which they have extended absolute immunity to parole boards that, in their releasing decisions at least, exercise a most judge-like function. Individual probation/parole officers generally can only establish qualified immunity.

## Basic Constitutional Rights

Most of the cases filed against probation/parole officers are based, directly or indirectly, on an alleged violation of a constitutional right. It is therefore helpful to be reminded of the basic rights under the Bill of Rights and the Fourteenth Amendment.

### First Amendment

1.  Freedom of religion
2.  Freedom of speech
3.  Freedom of the press
4.  Freedom of assembly
5.  Freedom to petition the government for redress of grievances.

### Fourth Amendment

Prohibition against unreasonable searches and seizures.

### Fifth Amendment

1.  Right to a grand jury indictment for capital or otherwise infamous crime
2.  Right against double jeopardy
3.  Right against self-incrimination
4.  Prohibition against the taking of life, liberty, or property without due process of law
5.  Right against the taking of private property for public use without just compensation.

### Sixth Amendment

1.  Right to a speedy and public trial
2.  Right to an impartial jury
3.  Right to be informed of the nature and cause of the accusation against him
4.  Right to be confronted with the witnesses against him
5.  Right to have compulsory process for obtaining witnesses in his favor
6.  Right to have the assistance of counsel.

### Eighth Amendment

1.  Prohibition against excessive bail
2.  Prohibition against cruel and unusual punishment.

### Fourteenth Amendment

1.  Right to privileges and immunities of citizens
2.  Right to due process
3.  Right to equal protection of the laws.

The right to privacy is a basic constitutional right, but is not one of the rights explicitly mentioned in the Constitution. The Court, however, has said that the right to privacy is implied from provisions of the First, Fourth, Fifth, Sixth, Ninth, and Fourteenth Amendments.[4]

### SUMMARY

This chapter focuses on the courts and some concepts that are essential to a proper understanding of liability litigation. The federal court system has three layers. At the top is the Supreme Court, followed by the Courts of Appeals, and then by the District Courts where most federal cases are tried. The court systems in the 50 states are organized basically along the same lines, except that some states do not have an intermediate court of appeals. The federal and state court systems merge at the United States Supreme Court level; hence decisions from the Supreme Court are binding throughout the United States.

Court decisions are generally limited in force and effect to the territorial limits of that court. Because of this, court decisions in similar legal issues may vary. Unless resolved on appeal to a higher court, the inconsistency stays unresolved. It is therefore important to know the decisions that apply to a particular jurisdiction and not rely on decisions from other courts. In the absence of a specific ruling, however, decisions from one court may have a persuasive effect in other jurisdicitons.

The basic terms explained in this chapter should enhance one's understanding of the civil litigation process. The Bill of Rights and other related Amendments to the Constitution are also summarized because, for the most part, liability ensues only if these basic constitutional rights are infringed by public officers.

### NOTES

### CHAPTER II

1.  Office of the Federal Register, General Services Administration, United States Government Manual 71, 71-74 (1981).

2.  A graphic outline of each state's court system, together with a summary of the jurisdiction of each court type, may be found in National Center for State Courts, State Court Caseload Statistics:  Annual Report, 1975 at 81-238 (1979).

3.  For a survey of these effects, see Special Project - The Collateral Consequences of a Criminal Conviction, 23 Vand. L. Rev. 929 (1970).

4.  Griswold v. Connecticut, 381 U.S. 479 (1965).

PART TWO - OVERVIEW OF LEGAL LIABILITIES


CHAPTER III - AN OVERVIEW OF FEDERAL AND STATE LIABILITIES

CHAPTER IV  - CIVIL LIABILITY UNDER 42 UNITED STATES CODE,
             SECTION 1983:  CIVIL RIGHTS CASES

CHAPTER V   - LIABILITY UNDER STATE LAW:  STATE TORT LAW AND
             NEGLIGENCE CASES

CHAPTER VI  - LEGAL REPRESENTATION AND INDEMNIFICATION

Preceding page blank

# CHAPTER III

## AN OVERVIEW OF FEDERAL AND STATE LIABILITIES

The sources of legal liabilities to which public officers may be exposed are many and varied.  They range from state to federal law and from civil to criminal.  Generally, state cases are tried in state courts, while federal cases are tried in federal courts. Section 1983 cases are an exception to this because they may be tried in either court system.  For purpose of an overview, legal liabilities may be classified as follows.

### TABLE III.1

#### POTENTIAL SOURCES OF PERSONAL LIABILITY FOR INDIVIDUAL PROBATION/PAROLE OFFICERS*

|  | Federal Law | State Law |
|---|---|---|
| Civil Liabilities | • Title 42 of U.S. Code, Section 1983-Civil Action for Deprivation of Civil Rights | • State Tort Law |
|  |  | • State Civil Rights Law |
|  | • Title 42 of U.S. Code, Section 1985-Civil Action for Conspiracy |  |
|  | • Title 42 of U.S. Code, Section 1981-Equal Rights Under the Law |  |
| Criminal Liabilities | • Title 18 of U.S. Code, Section 242-Criminal Liability for Deprivation of Civil Rights | • State Penal Code Provisions specially aimed at Public Officers |
|  | • Title 18 of U.S. Code, Section 241-Criminal Liability for Conspiracy to Deprive a Person of Rights | • Regular Penal Code Provisions Punishing Criminal Acts |
|  | • Title 18 of U.S. Code, Section 245-Violation of Federally-Protected Activities |  |

*NOTE:  In addition, the officer may be subject to agency administrative disciplinary procedure that can result in transfer, suspension, demotion, dismissal, or other forms of sanction.

Two points must be stressed.  First, the liabilities enumerated apply to all public officers, and not just to probation/parole officers.  Police officers, jailers, prison officials, correctional officers, and just about any officer in the criminal justice system, and even those outside it, may be held liable for any or all of the above provisions based on a single act.  Assume that a parole officer unjustifiably uses extreme force on a parolee.  Conceivably, he may be liable under all of the above provisions if a second actor was involved.  He may be liable for conspiracy if he acted with another to deprive the parolee of his civil rights, as well as for the act itself, which constitutes the deprivation.  The same parole officer may be prosecuted criminally and civilly under federal law and then be held criminally and civilly liable under state law for the same act.  The double jeopardy defense cannot exempt him from multiple liability because double jeopardy applies only in criminal (not civil) cases, and only when two criminal prosecutions are made for the same offense by the same jurisdiction.  Criminal prosecution under state and then federal law for the same act is possible, although as a matter of policy not usually done; when it is done, it indicates that the second prosecuting authority believes that justice was not obtained in the first prosecution.

All of the above provisions are discussed briefly in this chapter, but the bulk of the discussion concerns civil liabilities under Section 1983 of Title 42 of the United States Code, to which the next chapter is devoted.  Possible sources of liability can be classified according to federal or state law.

### FEDERAL LAW

Under federal law, there are two types of liability:  civil and criminal.  The statutory provisions establishing these liabilities follow.

#### Civil Liabilities

##### Title 42 of the U.S. Code, Section 1983 - Civil Action for Deprivation of Civil Rights:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in action at law, suit in equity, or other proper proceeding for redress.

This is discussed separately in Chapter IV because the overwhelming number of current cases are filed under this section.  Refer to that Chapter for an exhaustive discussion.

Title 42 of the U.S. Code, Section 1985 - Civil Action for
Conspiracy. Section 1985 (3) provides a civil remedy against
any two or more officers, who:

1. Conspire to deprive a plaintiff of equal pro-
   tection of the law or equal privileges and immuni-
   ties under the law, with

2. A purposeful intent to deny equal protection of
   the law,

3. When defendants act under color of state law, and

4. The acts in furtherance of the conspiracy injure
   the plaintiff in his person or property, or
   deprive him of having and exercising a right or
   privilege of a citizen of the United States.

This section, passed by the United States Congress in 1861,
provides for civil damages to be awarded to any individual
who can show that two or more officers conspired to deprive
him of civil rights. Note that a probation/parole officer
may therefore be held civilly liable not only for actually
depriving a person of his civil rights (under Section 1983),
but also for conspiring to deprive that person of his civil
rights (under Section 1985). The two acts are separate and
distinct and therefore may be punished separately. Under
this section, it must be shown that the officers got together
and actually agreed to commit the act, although no exact
statement of a common goal need be proven. In most cases,
the act is felonious in nature (as opposed to a misdemeanor)
and is aimed at depriving the plaintiff of his civil rights.
The plaintiff must also be able to prove that the officers
purposely intended to deprive him of equal protection that is
guaranteed him by law. This section, however, is seldom
used against public officers because the act of conspiracy is
often difficult to prove except through the testimony of co-
conspirators. Moreover, it is limited to situations in which the
objective of the conspiracy is invidious discrimination, which is
difficult to prove in court. It is difficult for a plaintiff to
establish in a trial that the probation/parole officer's action
was discriminatory based on sex, race, or national origin.

Title 42 of the U.S. Code, Section 1981 - Equal Rights Under
the Law:

   All persons within the jurisdiction of the United States
   shall have the same rights in every State and Territory
   to make and enforce contracts, to sue, be parties, give
   evidence, and to the full and equal benefit of all laws
   and proceedings for the security of persons and property
   as is enjoyed by white citizens, and shall be subject to
   like punishment, pains, penalties, taxes, licenses, and
   exactions of every kind, and to no other.

This section was passed in 1870, a year earlier than Section
1983. In one sense, its scope is broader than Section
1983 because it does not require that the constitutional violation be
made under color of state law. Until recently, the plaintiff had
to show that he was discriminated against because of his race,
thus limiting the number of potential plaintiffs.

Section 1981 has been widely used in employment and housing
discrimination cases (under its contracts and equal benefits
provisions). However, currently the equal punishments provision
is of greatest significance for probation and parole authorities.[1]
The courts are in the process of expanding the meaning of the law,
so it could conceivably be a rich source of litigation in the
future.[2]

Criminal Liabilities

Title 18 of the U.S. Code, Section 242 - Criminal Liability for
Deprivation of Civil Rights:

   Whoever, under color of any law, statute, ordinance,
   regulation, or custom, willfully subjects any inhabitant
   of any State, Territory, or District to the deprivation
   of any rights, privileges, or immunities secured or
   protected by the Constitution or laws of the United
   States, or to different punishments, pains, or penalties
   on account of such inhabitant being an alien, or by
   reason of his color, or race than are prescribed for the
   punishment of citizens, shall be fined not more than
   $1,000 or imprisoned not more than one year, or both; and
   if death results shall be subject to imprisonment for any
   term of years or for life.

This section provides for criminal action against any officer
who actually deprives another of his civil rights. An essential
element of this section is for the government to be able to show
that the officer, acting "under color of any law," did actually
commit an act that amounted to the deprivation of one's civil
rights. Essential elements of Section 242 are: (a) the defendant
must have been acting under color of law; (b) a deprivation of any
right secured by federal laws and the United States Constitution;
and (c) specific intent on the part of the defendant to deprive
the victim of rights.

Title 18 of the U.S. Code, Section 241 - Criminal Liability for
Conspiracy to Deprive a Person of Rights:

   If two or more persons conspire to injure, oppress,
   threaten, or intimidate any citizen in the free exercise
   or enjoyment of any right or privilege secured to him by
   the Constitution or laws of the United States, or because
   of his having exercised the same; . . . [they shall be
   guilty of a felony]. . . . They shall be fined not more
   than $10,000 or imprisoned not more than ten years, or

both; and if death results, they shall be subject to imprisonment for any term of years or for life.

As interpreted by the courts, this section requires: (1) the existence of a conspiracy whose purpose is to injure, oppress, threaten, or intimidate; (2) one or more of the intended victims must be a United States citizen; and (3) the conspiracy must be directed at the free exercise or enjoyment by such a citizen of any right or privilege under federal laws or the United States Constitution.

The main distinction between Section 242 and Section 241 is that Section 242 punishes the act itself, whereas Section 241 punishes the conspiracy to commit the act. Inasmuch as conspiracy, by definition, needs at least two participants, Section 241 cannot be committed by a person acting alone. Moreover, while Section 242 requires the officer to be acting "under the color of law," there is no such requirement under Section 241; hence, Section 241 can be committed by a private person. As worded, Section 242 is also broader in that it punishes violations against an inhabitant of any state or territory of the United States, while Section 241 only applies where there is a citizen-victim.

**Title 18 of the U.S. Code, Section 245 - Federally Protected Activities.** This section is aimed at private individuals but is also applicable to public officers who forcibly interfere with such federally protected activities as:

- Voting or running for an elective office

- Participating in government-administered programs

- Enjoying the benefits of federal employment

- Serving as juror in a federal court

- Participating in any program receiving federal financial assistance.

Violations of Section 245 carry a fine of not more than $1,000 or imprisonment of not more than one year, or both. Should death result from a violation, imprisonment can be for life. This is a more recent federal statute, passed in 1968, which seeks to punish private individuals who forcibly interfere with federally protected activities. Therefore, it applies to probation/parole officers who act in their private capacity. The first part of the law penalizes a variety of acts, as already noted. The second part refers to deprivations of such rights as attending a public school or college; participating in state or locally sponsored programs; serving on a state jury; interstate travel; or using accommodations serving the public, such as eating places, gas stations, and motels. The third part penalizes interference with persons who encourage or give an opportunity for others to participate in or enjoy the rights enumerated in the statute. It

is distinguished from Sections 241 and 242 in that it can be violated by a person acting singly and in a private capacity. This law is seldom used at present.

## STATE LAW

The table also lists two basic types of liability under state law:  civil and criminal.

### Civil Liability Under State Tort Law

This liability is more fully discussed in Chapter V, Tort Law and Negligence Cases. For purposes of this overview section, the following information should suffice.

A tort may be defined as a wrong in which the action of one person causes injury to the person or property of another in violation of a legal duty imposed by law. Torts may involve a wrongdoing against a person, such as assault, battery, false arrest, false imprisonment, invasion of privacy, libel, slander, wrongful death, and malicious prosecution; or against property, such as trespass. A tort may be intentional (acts based on the intent of the actor to cause a certain event or harm) or caused by negligence. Probation/parole officers may therefore be held liable for a tortious act that causes damage to person or property of another. Note that Section 1983 actions are sometimes referred to as tort cases, but the reference is to federal instead of state torts.

### Criminal Liability Under State Law

State criminal liability can come under a provision of the state penal code specifically designed for public officers. For example, Section 39.02 of the Texas Penal Code contains a provision on Official Oppression that states that a public servant acting under color of his office or employment commits an offense if he:

1. Intentionally subjects another to mistreatment or to arrest, detention, search, seizure, dispossession, assessment, or lien that he knows is unlawful; or

2. Intentionally denies or impedes another in the exercise or enjoyment of any right, privilege, power, or immunity knowing his conduct is lawful.

A questionnaire sent by the project staff to state attorneys general and probation/parole agency legal counsel asked if their states had statutes providing for criminal liability for probation, parole, and public officers in general. The results show that only a few states have statutes pertaining to liability for probation and parole officers specifically, 8 percent in both cases, but 84 percent of the states have statutes concerning the criminal liability of public officers in general.

In addition to specific provisions, probation/parole officers may also be liable just like any other person under the provisions of the state penal code. Thus they may be liable for murder, manslaughter, serious physical injury, etc., done to any probationer or parolee.

## DAMAGES AWARDED IN CIVIL ACTIONS

Actual or compensatory damages reduce to monetary terms all actual injuries shown by the plaintiff. Consequential damages, such as medical bills and lost wages, are termed special damages and are included in the category of compensatory damages.

Cary v. Piphus[3] specifies that in a Section 1983 procedural due process action, the plaintiff must show actual injury, i.e., actual injury, in at least this one type of Section 1983 suit, may not be presumed from a deprivation of rights actionable under Section 1983.

Nominal damages are an acknowledgement by the court that the plaintiff proved his cause of action, usually in the amount of $1.00. When the plaintiff was wronged but suffered no actual injury, nominal damages would be appropriate.

Where nominal damages vindicate the plaintiff as wronged, the door to punitive damages is opened, with or without a compensatory damage award. Nominal damages also lay the basis for awarding 1983 attorney fees in that they identify the prevailing party.

Punitive or exemplary damages are designed to punish or make an example of the wrong-doer. Therefore, the monetary amount will be proportional to the gravity of the wrong done.[4] Punitive damages are awarded only against willful transgressors. However, the Supreme Court has ruled that no punitive damages may be awarded against local governments.[5]

Attorney's fees are not normally awarded under U.S. law. A significant exception to this "American Rule" is Section 1983 actions. Many Section 1983 suits are not suits for damages. An example is the mammoth Texas prison lawsuit, Ruiz v. Estelle. However, as of June 1985, plaintiff attorneys have been awarded $1.6 million in attorney fees.[6]

## SUMMARY

Probation/parole may be exposed to legal liabilities under federal and state law. Legal liabilities may also be classified into civil or criminal. This chapter discusses the various laws to which an officer may be exposed in connection with his work. These liabilities are not mutually exclusive; in fact, one serious act may expose the officer to a number of civil and criminal liabilities under federal and state law. In addition, the officer may be subject to administrative disciplinary proceedings that can

result in transfer, suspension, demotion, dismissal, or other forms of sanction.

The constitutional protection against double jeopardy does not apply to the above cases because the cases are not all criminal in nature, the criminal prosecutions discussed here do not refer to the same act, and the prosecution is by different jurisdictions. Double jeopardy applies only where criminal prosecutions of the same offense are made by the same jurisdictions.

NOTES

CHAPTER III

1. <u>See</u> unpublished manuscript of Charls E. Walker, Jr., General Counsel Board of Pardons and Paroles, Austin, Texas, "Legal Liabilities of Probation and Parole Authorities."

2. Mahone v. Waddle, 564 F. 2d. 1018 (3d. Cir. 1977), <u>cert. denied</u>, 438 U.S. 904, 98 S. Ct. 3122, 57 1. 3d. 2d. 1147 (U.S.S.C. 1978); Rafferty v. Prince George's County, 423 F. Supp. 1045 (D. Md. 1976); Milburn v. Girard, 441 F. Supp. 184 (E. D. Pa. 1977).

3. Carey v. Piphus, 435 U.S. 247, 98 S.Ct. 1042, 55 L. Ed. 2d. 252 (U.S.S.C. 1978).

4. <u>See</u> Lee v. Southern Home Sites Corp, 429 F 2d. 290 (5th Cir. 1970).

5. City of Newport v. Fact Concerts, Inc., 435 U.S. 247, 101 S. Ct. 2748, 79 L. Ed. 2d. 616 (U.S.S.C. 1981).

6. Personal interview with administrators at the Texas Department of Corrections.

CHAPTER IV

CIVIL LIABILITY UNDER 42 UNITED STATES CODE, SECTION 1983: CIVIL RIGHTS CASES

Title 42, United States Code, Section 1983 -- Civil action for deprivation of rights, reads as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

This has been the most frequently used provision in the array of legal liability statutes previously identified. From all indications, it continues to be the main source of legal redress.

In 1960, only 247 civil rights cases were filed in federal district courts throughout the United States. In 1970, there were 3,985 such suits, an increase of 1,614 percent, and in 1976, the figure had grown to 12,329, an increase of 4,991 percent over 1960. In 1982, state prisoners alone filed 16,741 civil rights cases, an increase of 7.0 percent over the previous year. These suits involve claims against almost every type and level of government official, from the President of the United States, the Attorney General, White House and FBI officials, cabinet officers, and governors, to sheriffs, police officers, school administrators, IRS agents, hospital superintendents, state military officials, building inspectors, prison officials, and other correctional officers. Substantively, Section 1983 cases cover a variety of alleged civil rights violations, including assaults, illegal searches, illegal arrests or break-ins, inadequate medical attention, tax investigation, illegal wiretaps, and just about every conceivable type of possibly improper action that might involve a public officer.[1]

Only a small percentage of these cases, however, actually go to trial. In 1979, for example, 9,943 out of 10,301 (96.5 percent) civil rights cases filed by prisoners in federal court were dismissed or otherwise concluded prior to trial. Only 358 (3.5 percent) of state prisoner civil rights cases went to trial.[2] Nonetheless, both parties invest a tremendous amount of effort and anxiety even if the case never gets to the trial stage. Until <u>his</u> case is dismissed, the probation/parole officer who finds he is a defendant probably should assume his case is in the minority rather than the majority category and prepare accordingly.

## HISTORY

Cases under Section 1983 are generally referred to as civil rights or federal tort suits. This section dates from the post-Civil War Reconstruction Era when Congress saw a need for civil means to redress civil rights violations. It was not feasible at that time to enact a federal criminal statute. In 1871, the Federal Congress passed Section 1983, then popularly known as the Klu Klux Klan Act.[3] It was designed to enforce the provisions of the fourteenth amendment against discrimination and to minimize racial abuses by state officials. Its immediate aim was to provide protection to those wronged through the misuse of power possessed by virtue of state law and made possible only because the wrongdoer was clothed with the authority of state law. As originally interpreted, however, the law did not apply to civil rights violations where the officer's conduct was such that it could not have been authorized by the agency; hence, it was seldom used. That picture changed in 1961 when Monroe v. Pape was decided.

In Monroe v. Pape,[4] the United States Supreme Court ruled that Section 1983 applied to all violations of constitutional rights even when the public officer was acting outside the scope of employment. This greatly expanded the scope of protected rights and gave impetus to a virtual avalanche of cases filed in federal courts based on a variety of alleged constitutional rights violations, whether the officer was acting within or outside the scope of duty.

## WHY SECTION 1983 SUITS HAVE INCREASED DRAMATICALLY

Civil rights suits have gained popularity for a variety of reasons. First, they almost always seek damage from the defendant, meaning that if the plaintiff wins, somebody pays. This can be very intimidating to a probation/parole officer who may not have the personal resources or the insurance to cover liabilities. Second, civil rights suits can be filed as a class action suit where several plaintiffs alleging similar violations are grouped together and their cases heard collectively. This presents the appearance of strength and unity and affords plaintiffs mutual moral support. Third, if a civil rights suit succeeds, its effect is generic rather than specific. For example, if a civil rights suit succeeds in declaring unconstitutional the practice of giving parolees only one hearing before revocation instead of a preliminary and final hearing as indicated in Morrissey v. Brewer, the ruling benefits all parolees instead of just the plaintiff. Fourth, civil rights cases are usually filed directly in federal courts where procedures for obtaining materials from the defendant (called "discovery") are often more liberal than in state courts. This facilitates access to important state documents and records needed for trial. Fifth, civil rights suits, when filed in federal courts, do not have to exhaust state judicial remedies, thus avoiding long delays in state courts. A sixth and perhaps most important reason is that

since 1976, under federal law, a prevailing plaintiff may recover attorney's fees. Consequently, lawyers have become more accommodating to Section 1983 cases if they see any semblance of merit in the suit. The topic of attorney's fees is discussed in Chapter VI.

Plaintiffs also continue to use Section 1983 suits extensively despite the availability of criminal sanctions against the public officer. One reason is that the two are not mutually exclusive. A case filed under Section 1983 is a civil case in which the plaintiff seeks vindication of his rights; he is in control. The vindication that an injured party may realize if a criminal case is brought because of his injury is less direct. Moreover, there are definite barriers to the use of criminal sanctions against erring probation/parole officers. Among these are the unwillingness of some district attorneys to file cases against public officers with whom they work and whose help they may sometimes need. Another difficulty is that serious criminal cases in most states must be referred to a grand jury for indictment. Grand juries may not be inclined to charge public officers with criminal offenses unless it is shown clearly that the act was gross and blatant abuse of discretion. In many criminal cases involving alleged violation of rights, the evidence may come down to the word of the complainant against the word of a public officer. The grand jury may be more inclined to believe the probation/parole officer's testimony. Lastly, the degree of certainty needed to succeed in civil cases is mere preponderance of evidence (roughly, more than 50 percent certainty), much lower than the guilt beyond a reasonable doubt measure that is needed to convict criminal defendants.

## BASIC ELEMENTS OF A SECTION 1983 SUIT

As interpreted by the courts, there are four basic elements for the success of a 1983 suit:

- The defendant must be a natural person or a local government.

- The defendant must be acting under "color of law."

- The violation must be of a constitutional or a federally protected right.

- The violation must reach constitutional level.

Each element deserves a brief elaboration.

### The Defendant Must be a Natural Person or a Local Government

Until recently, only natural persons could be held liable in 1983 suits. State and local governments were exempt because of the doctrine of sovereign immunity. In 1978, however, the United States Supreme Court, in Monnell v. Department of Social

Services,[5] held that the local units of government may be held liable if the allegedly unconstitutional action was taken by the officer as a part of an official policy or custom. What "policy or custom" means has not been made clear and is subject to varying interpretations. Apparently, if the employee on his own and without sanction or participation by the local government deprived another of his rights, no liability attaches to the local government even if the officer is adjudged liable.

Monnell does not affect state immunity because it applies to local governments only. This is not of much consolation to state officers, however; civil rights cases can be filed against the state officer himself, and he will be personally liable if the suit succeeds. While Monnell involved social services personnel, there is no reason to believe it does not apply to local probation/parole operations. Lower courts have already applied it to many local agencies.

## The Defendant Must Be Acting Under "Color of State Law"

This means the misuse of power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.[6] While it is easy to identify acts that are wholly within the term "color of state law" (as when a probation officer conducts a pre-sentence investigation upon court order), there are gray areas that defy easy categorization (as when a probation officer who moonlights as a private security guard illegally arrests a person whom he knows to be a probationer). As a general rule, anything a probation/parole officer does in the performance of his regular duties and during the usual hours is considered under color of state law. Conversely, what he does as a private citizen during his off-hours falls outside the color of state law. For the difficult cases in between, the court makes a determination based on the specific facts presented.

A word of caution. The courts have broadly interpreted the term "color of state law" to include local laws or regulations. Therefore, a probation officer who acts in accordance with a county or city ordinance is acting under color of state law. Also, the phrase does not mean that the act was in fact authorized by law. It is sufficient if the act appeared to be lawful even if it was not in fact authorized.[7] Hence, if the probation/parole officer exceeded his lawful authority, he is still considered to have acted under color of law. An example is a probation officer who searches a probationer's residence without legal authorization. Such officer is considered to have acted under color of law and therefore may be sued under Section 1983.

Given the "color of state law" requirement, can federal officers be sued under Section 1983? The United States Supreme Court in Bivens v. Six Unknown Agents,[8] decided in 1971, in effect said yes. The court stated that a cause of action, derived from the Constitution, exists in favor of victims of federal officials'

misconduct. In addition, a federal officer can be sued directly under Section 1983 if he assists state officers who act under color of state law.[9]

## The Violation Must be of a Constitutional or a Federally Protected Right

Under this requisite, the right violated must be one that is guaranteed by the United States Constitution or is given the plaintiff by federal law. Rights given only by state law are not protected under Section 1983. For example, the right to a lawyer during a parole release hearing is not given by the Constitution or by federal law, so violation thereof does not give rise to a 1983 suit. If this right is given an inmate by state law, its violation may be punishable under state law or administrative regulation.

The worrisome aspects of this requirement are not acts of probation/parole officers that are blatantly violative of a constitutional right (as when a probation officer searches a probationer's house without authorization). The problem lies in the difficulty in ascertaining whether or not a specific constitutional right exists. This is particularly troublesome in the probation/parole where the courts have only recently started to define the specific rights to which probationers and parolees are constitutionally entitled. The United States Supreme Court has decided only a handful of cases thus far, although federal district courts and courts of appeals have decided many. Some of these decisions may be inconsistent with each other. It is important, therefore, for the probation/parole officer to be familiar with the current law as decided by the courts in his jurisdiction. This is the law that must be followed regardless of decisions to the contrary in other states.

## The Violation Must Reach Constitutional Level

Not all violations of rights lead to liability under Section 1983. The violation must be of constitutional proportion. Again, what this means is not exactly clear, except that unusually serious violations are actionable whereas less serious ones are not. This is reflected in the requirement, previously noted, of "gross negligence" or "deliberate indifference," etc. In the words of the Eighth Circuit Court of Appeals:

> Courts cannot prohibit a given condition or type of treatment unless it reaches a level of constitutional abuse. Courts encounter numerous cases in which the acts or conditions under attack are clearly undesirable . . . but the courts are powerless to act because the practices are not so abusive as to violate a constitutional right.[10]

Mere words, threats, a push, or a shove do not necessarily constitute a civil rights violation.[11] Neither does Section 1983

apply to such cases as the officer giving false testimony, simple negligence, or name-calling.[12] On the other hand, the denial of the right to a parole revocation hearing, as mandated in Morrissey v. Brewer, now constitutes a clear violation of civil rights. Before 1972, it would not have done so.

A probation/parole officer is liable if the above four elements are present. Absence of any of these means that there is no liability under Section 1983. The officer may, however, be liable under some other law, as for tort, or under the penal code, but not Section 1983. For example, a drunken probation officer who beats up somebody in a downtown bar may be liable under the regular penal code provisions for assault and battery, but not under Section 1983. Regrettably, the absence of any of the above elements does not prevent the filing of a 1983 suit. Suits may be filed by anybody at any time. Whether the suit will succeed or not is a different matter.

## DEFENSES IN SECTION 1983 SUITS

### General

In general, all of the usual substantive and procedural defenses available to a defendant in a state tort action can be raised by a Section 1983 defendant. Substantive defenses are those that refute the elements of the Section 1983 suit, as enumerated in the previous section. Procedural defenses would include challenges based on the requirements for proper filing of the case, service of process, etc. In certain narrow circumstances, a variety of technical defenses (collateral estoppel, res judicata, laches, the Younger doctrine, etc.) can also come into play. Discussion of these is beyond the scope of the manual.[13] Two defenses in particular -- immunity and good faith -- have proven both popular and somewhat effective.

### The Immunity Defense

There are classes of defendants on whom the law, solely for reasons of policy, has conferred immunity or exemption from tort liability. Hence, immunity may be classified into two types: governmental immunity and official immunity.

Governmental Immunity. This type of immunity protects government (instead of individuals) from liability. It derives from the early English concept of "sovereign immunity" -- "the King could do no wrong," and, therefore, he could not be subjected to suits in his own courts.[14] Sovereign immunity was adopted in the United States at an early date through court cases and memorialized in the eleventh amendment to the Constitution.[15]

Initially, the doctrine was held by the court to bar suits against the federal and state governments, based on the premise that the government had authority to protect itself from liability

suits. The right to sue for damages was created by the government, and the government, as the creator, could exempt itself from the enforcement of that right. Various justifications for exempting the government from liability were advanced, involving considerations of finance and administrative feasibility.[16]

Neither the federal government nor any state fully retains its sovereign immunity. Legislatures in every jurisdiction have been under pressure to compensate victims of governmental wrongs, and all have adopted legislation waiving immunity in at least some areas of governmental activity. As noted by one scholar:

> The urgent fiscal necessities that made the governmental immunity acceptable at the outset are no longer present . . . the United States and a growing number of states have found it financially feasible for them to accept liability for and consent to suit upon claims of negligence and omission, for which they traditionally bore no liability at all; the availability of public liability insurance as well as self-insurance makes the assumption of this wholly new liability quite tolerable.[17]

No jurisdiction, however, has gone so far as to totally relinquish immunity for all injuries caused through the misadministration of the governmental process.

State immunity, subject to waiver by legislation or judicial decree, is an operational doctrine for states and their agencies. A distinction must be made, however, between agency liability and individual liability. State immunity only extends to state agencies. It does not necessarily extend to individual state officers who can be sued and held personally liable for civil right violations or tortious acts. Therefore, in states where sovereign immunity has not been waived, state officials may still be sued and held liable because they do not partake of governmental immunity.

Prior to the 1978 Supreme Court decision in Monell, municipal governments often argued that, as units of the state which created them, they shared the state's immunity. That argument is now foreclosed.

Official Immunity. The second type of immunity from liability applies to public officials. The historical rationale for official immunity is that since a government can only act through its officials and since sovereign immunity is to protect the operations of government, then those who carry out governmental operations must also be immune.[18] Another argument advanced is that it would be unfair and intimidating to allow a private individual to hold a government officer or employee liable for performing his duty.[19] For example, if a prosecutor could be subjected to a possible damage action every time a prosecution

failed, he might well decide to prosecute only in those cases where he was absolutely certain that his judgment would be vindicated by the jury's verdict. The fear of tort liability could produce an overly cautious policy that would result in less effective law enforcement.

For purposes of this Manual, official immunity is divided into three categories: absolute, qualified, and quasi-judicial.

Absolute Immunity. The need to encourage fearless decision-making has led to recognition of an absolute immunity for some officials. This privilege protects the official from liability for his official acts even if they were done with malice, and allows the courts to dismiss actions for damages immediately without going into the merits of the plaintiff's claim.[20] Federal and state legislators, judges, and prosecutors have this type of immunity. (Indeed, it is often referred to as judicial immunity.) Although they could be sued in actions alleging their decisions were based on malicious grounds, such cases may be dismissed by the courts. These officials are thus protected from liability. Courts at both the federal and state levels have consistently upheld absolute immunity for legislators and judges, based on the rationale that these officials must be free from the fear of liability in order to exercise their discretion appropriately.[21] (Of course, this does not mean that absolutely immune officials are not accountable for their decisions. Legislative and judicial ethics bodies may inquire into and punish misconduct; somewhat more formally, legislators and judges can be impeached in appropriate cases; and all legislators and many judges are subject to citizen censure at the polls. They are simply protected from personal financial liability.)

Qualified Immunity. The courts have been less willing to find absolute immunity for other public employees who are not involved in the legislative or judicial process. These officials are usually from the executive department of government. With few exceptions, probation/parole officers enjoy only qualified immunity.

The doctrine of qualified immunity has two different formulations. According to one, the immunity defense is held to apply to an official's discretionary acts, meaning those that require personal deliberation and judgment. The immunity defense is not available, however, for ministerial acts, meaning those that amount only to the performance of a duty in which the officer is left with no significant choice of his own.[22] For example, a parole hearing officer's recommendation to revoke or not to revoke parole is a discretionary act, but the duty to give the parolee a hearing before revocation is ministerial because a hearing is required by Morrissey v. Brewer. A major difficulty with the discretionary-ministerial distinction is that there is no adequate way of separating discretionary from ministerial duties. The distinction seems to vary from judge to judge and from

jurisdiction to jurisdiction and is thus difficult to predict. It is clear, however, that officials in policymaking positions (such as probation/parole board members) at the planning level of government are more likely to be making discretionary decisions and thus better able to claim the immunity defense for their actions. Field officers and others at government's operational level usually perform ministerial acts and, therefore, are advised to consider their functions as ministerial and not immune, unless otherwise previously decided by a court in closely similar circumstances.

It must be noted that in Martinez v. California,[23] the United States Supreme Court said that California's immunity statute was constitutional when applied to defeat a tort claim arising under state law. What this means is that if a state enacts a similar statute (as some states have), such statute is constitutional. Chances are, however, that the state-conferred immunity cannot be used to shield probation/parole officers from liability in federal civil rights (Section 1983) cases.

A second and better known way of interpreting qualified immunity is by relating it to the "good faith" defense. Under this concept, a public officer (other than one who enjoys absolute immunity) is exempt from liability only if he can demonstrate that his actions were reasonable and were performed in good faith within the scope of his employment.[24] The good faith defense is discussed fully below.

Quasi-Judicial Immunity. Absolute immunity is generally applied to those officials in the judicial and legislative branches of government, while qualified immunity applies to those in the executive branches. Some officials, however, have both judicial and executive functions. Such officials include court personnel, parole board members, and some probation officers. These officials are given some protection, referred to as "quasi-judicial immunity." Under this type of immunity, judicial-type functions that involve discretionary decisionmaking or court functions are immune from liability, while some other functions (such as ministerial duties of the job) are not.[25] The emphasis therefore is on the function performed instead of on the officer.

Given these three forms of official immunity, where do probation/parole officials stand? Immunity for such officials is often dependent on the agencies for whom they work and the nature of the functions performed. Probation officers who are employees of the court and work under court supervision do not enjoy the same absolute immunity of judges, but they may have judicial immunity for some acts. For example, in a recent federal case, the Fifth Circuit Court of Appeals held that a probation officer was entitled to judicial immunity when preparing and submitting a pre-sentence report in a criminal case and was not subject to liability for monetary damages.[26] Another case, decided by the

Ninth Circuit Court of Appeals in 1970, held that in preparing and submitting a probation report on the defendant, the probation officer was performing a "quasi-judicial" function and was therefore immune from liability under Section 1983.[27]

Many of such court-supervised probation officers, however, are considered executive, and hence are likely to come under qualified immunity. Probation officers are liable unless the act is discretionary or done in good faith. Parole officers are usually employees of the executive department of the state and, as such, they enjoy only qualified immunity. They do not enjoy any type of judicial immunity that some courts say probation officers have when performing some court-ordered functions.

Most federal courts of appeals have ruled that higher officials of the executive branch who must make judge-like decisions are performing a judicial function that deserves absolute immunity. This particularly refers to parole boards when performing such functions as considering applications for parole, recommending that a parole date be rescinded, or conducting a parole revocation hearing.[28] One federal appellate court, however, has stated that probation and parole board members and officers enjoy absolute immunity when engaged in adjudicatory duties, but only qualified, good faith immunity for administrative acts. The same court categorized the failure to provide procedural due process in a revocation hearing as administrative (ministerial) in nature, for which liability attached.[29]

As is evident from the above discussion, the immunity defense is complex, confusing, and far from settled, particularly in the case of probation/parole officers. Variations are found from state to state and from one jurisdiction to another. The above discussion is designed merely to provide a general framework and guideline. (Table IV.1 on the next page presents the tendency of the courts in outline form. It is not meant to be a definitive statement on the issue of immunity. Readers should consult their legal advisor for the law and court decisions in their state.)

The Good Faith Defense

Good faith is by far the most often invoked defense in civil rights cases. It has been recognized since 1967 in actions seeking damages under Section 1983. Good faith basically means that the probation or parole officer is acting with honest intentions, under the law, and in the absence of fraud, deceit, collusion, or gross negligence.[30] The opposite of good faith in legal language is bad faith. Until 1982, good faith as a defense required proof of two elements: (1) a subjective test that the officer acted sincerely and with a belief that what he was doing was lawful and (2) an objective test that judge or jury be convinced such belief was reasonable.[31]

### TABLE IV.1.

#### GENERAL GUIDE TO TYPES OF OFFICIAL IMMUNITY IN DAMAGE SUITS

|  | Absolute* | Quasi-Judicial+ | Qualified# |
|---|---|---|---|
| Judges | X | | |
| Legislators | X | | |
| Prosecutors | X | | |
| Parole Board Members | | X (If performing a judge-like function) | X (If performing other functions) |
| Supervisors (Probation, Parole Prison & Police) | | | X |
| Probation Officers | | X (If preparing a pre-sentence report under order of judge) | X (If performing other functions) |
| Parole Officers | | | X |
| Law Enforcement Officers | | | X |
| Prison Guards | | | X |
| State Agencies | X (Unless waived by law or court decision) | | |
| Local Agencies | No Immunity | | No Immunity |

*Absolute immunity means that a civil liability suit, if brought, is dismissed by the court without going into the merits of the plaintiff's claim. No liability.

+Quasi-judicial immunity means that officers are immune if performing judicial-type functions, such as when preparing a pre-sentence report under orders of the judge, and liable if performing other functions.

#Qualified immunity means that the officer's act is immune from liability if discretionary, but not if ministerial. Also, an officer may not be liable even if the act is ministerial if it was done in good faith.

In 1982, <u>Wood v. Strickland</u>,[32] the source of the above good faith standard, was superseded by <u>Harlow v. Fitzgerald</u>.[33] The Supreme Court addressed in <u>Harlow</u> the traditional common law concern that public officers require immunity as a shield from undue interference with their duties and from potentially disabling threats of liability. Central to the opinion is the observation that the <u>Wood v. Strickland</u> subjective element of the good faith defense had resulted in insubstantial claims proceeding to trial, at excessive cost to the government. Cost, here, is identified as including:

> general costs of subjecting officials to the risks of trial -- distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service. There are special costs to "subjective" inquiries of this kind. Immunity generally is available only to officials performing discretionary functions. In contrast with the thought processes accompanying "ministerial" tasks, the judgments surrounding discretionary action almost inevitably are influenced by the decision-maker's experiences, values, and emotions. These variables explain in part why questions of subjective intent so rarely can be decided by summary judgment. Yet they also frame a background in which there often is no clear end to the relevant evidence. Judicial inquiry into subjective motivation, therefore, may entail broad-ranging discovery and the deposing of numerous persons, including an official's professional colleagues. Inquiries of this kind can be peculiarly disruptive of effective government.[34]

In keeping with the Courts' concern for social as well as economic costs, the holding in <u>Harlow</u> states that "government officials performing discretionary functions generally are <u>shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.</u>"[35] (Emphasis added.) This ruling, effectively jettisoning the subjective element of the good faith test, has immediate practical effect for public officials. Many actions, if not most, may be disposed of by a judge on motion for summary judgment if the law at the time of the challenged official action was unclear. If the official could not at the time have been able reasonably to know the law, no liability can attach under <u>Harlow</u>. If there is no liability, no discovery need be allowed and most of the costs are therefore prevented.

The Court cautions that the limitation of qualified immunity to objective terms provides "no license to lawless conduct."

The public interest in deterrence of unlawful conduct and in compensation of victims remains protected by a

test that focuses on the objective legal reasonableness of an official's acts. Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action. But where an official's duties legitimately require action in which clearly established rights are not implicated, the public interest may be better served by action taken "with independence and without fear of consequences."[36]

The major problem with the "reasonably should have known" standard in <u>Harlow</u> is that often one is not sure whether a constitutional right has been clearly established, particularly in the probation and parole area. The following statement, however, indicates general guidelines.

> It is probably true that a right does not have to be decided by the Supreme Court before it is established, but beyond this there is little on which officials can rely. They should, though, avoid action held unconstitutional by a number of lower federal courts. Where the courts disagree or where there is a paucity of decisions, a right may not be clearly established, but such a conclusion should be made with extreme caution.[37]

Whether the <u>Harlow</u> good faith standard is applicable to probation/parole officers is undecided. In a 1979 case, <u>De Shields v. U.S. Parole Commission</u>,[38] the Eighth Circuit Court of Appeals cited <u>Wood v. Strickland</u> in a civil rights case brought by prisoners against the Parole Commission. But the decision failed to state whether that good faith standard applied to probation/parole officers.

While <u>Harlow</u> emphasizes a narrow construction of derivative immunity, it specifically applies to "all government officials performing discretionary functions."[39] Given this uncertainty, it is safer for officers to assume that the standard of "reasonably should have known" applies to them, and act accordingly. This means that they must know agency regulations and have a good working knowledge of the basic and unquestioned rights of probationers and parolees as decided by the courts in their jurisdiction. For example, probation officers should know that probationers are entitled to a hearing (<u>Gagnon v. Scarpelli</u>) before revocation (<u>Gagnon v. Scarpelli</u>), and parole officers should know that parolees are entitled to certain due process rights (<u>Morrissey v. Brewer</u>) before revoking parole. Basic rights of probationers and parolees are covered in Part Three of this Manual. Other civil rights cases, not specifically involving probation/parole officers, have decided that an agency's failure to follow its own rules and regulations may result in a violation of a constitutional right under the due process clause of the

fourteenth amendment. In the context of a good faith defense, such failure may serve as conclusive evidence of bad faith. Also, lack of subjective good faith may be inferred from inaction and failure to act. Moreover, the fact that an officer may have been ordered to violate a person's constitutional rights cannot serve as the basis of an objective good faith defense.[40]

While there have been many cases involving other executive officials, particularly police officers, where liability was denied because of the good faith defense, there has been hardly any significant decision involving probation and parole officers. One such case was Henzel v. Gerstein,[41] decided by the Fifth Circuit Court of Appeals in 1980. In Henzel, the plaintiff brought a Section 1983 civil rights action claiming that probation and parole officials violated his civil rights when they contacted a prospective employer and the employer subsequently withdrew his offer of employment because of Henzel's record. The facts are as follows. While on parole, Henzel requested permission to visit Massachusetts and New York in connection with certain business ventures. Lawson, the Parole and Probation Commissioner, called the Massachusetts Parole Office to obtain authorization for the visit and to verify the legality of the business contacts. The Massachusetts office placed calls to the businesses. Henzel maintained that, as a result of these calls, the firms refused to continue contractual negotiations with him. He alleged that Lawson's purpose in making the calls was to interfere unlawfully with his business relationships. Lawson's affidavit agreed that the calls were placed to the Massachusetts office, but contended that they were made in a good-faith effort to obtain authorization for the visit, in accordance with the parole board's practice. Lawson concluded by stating that these precautions were taken because Henzel, since his release on parole, had been traveling with known criminals, and the parole board was attempting to prevent his further involvement in criminal activity. The district court dismissed the case, and the plaintiff appealed. The court, citing cases decided by the United States Supreme Court involving other executive officials, held that "state officials are protected by a qualified immunity from Section 1983 damage suits upon showing that they acted in good faith and without malice." It went on to uphold the lower court judgment of dismissal.

In another case, decided in 1978 by a federal district court in Pennsylvania, members of the parole board and their employees were adjudged not liable on the grounds that they arbitrarily or in bad faith denied parole to plaintiff, where the plaintiff's file indicated that parole was denied because of his refusal to participate in therapy for alcohol addiction; his need for further counseling, treatment, and educational and vocational training; and concern with the plaintiff's "unrealistic attitude," particularly concerning acceptance of authority.[42]

## Other Good Faith Concerns

There are issues other than the meaning of good faith that need to be addressed in this section. One is the question of procedure during the trial. The question is this: In a Section 1983 case, should the plaintiff prove bad faith on the part of the defendant to be entitled to damages, or is it enough for the plaintiff to state that he was deprived of a constitutional right and leave it to the defendant to prove good faith, if that be his defense? This is important because it is often difficult for a plaintiff to prove the bad faith state of mind. Obviously, the defendant will always claim good faith in an effort to justify his act. In Gomez v. Toledo,[43] decided in 1980, the United States Supreme Court resolved this issue, which had long troubled lower appellate courts and had resulted in inconsistent decisions. The Court stated that in Section 1983 actions the plaintiff is not required to allege, much less prove, that the defendant acted in bad faith in order to state a claim for relief. The burden is on the defendant to plead good faith as an affirmative defense. The court construed the provisions of Section 1983 as requiring only two allegations:

- The plaintiff must allege that some person has deprived him of a federal right.

- The person who has deprived him of that right acted under color of law.

The decision is significant in that the defendant in a civil rights suit now has the burden of proving good faith in the performance of his responsibilities. He must rely on the strength of his own good faith defense instead of hoping that the plaintiff's case is weak and that it fails to prove bad faith.

A second important issue involving good faith was resolved by the United States Supreme Court in Owen v. City of Independence,[44] also decided in 1980. In Owen, the Court said that a municipality sued under Section 1983 cannot invoke the good faith defense, which is available to its officers and employees. Stating that individual blameworthiness is no longer the acid test of liability, the Court said that "the principle of equitable loss-spreading has joined fault as a factor in distributing the costs of official misconduct." The decision concluded thus:

The innocent individual who is harmed by an abuse of governmental authority is assured that he will be compensated for his injury. The offending official, so long as he conducts himself in good faith, may go about his business secure in the knowledge that a qualified immunity will protect him from personal liability for damages that are more appropriately chargeable to the populace as a whole.[45]

The decision should cause some concern to probation and parole officers employed by local agencies because of its budgetary and supervisory implications.  It would appear from the decision that once damage is established in court, liability on the part of the agency ensues under the "equitable loss-spreading" rationale, even if the act was done in good faith by municipal officials.  The concomitant budgetary strain from this decision is obviously difficult to estimate.  Should the liability have no exceptions, then the decision may have the salutary effect of motivating local governments to scrutinize their own rules and practices as an act of fiscal wisdom.  The Court in fact hoped that the threat that damages may be levied against the city might encourage those in policymaking positions to institute internal rules and programs designed to minimize the likelihood of unintentional infringements on constitutional rights.  In addition, the Court anticipated that the threat of liability ought to increase the attentiveness with which officials at higher levels of government supervise the conduct of their subordinates.  Unless subsequent decisions blunt its sharp effects, the Owen case, although assuring a degree of victim compensation at a time when it is fashionable to do so, may create problems among local governmental agencies that will doubtless have interesting ramifications for local probation/parole officers.

SUMMARY

In summary, good faith is the defense most often used, and used successfully, by public officers in Section 1983 cases.  For this defense to succeed, the defendant must prove that he believed what he was doing was lawful and must convince the judge or jury that such belief was reasonable.  Under Harlow v. Fitzgerald, a public officer is beholden to know clearly established constitutional rights that a reasonable person would have known.  This is a rather difficult task in probation/parole where such rights have not yet been clearly established.  Although the Harlow decision involved a degree of Presidential aides, it has already been applied to other public officers.  The United States Supreme Court has decided that the good faith defense must be raised by the defendant affirmatively.  It has also decided that a municipality cannot invoke the good faith defense.  Hence, innocent individuals who are harmed by an abuse of local governmental authority are assured that they will be compensated for their injury by either the officer or the municipality.

NOTES

CHAPTER IV

1.  See Friedman, The Good Faith Defense in Constitutional Litigation, 5 Hofstra L.R. 501, 501-503 (1977).

2.  The Federal Judicial Center, Recommended Procedures for Handling Prisoner Civil Rights Cases in the Federal Courts 9,10 (1980).

3.  M. Weisz & R. Crane, Defenses to Civil Rights Actions Against Correctional Employers 3 (Correctional Law Project, American Correctional Association, 1977).

4.  365 United States 167 (1961).

5.  436 United States 658 (1978).

6.  Williams v. United States, 342 U.S. 97 (1951).

7.  Americans for Effective Law Enforcement, Defense Manual: Civil Rights Suits Against Police Officers - Part I, at 13 (1980).  For cases on actions under color of law, see id., at 14,15.

8.  403 United States 388 (1971).

9.  See supra note 7, at 9.

10.  Wittke v. State of Oregon, Dept. of Corr., 406 F. 2d 515, 517-518 (8th Cir. 1969).

11.  See supra notes 8, 9 & 10.

12.  See supra note 7, at 30.

13.  Most of these defenses are extensively discussed and properly referenced in supra note 3, at 20-28, and supra note 7, at 46-50.

14.  Committee on the Office of Attorney General, National Association of Attorneys General, Sovereign Immunity: The Tort Liability of Government and its Officials, 1 (September, 1979).

15.  Id. at 2.

16.  Id. at 5.

17.  Engdahl, Immunity and Accountability for Positive Governmental Wrongs, 44 U. Colo. Rev. 1, 60 (1972).

18. Committee on the Office of Attorney General, National Association of Attorneys General, <u>Official Liability: Immunity Under Section 1983</u>, 7 (July 1979).

19. <u>Id</u>.

20. Texas Advisory Commission on Intergovernmental Relations, <u>Personal Tort Liability of Texas Public Employees and Officials: A Legal Guide</u>, 12 (1979).

21. <u>Supra</u> note 18, at 35.

22. <u>Supra</u> note 20, at 8.

23. 444 U.S. 277 (1980).

24. <u>Supra</u> note 18, at 69.

25. <u>Id</u>. at 47.

26. Spaulding v. Nielsen, 599 F. 2d 728 (5th Cir. 1979).

27. Burkes v. Callion, 433 F. 2d 318 (9th Cir. 1970), <u>cert. denied</u>, 403 U.S. 908 (1970).

28. Keeton v. Procunier, 468 F. 2d 810 (9th Cir. 1972), <u>cert. denied</u>, 411 United States 987 (1973); Pope v. Chew, 521 F. 2nd 400 (4th Cir. 1975); Douglas v. Muncy, 570 F. 2d 499 (4th Cir. 1978). For a more detailed discussion of cases on the issue of immunity in the performance of quasi-judicial functions, <u>see supra</u> note 20, p. 47 et seq.

29. Thompson v. Burke, 556 F. 2d 231 (3rd Cir. 1977).

30. <u>Black's Law Dictionary</u> 822 (1968).

31. Scheuer v. Rhodes, 416 United States 232 (1974); Wood v. Strickland, 420 United States 308 (1975); O'Connor v. Donaldson, 422 U.S. 563 (1975).

32. 420 United States 308 (1975).

33. 457 U.S. 800 (1982).

34. <u>Id</u>. at 816-817.

35. <u>Id</u>. at 818.

36. <u>Id</u>. at 819.

37. P. Hardy & J. Weeks, <u>Personal Liability of Public Officials Under Federal Law</u>, 5 (Institute of Government, University of Georgia, 1980).

38. 593 F. 2d 354 (8th Cir. 1979).

39. <u>Supra</u> note 33, at 818 and 821.

40. <u>Supra</u> note 1, at 537.

41. 608 F. 2d 654 (5th Cir. 1980).

42. Gahagan v. Pennsylvania Board of Prob. and Parole, 444 F. Supp. 1326 (E.D. Pa. 1978).

43. 446 U.S. 635 (1980).
    Affirmed in <u>Harlow v. Fitzgerald</u>, 457 U.S. 800 (1982).

44. 445 U.S. 622 (1980).

45. <u>Id</u>. at 4399.

# CHAPTER V

## LIABILITY UNDER STATE LAW:  STATE TORT LAW AND NEGLIGENCE CASES

This chapter outlines the major kinds of state tort cases, including negligence, that experience has shown are likely to be alleged to have been committed by probation/parole officers. In addition to this chapter's independent significance, the reader should be aware that the underlying conduct discussed here as tortious may also be actionable (when other requisites are present) under Section 1983. (See Chapter IV for an extended discussion of Section 1983 issues.)

## STATE TORT LAW

A civil action alleging a state tort law violation is often the type of suit filed by plaintiffs against public officers when a federal case under Section 1983 cannot be brought because not all elements of a Section 1983 suit are present. There is so much variation in state tort law from one state to another that this discussion is restricted to general principles.

### Definition

A tort may be defined as a wrong (independent of contract), in which the action of one person causes injury to the person or property of another in violation of a duty imposed by law.[1]  Tort law reaches wrongful acts that result in physical and non-physical injuries.  "Injury" is used hereafter in this broad sense.  A tortfeasor is a person who commits a tort; the act is called a tortious act.

The same act can be a crime against the state and a tort against an individual.  Thus, both a criminal prosecution and a civil tort action may arise from the same act.  For example, a person who drives while intoxicated and causes an accident resulting in injury to another driver and damage to his car may be guilty of the criminal offense of driving while intoxicated, and civilly liable for the injury inflicted on the other person and the damage to his car.  Tortious acts may also be the basis for suits charging violation of civil rights under Section 1983.  In fact, Section 1983 suits sometimes are called federal tort suits.

In order to recover damages in a tort action, the individual bringing the suit must prove that the defendant failed to observe a duty to act or refrain therefrom and that the defendant's action or failure to act was the cause of the injury sustained.  Civil actions are usually tried in state court before a jury that makes the determination of liability and the amount of damages to be paid under instructions from the judge as to the applicable law.  The jury determination is subject to modification, either by the trial judge or on appeal.  A successful tort action generally results in payment of monetary damages to the wronged party.

Compensatory damages are awarded to cover the actual harm suffered by the plaintiff.  Damages may also be awarded in excess of compensatory damages to punish the defendant.  Such awards are known as punitive or exemplary damages.[2]

### Torts to Bodily Integrity

Some torts, such as assault and battery, involve injury to the person; others, such as trespass, represent a wrong to a person's property.  These torts are intentional, which means that they are based on the intent of the actor to do the act which caused a certain event or harm.  Other torts include false arrest or false imprisonment, conversion, invasion of privacy, infliction of mental distress, libel, slander, misrepresentation, wrongful death, and malicious prosecution.  The elements of some of these torts follow.

- Battery is the intentional infliction by an individual of a harmful or offensive touching.  The defendant in a case of battery is liable not only for contacts that do actual physical harm, but also for relatively trivial ones that are merely offensive or insulting, such as pushing, spitting in the face, forcibly removing a person's hat, or any touching of someone in anger.  The consent of the plaintiff to the contact is a defense.[3]

- Assault, on the other hand, is an intentional act on the part of an individual that might not involve any contact, but that places a person in reasonable apprehension of immediate touching.  Assault is thus a mental invasion, rather than the physical invasion involved in battery (although in many cases both assault and battery are involved.)  Examples of assault include shaking a fist in someone's face, raising a weapon, or chasing someone in a hostile manner.  Threatening words alone are usually not sufficient, although they may contribute to an assault.  Note that the trend among the states is to combine assault and battery as a single, combined offense.[4]

- False arrest and false imprisonment are two other tortious actions for which probation/parole officers may be liable.  False arrest takes place when a person is illegally arrested in the absence of a warrant.  This occurs, usually, when the arresting officer lacks probable cause to believe that a crime was committed and that the person arrested committed the act.  False imprisonment takes place when, after arrest, a person is illegally detained.  The detention does not have to be in a prison or jail.  It can take place in such facilities as a halfway house, juvenile home, mental facility, hospital, or even in a private home.  Physical force need not be used under false imprisonment.  Present, immediate threats are sufficient; future ones

are not. A probation/parole officer need not actually use force to detain a probation/parolee illegally. Although false imprisonment usually follows false arrest, false imprisonment may take place even after a valid arrest, e.g., if a probation officer makes a valid arrest but refuses to release the probationer after having been ordered to do so by the judge.[5]

## Torts to Non-Physical Interests

Harm to an individual's non-physical interests, such as his reputation, privacy, and emotional well-being, is also tortious. Defamation, for example, refers to invasion of a person's interest in his reputation. In order for defamation to take place, material about an individual must be communicated, either orally (slander) or in written form (libel), to at least one third person who understood it.[6] The material must tend to lower the reputation of the person to whom it refers, in the estimation of at least a substantial minority of a community. Proof of the statement's truth is an absolute defense regardless of how damaging it is.

The tort of invasion of privacy is an umbrella concept embracing several distinct means of interfering with an individual's solitude or personality. Each, in its own way, is an unreasonable interference with a person's right to be left alone. The areas of concern include (1) intrusion of the plaintiff's private affairs or seclusion, (2) publication of facts placing the plaintiff in a false light, and (3) public disclosure of private facts about the plaintiff. These act of invasion may be mere words, such as the unauthorized communication of some incident of a person's private life, or it may be an overt act, such as wiretapping, "peeping," or taking unauthorized photographs.[7]

A person may also be held liable for his acts (either intentional or negligent) that cause emotional distress. Words alone or gestures or conduct may be sufficient. Bullying tactics by probation/parole officers or insults shouted in public might be examples, especially if they can be deemed "extreme" and "outrageous." In some states, the emotional distress must be severe enough to have resulted in demonstrable physical injuries. In other states, however, the outrageous nature of the defendant's conduct is a sufficient basis for liability.[8]

Individuals can also be held liable for misrepresentation of facts. By the nature of their work, probation/parole officers may be susceptible to this. The tort requires a false representation of a past or present fact, on which individuals may justifiably and do actually rely in making decisions. A related tort is disparagement, or injurious falsehoods. These falsehoods are statements harmful to a person, but which do not necessarily hurt his reputation. False statements such as "A is no longer in business," or the filing of a false change of address card with the post office, are examples.[9]

Another tort reaches harm to a person's interest in freedom from legal proceedings. Often referred to as "malicious prosecution," this tort involves the initiation of criminal proceedings, as in a report to the police or other official that results in a warrant for the plaintiff's arrest. The accusation must be without probable cause and for an improper reason, such as revenge. In order for the defendant to be liable for malicious prosecution, the plaintiff against whom proceedings were initiated must be found innocent.[10]

Finally, an individual can be held liable for the "wrongful death" of another. Here, the suit is brought by an involved party, such as surviving relatives or the executor of the deceased's estate. This tort provides damages to those hurt by the death when it was wrongfully caused by the actions of another. No recovery is possible if the deceased could not have won a suit in his own right had he survived.

## Defenses Against Tort Actions

Defenses are available against every type of tort. In the case of assault, battery, and the other intentional torts, for example, the plaintiff must prove the defendant intended to commit the wrongful act. Proof that the act was not volitional thus defeats an intentional tort case. Some defenses apply only to specific torts. False imprisonment, for example, does not take place if there is an escape available and the person being confined knows of it. An individual cannot be successfully sued for libel or slander if the matter communicated is the truth; both of these defamation torts and the tort of misrepresentation must involve statements that are not only false, but are harmful to a person as well. Invasion of privacy or trespass does not take place if there was consent to the act. Thus, these defenses may include such elements as: (1) lack of intent, (2) no harm or injury, (3) consent, and (4) truth. The generic immunity defense, discussed in Chapter IV, arises from public policy reconsiderations, rather than the elements of the state torts themselves.

Under federal law, there are specific defenses for some types of federal suits, such as 1983 suits. These defenses are discussed in Chapter IV.

## NEGLIGENCE

What is negligence? One court offers this widely-accepted definition:

Negligence, in the absence of statute, is defined as the doing of that thing which a reasonably prudent person would not have done, or the failure to do that thing which a reasonably prudent person would have done in like or similar circumstances; it is the failure to exercise that degree of care and prudence that reasonably prudent persons would have exercised . . . in like or similar circumstances.[11]

Of course, where a definition is found in a state statute, that definition prevails.

Negligence may be slight, gross, or willfull.  Slight negligence is defined as "an absence of that degree of care and vigilance which persons of extraordinary prudence and foresight are accustomed to use;" in other words, a failure to exercise great care.  Gross negligence is described as a failure to exercise even that care which a careless person would use, while willful negligence means that the actor has intentionally done an act of an unreasonable character in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, or so great as to make it highly probable that harm would follow.[12]

Under state law, a defendant may be liable for what he does if the following elements under tort are present:

1.  A legal duty owed to the plaintiff;

2.  A breach of that duty by omission or commission;

3.  The plaintiff must have suffered an injury as a result of that breach; and

4.  The defendant's act must have been the proximate cause of the injury.[13]

The same act may be a crime against the state and a tort against a private individual.  Damages assessed may be nominal, actual, or punitive.  Nominal damages are token amounts; actual damages compensate plaintiffs for measurable damages and expenses, while punitive damages penalize defendants for gross or excessive violations.  While nominal and actual damages may sometimes be low, punitive damages can run into millions of dollars.

Negligence liability is a potential concern to all public officers.  Although most of the decided cases in the negligence area involve prison officials or police personnel, the principles of these cases almost certainly apply to probation/parole officers in similar circumstances.  It is hoped that knowledge of specific circumstances will enable probation/parole officers to better analogize these cases to their own situations.

For ease of discussion, negligence liability issues are treated here under these general classifications:

1.  Source of Liability

    ● State tort law.

    ● Federal law, particularly Section 1983.

-50-

2.  Possible Parties Defendant

    ● Governmental agency (such as state parole boards or county probation departments).

    ● Individuals (i.e., members of parole or probation boards, other individuals responsible for release, probation/parole field officers responsible for supervision).

Source of Liability in Tort Cases

Negligence liability may arise under state tort law or Section 1983.  Liability under state tort law is found when the actions of one person cause foreseeable injury to another person, in violation of a duty imposed by law.  Most ordinary negligence cases are filed under state tort law.  A second possible source of liability based on negligence is federal law, particularly Section 1983.  This is discussed fully in Chapter IV.  Here, however, there is disagreement among the courts.  Admittedly, liability ensues under Section 1983 for intentional acts, such as when a parole or probation officer makes an arrest without authorization.  Whether Section 1983 liability can be based on negligence (supposedly unintentional) or inaction, however, is a question that has generated considerable controversy in recent years.  The United States Supreme Court has not addressed this question directly, but in Smith v. Wade, a 1983 case, the U.S. Supreme Court said:

> We held that a jury may be permitted to assess punitive damages in an action under Section 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.[14]

This statement appears to indicate clearly that negligence, at least gross negligence, may be a basis for liability under Section 1983.

Most lower courts allow Section 1983 liability based on negligence.  Typical are cases in which a police chief negligently failed to train and supervise police officers under his control, a prison official negligently failed to provide necessary medical attention to inmates or to control guards beating up a prisoner, and mental health officials negligently failed to prevent some inmates from beating another inmate.[15]  Most courts that allow recovery require gross, reckless, or culpable negligence on the part of the public officer-defendant as opposed to mere or simple negligence.  Whether these enhanced forms of negligence have been proven -- and even what these terms mean to some extent -- is up to the courts to determine on a case-by-case basis, taking into account the totality of circumstances involved.

-51-

## POSSIBLE PARTIES DEFENDANT IN TORT CASES

Plaintiffs generally name as defendants everyone who might possibly be liable in a case. This includes the governmental agency involved (parole board, probation office, etc.), the board members in their individual capacities, and the probation/parole officer.

### Governmental Agency as Defendant

In lawsuits against the agency, immunity usually attaches if the defendant is a state agency. This sovereign immunity, however, may be waived through state law or state judicial decision, and many states have waived it. When sovereign immunity does exist in a state, the question arises whether the particular function involved was governmental -- for which there is immunity, or proprietary -- for which there is no immunity.

As discussed elsewhere, local agencies are now subject to liability under <u>Monnell v. Department of Social Services</u>.[16] They have been deprived of the sovereign immunity defense in Section 1983, which was available to them until the <u>Monnell</u> decision in 1978. Local agencies include probation/parole offices if supported by local funds, school boards, police agencies, and county boards.

### Individual Officers as Defendant

Although state agencies are exempt from liability for their governmental activities unless waived, immunity ordinarily is unavailable to individual state officers who are sued. Therefore, members of state probation/parole boards may be sued as individuals. The fact that a state provides counsel, or indemnifies the officer if held liable, does not mean that the state has consented to be sued. It simply means that, if held liable, the officer pays the damages and the state indemnifies or reimburses him. All officers, state or local, may therefore be sued in their individual capacity under Section 1983.

### Liability of Probation/Parole Field Officers

This topic is discussed more extensively under the chapter on Supervision (Chapter XI). What follows here is simply the summary of that discussion.

Liability ensues when harm or injury is inflicted on another person by a probationer or parolee who is under the supervision of the officer. The rule appears to be that the government is not liable to specific individuals for mere negligent omission in the provision of public services, including non-disclosure to the public of prior record. Liability exists, however, when a special relationship has been established between the governmental unit and an individual. What circumstances must be present to establish this relationship are not clear and will be decided by

the courts on a case-by-case basis. The cases cited and discussed in Chapter XI, however, indicate some of the considerations the courts will take into account when making that decision.

### SUMMARY

This chapter presents an overview of the various forms of liability to which a probation/parole officer may be exposed under state tort law. These tort cases may be classified into torts to bodily integrity and torts to non-physical interests. Negligence may also be the basis for tort action. Although not directly decided by the U.S. Supreme Court, a recent decision strongly suggests that gross negligence can also be a ground for a federal Section 1983 lawsuit.

NOTES

CHAPTER V

1.  Texas Advisory Commission on Intergovernmental Relations, Handbook of the Law of Personal Tort Liability of Texas Public Employees and Officials, No. VI-3, 1 (1978).

2.  W. Prosser, Handbook of the Law of Torts, 10 (4th ed. 1971).

3.  Id. at 35-36.

4.  Id. at 41.

5.  Id. at 47.

6.  Bay Area Review Course, Torts (Los Angeles, Ca., Bay Area Review Course, Inc., 1972) p. 76.

7.  Id. at 87.

8.  Id. at 89.

9.  Id. at 97-98.

10. Id. at 101.

11. Biddle v. Mazzocco, 204 Or. 547, 248 P. 2d 364, 368 (1955).

12. W. Prosser, supra note 2 at 183-85.

13. Id. at 143.

14. Smith v. Wade, 33 CrL 3021 (1983), at 3028.

15. See L. Friedman, Developments in Constitutional Law:  The Good Faith Defense in Constitutional Litigation, 5 Hofstra L.Rev. 501, 520 (1977).

16. Monell v. Department of Social Serv., 436 U.S. 658 (1978).

CHAPTER VI

LEGAL REPRESENTATION AND INDEMNIFICATION

A probation or parole officer facing a liability suit under federal or state law has two immediate concerns:  legal representation and, if held liable, monetary indemnification. Each is discussed below in the light of legal research and findings from the questionnaire sent by the project staff to attorneys general in the various states.  (Note:  The survey, conducted in 1980, may be outdated in some respects.  See Update Section, infra).

LEGAL REPRESENTATION

States use various guidelines in deciding what kinds of acts of public officers they will defend.  In general, the states are more willing to provide legal assistance to state employees sued in civil cases than they are to those accused of criminal wrong-doing.  All of the states in the survey cover civil actions at least some of the time for both probation and parole officers.  A substantial percentage, however, indicate that they will not defend in all civil suits.

Civil Liability Cases

Most of the states set few restrictions on the types of acts they will defend in civil suits -- requiring only that the officer's act or omission occur within the scope of employment. Some states require, additionally, that the officer act in good faith.   The term "good faith" is ill-defined, varying from state to state.  In some states, good faith means "not grossly negligent;" in others, it means that the officer has not violated a state rule or law.  Good faith in this context is not identical to good faith as discussed in the preceding section.

If a probation or parole officer's behavior is within state guidelines, the attorney general may serve as the officer's legal representative in the suit.  Many states have no other provisions for the defense of state employees.  In some states, however, if the particular act comes under an applicable insurance policy (such as in an automobile accident), the insurer's counsel may undertake the defense.  (Reliance on such insurance can be risky if policy limits are unrealistically low because insurance carriers can sometimes simply pay the limit of their liability in court in lieu of defending a suit; the officer could be left unrepresented and exposed personally, potentially at least, to the balance of the claim.)

There are states that have provisions that permit outside lawyers to be hired at state expense to defend a state employee. Some of these states allow reimbursement by the state for lawyers' fees and court costs if the employee wins the suit after the

state's attorney general's office has refused to defend the officer. On the other hand, if the state does undertake the defense of the officer and the individual is found to have acted in bad faith, and thus held liable, such officer may have to reimburse that state for costs (in at least three states). Thus, there are some uncertainties involved in the process of obtaining legal representation for state officials.

The attorney general's office has considerable discretion in undertaking the defense of an officer who is sued in a civil suit. In those cases in which the attorney general's office refuses to defend the officer, private legal assistance must be obtained. Only two states, California and Vermont, have procedures for appealing the state's refusal to defend the officer. Only California requires a judicial determination of whether the employee is entitled to legal assistance from the state.

If known, the fact that the state refuses to defend the officer could serve to prejudice the judge or jury. However, the majority of states, with the exception of Maryland, Oklahoma, and Oregon, make no provision for barring evidence of state refusal to defend in the trial. This could be potentially damaging evidence against the state employee because of the implication, warranted or unwarranted, that the state found the case to be outside the scope of the officer's duty.

## TABLE VI.1[1]

### DEFENSE OF PROBATION OFFICERS IN CIVIL CASES

QUESTION: If a <u>probation officer</u> in your state is sued in a <u>civil</u> case, will the governmental agency undertake the defense of that officer? Number of states responding: 49.

| | Number | Percent |
|---|---|---|
| Yes | 20 | 40.8 |
| Sometimes | 29 | 59.2 |
| No | 0 | 0.0 |

## TABLE VI.2

### DEFENSE OF PAROLE OFFICERS IN CIVIL CASES

QUESTION: If a <u>parole officer</u> in your state is sued in a <u>civil</u> case, will the governmental agency undertake the defense of that officer? Number of states responding: 50.

| | Number | Percent |
|---|---|---|
| Yes | 22 | 44.0 |
| Sometimes | 28 | 56.0 |
| No | 0 | 0.0 |

### Criminal Liability Cases

The picture is somewhat different if the probation or parole officer is alleged to be involved in a criminal action. Almost one-half of the states will not undertake a defense of an officer. In many states, the state becomes the prosecutor (in fact as well as theory) against an officer if the charges involve criminal liability. A conflict of interest would thus prevent the state from representing the probation or parole officer. The response from several of the states in this project's survey indicated that state legal representation would be at the discretion of the attorney general's office. Others stated that the situation had never arisen and that the policies were unclear. Very few states indicated unequivocally that the state would undertake the defense of an officer if the case were a criminal matter.

## TABLE VI.3

### DEFENSE OF PROBATION OFFICERS IN CRIMINAL CASES

QUESTION: If a <u>probation officer</u> in your state is sued in a <u>criminal case</u>, will the governmental agency undertake the defense of that officer? Number of states responding: 47.

| | Number | Percent |
|---|---|---|
| Yes | 4 | 8.5 |
| Sometimes | 21 | 44.7 |
| No | 22 | 46.8 |

## TABLE VI.4

### DEFENSE OF PAROLE OFFICERS IN CRIMINAL CASES

QUESTION: If a <u>parole officer</u> in your state is sued in a <u>criminal case</u>, will the governmental agency undertake the defense of that officer? Number of states responding: 49.

| | Number | Percent |
|---|---|---|
| Yes | 4 | 8.2 |
| Sometimes | 22 | 44.9 |
| No | 23 | 46.9 |

## INDEMNIFICATION IN CASE OF LIABILITY

If an employee is held liable for his actions, who pays for damages assessed against him by the court? A majority of the states provide for indemnification or reimbursement for civil damages assessed against employees. However, the amount that states are willing to pay varies considerably. In addition, the

conditions under which the state will pay vary and are sometimes unclear. Some states set no limits on the amount of money they will pay in a suit against a state employee. The majority of states set some type of limit.[2] If the court awards the plaintiff an amount larger than the maximum allowed by the state, the employee, apparently, would have to pay the difference. The states range from not allowing indemnification to setting no limit.

Although most states provide some form of indemnification for officers who are sued, this provision does not mean that the state will automatically indemnify. The majority of states will help pay the judgment only if the act on which the finding of liability is based was "within the scope of employment." This phrase is susceptible to different interpretations in different states. Moreover, most states also require that the employee performed the act in good faith.[3] As indicated previously, definitions of "good faith" vary from state to state, ranging from "conduct that is not willful or wanton" to "conduct that is not violative of established rules or regulations." The determination of good faith may also vary depending on whether the suit is a state tort claim (and, hence, may be governed by a specific definition in a state statute) or a Section 1983 civil rights suit.

### TABLE VI.5

### PROBATION OFFICER INDEMNIFICATION

QUESTION:  If a probation officer in your state is held civilly liable, will the governmental agency of which he is an employee pay or indemnify? Number of states responding: 48.

|           | Number | Percent |
|-----------|--------|---------|
| Yes       | 9      | 18.8    |
| Sometimes | 33     | 68.8    |
| No        | 6      | 12.5    |

### TABLE VI.6

### PAROLE OFFICER INDEMNIFICATION

QUESTION:  If a parole officer in your state is held civilly liable, will the governmental agency of which he is an employee pay or indemnify? Number of states responding: 49.

|           | Number | Percent |
|-----------|--------|---------|
| Yes       | 10     | 20.4    |
| Sometimes | 32     | 65.3    |
| No        | 7      | 14.3    |

An important question in terms of procedure is this: Whose determination of good faith is binding for purposes of indemnification eligibility? In general, the determination is made by the state attorney general, the court trying the case, or the state agency. In some states, the judgment determines if the employee acted in bad faith. If, however, the state makes a pre-trial investigation to determine if the employee is eligible for state legal representation, the result of that investigation could potentially bind the state to indemnify, even if a subsequent court decision on the case finds that employee acted in bad faith. In some states, the steps for determining good faith are unclear; some indicated that the situation had not yet arisen with respect to probation/parole officers. In other states, only the matter of scope of employment must be determined.

In summary, a probation or parole officer who is sued faces a number of uncertainties. He may ask for and be provided with legal assistance, depending on the state. If the state has provision for indemnification, he may have to undergo more than one determination of good faith, in which "good faith" might not be a well-defined, or consistently applied, term. Despite these determinations, a court ruling against him may negate his claim to good faith and thus his claim to indemnification. Even if the officer is indemnified, not all of the expenses may be covered, particularly in states that place a limit on the amount of indemnification allowed per case. Finally, state assistance may vary depending on whether the suit is brought in state or federal court. For these reasons, better legal and financial protection is needed for probation and parole officers.

### ATTORNEY'S FEES IN SECTION 1983 CASES

In 1976, legislation was passed providing attorney's fees for cases at the federal level. The act, known as the Civil Rights Attorney's Fees Awards Act of 1976 (Section 1988), allows the court to award attorney's fees to the prevailing party in some types of federal civil rights suits. Specifically, the Act states:

> In any action or proceeding to enforce a provision of Sections 1981, 1982, 1983, 1985, and 1986 of 42 U.S. Code . . . or Title VI of the Civil Rights Act of 1964, the Court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.[4]

Prior to the passage of this statute, an award of attorney's fees was relatively rare. The passage of this Act now makes it more likely that a prevailing party in a federal civil rights suit can also collect attorney's fees, as well as damages or injunctive relief, from the defendant.[5]

The Act allows an award of fees to the "prevailing party" in a federal action. The term "prevailing party" has been broadly

circumstances. According to the 1980 survey, a minority of states (30%) had purchased this insurance for probation and parole officers. The purchase of insurance is likely to be dependent upon the standards for the immunity doctrine in the particular state or jurisdiction. It may also depend on statutes legally authorizing the governmental unit or agency to purchase insurance, as authorization must exist to take such action.[16]

Insurance for public employees is sometimes rejected on the ground that it would serve to encourage the filing of lawsuits by citizens against public officers. Furthermore, it is feared that the amount of damages awarded would increase if the judge or jury became aware that the costs would be borne by an insurance company, rather than by an individual or governmental unit.[17]  In many jurisdictions, however, insurance ownership or governmental indemnification cannot be mentioned at a trial or hearing. In addition, it can be argued that if insurance coverage is available, the public would be better served, in that the public officer would better fulfill his duties if he is not concerned with personal liability for acts performed in good faith and in the scope of his duties.

In light of such considerations, insurance purchase by agencies or the state appears to be one viable alternative for protecting the public employee, although it could serve to increase the number of suits filed. Insurance would appear to be desirable in jurisdictions in which either state legal representation or indemnification is uncertain, as insurance companies may provide both legal counsel and damage compensation. It should be noted that policies may be limited to acts performed within the scope of employment and may require a demonstration of good faith. In those jurisdictions that do not provide for the purchase of insurance, administrators might wish to work for the modification of statutes and policies so that insurance for agency employees could be obtained. If this proves to be unfeasible, self-insurance should be considered.

### TABLE VI.7

### LIABILITY INSURANCE FOR PROBATION OFFICERS

QUESTION:   Is there any form of liability insurance supplied
            by the governmental agencies that employ
            probation officers in your state? Number of
            states responding:  48.

|       | Number | Percent |
|-------|--------|---------|
| Yes   | 14     | 29.2    |
| Some  | 7      | 14.6    |
| No    | 27     | 56.3    |

### TABLE VI.8

### LIABILITY INSURANCE FOR PAROLE OFFICERS

QUESTION:   Is there any form of liability insurance suppplied
            by the governmental agencies that employ parole
            officers in your state?  Number of states
            responding:  50.

|       | Number | Percent |
|-------|--------|---------|
| Yes   | 15     | 30.0    |
| Some  | 5      | 10.0    |
| No    | 30     | 60.0    |

## UPDATE - 1982 SURVEY ON REPRESENTATION AND INDEMNIFICATION

In January 1982, the National Center for State Courts completed a fifty state statutory survey on indemnification and representation.[18]  Related statutes, administrative regulations, opinions of the attorney general, and informal practices may also affect the outcome in a specific jurisdiction. State officer, in the context of the statutes surveyed, refers to judges and those state officials whose qualified immunity derives from judicial immunity. Therefore, survey findings would be applicable to probation and parole officers.

About half the states provide fairly complete indemnification procedures, including provisions for legal representation and payment of claims and judgments entered against state officers while acting in their official capacity. The remaining states provide various legal services.

Several statutory formats exist, each providing a different form of indemnification. The Delaware Tort Claims Act, for example, indemnifies state officers for attorney fees, disbursements, judgments, fines, and costs when the challenged act is discretionary, in good faith, and without gross and wanton negligence. The Wyoming statute provides a right to defense and indemnification for claims and judgments arising out of acts or omissions within the scope of duty, whether or not the acts are alleged to be malicious or fraudulent.

Several states, including California, Kansas, New Jersey, New York, and Utah, except punitive or exemplary damages from their indemnification provisions. Oregon, New Jersey, and Vermont provide for a denial of a representation request where investigation reveals a basis for refusal specified statutorily, e.g., fraudulent or willful misconduct. Iowa excepts indemnification for malfeasance or willful and wanton conduct. Kansas requires the act be committed in good faith. New York excepts intentional wrongdoing or recklessness.

North Carolina defends public officials but judgments are paid by the official's department, agency, board, or commission. Colorado also makes the public entity liable, unless the act or omission is willful or wanton. Connecticut and Florida allow actions against governmental entities but not against public officers, resulting in a variant of indemnification. Some jurisdictions, e.g., Maine, Massachusetts, Michigan, Rhode Island, and South Dakota, have discretionary language in their indemnification and representation statutes. In these jurisdictions, as well as in those providing only representation, immunity doctrines or non-statutory forms of indemnity or insurance may shield both the employee and the state from liability, thereby reducing the need for indemnification. A few jurisdictions, in lieu of indemnification and representation statutes, require claimants to sue the governmental body directly. Again, each officer should determine statutes applicable to his jurisdiction.

## SUMMARY

Legal representation and indemnification are two real concerns of probation/parole officers in liability cases. Surveys show that modes of representation and indemnification vary greatly among states, ranging from guaranteed representation or indemnification to no formal representation whatsoever. Most states that provide representation do it in civil cases only, while others include criminal cases as well. The Attorney's Fees Award Act of 1976 allow courts to award attorney's fees to the prevailing plaintiff in a civil rights lawsuit. There is hardly any policy as to who pays these fees. Some states will pay the bill, others will not. Professional liability insurance provides protection to probation/parole officers but has inherent problems such as who pays the premium, will it encourage the filing of more lawsuits, and whether or not an insurance company is available to underwrite the policy.

## NOTES

### CHAPTER VI

1. The tables in this chapter are taken from R. del Carmen and C. Veneziano, "Legal Liabilities, Representations, and Indemnifications of Probation and Parole Officer," 17 U. San Fran., L. Ren., 240-243 (1983).

2. Committee on the Office of Attorney General, Sovereign Immunity: The Tort Liability of Government and its Officials (September 1979).

3. R. Crane and G. Roberts, Legal Representation and Financial Indemnification for State Employees: A Study (Correctional Law Project, American Correctional Association, 1977).

4. 42 U.S.C. Section 1988 (1976).

5. Americans for Effective Law Enforcement, Defense Manual: The Civil Rights Attorney's Fees Awards Act of 1976, 3 (1979).

6. Americans for Effective Law Enforcement Inc., Defense Manual: Civil Rights Suits Against Police Officers – Part II, at 61 (1979); Brown v. Culpepper, 559 F. 2d 274 (5th Cir. 1977).

7. Maher v. Gagne, 48 LW 4893 (1980).

8. Guajardo v. Estelle, 432 F. Supp. 1373 (S.D. Tex. 1977), modified 580 F. 2d 748 (5th Cir. 1978).

9. Hutto v. Finney, 437 United States 678 (1978).

10. Id. at 62.

11. Christianberg Garmet Co. v. EEOC, 434 U.S. 412 (1978).

12. 448 U.S. 1 (1980).

13. Supra note 9, at 62.

14. 489 F. 2d 298 (5th Cir. 1973).

15. Ruiz v. Estelle, 503 F. Supp. 1265 (S.D. Tex. 1980), (stay granted and denied, 650 F. 2d 555, 5th Cir. 1981). Interium with administrative officers.

16. Texas Advisory Commission on Intergovernmental Relations, Intergovernmental Brief, Tort Liability Insurance for Public Employees and Officials: An Introductory Guide, 8 (August 1978).

17. W. Prosser, Handbook of the Law of Torts, 4th Edition (1971).

18.  Martha M. Murphey, "Judicial Immunity and Indemnification of
     State Officers and Employees," unpublished manuscript
     (National Center for State Courts, 1983).

PART THREE - SPECIFIC AREAS OF LIABILITY

CHAPTER VII   -   PRE-SENTENCE/PRE-PAROLE INVESTIGATIONS AND REPORTS

CHAPTER VIII  -   THE PAROLE RELEASE HEARING AND LIABILITY OF PAROLE
                  BOARD MEMBERS FOR RELEASE

CHAPTER IX    -   CONDITIONS

CHAPTER X     -   MODIFICATION OF CONDITIONS AND CHANGES IN STATUS

CHAPTER XI    -   SUPERVISION

CHAPTER XII   -   REVOCATION

CHAPTER XIII  -   LIABILITIES OF AGENCY SUPERVISORS

CHAPTER XIV   -   LIABILITY FOR PRIVATE PROGRAMS AND COMMUNITY
                  SERVICE WORK

## CHAPTER VII

### PRE-SENTENCE/PRE-PAROLE INVESTIGATIONS AND REPORTS

The result of the survey research for this manual showed that probation/parole officers frequently were concerned about pre-sentence and pre-parole report issues. That finding heightens the importance of the material in this Chapter.

### PROBATION PRE-SENTENCE REPORTS

An examination of state court decisions shows that the states generally follow federal court decisions in determining the local use of pre-sentence reports. This should come as no surprise as most of the federal cases are decided on due process grounds, a constitutional issue, thus forcing the states to follow federal decisions.

There are, of course, states that have afforded defendants greater or earlier protections than those required by the federal courts. But recent federal activity makes it the leader on such issues as restricting judicial discretion concerning report disclosure. An examination of the pertinent federal case law should serve to identify the trends and patterns most jurisdictions are following.

### Contents

In order to better appreciate the direction the law is taking in this area, it is helpful to recall the purpose of the pre-sentence report. Briefly stated, the purpose of the report is to help the judge impose the most appropriate sentence by providing him with information about the defendant's life and characteristics, and, if customarily or specially requested, the informed recommendation of the probation officer. The report helps implement the modern concept that rehabilitation is promoted by individualized sentences. Because the stage of deciding guilt or innocence has passed, it has been held to be reasonable to allow the judge to exercise wide discretion as to the sources and types of information he will use to assist him in sentence selection.[1] Studies examining the actual utilization of these reports indicate some variation in perceived value and use, but in general show a high correlation between the report recommendations and the sentence passed.[2] It should come as no surprise, therefore, that defense counsels feel that due process, meaning fundamental fairness, requires their access to the report. Lawyers maintain that there is a distinct liberty interest involved at the pre-sentence stage that does not always exist after sentence has been passed. In general, however, a judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider or the source from which it may come.[3]

-67-

General.  State courts and state statutes either require or allow
a variety of data in the pre-sentence report.  The officer must be
aware of the local rules on this subject because they are so
different.  Jurisdictions vary, for example, on the use of
criminal justice system contacts that were dismissed or did not
result in conviction.  In general, however, it is safe to assume
that if the information is relevant to the particular case, it
will be permitted.

Hearsay.  "Hearsay" is information that is offered as a truthful
assertion that does not come from the personal knowledge of the
person stating the information, but from knowledge that person
received from another.  Generally, it is not admissible in trials
under the rules of evidence because the truth of the facts
asserted cannot be tested by cross examination of the witness.
Decided cases make it clear, however, that hearsay is not in and
of itself constitutionally objectionable in a pre-sentence
report.  The purpose of the report is to aid the judge in
determining an appropriate sentence and, as such, it is important
that the judge "not be denied an opportunity to obtain pertinent
information by a requirement of rigid adherence to the restrictive
rules of evidence properly applicable at trial."[4]  In addition,
pre-sentence reports are not restricted in their content to
established fact.[5]  As the report is usually not compiled by
persons trained in the law, it is up to the judge to exercise both
proper and wide discretion as to the sources and types of
information used to assist him.  This does not give the court
unlimited discretion, however.  The defendant must have an
opportunity to rebut information that he claims is false.

Confrontation and Cross-Examination.  Some jurisdictions allow the
defendant to cross-examine the pre-sentence report author or
experts relied upon in compiling the report.  The more damaging
the information, the more likely it is that the court will permit
cross-examination.  Jurisdictions vary in their restriction of the
defendants' right to confront sources of adverse information.

Criminal Record.  A pre-sentence report is not considered to be
manifestly unjust because it contains a history of a defendant's
prior arrests.[6]  Information relating to prior criminal activity
is likely to be considered critical and, therefore, subject to
mandatory disclosure.

Suppressed Evidence.  The Supreme Court under Chief Justice Warren
E. Burger has shown marked antipathy to the exclusionary rule.
That court-developed doctrine prohibits the use in a criminal
trial, as direct evidence of the defendant's guilt, of information
obtained in violation of the defendant's fourth, fifth, or sixth
amendment rights.  The Court consistently has resisted efforts to
extend the remedy of exclusion or suppression of such evidence to
proceedings other than the trial itself.  For example, the Court
has allowed suppressed material to be considered by a grand jury.[7]

# CONTINUED

# 1 OF 3

The current Supreme Court majority argues that the rule is justified by the need to deter police misconduct, discounting other proffered bases. In cases where it has held that the extension of the exclusion remedy is not warranted, the Court has said that additional deterrence of official misconduct cannot be obtained without undue harm to the public interest. When examined in the context of a probation revocation hearing (see Chapter XII), the argument may be sound: the new proceeding may be so remote from the misconduct that gave rise to the trial suppression that no additional deterrence can be obtained through exclusion from different proceedings.

It can also be argued, however, that sentencing is so closely related to the trial that use there is improper. While there is a general tendency in the courts to permit all uses of suppressed information once guilt has been determined, the Supreme Court has not ruled specifically on the propriety of its inclusion in pre-sentence reports. But where illegally obtained evidence is acquired solely for use in a pre-sentence report, the exclusionary rule may be invoked as a deterrent. Probation officers should determine the current local rule.

## Disclosure

On the federal level, the Federal Rules of Criminal Procedure require a federal judge to disclose[8] all information relied upon in sentencing except where:

1.   Disclosure might disrupt rehabilitation of the defendant;

2.   The information was obtained on a promise of confidentiality; or

3.   Harm may result to the defendant or to any other person.

The rule does not give the defendant access to a co-defendant's pre-sentence report.[9]

The general rule is that the court shall disclose such information in the report as was taken into consideration by the court. However, some states provide by law that the information may be given to counsel rather than to the defendant personally. Counsel may be given access with instructions not to disclose its content to the defendant.[10]  Partial access that excludes information for reasons other than those listed above is insufficient access.[11]

A variation of the application of the rule is found in the First Circuit, where the judge may either identify for the record and disavow any information not relied upon or disclose those portions of the report that were relied upon.[12]

While the trend is toward disclosure, the United States Supreme Court has to date not considered the failure or refusal to disclose the contents of the pre-sentence report as violative of constitutional rights per se. However, in a Florida case involving imposition of the death penalty, the Court did consider it a denial of due process where the sentence was passed on the basis of information that the defendant had no opportunity to deny or explain. The case does not indicate that similar requirements would hold in a non-capital situation.[13]

A few cases have specifically held that there is no constitutional right of access to a pre-sentence report per se.[14] But several jurisdictions require disclosure under a statute or rule of court. The jurisdictions so holding include Arizona, Florida, Illinois, Kentucky, Michigan, Montana, Nevada, New York, Ohio, Oregon, Texas, and Wisconsin.[15]

Several jurisdictions have ruled that the defendant has a right to disclosure, even in the absence of a statute or rule stating otherwise. Caution is suggested here as these jurisdictions utilize various restrictions on access, such as limiting disclosed information to that which defames the defendant (North Carolina), or to that which is relevant and which does not include diagnostic material (New Jersey). Other states in this group include Louisiana, Massachusetts, and Pennsylvania.[16]

State statute or rules have been held to leave the matter of disclosure to the discretion of the court in Georgia, Iowa, Maryland, Minnesota, Nebraska, Oklahoma, and South Dakota.[17]

Several jurisdictions still recognize the court's discretion in the absence of statute or rules. This is true in the states of Delaware, Texas, Utah, and Vermont.[18]

Idaho's position[19] is unusual, if not unique. There, a defendant must apply for probation. In considering that application, the court need not (but it has the discretionary power to) disclose anything other than adverse information in a pre-sentence report. If the application is denied, a sentencing hearing must be held. Prior to that hearing, the court must disclose in full the contents of any pre-sentence report to be used in sentencing.

The lack of national uniformity on the basic disclosure issue is reflected in other aspects. For example, Michigan requires that material must be prejudicial to the defendant to qualify for disclosure.[20] Minnesota requires that when the court exercises its discretion against disclosure, it must give the reasons for its decision.[21] And Arizona permits withholding of the source of confidential information, but not the contents, even if it might be possible from the released data to infer the identity of the informant.[22]

In summary, it is most likely that all or part of every pre-sentence report will be disclosed to the defendant or his counsel as a result of state statute, court rule, or the exercise of judicial discretion. The probation officer, therefore, should exercise care in selecting material for inclusion in a report and assuring accurate presentation.

The officer should exercise this care to avoid tort, and possibly criminal, liability and to prevent damage to the interests of justice he is sworn to advance. Probation/parole officers should know that intentionally including inaccurate information in a report with knowledge of its falsity or with reckless disregard for its truth or falsity could make them liable to the defendant. In addition to defamation-based torts, other intentional torts are possible. Additionally, negligence charges have been brought when a defendant could allege that unprofessional care was exercised in report preparation.

The 5th Circuit, in Maynard v. Havenstrite, 727 F. 2d 439 (5th Cir. 1984), found liability where an inaccurate pre-sentence report was not shown to the plaintiff prior to sentencing. Defendant Chief U.S. Probation Officer and a federal probation officer were granted absolute immunity from monetary damages. However, the appellate court held that, where administrative remedies were exhausted, the officers were not necessarily immune from an action for declaratory and injunctive relief.

But the harm to the public interest can be more substantial. It has long been the rule that a sentence cannot be based on false information.[23] When a defendant is sentenced on the basis of a report that is materially false or unreliable, that person's right to due process is violated.[24] The remedy usually invoked in such cases is the vacation of the sentence imposed and remand for resentencing. This involves unnecessary cost and delay.

## PAROLE INVESTIGATION AND REPORT ISSUES

The major issue that arises out of pre-parole investigation concerns the extent to which prisoners are given access to files containing information about them. When this issue has been litigated, courts have had to resolve three questions:

- Does any applicable statute or administrative rule provide access?

- Does the prisoner have a right to due process in connection with the parole release proceedings?

- If there is such a due process right, is file access encompassed within it?

The traditions under which courts operate require them to settle cases on non-constitutional bases whenever possible. Recent litigation has granted file access to federal prisoners,

thus obviating the need for litigation on this issue, although
suits concerning the contours of the statutory right are still
possible.

## Federal Prisoner File Access

The Parole Commission and Reorganizaiton Act of 1976[25]
provides that a federal prisoner shall be given reasonable access
to any report or other document the Parole Commission will use in
making its release decision.  Not all file material need be
released; the material that may be withheld is the same kind of
information a federal court need not disclose to a defendant in
connection with sentencing:

   1.  Diagnostic opinions that, if made known to the
       eligible prisoner, could lead to a serious
       disruption of his institutional program;

   2.  Any document that reveals sources of information
       obtained upon a promise of confidentiality; or,

   3.  Any other information that, if disclosed, might
       result in harm, physical or otherwise, to any
       person.

## State Prisoner File Access

Where there is a state statute, or parole board or other
rule, that grants file access to a state prisoner, the scope of
potential litigation is restricted to issues of rule compliance
and the applicability of any exceptions that limit the grant of
access.  In the absence of such a provision, however, file access
can be secured through litigation only by establishing that the
prisoner has a fourteenth amendment right to due process in parole
release decisionmaking, and that the right includes file access.
The Supreme Court has addressed the first branch of that inquiry.

## The Greenholtz Case - Does Due Process Apply?  The fourteenth
amendment bars states from depriving a person of "liberty" without
due process of law.  What does "liberty" mean in the parole
release context?  When the Supreme Court took up that question in
1979, the federal courts of appeal were sharply divided.  The
Third, Fifth, Sixth, Ninth, and Tenth Circuits[26] held that
"liberty" was not involved and that due process rights were there-
fore inapplicable.  But the Second, Fourth, Seventh, and District
of Columbia Circuits[27] had reached the opposite conclusion.

In Greenholtz v. Inmates of the Nebraska Penal and
Correctional Complex,[28] the Supreme Court held that unless a state
law creates a reasonable expectation that the prisoner will be
paroled, the prisoner's constitutional "liberty" is not affected
by the releasing process and no federal due process right applies.
The Court held:

That the state holds out the possibility of parole
provides no more than a mere hope that the benefit will
be obtained . . . to that extent the general interest
asserted here is no more than the inmate's hope that he
will not be transferred to another prison, hope which is
not protected by due process. . . .[29]

Because the Nebraska law provided that the parole board
"shall" release a parole-eligible prisoner "unless" certain
anti-release factors were found to exist,[30] the Court held the
statute did create the necessary reasonable expectation and that
due process applied.  By grounding its conclusion on the partic-
ular wording of the Nebraska law, the Court assured that decisions
about other states would have to be made on a case-by-case basis.

The Nebraska law may be unique.  Most post-Greenholtz reviews
of parole laws have found that they lack the existing, presently
enjoyed state-law-created liberty interest that the Court held is
necessary.  Two early post-Greenholtz cases make clear that the
federal courts of appeal understand that they are to require a
high degree of specificity before concluding that due process
applies.  In Schuemann v. Colorado State Board of Adult Parole,[31]
the Tenth Circuit Court of Appeals held that the state's parole
statute gave the board broad discretion to release or not and
raised no "reasonable expectation."  The court went on to add that
even if it had held due process applicable, it would not have
granted file access as the plaintiff requested.  Boothe v.
Hammock[32] was the first post-Greenholtz case to be decided by a
circuit court that had earlier found that parole release decision-
making implicated the due process clause.  In Booth, the Second
Circuit took a fresh look at the New York law and found no due
process trigger language; it therefore reversed its earlier
cases.[33]  The Oklahoma law has also been scrutinized,[34] with the
same result.

In general, the more discretion is limited, the greater the
likelihood exists of a liberty interest.  In addition to
statutorily-created liberty interests, administrative rules may
sufficiently limit agency discretion so as to create a liberty
interest.  However, such rules may be susceptible to reformulation
and consequent dissolution of an administratively created liberty
interest.

Past practice may give rise to an expectation of parole by
various categories of prisoners.  The current trend denies that
past practice creates the "mutually explicit understandings"
necessary to create a liberty interest.  However, the argument is
frequently raised in litigation, occasionally succeeding.[35]

## Does Due Process Embrace File Access?  Although the fifth and
fourteenth amendments refer to the "due process of law," the
Constitution nowhere defines that term or gives it substance.  A
short definition of due process is "fundamental fairness" in
procedure.  But what does that mean?  In modern litigation, due

process has been treated as a flexible concept that derives its meaning from the nature and weight of the competing rights and interests at stake in a particular proceeding. In the first parole case it fully considered, the Supreme Court applied such a balancing analysis to determine parolees' rights in revocation cases.[36]

Lower courts took this as a signal (erroneously, as we now know) that due process should apply to other parole proceedings and began the weighing process to give content to the concept in a variety of contexts. Although commentators concluded that due process embraced file access,[37] the courts were not so willing to do so. Thus, in Williams v. Ward,[38] the Second Circuit Court of Appeals held (before Greenholtz) that while the interest of a state parole applicant in the parole release decision was subject to some due process protections, the disclosure of the parole file was not constitutionally required.

Likewise in Franklin v. Shields (also before Greenholtz), the Fourth Circuit Court of Appeals stated that "we discern no constitutional requirement that each (state) prisoner receive a personal hearing, have access to his files, or be entitled to call witnesses in his behalf to appear before the Board. These are all matters which are better left to the discretion of the parole authorities."[39]

But, in Walker v. Prisoner Review Board (after Greenholtz),[40] where the State Board of Parole acted in violation of the state Rules Governing Parole, failure to allow inmate access to his file was ruled an infringement of due process.

## RIGHT TO NOTICE OF A PAROLE HEARING

If the prisoner can establish a liberty interest in parole, notice becomes a fundamental procedural right. Even without statutory provision for notice, courts could be expected to require it. On the basis of Greenholtz, the nature of the requirement would be functional: time to obtain evidence, inspect the file, and challenge adverse evidence -- as permitted within the particular jurisdiction.

Again, if the prisoner can establish a liberty interest, notice would be meaningless without the right to present evidence at the hearing. However, under Greenholtz, such a right does not necessarily require personal appearance.[41] Functional input into the decision-making process would satisfy the Greenholtz court.

## SUMMARY

This chapter has examined probation pre-sentence reports and pre-parole investigation reports in the areas of content and access. In general, the content of the probation pre-sentence report is open-ended, guided by the general rules of good faith, reasonableness, and germaneness. The trend across jurisdictions

is toward disclosure of the report's content, at least to legal counsel; however, most jurisdictions do not recognize a constitutionally based right to disclosure. Generally, state statute law or court rulings regulate disclosure.

The section on parole concentrated on the effects of the Greenholtz case. The principal holding in Greenholtz is that due process does not apply to parole release proceedings unless a state law creates an expectation that parole will be granted, thereby establishing a liberty interest. Any due process must emanate from the state statute and is not generated by the United States Constitution. Thus, access to the pre-parole report and other files is dependent on statute.

NOTES

CHAPTER VII

1. Williams v. New York, 337 United States 241 (1949).

2. For three different views on the impact of pre-sentence reports in the sentencing process, see J. Hogarth, Sentencing Project: An Experiment in the Use of Short-Form Pre-Sentence Reports for Adult Misdemeanants (1971); R. Carter and L. Wilkins, Some Factors in Sentencing Policy, 1967 J. Crim. L.C. & P.S. 503.

3. United States v. Tucker, 404 United States 443 (1972).

4. Williams v. New York, 337 United States 241, 247 (1949).

5. Farrow v. United States, 580 F. 2d. 1339 (9th Cir. 1978).

6. The pre-sentence report in Williams v. New York contained such data.

7. United States v. Calandra, 414 United States 338 (1974).

8. Fed. R. Crim. P. 32(c)(3). For the effect of Rule 32(c)(3), FRCP, on disclosure of presentence reports, see Duhois, "Disclosure of Presentence Reports in the United States District Courts," 45 Fed Probation 3 (March 1981).

9. United States v. Martinello, 556 F. 2d. 1215 (5th Cir. 1977).

10. United States v. Long, 411 F. Supp. 1203 (E.D. Mich. 1976).

11. United States v. Hodges, 547 F. 2d. 951 (5th Cir. 1977).

12. United States v. Piccard, 464 F. 2d. 215 (1st Cir. 1972).

13. Gardner v. Florida, 430 United States 349 (1977).

14. People v. Brant, 83 Misc. 2d 888, 373 N.Y.S. 2d 991 (Erie Co. Ct. 1975); Buchea v. Sullivan, 262 Or. 222, 497 P. 2d 1169 (1972).

15. Ariz: Ariz. R. Crim. P. 26.6; State v. Pierce, 108 Ariz. 174, 494 P. 2d 696 (1972); Fla: Funches v. State, 367 So.2d 1007 (Fla. 1979); Ill: People v. Spurlark, 67 Ill. App. 3rd 186, 384 N.E.2d 767 (1978); Ky: Eversole v. Commonwealth, 575 S.W.2d 457 (Ky. 1978); Mich: Mata v. Egeler, 383 F. Supp 1091 (E.D. Mich. 1974); Mont: Kuhl v. District Court, 139 Mont. 536, 366 P. 2d 347 (1961); Nev: Heidmark v. Warden, Nevada State Prison, 91 Nev. 594, 540 P. 2d 111 (1975); N.Y.: People v. Pacheco, 58 App. Div. 2d 549, 396 N.Y.S.2d 13 (1977); Ohio: State v. Vance, 117 Ohio App. 169, 191 N.E. 2d

737 (1962); Or: Buchea v. Sullivan, 262 OR.222, 497 P. 2d 1169 (1972); Wisc: Rosado v. State, 70 Wisc. 2d 280, 234 N.W. 2d 69 (1974).

16. La: State v. Trahan, 367 So. 2d 752 (La. 1978); Mass: United States v. O'Shea, 479 F. 2d 313 (1st Cir. 1973); N.J.: State v. Kunz, 55 N.J. 128, 259 A. 2d 895 (1969); N.C.: State v. Pope, 257 N.C. 326, 126 S.E. 2d 126 (1962); Pa: Commonwealth v. Burton, 451 Pa. 12, 301 A. 2d 675 (1973).

17. Ga: Benefield v. State, 140 Ga. App. 727, 232 S.E. 2d 89 (1976); Iowa: State v. Randall, 258 N.W. 2d 359 (Iowa 1977); Md: Haynes v. State, 19 Md. App. 428, 311 A. 2d 822 (1973); Minn: County of Sherburne v. Schoen, 306 Minn. 171, 236 N.W. 2d 592 (1975); Nebr: State v. Richter, 191 Neb. 34, 214 N.W. 2d 16 (1973); Okla: Lucker v. State, 552 P. 2d 711 (Okla. Crim. App. 1976); S.D.: State v. Robinson, 87 S.D. 375, 209 N.W. 2d 374 (1973); State v. Hanson, 88 S.D. 48, 215 N.W.2d 130 (1974).

18. Del: State v. Moore, 49 Del. 29, 108 A. 2d 675 (Newcastle Super. Ct. 1954); Tex: Rodriguez v. State, 502 S.W. 2d 13 (Tex. Crim. App. 1973); Utah: State v. Doremus, 29 Utah 2d 373, 510 P. 2d 529 (1973); State v. Dowell, 30 Utah 2d 323, 517 P. 2d 1016 (1973), cert. denied 417 United States 962 (1974); State v. Harris, 585 P. 2d 450 (Utah 1973); Vt: In Re Shuttle, 131 Vt. 457, 306 A. 2d 667 (1973).

19. State v. Rolfe, 92 Idaho 467, 444 P. 2d 428 (1968).

20. People v. Jackson, 41 Mich. App. 649, 200 N.W. 2d 459 (1972).

21. County of Sherburne v. Schoen, 306 Minn. 171, 236 N.W. 2d 592 (1975).

22. State v. Weatherholt, 121 Ariz. 240, 589 P. 2d 883 (1979).

23. Townsend v. Burke, 334 United States 736 (1948).

24. United States v. Lasky, 592 F. 2d 560 (9th Cir. 1979); Moore v. United States, 571 F. 2d 179 (3rd Cir. 1978).

25. Publ. L. No. 94-233, 90 Stat. 219 (codified at 18 United States Code 4201-4218 (1976).

26. See Mosley v. Ashby, 459 F. 2d 477 (3rd Cir. 1972); Madden v. New Jersey State Parole Bd., 438 F. 2d 1189 (3rd Cir. 1971); Cruz v. Skelton, 543 F. 2d 86 (5th Cir. 1976); Brown v. Lundgren, 528 F. 2d 1050 (5th Cir.), cert. denied, 429 United States 917 (1976); Scarpa v. United States Bd. of Parole, 477 F. 2d 278 (5th Cir.) (en banc), vacated as moot, 414 United States 809 (1973); Scott v. Kentucky Parole Bd., No. 74-1899 (6th Cir. Jan. 15, 1975), remanded for

consideration of mootness, 429 United States 60 (1976), reaffirmed sub nom. Bell v. Kentucky Parole Bd., 556 F. 2d 805 (6th Cir. 1977), cert. denied, 434 United States 960 (1978); Dorado v. Kerr, 454 F. 2d 892 (9th Cir. 1972); Schawartzberg v. United States Bd. of Parole, 399 F. 2d 297 (10th Cir. 1968).

27. See United States ex rel. Johnson v. Chairman, New York State Bd. of Parole, 500 F. 2d 925 (2nd Cir. 1974), vacated as moot, 419 United States 1015 (1975); Coralluzzo v. New York State Parole Bd., 566 F. 2d 375 (2nd Cir. 1977), cert. dismissed as improvidently granted, 435 United States 912 (1978); Bradford v. Weinstein, 519 F. 2d 728 (4th Cir. 1974), vacated as moot, 423 United States 147 (1975); Franklin v. Shields, 569 F. 2d 784 (4th Cir. 1977) (en banc), cert. denied, 435 United States 1003 (1978); United States ex rel. Richerson v. Wolff, 525 F. 2d 797 (7th Cir. 1975); Childs v. United States Bd. of Parole, 511 F. 2d 1270 (D.C. Cir. 1974).

28. Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex, 442 United States 1 (1979).

29. Id. at 11.

30. Neb. Rev. Stat.  83-1, 114 (1) (1971).

31. 624 F. 2d 172 (10th Cir. 1980).

32. 605 F. 2d 661 (2d Cir. 1979).

33. See United States ex rel. Johnson v. Chairman, New York State Bd. of Parole, 500 F. 2d 925 (2nd Cir. 1974), vacated as moot, 419 United States 1015 (1975); Coralluzzo v. New York State Parole Bd., 566 F. 2d 375 (2nd Cir. 1977), cert. dismissed as improvidently granted, 435 United States 912 (1978).

34. Phillips v. Williams, 583 P. 2d 488 (Okla. 1978), vacated 442 United States 926 (1979) (for reconsideration in light of Greenholtz), rev'd. on remand 608 P. 2d 1131, cert. denied 449 United States 860 (1980).

35. See Conn. Bd. of Pardons v. Dumschat, 452 U.S. 458, 467 (1981) (Brennan, J., concurring) ("[R]espondents must also show -- by reference to statute, regulation, administrative practice, contractual arrangements or other mutual understanding -- that particularized standards or criteria guide the state's decisionmakers"); Leis v. Flynt, 439 U.S. 438, 442 (1979) ("A claim of entitlement under state law, to be enforceable, must be derived from statute or legal rule or through a mutually explicit understanding"); Hewitt v. Helms, 103 S. Ct. 864, 871 (1983) (". . . respondent did acquire a liberty interest by remaining in the general prison population [rather than in administrative segregation]").

36. Morrissey v. Brewer, 408 United States 471 (1972).

37. Note, Prisoners Access to Parole Files:  A Due Process Analysis, 47 Fordham L.R. 260 (1978).

38. 556 F. 2d 1143 (2nd Cir. 1977), cert. dismissed, 434 United States 944 (1978).

39. 469 F. 2d 8 (4th Cir.) aff'd in part and rev'd in part en banc, 569 F. 2d 784 at 800 (1977), cert. denied, 435 United States 13 (1978).

40. Walker v. Prisoner Review Board, 594 F. Supp. 556 (U.S.D. Ill., 1984).  See, also, Braxton v. Josey, 567 F. Supp. 1479 (D Md. 1983), contra, and Stanley v. Dale, 298 SE 2d. 225 (W. Va. 1982) (Prisoner entitled to see file unless security considerations dictate otherwise).

41. See Ybarra v. Dermitt, 104 Idaho 150, 657, P. 2d. 14 (1983) (no right to confront authors of letters contained in parolee's pre-sentence report).

## CHAPTER VIII

### THE PAROLE RELEASE HEARING AND LIABILITY OF
### PAROLE BOARD MEMBERS FOR RELEASE

**THE PAROLE RELEASE HEARING**

Perhaps this project was undertaken after the Supreme Court decision in <u>Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex</u>, the survey research did not reveal professional concern about the three aspects of parole release decision-making addressed in this Chapter. The staff believes, nevertheless, that the issues of right to counsel, articulation of release criteria, and explanation of parole denial warrant discussion. Not only are these topics of significant interest to prospective parolees, but they appear to be fertile areas for litigation, even if <u>Greenholtz</u> generally foretells the outcome at the present time. Moreover, recent years have seen a rash of cases against parole board members for releases that result in damage or injury to an innocent third party.

### Right to Counsel

The general rule on representation is that there is no right to either retained or appointed counsel as a matter of constitutional law. Of course, any jurisdiction, state or federal, may allow representation, but most do not. As of 1976, 20 states and the Federal Parole Commission permitted attorneys at the release hearing while the remainder did not.[1] Several states are experimenting with retained counsel at the hearing, and many allow access to an attorney in preparation for a hearing.[2]

<u>Federal</u>. The right of the federal prisoner to retain counsel to accompany him to his parole release hearing has not been at issue since the enactment of the Parole Commisson and Reorganization Act of 1976.[3] The Act provides that a prisoner, prior to parole determination, may consult with a representative who qualifies under the rules and regulations of the Commission. Attorneys are not to be excluded as a class.[4] This statute changed the prior federal rule on representation.

<u>State</u>. The question of whether a state parolee should be afforded the right to counsel remains basically a state question. The role of counsel in most states is restricted to advising the prisoner before the hearing, or making oral or written arguments to the parole board after the hearing.[5] In addition, courts have considered the issue on constitutional grounds have decided there is no constitutional right to assistance of counsel at the release hearing.[6] For example, Connecticut statutes provide that counsel for the prisoner is permitted to have a pre-hearing conference with the chairman of the panel that will decide the prisoner's case. When this was challenged, the Second Circuit Court of Appeals held that the Constitution does not require the board to permit counsel to attend the hearings. The Connecticut law was viewed as affording a generous opportunity for counsel to place his views on record prior to the hearing.[7]

In the Seventh Circuit, controlling case law holds that the Constitution does not require the appointment of counsel at a parole release hearing.[8] Six states do appoint counsel to assist prisoners at parole hearings.[9]

In the Fifth Circuit, controlling case law holds that the assistance of counsel is not required at a parole application proceeding.[10]

Because court decisions since the 1976 survey have not lent support to prisoners' entitlement as of right to the assistance of counsel at release hearings, we may assume that representation remains the exception rather than the rule. State legislatures have been reluctant to provide the assistance of counsel in this part of the criminal justice system.

Prisoners able to prove a liberty interest in parole may be able to make an argument for a right to representation. Following <u>Greenholtz</u>, <u>supra</u>, the inmate would also have to show that counsel would "minimize the risk of erroneous decisions."

### Release Criteria

<u>Federal</u>. Once again federal statute sets out the criteria that the Parole Commission shall use in determining whether to release the prospective parolee.[11] Publication of such criteria provides a guide to the Commission and some assurance that decisions will not be arbitrary.[12] Such criteria and the implementing Parole Commission guidelines are a step toward confining the discretion of the paroling authority without stripping it of its discretionary authority.[13]

<u>State</u>. The question of whether a state prisoner should be entitled to know what criteria the paroling authority uses in making its determination is basically an issue of state law. When the issue was brought to the courts in the past, the prospective parolee was usually in a state that did not require publication of criteria. When the inmate brought the issue before a court, the allegations were based on a due process claim.

Even before the <u>Greenholtz</u> decision, inmates were not successful in most courts in claiming that due process mandated that the criteria used by an authority in making its release decision be published. For example, the Fifth Circuit Court of Appeals held in a Texas case that the parole board's standards for deciding parole applications are of judicial concern only where arbitrary action results in the denial of a constitutionally protected liberty interest, and the expectation of release on parole is not such an interest.[14] The Second Circuit holds that

"unless and until" the statement of specific facts and reasons for denial of parole given to New York prisoners prove inadequate to protect inmates in the parole decision-making process, the court would not compel the parole board to reveal its release criteria.[15]

The fact that a federal court of appeals has determined that a federal constitutional right does not apply does not prevent a state or federal court from finding otherwise under a state constitution. The basic principle here is that a state is not restricted in extending rights to its citizens by the rights granted by the federal Constitution. In fact, the states have been doing what the federal courts have declined to require. Building on the success of the federal guidelines experiment, states have been adopting this approach. As of 1979, 13 states had adopted parole guidelines.[16] While a minority, the states using guidelines contributed almost half of the total conditional release population in 1979.[17]

Liability in this area focuses on the discretionary powers of the parole board. For example, a parole board cannot be held liable under the Federal Tort Claims Act (FTCA) for a decision made in exercise of its discretionary function. However, FTCA liability may exist when required steps of the decision-making process are ignored.[18]

Payton v. U.S.[19] suggests several bases for liability. Probation officers were found to have a duty to furnish the parole board information concerning prisoners as well as, wherever not incompatible with public interest, their views and recommendations with respect to parole disposition. Parole boards may have a duty to acquire and read pertinent reports that would inform board members of inmates' violent propensities.

United States v. Irving[20] found parole board members absolutely immune from liability claims under Section 1983. However, the court noted that the plaintiff's claims of systematic racial discrimination against black inmates with regard to parole releases were sufficient for declaratory relief. Impermissible discrimination on the part of the board is actionable, therefore, in spite of immunity principles. Liability for abuse of discretion may require a showing of bad faith or action outside the scope of board authority.[21] For example, board failure to consider, in the context of the Youth Corrections Act, the plaintiff's response to rehabilitation might reasonably constitute abuse of discretion.[22]

In Ross v. U.S.,[23] the plaintiff three times over a period of four years successfully brought habeas corpus petitions for wrongful denial of parole consideration. The plaintiff was finally released by a federal district court order, but absolute immunity of the board to suit was found. If a prisoner can demonstrate a liberty interest, due process may be invoked. But due process

does not require a summary of the evidence relied on to deny parole. The parole decision is based on broad discretion of statutorily granted authority.[24] Where a co-defendant was granted parole, the plaintiff prisoner's claim of arbitrary and capricious denial of parole was without merit according to the district court. Parole, like sentencing, is an individual act.[25]

Where due process is required by the finding of a liberty interest in parole, one court ruled that due process required a statement of reasons for parole denial sufficient to enable a reviewing body to determine if the parole had been denied for an impermissible reason.[26] A West Virginia court specified that a person denied parole was entitled to more than "mechanistic" written reasons.[27] But use of a checklist to inform an inmate of reasons for parole denial was deemed not improper in another case.[28]

## Explanation for Denial of Parole

Since there is no general federal constitutional right to due process in parole decision-making, there is no general constitutional right to be given the reason for parole denial. As this once was an area of considerable litigation, however, it deserves some discussion. As a practical matter, this issue had been resolved in favor of the provision of reasons by 1976, when 47 jurisdictions routinely gave written explanations.[29] Prisoner complaints in some cases were based on a due process theory and, in others, on an administrative procedures act. Both types are treated below.

Administrative Procedures Act (APA). Administrative law is the body of law that governs the powers, procedures, and judicial reviewability of administrative agencies and their actions. An administrative procedures act is a codification by a legislature of a set of generic rules in these areas.

Federal. Section 555(e) of the federal APA requires that notice be given upon denial of an application before an administrative agency. In a 1974 case, the Seventh Circuit found the APA applicable to the United States Board of Parole and required the Board to give the appellant a statement of reasons for refusing his application for parole.[30] The traditional view had been that the APA was not applicable to the Board of Parole.

The relevance of the APA at the federal level has become of academic interest only since the creation of the Parole Commission. Sections 4206 and 4208(g) of Title 18, U.S.C., provide that if parole is denied, a personal conference to explain the reasons for denial shall be held at the conclusion of the proceedings, if feasible. Furthermore, Section 4206(b) provides that if parole is denied, notice of that determination shall state with particularity the reasons for such denial.

State.  Where the interpretation of state statutes is in issue, federal rulings on related federal statutes have some influence but no direct precedential value.  Moreover, unlike the federal administrative procedures act, some state laws have a specific exception for parole decisions.[31]  Not all states have such laws.  The reader is advised to check with local authorities for holdings pertinent to his jurisdiction.

Due Process Analysis - State Application.  Due process application is an issue that must be settled on a state-by-state basis.[32]  Only if the issue is settled in favor of the applicability of due process does the question arise whether statements of reasons for denial can be required.  Prior to Greenholtz, the trend was to require such statements.[33]  Since Greenholtz, the trend in the courts appears to have been reversed.  For instance, the Sixth Circuit Court of Appeals reversed a lower court's holding in an Ohio case, stating that the statute did not express a presumption of parole release, and, therefore, did not create a protected entitlement to parole on which the prisoners could base a due process claim.[34]

## LIABILITY OF PAROLE BOARD MEMBERS FOR RELEASE

Parole board liability for the release of an inmate on parole who subsequently commits an offense is an important legal issue that has drawn the attention of the courts and will continue to be litigated in the immediate future.  The question centers on possible liability of parole board members to victims or their families for crimes, particularly of a violent and predatory nature, committed by inmates released on parole.[35]

Recent case law in this area suggests most courts will honor immunity principles, but find some limited liability or an argument for potential limited liability.  Judicial analyses focus on discretion.  Where a Parole Board is seen by a court to omit a required step in its discretionary decision-making process or to abuse discretion, that Board's members may jeopardize their claims to immunity.

In Santangelo v. State,[36] an action for negligent release was brought in the New York Court of Claims against the state by a woman who was raped by a released inmate.  The court conceded that there is a valid public interest in protecting society from the depredations of known dangerous individuals, but added that there also exists a recognized public interest in rehabilitating and reforming offenders.  The court pointed out that the Temporary Release Committee had the duty to exercise reasonable care to avoid the release of a prisoner where to do so would not be found just because subsequent events proved a release decision wrong.  In the Santangelo case, the record reflected that the release decision did not entail a very thorough examination into the releasee's background or character.  The inmate was never interviewed personally by the committee and appeared before the committee only to have the conditions of release explained to

-84-

him.  His parole officer was not consulted, even though it was the officer's recommendation that the inmate serve additional time.  Moreover, no psychiatric or psychological reports were considered.

Despite these indications of lack of due care, the court dismissed the plaintiff's claim because there was not sufficient evidence before it to determine if the committee's decision would have been any different had a more thorough examination been undertaken.  (Before negligence liability is assessed, it is usually required that the negligence be proven to be the cause in fact of the injury.  Here, it could not be said that "but for" the failure to take these diagnostic steps, the harm could have been prevented.)  Thus, the plaintiff failed to establish that the committee knew or should have known of the dangers posed by its decision to release.  No liability was assessed.

Similarly, in Welch v. State,[37] action was brought against the State of New York claiming damages caused by the state's negligence in paroling one Freddie Lee Davis, who had a history of violent anti-social and deviant behavior and who had been incarcerated for viciously attacking and raping young women.  It was further alleged that the state was negligent in supervising Davis as a parolee, thus causing the plaintiff permanent injuries when the parolee struck her with a piece of lumber and threw her in a river.  The trial court dismissed the case and the plaintiff appealed.  The state appellate court affirmed the dismissal, stating that the nature and extent of the state's duty of supervision, as well as the question of whether the released prisoner's actions were foreseeable, can be put at issue only if the claim sets forth adequate factual allegations supportive of the charge of negligence on the part of the state.  In this case, the terms and conditions of the parolee's release were not set forth, nor were there any factual allegations as to the manner in which the state was negligent.  The negligence of the state was not presumed from the fact of the assault.  No liability was imposed.

Note that in these two cases, the courts did not say that the officers could never be held liable for what they did.  On the contrary, the liability claim in Santangelo was the result of failure by the plaintiff to prove that without negligence the resulting decision by the agency would have been different, and, in the Welch case, it was the failure of the plaintiff to bring forth evidence sufficient to prove negligence on the part of the officers.

In Thompson v. County of Alameda,[38] decided by the California Supreme Court in 1980, a five-year-old boy was sexually assaulted and killed by a delinquent within 24 hours after the delinquent's release by the county probation department.  The parents filed action against Alameda County for reckless, wanton, and grossly negligent conduct in: (1) releasing the juvenile delinquent to the community, (2) failing to give notice of the delinquent's

-85-

propensities to the delinquent's mother, the police, and the parents of the young children in the neighborhood, and notice of the fact and place of release to the police and such parents, (3) failing to exercise reasonable care through its agent, the delinquent's mother, after his release, and (4) failing to use reasonable care in the selection of its agent to undertake the delinquent's custody.  Basing its decision primarily on the California law that provides immunity from liability for discretionary acts by government employees and immunity in determining parole or parole conditions, the trial court dismissed the case and the parents appealed.  The appellate court found no liability because (1) the plaintiffs alleged no special or continuing relationship between themselves and the defendant county and (2) the decedent had not been a foreseeable or readily identifiable target of the juvenile offender's threats.

The Court pointed out that warnings to the public upon release of every offender with a history of violence and who had made a generalized threat would not effectively protect the public.  Neither neighbors nor police could effect greater precautions if continually warned about new parolees returning to the community.  It is doubtful, also, that sufficient personnel exist to satisfactorily carry out the warnings sought by the plaintiffs.  The court observed that the mother, if warned, would not have been likely to warn neighbors voluntarily that her son was a threat to their safety.

In summary, the court ruled:

Whenever a potentially dangerous offender is released and thereafter commits a crime, the possibility of the commission of that crime is statistically foreseeable. Yet the Legislature has concluded that the benefits to society from rehabilitative release programs mandate their continuance.  Within this context and for policy reasons the duty to warn depends upon and arises from the existence of a prior threat to a specific identifiable victim or group of victims . . . (citations omitted).  In those instances in which the released offender poses a predictable threat of harm to a named or readily identifiable victim or group of victims who can be effectively warned of the danger, a releasing agent may well be liable for failure to warn such persons.[39]

In Larson v. Darnell,[40] a juvenile parolee raped and murdered a 12-year-old girl.  The court found immunity for the board even if its decisions over whom to parole, when to parole, and where to place the parolee were performed negligently, willfully, and wantonly.  Although the court noted that evidence of corrupt or malicious motives or abuse of power might have brought about a different result, the decision reflects a strong public policy interest in protecting discretionary decisions.  Larson draws the boundaries of responsibility between board supervisory decisions and officers administering board supervisory decisions.

In the following cases, the potential liability recognized in the above cases was proved; hence liability ensued.

In Grimm v. Arizona Board of Pardons and Paroles,[41] the parole board and its members were sued for negligent release of Mitchell Blazak, a diagnosed dangerous social psychopath who had served one-third of a sentence for armed robbery and assault with intent to kill.  The parole board invoked the absolute immunity defense, but this was rejected by the Arizona Supreme Court.  The court held that parole board members enjoy only qualified immunity in the exercise of their discretionary functions.  Relying on the law, the court said that the Board had narrowed its duty in the case from one owed to the general public (for which there is no liability) to one owed to individuals (for which there may be liability) by assuming parole supervision over, or taking charge of, a person having dangerous tendencies.  Liability was also based on the finding that the release decision was reckless or grossly or clearly negligent.

In jurisdictions like Arizona that reject the absolute immunity rule and therefore allow liability, the central issue becomes when are parole board members reckless or grossly or clearly negligent in granting a parole release?[42] There is no definitive answer; however, courts tend to use the standards of duty and foreseeability -- meaning whether there was a legal duty of care imposed on the parole board members and whether, given the facts in the case, the danger could have been foreseen.  One writer points out that a decision to release would be grossly negligent if the entire record of the prisoner indicated violent tendencies (as in Grimm), and there is no reasonable basis to believe that the prisoner has changed.[43]

Another decision, Payton v. United States,[44] was handed down by a panel of the Fifth Circuit Court of Appeals on February 3, 1981.  It was held that the United States Parole Commission can be sued for negligence because it released a federal prisoner who then kidnapped, raped, and murdered three women.  The suit, brought under the Federal Tort Claims Act (not under Section 1983 or state tort), charged that the parole commission was negligent when it released a federal prisoner who had been repeatedly diagnosed as a dangerous, homicidal psychotic while in prison, and who had been sentenced to 20 years in prison for severely beating a woman.  Despite these warning signals, the prisoner's sentence was reduced to 10 years and he was later granted parole in the custody of a priest.  He later killed three women.  The court said that the release of a prisoner in total disregard of his known propensities for repetitive brutal behavior was not an exercise of discretion, but, instead, was an act completely outside of clear statutory limitations.

The court distinguished between the Commission's role as the promulgator of paroling guidelines and its responsibilities in applying the guidelines to individual cases.  The court of appeals said that the government would have been immune if the damage suit

had attacked the government guidelines themselves, because the dispute would then have concerned the selection of the appropriate release policy, which by law has been committed to agency discretion. In this case, however, the suit charged that the guidelines for parole were not properly applied to this particular parolee. This implies that the government enjoys immunity for drafting parole guidelines, but not for their negligent application. The court concluded by saying:

> As government grows and the potential for harm by its negligence increases, the need to compensate individuals bearing the full burden of that negligence also increases . . . . Suits under the Federal Tort Claims Act provide a fair and efficient means to distribute the losses as well as the benefits of a parole system.[45]

However, on subsequent rehearing by the Fifth Circuit, the decision to release without supervision was held to be discretionary and not, therefore, actionable under the FTCA. The court noted that, although plaintiffs alleged the Parole Commission ignored a required step of the decision-making process, such a claim would be actionable. Alternatively, the court suggested, a claim would be actionable where the Board could be shown to have breached a duty sufficiently separable from the decision-making function to be non-discretionary and, therefore, outside the judicial immunity exception to the FTCA. The court, speculating as to the course of arguments not made, also noted that the Board could have provided for continued supervision of the parolee and that failure to do so may have been an abuse of discretion.

In Hendricks v. State,[46] a 1984 Oregon case, a rape and assault victim claimed negligent release by the State Board of Parole of the parolee proximately caused her injuries. The Oregon court's analysis paralleled that of the Payton court and governmental immunity for discretionary decision-making was affirmed.

The Alabama Supreme Court, hearing Sellers v. Thompson[47] in 1984, also adopted a Payton analysis. Sellers was a Section 1983 action against individual Parole Board members brought by the wife of one of the murder victims of a parolee. The trial court found no liability for the Parole Board member who had voted against parole. The Sellers court found the negligence or wanton parole claims to be immunized by the discretionary nature of the parole release decision. However, the court held discretionary immunity did not apply to the allegation that the Parole Board members acted in excess of their statutory authority. The court found it had to determine whether the pertinent statute imposed a non-discretionary duty upon Parole Board members to obtain and review a psychiatric report prior to making their ultimate discretionary parole decision. Reading the statute narrowly, the court found the statute could be read to authorize the Board to cause a psychiatric evaluation to be made. However, the court ruled no necessary statutory violation occurred when the Board failed to order an evaluation.

Mason v. State,[48] a 1984 Colorado case, was a wrongful death action brought by the widow of a man who had been murdered by a parolee. The plaintiff alleged that the Board's release of the inmate was a statutory violation because the Board knew or should have known there existed a strong probability that the parolee would violate the law and that his release from institutional custody was incompatible with the welfare of society.

Appeal was taken solely on the issue of immunity. The Colorado court held that under state statutory language, where the state has liability insurance, public entities, including the Colorado Parole Board (but not its members individually), are deemed to have waived the defense of sovereign immunity. Because the Board could be sued directly, the court found that the state could be sued as the Parole Board's principal.

To summarize, decided cases strongly indicate that, although suits by victims of crime challenging release decisions do not usually succeed, liability may in fact be found in cases of negligent release by board members, supervisors, or governmental agents, but such negligence, given the offender's record, must be gross or reckless. Mere negligence is not enough. Gross or reckless negligence, however, cannot be defined with specificity and must be decided on a case-by-case basis. The preceding cases merely suggest general boundaries.

## Legislative Remedy

A case decided by the United States Supreme Court in 1980 invites special attention because it is an indication of what might and can be done legislatively to enable probation/parole officers to avoid state tort liability based on negligence. In Martinez v. California,[49] a 15-year-old girl was murdered by a parolee five months after he was released from prison, despite his history as a sex offender. The parents of the deceased girl brought an action in a California court under state law and Section 1983 (such claims may also be filed in state courts at the option of the plaintiff), claiming that state officials, by their action in releasing the parolee, subjected the murder victim to a deprivation of her life without due process of law and were therefore liable in damages for the harm caused by the parolee. The trial court dismissed the complaint. The case eventually reached the United States Supreme Court. The Supreme Court held: (1) that the California immunity statute is not unconstitutional when applied to defeat a tort claim arising under state law; and (2) that parole board members were not held liable under federal law because of the following:

- The fourteenth amendment protects a person from deprivation by the state of life without due process of law, and, although the decision to release the parolee from prison was state action, the parolee's action five months later cannot be considered as state action.

- Regardless of whether the parole board either had a duty to avoid harm to the parolee's victim or proximately caused her death, parole officials did not "deprive" the victim of life within the meaning of the fourteenth amendment.

- Under the particular circumstances where the parolee was in no sense an agent of the parole board, and the board was not aware that a particular person, as distinguished from the public at large, faced any special danger, that person's death was too remote a consequence of parole board's action to hold the officers thereof responsible under Section 1983.[50]

Notice that the Martinez case involved, among other issues, the constitutionality of a state statute passed by California specifically granting absolute immunity to a public entity or a public employee from liability under state tort law for any injury resulting from parole release determinations. What the Martinez case decided was simply that a state immunity statute is consti- tutional when applied to defeat a tort claim against state officials arising under state law. The court said that whether one agrees or disagrees with California's decision to provide absolute immunity for these cases, one cannot deny that the law rationally furthers a policy that reasonable lawmakers may favor. The case did not resolve the issue of whether a parole board member, when deciding whether to release an inmate, is entitled to absolute immunity as a matter of constitutional law. That issue is still unresolved. Other states might, however, pass a similar statute if they want to fully protect their officers from possible liability for official acts under state law. This would be of doubtless benefit to state probation/parole officers.

One other item needs to be discussed in the Martinez case. The claimants in Martinez contended that liability ensued under the fourteenth amendment of the Constitution. The United States Supreme Court replied, however, that the amendment protects persons only from deprivations by the state of life without due process of law. State involvement must be present for liability to ensue. Although the decision to release the parolee from prison in this case was originally considered an act of the state, what the parolee did five months after release could not be fairly characterized as state action. The death in this case was too remote a consequence of the parole officials' action to hold them responsible under the federal civil rights law. This implies that in federal litigation, a negligent initial decision to release is vitiated by the passage of time.

### LIABILITY TO THE INMATE OR PAROLEE - FUNDAMENTAL RIGHTS

Two recent cases involve Section 1983 claims against parole boards alleged to have deprived plaintiffs of fundamental civil liberties. In United States v. Irving,[51] a 1983 7th Circuit decision, the plaintiff claimed systematic racial discrimination against black inmates with respect to parole releases. In Jones v. Eagleville Hospital and Rehabilitation Center,[52] a 1984 Pennsylvania district court case, the plaintiff brought suit against the Parole Board after a parole revocation occasioned by the plaintiff's refusal to remove a skullcap with religious significance to the plaintiff while participating in a drug treatment program.

The Irving court found absolute immunity for Parole Board members. However, the court noted the plaintiff's claim for declaratory relief could still be addressed because evidence tended to demonstrate impermissible discrimination on the part of the Parole Board. The Jones court found the Parole Board not "a person" within the meaning of Section 1983. With regard to the hospital which terminated treatment on the plaintiff's refusal to remove his skullcap, the court found that the parolee could possibly make out a claim against it were he able to establish that the action taken was "state action."

### LIABILITY TO THE INMATE OR PAROLEE - PROCEDURAL RIGHTS

Parole boards are also subjected to suit for alleged due process violations. Here, recent case law demonstrates an easier compliance with notions of immunity. Partee v. Lane,[53] 1982, found a summary of evidence relied on to deny parole was not required by due process. Parole decisions are based on broad discretion statutorily granted the parole authority. Further, the Partee court held Parole Boards are absolutely immune from Section 1983 suits for actions taken when processing parole applications.

Adams v. Keller,[54] 1983, was a Section 1983 action against the Parole Commissioner for misapplication of youth parole guide- lines. The court examined the factual basis for the plaintiff's claim of abuse of discretion by the Parole Commission in setting the plaintiff's parole date. The court found no evidence of bad faith nor action outside the scope of authority by the Commis- sioner. However, the plaintiff's claim of right to a new parole hearing based on the Parole Commission's failure to consider the plaintiff's response to rehabilitation when setting a parole date was affirmed. The court found that, while Congress intended to apply concepts of punishment, retribution, and deterrence in passing the Youth Corrections Act, there was no indication that Congress intended to totally abandon any consideration of rehabil- itary potential.

In Corby v. Warden,[55] 1983, the plaintiff charged the State parole hearing officer violated his constitutional rights by intercepting mail explaining mitigating circumstances for the alleged violation of parole. The court found the claim was based on the hearing officer's acts as a judicial officer and that the officer was, therefore, entitled to quasi-judicial immunity.

In three other 1984 suits against parole boards,[56] courts easily found immunity for decisions relating to granting, denying,

or revoking parole. Walker v. Prisoner Review Board,[57] while finding failure of the Parole Board to allow the inmate access to his file a violation of due process rights provided under statutory law, specifically affirmed absolute immunity for official actions. The court held the Board's consideration of various newspaper articles would not be a violation of due process unless the inmate had not been given an opportunity to refute the information. The Board is entitled to consider a wide array of information, and such information need bear no relation to the crime with which the inmate plaintiff is charged. Finally, the court noted the Seventh Circuit's holding that all tasks of the Illinois Prisoner Review Board are adjudicatory in nature, meaning that no distinction between ministerial and adjudicatory functions was recognized. Therefore, Illinois parole officials enjoy absolute immunity for virtually all official actions.

While there is inadequate case law to determine a trend, each of the above three categories of parole board liability cases exhibits a similar pattern of analysis and similar results. Parole Boards may find careful analysis of the statutes under which they operate to be a useful guide to procedural requirements. In addition, parole board counsel can advise as to jurisdictional treatment of, particularly, quasi-judicial immunity and abuse of discretion. One trend is clear. As some courts become willing to limit immunity defenses, new suits are encouraged and, therefore, filed by plaintiffs hoping to further erode immunity concepts.

### SUMMARY

Whether a statement of reasons for denial is required is not a totally independent issue, but rather is dependent upon one of three factors:

- State court interpretation of, or legislative inclusion or exclusion within, a state administrative procedure act;

- State court interpretation of the state's constitution concerning due process, or;

- The policy of an administrative agency.

In those states without a state Administrative Procedures Act, the presumption would be that there is no right to an explanation of a parole decision. However, as already mentioned, the vast majority of states provided oral or written explanations of the parole decision.

In any event, the field officer must remain alert to the danger of giving gratuitous advice. The officer is not an attorney and has no obligation to act as one.[58] Any action by the officer that gives the appearance of giving legal advice could expose him to liability for giving bad advice and for practicing law without a license.

Most jurisdictions immunize parole board members from liability for release of prisoners on parole. A few states, however, notably Arizona, impose liability when parole board members act recklessly, or grossly, or are clearly negligent in granting the parole release.

**NOTES**

**CHAPTER VIII**

1. V. O'Leary and K. Hanrahan, Parole Systems in the United States 39 (3rd ed. 1976); see also, Note, Due Process and the Parole Release Decision, 66 Ky. L.J. 404 (1977-78).

2. It is doubtful whether any correctional system could prevent prisoners from securing pre-hearing legal assistance. See Bounds v. Smith, 430 United States 817, 828 (1977). Pub. L. No. 94-233, 90 Stat. 219 (codified at 18 U.S.C. Section 4201-4218 (1976)).

3. 18 U.S.C. Section 4208(d)(1) (1976).

4. See 28 C.F.R. Section 2.13(b) (1981) for the functions of a representative at a parole hearing.

5. Comment, Due Process: The Right to Counsel in Parole Release Hearings, 54 Iowa L.R. 497, 499 (1968).

6. Id. at 499.

7. Holup v. Gates, 544 F. 2d 82 (2d Cir. 1976), cert. denied, 430 United States 941 (1977).

8. Ganz v. Bennsinger, 480 F. 2d 88 (7th Cir. 1973).

9. V. O'Leary and K. Hanrahan, Parole Systems in the United States 39 (3d ed. 1976).

10. Buchanan v. Clark, 446 F. 2d 1379 (5th Cir.), cert. denied, 404 United States 979 (1971).

11. 18 U.S.C. Section 4206 (1976).

12. F. Merritt, Due Process in Parole Granting: A Current Assessment, 10 John Marshall J. 93, 111 (1976).

13. Id. at 113. The current guidelines are published at 28 C.F.R. Section 2.20 et seq. (1981).

14. Johnson v. Wells, 566 F. 2d 1016 (5th Cir. 1978).

15. Haymes v. Regan, 525 F. 2d 540, 544 (2d Cir. 1975).

16. J.L. Galvin, C. Ruby, and J.J. Galvin, Parole in the United States: 1979, 10 (1980).

17. Id.

18. Payton v. U.S., 679 F. 2d 475 (5th Cir. 1982).

19. Id.

20. United States v. Irving, 684 F. 2d. 494 (7th Cir. 1982).

21. Adams v. Keller, 713 F. 2d. 1195 (6th Cir. 1983).

22. Id.

23. Ross v. United States, 574 F. Supp. 536 (U.S.D.N.Y. 1984).

24. Partee v. Lane, 528 F. Supp. 1254 (U.S.D. Ill. 1982).

25. Id.

26. Horton v. Irving, 553 F. Supp. 213, (N.D. Ill. 1982). See, also, U.S. ex. rel. Scott v. Illinois Parole & Pardon Board, 669, F. 2d. 1185 (7th Cir. 1982).

27. Stanley v. Dale, 298 S.E. 2d. 225 (W. Va., 1982).

28. Partee v. Lane, supra.

29. V. O'Leary and K. Hanrahan, Parole Systems in the United States, 44 (3d ed. 1976).

30. King v. United States, 492 F. 2d 1337 (7th Cir. 1974); see, also, Fronczals v. Warden, El Reno Reformatory, 553 F.2d 1219 (10th Cir. 1977).

31. See, e.g., Okla. Stat. Tit. 75, Section 301 et.seq. (1971).

32. See Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex, 442 United States 1 (1979).

33. See, e.g., Franklin v. Shields, 469 F. 2d 784 (4th Cir. 1977) (en banc), cert. denied, 435 United States 1003 (1978); United States ex rel. Johnson v. Chairman, New York State Bd. of Parole, 500 F. 2d 925 (2d Cir. 1974), vacated as moot, 419 United States 1015 (1975); Mower v. Britton, 504 F. 2d 396 (10th Cir. 1974). For state decisions, see, e.g., In re Sturm, 11 C. 3d 258, 521 P. 2d 97, 113 Cal. Rptr. 361 (1974); Monks v. New Jersey State Parole Bd., 58 N.J. 238, 277 A. 2d 193 (1971); Phillips v. Williams, 583 P. 2d 488 (Okla. 1978), vacated, 442 United States 926 (1979) (for reconsideration in light of Greenholtz), rev'd on remand, 608 P. 2d 1131, cert. denied 449 United States 860 (1980); State v. Goulette, 65 Wisc. 2d 207, 222 N.W. 2d 622 (1974).

34. Wagner v. Gilligan, 609 F. 2d 866 (6th Cir. 1979).

35. See generally Johnson v. Wells, 566 F. 2d 1016 (1978); Franklin v. Shields, 569 F. 2d 784 (1972); Thompson v. Burke, 566 F. 2d 231 (1977).

36. 426 N.Y.S. 2d. 931 (1980).

37.  424 N.Y.S. 2d 774 (1980).

38.  614 P. 2d. 728 (1980).

39.  Id. at 732.

40.  Larson v. Darnell, 448 N.E. 2d. 249 (Ill.App.Ct. 1983).

41.  Grimm v. Arizona, 115 Arizona 260, 564 P. 2d. 1227 (1977).
     Subsequently Ryan v. State, 656 P. 2d. 597 (Ariz. 1982)
     abolished the discretionary v. ministerial distinction in
     Arizona, hence severely curtailing the immunity defense.

42.  Note, Torts - Parole Board Members Have Only Qualified
     Immunity for Decision to Release Prisoner, 46 Ford. L. Rev.
     1301, 1313 (1979).

43.  Id. at 1314.

44.  Payton v. United States, 636 F. 2d 132 (5th Cir.), rehearing
     granted, 649 F. 2d. 385 (5th Cir. 1981); 679 F. 2d. 475 (5th
     Cir. 1982).

45.  Id.

46.  Hendricks v. State, 678 P. 2d. 759 (OR CT App 1984).

47.  Sellers v. Thompson, 452 So. 2d. 460, (Ala. Sup. Ct. 1984).

48.  Mason v. State, 689 P. 2d. 199 (Colo Ct. App. 1984).

49.  Martinez v. California, 444 U.S. 277 (1980).

50.  Id.

51.  See United States v. Irving, 684 F. 2d. 494 (7th Cir. 1982).

52.  Jones v. Eagleville Hospital and Rehabilitation Center, 588
     F. Supp. 53 (U.S.D. Pa 1984).

53.  Partee v. Lane, 528 F. Supp. 1254 (USD ILL. 1982).

54.  Adams v. Keller, 713 F. 2d. 1195 (6th Cir. 1983).

55.  Corby v. Warden, 561 F. Supp. 431 (USD NY 1983).

56.  Walker v. Missouri Bd. of Probation and Parole, 586 F. Supp.
     411 (USD Mo. 1984); Ross v. United States, 574 F. Supp 536
     (USD NY 1984); Walker v. Prisoner Review Board, 594 F.
     Supp 556 (USD Ill. 1984).

57.  Walker v. Missouri Bd. of Probation and Parole, 586 F. Supp.
     411 (USD Mo. 1984).

58.  See Fare v. Michael C., 442 U.S. 707 (1979).

# CHAPTER IX

## CONDITIONS

A significant majority of field officers surveyed expressed concern in three areas relating to the setting and enforcement of conditions. The issue of greatest concern was potential liability for special conditions that might be imposed, followed by potential liability for a condition requiring compliance with "any other order of the supervising officer," and liability for unequal enforcement of like conditions between different clients. In light of this concern, the conditions are treated here out of context, as separate issues.

A special condition is one that is not imposed as a matter of course on all probationers or parolees. It is usually designed to promote the rehabilitation of a specific client by requiring him to avoid an environment felt not to be conducive to his rehabilitation, such as exposure to those people or situations that appear to have brought him into the criminal justice system originally. So long as a condition can reasonably be said to contribute both to rehabilitation aims and the protection of society, the condition is likely to be held permissible;[1] however, a condition that violates a probationer/parolee's basic constitutional right is invalid even if it is rehabilitative of the individual or protective of society. Conditions are set only by the court or parole board, and the field officer need not fear liability for their imposition; however, he should be concerned with the enforcement of conditions, both as matters of rehabilitation and practicality. The best time to deal with such issues is before they are imposed. A pre-sentence or pre-parole report should not include a condition that is either overly difficult to supervise or open to serious question as to its function or legality. For example, a condition requiring church attendance would fall into this category because of a potential conflict with the first amendment's guarantee of the free exercise of religion.

A condition that is phrased in such a way as to require compliance by the client with "any other order" of the supervising officer can lead to serious problems for the officer. Such a condition is not meant to be a "blank check" to the officer to set conditions as he sees fit. It is not only illegal for an officer to order a client to do something illegal or not to do something legally required, but it is also not conducive to rehabilitation to put the client in a position that would cause severe peer or family conflict, such as ordering him to become an informant.

General rules can be stated that should give the field officer ample guidance. First, a formal condition set by the court or the board is generally acceptable. (Note the limitations discussed in this chapter.) Second, a reasonable condition, such as meeting with the officer at a certain time and place, is

acceptable so long as it is imposed in good faith. Third, in emergency situations, radical orders will be acceptable provided they are imposed in good faith, are temporary and necessary under a true emergency, and are not illegal. When faced with such a situation, the officer can best protect himself by obtaining from the client a written assent, or, if that is refused, a written admission that the client is aware of the order and wishes to challenge it. Fourth, substantial changes in set conditions should not be made except under emergency conditions. Fifth, any changes of an enduring nature must be made by the court or the board or, depending on local rules, they must at least be notified. An Oregon court has ruled, specifically, that a probation condition added by a probation officer cannot serve as the basis for revocation because the officer has no authority to add conditions.[2] In all events, the officer is obligated to notify the client and, as with conditions in general, explain the condition to the client.

Unequal enforcement of conditions can be the basis for a lawsuit under the equal protection clause of the Constitution. Unreasonable distinctions between individuals or classes of individuals will expose the officer to personal liability. The questions of reasonableness will be decided on a case-by-case basis. Class distinctions and unequal enforcement based on race or creed are extremely difficult to justify and should be avoided.

Several specific areas have been the target of judicial examination recently. After a brief statement of the current law on conditions in general, the remainder of the chapter will consider the more difficult ones: (1) conditions that infringe upon fundamental constitutional rights, (2) conditions that infringe upon other rights, and (3) explanation of conditions to the client.

## CONDITIONS IN GENERAL

Both probationers and parolees enjoy conditional freedom from confinement. All jurisdictions impose some explicit conditions, or standards of conduct, that the probationer or parolee is expected to observe in return for his release. Data about the number and variety of parole conditions are less abundant than probation condition data because the number of authorities imposing parole conditions is limited.[3]

Conditions used in 75 percent of the jurisdictions require parolees to:

- Notify their parole officer about, or seek his permission for, changes in residence or employment.

- Make periodic reports to their parole officer.

- Obtain permission for out-of-state travel.

- Observe limitations on the possession or ownership of firearms and other weapons.

- Obey the law.

The reservation of authority to impose "special conditions" is even more popular; it is found in 89 percent of the jurisdictions.[4]

Outside this core, state practices vary widely. At one extreme, numerous conditions are imposed to spell out in detail what a parolee cannot do, while at the other, few conditions are set.[5] The number of parole conditions range from 4 in Washington to 20 in New Mexico.[6]

Considering that there are about 1.5 million persons on probation or parole at any time, the frequency of litigation concerning the constitutionality and legality of conditions is small. This is because a probationer/parolee realizes that he has agreed to the conditions and is also aware of the possible consequences of challenging them. It must be noted, however, that the mere act of agreeing to the terms of probation/parole does not mean that a legal challenge is foreclosed because of waiver. Courts have said that some constitutional rights may not be waived, particularly if the alternative to a refusal to waive is incarceration or non-release. This is tantamount to undue influence or coercion.

As a general rule, the authority granting probation or parole has broad discretion to set the terms and conditions thereof within the statutory framework creating the disposition. Most authorizing statutes suggest minimum conditions. The supplemental discretion also conferred is not unlimited, however, and a challenged condition will not be upheld if it cannot be shown to bear some reasonable relationship to the rehabilitative purpose underlying the probation and parole systems. As the core conditions almost always are so related, challenges to them are few.

The balance of this Chapter deals with conditions that are less often imposed. The material presented will illustrate that the power to set conditions is limited and will discuss the approach the courts take to determine whether a condition is within permissible bounds.

## CONDITIONS IMPINGING ON FUNDAMENTAL RIGHTS

### Free Speech and Assembly

The concept of fundamental rights, like so many tools of judicial analysis, is flexible. In almost all cases, however, the first amendment guarantees of free speech and assembly are so characterized. Two leading cases have accorded them this status in the parole conditions content.

In <u>Sobell v. Reed</u>,[7] a federal parolee asserted that his first amendment rights had been violated by an action of the Board of Parole. Sobell was restricted by the board from going outside the limits of the Southern District of New York " . . . without permission from the parole officer." On a number of occasions after his release, Sobell sought and obtained permission to travel to, and to speak at, various places. However, on other occasions, such requests were denied. Sobell charged that such denials invaded his first amendment rights. The district court stated that while there are differences between prisoners and parolees, there are none that diminish the protections enjoyed by the latter under the first amendment.[8] After testing the restriction by the same principles, such as: "where the (parole) authorities strongly show some substantial and controlling interest which requires the subordination or limitation of these important constitutional rights, and which justifies their infringement . . . ,"[9] the court held that the board violated Sobell's exercise of his rights of speech, expression, or assembly, except when it could show that withholding permission was necessary to safeguard against specifically described and highly likely dangers of misconduct by the parolee.[10]

The second case, <u>Hyland v. Procunier</u>,[11] involved a California parolee. As a condition of his parole, he was required to obtain permission from his parole officer before giving any public speeches. The parolee's requests to give speeches about prison conditions at a college campus were denied on two occasions on grounds that the speeches might lead to student demonstrations at the prison. The court stated that "California (and) federal law has imposed the due process rule of reasonableness upon the State's discretion in granting or withholding privileges from prisoners, parolees, and probationers."[12] The court found that California made no showing that the condition imposed on Hyland was in any way related to the valid ends of California's rehabilitative system. Thus, the court permanently prohibited the state from:

1.  Conditioning Hyland's parole on his seeking such advance permission, and

2.  Prohibiting any California state parolee from addressing public assemblies held at the University of California at Santa Cruz, when such prohibition is because of the expected content of the speech.[13]

Note that the <u>Sobell</u> and <u>Hyland</u> decisions suggest that the parole board, its agents, officers, etc., must have or demonstrate strong reasons for infringing on a parolee's first amendment rights through conditions. Also note that the reasoning of these cases has been extended to the probation area.

In <u>Porth v. Templar</u>[14] the Tenth Circuit Court of Appeals stated that probation conditions must bear a relationship to the treatment of the offender and the protection of the public. "The

case stands for the proposition that absent a showing of a reasonable relationship between a release condition and the purpose of release, the abridgement of a fundamental right will not be tolerated."[15] Thus, one implication in viewing this case with the other two cases is that release conditions abridging fundamental rights can be sustained only if they serve a legitimate and demonstrated rehabilitative objective.[16]

These cases do not suggest, however, that the mere assertion by a probationer or parolee that some right is embraced within the first amendment will put that right beyond the reach of a properly tailored condition.

In <u>Porth v. Templar</u>, for example, the probation condition prohibited a long-time tax protestor from circulating or distributing materials concerning the "illegality" of the Federal Reserve System and the income tax, and from speaking or writing on those subjects. The court of appeals held these restrictions were too broad, but it approved a narrower condition prohibiting the probationer from encouraging others to violate the tax laws.[17] Another appeals court upheld a challenge to a condition of probation that a convicted gambler associate only with law-abiding citizens, a potential restriction on his associational rights.[18]

Political rights traditionally have been accorded preferred status. Nevertheless, a former Congressman, convicted of election law violations, was properly prohibited by a probation condition from engaging in political activity.[19]

## Other Fundamental Rights*

<u>Association</u>. Freedom of association is also protected by the first amendment. Conditions restricting association with, for example, persons of "disreputable" or "questionable" or "criminal" character, may be invalidated by courts for vagueness or overbreadth. The condition must be clear to the probationer or parolee[20] and also to the officer responsible for enforcing the conditions.[21] Unclear or vague conditions need to be clarified further by the officer so that the probationer/parolee generally knows which conduct is prohibited. For example, do local taverns or bars come under the term "disreputable places?" This is usually a matter of judicial or agency determination and therefore varies from place to place.

<u>Religion</u>. The "free exercise" clause of the first amendment generally puts beyond the reach of government all questions of how an individual chooses to regulate his religious life. In the context of correctional institutions, this does not mean that correctional authorities must permit or facilitate all practices claimed to have a religious origin or motivation. In the

---

\*   The issue of search and seizure is taken up in Chapter XI, Supervision.

conditions context, the issue can arise if a probation or parole
condition purports to require that a convicted person attend
Sunday school or church services.  Such a condition is improper.[22]

Privacy.  The right of privacy has been the basis of arguments
challenging conditions that restrict relationships with family
members,[23] prohibit child-bearing,[24] and limit sexual inter-
course.[25]  A condition is not invalidated merely because it
invades the fundamental right to privacy.  Only where no
compelling state interest exists to overcome the individual's
right to privacy does the condition fail.  The state therefore
bears the burden of establishing that a compelling state interest
justifies such condition.  This varies from case to case.  For
example, a condition that prohibits child-bearing would doubtless
be unconstitutional if imposed for driving while intoxicated, but
might be justifiable if the crime were infanticide.

Procreation.  The litigation concerning abortion and contraception
tells us that the Constitution protects -- as an aspect of a
non-specific right of privacy -- the procreative function from
government regulation unless extremely well justified.  In a
California case that antedated the development of this right to
its present status, a probation condition prohibiting a woman from
becoming pregnant without being married was struck down.[26]  It was
central to the court's reasoning that the probationer had been
convicted of robbery, and that there was no relationship between
robbery and pregnancy.

Travel.  Another non-specific, but important, right protected by
the Constitution concerns travel.  Banishment conditions, when
challenged, are usually invalidated as against public policy and
as not related to the offense.[27]  However, the limitation on
travel within a city or region may survive where firmly linked to
rehability goals.  Use of the Interstate Compact for the
supervision of parolees and probationers does not constitute
banishment.

However, travel at the instigation of a parolee may well be
controllable.  In Berrigan v. Sigler,[28] war protestors challenged
the federal parole board's denial of permission to make a trip to
North Vietnam.  This prohibition was upheld because it was
consistent with the foreign policy interests of the United States
and because it was necessary in order for the board to fulfill its
duty to supervise those for whom it was responsible.

Self-Incrimination.  Conviction does not void or lessen a person's
constitutional right not to testify against himself.  Two courts
of appeals recently were faced with probation conditions regarding
tax returns.  In one case, a probationer had been ordered to file
tax returns without claiming his fifth amendment privilege.[29]  In
the other, a probationer was ordered to file amended tax
returns.[30]  The first of these conditions was held to be improper,
while the second was approved.  In the latter case, while the

-102-

filing of amended returns was called for -- and presumably
complete returns were what the court had in mind -- there was no
attempt to interfere with the probationer's possible exercise of a
constitutional right; he could comply with the condition,
literally, and on the amended return claim his fifth amendment
privilege.  This would not violate the condition.  Hence,
probation could not be revoked for exercising an explicit right.
In the former case, however, for the mere assertion of the right
not to incriminate himself, the probationer would open himself up
to revocation.

Another fifth amendment issue arises when the probationer or
parolee is required by a condition, regular polygraph tests, for
example, to disclose information which could be used against him
in a new criminal proceeding.  In such circumstances, the result
of a fifth amendment challenge to the condition has turned on:
(1) whether the government could reasonably have expected
incriminating evidence to be forth-coming, (2) whether use
immunity was promised, and (3) whether fifth amendment rights were
voluntarily, knowingly, and intelligently waived.

In Minnesota v. Murphy,[31] the Supreme Court clarified the
situation as follows:

> [A] state may validly insist on answers to even
> incriminating questions and hence sensibly administer its
> probation system, as long as it recognizes that the
> required answers may not be used in a criminal proceeding
> and thus eliminates the threat of incrimination.  Under
> such circumstances, a probationer's "right to immunity as
> a result of his compelled testimony would not be at
> stake," and nothing in the Federal Constitution would
> prevent a state from revoking probation for a refusal to
> answer that violated an express condition of probation or
> from using the probationer's silence as "one of a number
> of factors to be considered by a finder of fact" in
> deciding whether other conditions of probation have been
> violated. . . . Id. 1147 n 7

> A defendant does not lose this [fifth amendment]
> protection by reason of his conviction of a crime;
> notwithstanding that a defendant is imprisoned or on
> probation at the time he makes incriminating statements,
> if those statements are compelled they are inadmissible
> in a subsequent trial for a crime other than that for
> which he has been convicted.  Id. 1142

Minnesota does not, therefore, extend Miranda protections to
questioning of a probationer by a probation officer in a
non-custodial setting.

-103-

## VAGUENESS AS A LIMITATION

Courts have settled on no standards for interpreting ambiguous conditions. Because such conditions may impinge upon constitutional rights, probationers and parolees (or their attorneys) may seek interpretation from probation and parole officers. Judicial review of conditions, usually in the context of revocation hearings, will generally incorporate officers' interpretations of conditions. Officers, therefore, would find it useful to make a written record of their interpretations or, in order to prevent the need for judicial review, to request the sentencing court or parole board imposing the vague condition for an interpretation.

## REASONABLENESS AS A LIMITATION

In addition to the requirements that a condition be related to rehabilitation of the offender and that it not unduly interfere with constitutional rights, the courts seem to insist that a challenged condition meet a general test of reasonableness before it can be enforced.

The following conditions have fallen, apparently because there is such a test.

1. A probationer was ordered to abstain from alcohol for five years. Evidence that he was an alcoholic led the court to deny probation revocation when the condition was violated.[32]

2. A former serviceman convicted of accepting kickbacks was placed on probation on condition that he forfeit all personal assets and work without compensation for three years, or 6200 hours. The condition was struck down as unduly harsh in its cumulative effect.[33]

3. A probationer was ordered to reimburse the government for the cost of court-appointed counsel and a translator. The condition was held unconstitutional because it was not made excusable if the probationer lacked the ability to pay.[34]

## EXPLANATION OF CONDITIONS

Probationers and parolees must have knowledge of the conditions they are expected to follow. Recent case law suggests the wisdom of establishing the regular practice of providing the offender with a copy of the release conditions.[35] But courts will generally infer a condition prohibiting criminal acts.[36]

One case speaks to the issue of explanation of conditions, distinguishing that duty from that of merely informing. In Panko v. McCauley,[37] a condition was held to be unconstitutionally vague

as applied to the petitioner. The condition forbade the petitioner from "frequenting" establishments selling alcoholic beverages. The condition was struck down since there was no evidence that the petitioner understood that the term "frequent" meant "visit." This case implies that there may be a duty to explain conditions.

Even if there is a duty to explain conditions sufficiently to assist the offender in avoiding unintentional violations, the scope of the duty is apt to be limited by a reasonableness concept. It is not likely, for example, that the officer will be required to anticipate and warn against every possible type of violation. In a Ninth Circuit case in which revocation of probation was being appealed, the probationer defended in part by asserting that he had no specific notice that training foreign military personnel would be charged as a violation of conditions. (It was admitted that no law was violated, technically.) The court of appeals was satisfied that the comments of the judge condemning the probationer's former life as a mercenary, together with the probation officer's warning to get rid of his guns, and other comments were sufficient notice of the behavior required.[38]

## WORK AS A CONDITION -- PAID OR VOLUNTEER*

It is a common practice to require probationers or parolees to hold employment and/or perform community service work. While such conditions are routinely upheld, they create potential liability issues. In the case of a paid employee who is injured or causes injury on the job, normal rules of respondeat superior may be liable.

However, in the case of a volunteer work assignment, who would be liable? Volunteers may not be covered by community agency liability or medical insurance. Workmen's compensation protection may not apply to volunteers. Ohio[39] requires offenders to pay a fee for liability insurance. Minnesota statutorily covers probationers under a state compensation plan for injured workers.[40]

Where the court requires work as a condition, judges are usually protected from liability by an absolute immunity. Parole boards enjoy a qualified immunity. Probation and parole officers share those immunities insofar as they are exercising professional discretion.

While there is as yet no precedent for guidance, it is likely that a community service volunteer could do grievous harm to a party who could then find no defendant capable of redressing the injury. Would a probation or parole officer be liable for arranging a placement without also arranging for insurance protection? Would failure to insure or to make placements in an

---

\* See Chapter V for a fuller treatment of specific tort liabilities.

agency insuring volunteers be considered ministerial and, thereby, unprotected by traditions of immunity?  To avoid potential liability, probation agencies might purchase insurance to cover volunteer work by offenders.

## SUMMARY

This chapter has examined several issues concerning the setting of conditions of probation and parole.  While there is rarely any dispute concerning conditions, problems can arise when a special condition either infringes upon a fundamental constitutional right or is not clearly associated with a rehabilitative purpose.  While officers indicated concern with the type of condition relating to "any other order of the officer," associated problems should be minor or non-existent when the officer understands that the condition does not empower him to set a specific condition not included in the court's order.

The so-called fundamental rights, such as "free speech," are given special treatment by the courts.  In the view of the United States Supreme Court, any right so essential to our concept of liberty that to do away with it would fundamentally alter our political and social system is a fundamental right.  Restrictions in these areas will always be considered "suspect;" that is, such conditions will be given a stricter review than other restrictions.  Often validation of a condition is dependent upon supplying the reviewing court with sufficient information to link the government's interest in rehabilitation with the challenged condition.

Work conditions may give rise to tort liabilities, particularly in the case of volunteer placements.  This risk may be covered by agency insurance.

## NOTES

### CHAPTER IX

1. United States v. Consuelo-Gonzalez, 521 F. 2d. 259 (9th Cir. 1975); Porth v. Templar, 453 F. 2d 330 (10th Cir. 1971).

2. State v. Maas, 41 Or. App. 133, 597 P. 2d 838 (1979).

3. For suggestions as to probation conditions employed with some frequency, see C. Imlay, See What Condition Your Conditions Are In, 35 Fed. Prob. 3 (1971); J. Best and P. Birzion, Conditions of Probation:  An Analysis, 51 Geo. L. J. 809 (1963).

4. W. Parker, Parole:  Origins, Development, Current Practices and Statutes 38 (1975).

5. Id. at 39.

6. Hill, Rights of the Convicted Felon on Parole, 13 U. Rich. L. Rev. 370 (1979).

7. 327 F. Supp. 1294 (S.D.N.Y. 1971).

8. Id. at 1304.

9. Id. at 1303.

10. Id. at 1306.

11. 311 F. Supp. 749 (N.D.Cal. 1970).  See, also, United States v. Lowe, 654 F. 2d. 562 (9th Cir. 1981); Barlip v. Commonwealth Board of Probation & Parole, 45 Pa Common 458, 405 A. 2d. 1338 (1979); State v. Camp, 59 NC App. 38, 295 SE 2d. 766 (1982).

12. 311 F. Supp. 749 (H.D. Cal. 1970) at 750.

13. Id. at 750-751.

14. 453 F. 2d. 330 (10th Cir. 1971).

15. Note, Fourth Amendment Limitations on Probation and Parole Supervision, 1976 Duke L. J. 71, 75 (1976).

16. Id. at 76.

17. Porth v. Templar, 453 F. 2d 330, 334 (10th Cir. 1971). Accord, United States v. Patterson, 627 F. 2d 760 (5th Cir. 1980, cert. denied, 101 S. Ct. 1378 (1981).

18. United States v. Furukawa, 596 F. 2d 921 (9th Cir. 1979).

19. United States v. Tonry, 605 F. 2d 144 (5th Cir. 1979).

20. See Rich v. State, 640 P. 2d. 159 (Alaska Ct. App. 1982);
    Whitehead v. State, 645 SW. 2d. 482 (Tex. Ct. App. 1982);
    People v. Warren, 89 App. Div. 501, 452 NYS. 2d. 50 (1982).

21. See Watson v. State, 17 Md. App. 263, 301 A. 2d. 26 (1973);
    Glenn v. State, 168 Tex. Crim. 312, 327 SW 2d. 763 (1959);
    Dulin v. State, 169 Ind. App. 211, 346 NE 2d. 746 (1976).

22. Jones v. Commonwelth, 185 Va. 335, 38 S.E. 2d 444 (1946).

23. See West v. State, 160 Ga. App. 855, 287 SE 2d. 694 (1982);
    State v. Martin, 282 Or. 583, 580 P. 2d. 536 (1979); In re
    Peeler, 266 Cal App 2d 483, 72 Cal Rptr 254 (1968); State v.
    Thomas, 428 So. 2d 950 (La Ct. App. 1983).

24. See State v. Livingston, 53 Ohio App. 2d. 195, 372 NE 2d.
    1335 (1976); Skinner v. Oklahoma, 316 U.S. 535 (1942); People
    v. Dominguez, 256 Cal. App. 2d. 623, 64 Cal. Rptr. 290
    (1967).

25. See Wiggins v. State, 386 So. 2d. 46 (Fla. Dist. Ct. App.
    1980); Michalow v. State, 362 So. 2d. 456 (Fla. Dist. Ct.
    App. 1978).

26. People v. Dominguez, 256 Cal. App. 2d 627, 64 Cal. Rptr. 290
    (1967).

27. People v. Baum, 251 Mich. 187, 231 N.W. 95 (1930) (banishment
    from state for five years); People v. Smith, 252 Mich. 4, 232
    N.W. 397 (1930) (move to another neighborhood). See, also,
    State ex rel Halverson v. Young, 278 Minn 381, 154 NW 2d. 699
    (1967); Flick v. State, 159 Ga. App. 678, 285 SE 2d 58
    (1981), State v. Gilliam, 274 SC 324, 262 SE 2d. 923 (1980);
    Carchedi v. Rhodes, 560 F. Supp. 1010 (SD Ohio 1982).

28. Berrigan v. Sigler, 358 F. Supp. 130 (D.D.C. 1973), aff'd,
    499 F. 2d 514 (D.C. Cir. 1974). See, also, Dukes v. State,
    423 So. 2d 329 (Ala. Crim. App. 1982) (person convicted of
    theft from certain store ordered to stay out of that store
    during probation term; State v. Churchill, 62 NC App. 81, 302
    SE 2d. 290 (1983) (cab driver guilty of trespassing at bus
    station ordered to stay away from bus station and adjoining
    restaurant unless travelling by bus with permission of
    probation officer). But, see, In re White, 97 Cal. App. 3d.
    141, 158 Cal. Rptr. 562 (1979) (affirming, under the
    California Constitution, the "basic human right" of
    intrastate travel).

29. United States v. Conforte, 624 F. 2d 869 (9th Cir.), cert.
    denied, 449 United States 1012 (1980).

30. United States v. McDonough, 603 F. 2d 19 (7th Cir. 1979).
    See, also, State ex rel Halverson v. Young, 278 Minn 381, 154
    NW 2d. 699 (1967); Flick v. State, 159 Ga. App 678, 285 SE 2d
    58 (1981); State v. Gilliam, 274 SC 324, 262 SE 2d. 923
    (1980); Carchedi v. Rhodes, 560 F. Supp. 1010 (SD Ohio 1982).

31. Minnesota v. Murphy, 104 S. Ct. 1136 (1984).

32. Sweeny v. United States, 353 F. 2d 10 (7th Cir. 1967).

33. Higdon v. United States, 627 F. 2d 893 (9th Cir. 1980).
    Compare, United States v. Arthur, 602 F. 2d 660 (4th Cir.),
    cert. denied, 444 United States 992 (1979) (former bank
    president who misapplied bank funds properly required to
    accept employment without salary for two years).

34. United States v. Jiminez, 600 F. 2d 1172 (5th Cir.), cert.
    denied, 444 United States 903 (1980). See, also, State v.
    Asher, 40 Or. App. 455, 595 P. 2d. 839 (1979); State v.
    Langford, 12 Wash. App. 228, 529 P. 2d 839 (1974).

35. Bennett v. State, 164 Ga. App. 239, 296 SE 2d. 787 (1982);
    Acosta v. State, 640 SW 2d. 381 (Tex. Ct. App. 1982);
    Meredith v. Raines, 131 Ariz 244, 640 P. 2d. 175 (1982) (oral
    notice of parole conditions permissible, but must be written
    notice for probation conditions).

36. See, Joynes v. State, 437 NE 2d 137 (1982); Shaw v. State,
    164 Ga. App. 208, 296 SE 2d. 765 (1982) (past experiences on
    parole or probation source of knowledge of condition
    requiring obedience to law). But, Neely v. State, 7 Ark.
    App. 238, 647 SW 2d. 473 (1983), contra (probationer not
    given list of conditions barring illegal act).

37. Panko v. McCauley, 473 F. Supp. 325 (C.D. Wisc. 1979).
    Information as well as explanation are statutorily required
    in some jurisdictions, See, e.g., Mo. Ann. Stat. Section
    549.237 (Vernon); NY Exec. Law Section 257(4) (McKinney).

38. United States v. Dane, 570 F. 2d 840 (9th Cir. 1977). See,
    also, United States v. Dane, 587 F. 2d 436 (9th Cir. 1978).

39. Ohio Rev. Code Ann. Section 2951.02 (g) (Page).

40. Minn. Stat. Ann. Section 3.739 (West).

# CHAPTER X

## MODIFICATION OF CONDITIONS AND CHANGES IN STATUS

This chapter addresses modification of conditions and changes that can occur in the status of a probationer or parolee in addition to revocation.

## MODIFICATION

Changed circumstances after parole or probation is initiated may require modification of the original terms.  Modification may be requested by the probationer or parolee or by the field officer assigned the case by the supervisory court or parole board.  Modification may be toward easing conditions, or toward adding, clarifying, or extending them.  Typically, field officers seek additional restrictions or increased supervision to increase the likelihood of the offender's progress.

Because parole and probation officers may regularly initiate revocation hearings, it is normally assumed such officers have the right to <u>suggest</u> the need for modification or change of conditions to the court or the parole board.  In a few jurisdictions, parole and probation officers themselves have the power to modify conditions.  In these jurisdictions, the officer may go ahead and modify the conditions, but only if it is clear that authority to modify conditions is given to the officer.  The National Advisory Commission on Criminal Justice Standards and Goals has recommended that parole officers be authorized to carry out their requested modifications pending parole board approval.[1]

Most jurisdictions, either by legislation or court decisions, do not authorize officers to modify conditions on their own because this act is generally considered a judicial or board function that cannot be validly delegated to the probation/parole officer.  In reality, however, many judges do in fact delegate to the officer the power to modify or change conditions, or to specify the details of an imposed condition (such as the need for psychological treatment).  It is also a common practice for judges to provide that the probationer may be subject "to such other conditions as the probation officer may deem proper to impose."

Modifying or changing probation conditions by the officer alone, without authorization, must be avoided if at all possible.  It is proper for the officer to <u>suggest</u> that conditions be modified or changed, but unless otherwise clearly authorized, only the judge or board should make that change.  If change or modification by the officer is unavoidable (either because the judge insists on such delegation despite invalidity or because of emergency conditions), the officer is best protected against liability by putting the modification or change in writing and making sure that the condition is accepted by the client in

writing.  Once this is done, a copy should be sent to the judge or board to inform this authority of the change.

In sum, officers should not modify or change conditions unless clearly authorized by law or court decisions.  As much as possible, modifications or changes must be done by the judge or court because they enjoy absolute immunity whereas the officer does not.

There appear to be no clear due process standards for modification.  Case law suggests notice is probably necessary; however, it is ambiguous as to the right to a hearing.[2]  Whether a liberty interest may be at stake is as yet untested except by analogy to the weak authority of the rescission cases.

As parole and probation officers raise their professional standards, the possibility of an implied duty to seek modification may arise.  If, for example, a probationer or parolee is obviously in need of a different supervision than that originally deemed appropriate, a resulting victim -- injured by the inadequately supervised offender -- may allege failure to seek modification is an act of negligence, implying liability.  For this reason, it is crucial for officers to be aware of the supervisory authority granted them by their particular jurisdiction.

## RESCISSION

Except under extraordinary circumstances, some time passes between the decision to release a prisoner on parole and the person's actual release.  During this period, the prisoner -- either explicitly or implicitly -- is expected to maintain proper behavior as a condition precedent to release.  Unfortunately, he does not always behave so.  This may give rise to a proceeding before the parole board to rescind or annul the grant of parole or to retard its effective date.  (The same proceeding is sometimes activated by the parole board's receipt of supplemental information about the parolee, or by the prisoner's inability to complete arrangements for an acceptable parole plan).  To what rights is the prisoner entitled in such proceedings?

That question is not directly answered by <u>Morrissey v. Brewer</u>,[3] <u>Gagnon v. Scarpelli</u>,[4] nor by <u>Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex</u>.[5]  <u>Morrissey</u> and <u>Gagnon</u> do not apply directly because the prisoner has not yet begun to enjoy the conditional liberty which, the Supreme Court held, was the occasion for the ripening of due process rights.  And, arguably, whatever state law may say about a prisoner's entitlement to release on parole, a prisoner would seem to have more than the "mere expectation" of release on which <u>Greenholtz</u> turned, once the release decision has been made and communicated.

In <u>Jago v. Van Curen</u>,[6] decided in 1981, the Supreme Court addressed this issue.  Van Curen had a parole hearing in 1974. He was recommended for immediate parole and enrolled in pre-release

classes; he was measured for civilian clothes. But within days, the Ohio Adult Parole Authority received information that led it to suspend the grant of parole and then to rescind it. Van Curen was given no hearings in connection with these decisions.

Just before the case reached the Supreme Court, the Sixth Circuit Court of Appeals held that parole in Ohio is purely discretionary. But it also held that the notice to Van Curen gave rise to a "mutually explicit understanding" that the prisoner would be released, and that this was a sufficient "liberty" interest to cause due process rights to attach. The Supreme Court, without hearing oral argument, reversed in a brief per curiam opinion. The Court said that, at most, Van Curen had a unilateral belief that parole would actually take place, and that the parole authority never lost its full discretionary authority to grant or withhold parole.

Van Curen does not foreclose all challenges to parole rescission actions. It can be argued that the language of a state parole law gives a prospective parolee a kind of "liberty" interest and, hence, that rescission is subject to some procedural safeguards. The customary parole law lacks this kind of specific language, however, and most such claims will fail.

Prior to Van Curen, several courts of appeals had given lengthy consideration to the rescission rights issue. These decisions[7] held that some process was due and that Wolff v. McDonnell,[8] the Supreme Court's prison disciplinary procedure case, should be the starting point for analysis of the specific procedures required. These cases are now technically of little significance, along with several pertinent lower federal and state court cases examining rescission.[9] However, the Circuit Courts cite Jago v. Van Curen, generally, as authority for the proposition that a person may have a protected property interest created by state law or implied by state custom or practice. Lokey v. Richardson,[10] the only court specifically affirming Van Curen, qualifies its approval, saying:

> We are cognizant of the weakness in the reasoning underlying the Van Curen decision. As long as state prison and parole officials manage to keep their guidelines informal, unofficial and (especially) unpublished, they do not create additional liberty interests which may be protected by the 14th Amendment. We do not, of course, imply that the Supreme Court's intent is to create a disincentive to the formation of clearly established guidelines in the administration of prisons. Nevertheless, this may be a lamentable side-effect of the Supreme Court's continuing efforts to provide prison administrators with the necessary flexibility to operate efficiently in a day-to-day context.[11]

Justice Stevens' dissent in Van Curen is noted by the Second Circuit in Iuteri v. Nardozo,[12] observing that

> because the majority [of the Supreme Court] relied upon a statement by the Court of Appeals that Ohio law creates no protected liberty interest, the question remains whether the grant of a specific release date creates a legitimate expectation of freedom so as to trigger due process protection.[13]

The First Circuit cites Van Curen to imply a due process requirement for a "conditioned," "revocable," and "temporary" permit, suggesting that even a limited reliance interest entitles a plaintiff to some procedural protection.[14]

While some deference to Van Curen may remain,[15] the majority of the Circuit decisions view Van Curen as providing a contract law basis for creating parole release interests for offenders. Therefore, new lawsuits can be expected to focus on implied contracts for release, created by custom or practice. When the Circuit courts find a Supreme Court decision unsatisfactory, as they appear to find Van Curen, inevitably the disputed issue is presented to the Supreme Court again, in a new factual setting, for modification.

**EXTENSION**

Conviction of an offense authorizes the state to intervene in the offender's life in specific ways authorized by statute. These limits are in general rigidly observed because of the severe nature of the infringements they impose on the rights of individuals. A corollary of this rule is that once service of sentence has begun, it is not subject to detrimental modification (absent special circumstances not relevant here.)[16] It also follows that once a sentence has been served, jurisdiction is lost over the offender.

To what extent do grants of probation and parole provide authority to prolong a period of actual confinement beyond the duration originally set? One possibility, which the courts have not adopted, is to consider probation and parole time as the equivalent of confinement, thus freeing the offender at the end of the original period. While the states vary on the extent to which they give credit for street time against the period of actual confinement, there is agreement that entry into probation or parole status extends the time during which consideration may be given to imprisoning or reimprisoning the offender.

The question arises in several situations. In one, proceedings are begun to revoke probation or parole within the probation or parole term. In this case, even when the proceedings are not completed within the usual period, the new decision is given effect so long as the delay was not due to a lack of diligent prosecution on the state's part. Thus, a parolee who absconds

from supervision,[17] or a probationer who seeks continuances that delay the hearing,[18] is not permitted to object that the proceedings and decision are untimely. Similarly, a New Jersey court held that the time for revoking New Jersey parole was extended during the period the offender was serving a New York sentence imposed while the offender was on parole, even though the New York court made the sentence concurrent with the original New Jersey sentence.[19]

The problem also arises when a new sentencing law comes into effect after an offender's conviction. Here, a different result is apt to occur. For example, California courts have held[20] that new penal laws extending the period of parole supervision may not be given retroactive effect, at least for those paroled under the more favorable terms of prior law. To do otherwise would run afoul of the ex post facto clause, the courts said.

### TERMINATION

The federal parole law provides that parole does not end automatically at the conclusion of the term ordered, but continues until affirmatively granted after a termination hearing. The statute provided the hearing had to be held within five years when Robbins v. Thomas[21] arose. In that case, the hearing was five-and-one-half years after parole was granted. On the day after the hearing, but before the parole commission made a decision on termination, Robbins was arrested on a new charge. The parole commission reopened its file to give consideration to this fact, and decided to extend parole. Robbins argued that the comission was without power to consider anything occurring after five years or, in any event, after the termination hearing. The Ninth Circuit Court of Appeals disagreed, finding that until actual termination the commission could -- indeed, was expected to -- consider relevant evidence.

The court went on to rule that the procedures to be followed in such cases were equivalent to those provided for revocation hearings. While the decision not to terminate parole does not deprive a parolee of his conditional liberty, which would activate Morrissey rights, the statute appears to make termination automatic in the absence of an affirmative finding that the parolee is unlikely to respect the law. Thus, there is more than a "mere expectation" of the termination benefit, and some process is clearly due. Other courts could well choose a less-than-Morrissey standard, however.

### SUMMARY

A few jurisdictions authorize officers to modify or change conditions, but most jurisdictions do not. Unless clearly authorized by law or court decisions, an officer should not modify or change conditions because possible liability attaches should such conditions turn out to be unconstitutional or injurious to the client or a third party.

-114-

No clear due process standards have been set for modification, but case law suggests that notice is probably necessary. The rights in Morrissey do not apply to parolees in rescission proceedings according to a 1981 Supreme Court ruling. Extensions of probation or parole are generally frowned upon because they constitute further deprivations of freedom. When probation/parole actually terminates is governed by state law, not by a constitutional standard.

-115-

# NOTES

## CHAPTER X

1.  National Advisory Commission on Criminal Justice Standards and Goals, Corrections, Standard 12.7 (1973).

2.  See United States v. Warden, 705 F. 2d. 189 (7th Cir. 1983), Forgues v. United States, 636 F. 2d. 1125 (6th Cir. 1980); Tyra v. State, 644 SW 2d. 865 (Tex. Ct. App. 1982); In re Appeal in Pinal County, Juvenile Action, 131 Ariz. 187, 639 P. 2d. 377 (Ct. App. 1981); State v. Simpson, 2 Ohio App 3d. 40, 440 NE 2d 617 (1981); State v. Coltrane, 307 NC 511, 299 SE 2d. 199 (1983); Kelly v. State, 627 SW 2d. 826 (Tex. Ct. App. 1982).

3.  Morrissey v. Brewer, 408 U.S. 471 (1972).

4.  Gagnon v. Scarpelli, 411 U.S. 778 (1973).

5.  Greenholtz v. Inmates of Nebraska Penal and Correctional Complex, 99 S. Ct. 2100 (1979).

6.  454 United States 14 (1981), rev'g. 641 F. 2d 411 (6th Cir. 1981).

7.  Drayton v. McCall, 584 F. 2d 1208 (2d Cir. 1978); Christopher v. United States Bd. of Parole, 589 F. 2d 924 (7th Cir. 1978).

8.  418 United States 539 (1974).

9.  Galante v. United States Parole Comm'n., 466 F. Supp. 1266 (D. Conn. 1979); Green v. Nelson, 442 F. Supp. 1047 (D. Conn. 1977); Tracy v. Salamack, 440 F. Supp. 930 (S.D.N.Y., 1977), modified, 572 F. 2d 393 (2d Cir. 1978); State ex rel Klinke v. Wisconsin Dept. of Health and Social Serv., 87 Wis. 2d 110, 273 N.W. 2d 379 (Dist. Ct. App. 1978) (decided on federal constitutional grounds). See, also, Application of Upsoff, 7 Kan. App. 301, 641 P. 2d 406 (1982); Tortora v. Petrovsky, 545 F. Supp. 369 (WD Mo. 1982).

10. Lokey v. Richardson, 534 F. Sup. 1015 (9th Cir. 1982).

11. Id. at 1026.

12. Iuteri v. Nardozo, 560 F. Supp 745 (2nd Cir. 1983).

13. Id. at 750, citing Van Curen at 25-26, n. 3.

14. Sucn. Suarez v. Gelabert, 541 F. Supp 1253 (1st Circuit 1982), 1261.

15. See, e.g., Slocum v. Georgia State Board of Pardons and Paroles, 678 F. 2d. 940 (11th Cir. 1982), where the court restricts a protectable interest in parole release to that created by state statute.

16. See 541 F. Supp. 1253 (1st Cir. 1982); 560 F. Supp. 745 (2nd Cir. 1983); 670 F. 2d 507 (5th Cir. 1982); 699 F. 2d. 822 (6th Cir. 1983); 681 F. 2d. 1091 (7th Cir. 1982); 699 F. 2d. 387 (7th Cir. 1983); 555 F. Supp. 1344 (7th Cir. 1983); 706 F. 2d. 1435 (7th Cir. 1983); 718 F. 2d 921 (9th Cir. 1983); 534 F. Supp. 1015 (9th Cir. 1982); 678 F. 2d 940 (11th Cir. 1982); 682 F. 2d 1366 (11th Cir. 1982).

17. People ex rel Flores v. Dalsheim, 66 A.D. 2d 381, 413 N.Y.S. 2d 188 (1979).

18. State v. Hultman, 92 Wash. 2d 736, 600 P. 2d 1291 (1979).

19. Board of Trustees v. Smalls, 172 N.J. Super. 1, 410 A. 2d 691 (1979).

20. In re Bray, 97 Cal. App. 3d 506, 158 Cal. Rptr. 745 (1979); Matter of Harper, 96 Cal. App. 3d 138, 157 Cal. Rptr. 759 (1979).

21. 592 F. 2d 546 (9th Cir. 1979).

# CHAPTER XI

## SUPERVISION

Field officers surveyed revealed a high degree of concern about potential liability for disclosure of client background information. They were equally anxious about liability to third persons when there is a failure to disclose, and to the client when there is disclosure. These matters are covered in this chapter, along with the law of search and seizure as it applies to probationers and the parolees, and the collection of funds from clients.

## DUTY TO THE CLIENT NOT TO DISCLOSE INFORMATION

Research failed to disclose more than one case discussing the liability of a probation/parole officer to a client for the disclosure of information about the client. One writer, however, gives this opinion on the issue:

> It is doubtful that such acts as the disclosure of information to employers proscribing certain employment would be deemed tortious. Federal officers can reveal items of information from public records, such as records of prior arrests or convictions, free of liability from the tort of defamation. Regardless of the source of the information, if it is accurate, no liability could arise for defamation, since truth is a complete defense. As to the tort of invasion of privacy, disclosure of items of public record creates no liability. Also, releases of information to a large number of persons is an essential element of the tort of invasion of privacy; that element would be lacking in the release of information to an individual employer. Finally, the tort of interference with a contract or a prospective contract can be justified if the ultimate purpose of the disclosure outweighs the harm to the plaintiff. The impersonal disclosure of information to an employer to protect the public or a third party would appear to be within that rule of justification.[1]

In Anderson v. Boyd,[2] the plaintiff parolee brought suit against parole officers, claiming the defendants had knowingly repeated false statements regarding the plaintiff's criminal record to Idaho State Officials and local police authorities. The court ruled that dissemination of information about a parolee to persons outside the parole board does not relate to the parole officers' duties in deciding to grant, deny, or revoke parole. Therefore, absolute immunity does not extend to such conduct; at most, parole officers would be entitled to executive, good faith immunity for their alleged conduct.

-118-

In addition to information gleaned from public records and correctional files about the offender, probation/parole officers frequently receive information directly from the client and the officer's associates. If the client has a right to prevent the dissemination of information from such sources, might he be able to recover damages from the officer in a proper suit in the event of disclosure?

As a matter of general law, apparently the answer is no. Again, case law support for this conclusion is thin, but that in itself is somewhat indicative of the weakness of the argument that must be made to support liability. The question hinges on the nature of the relationship between the probation/parole officer and the client.

One of the closest examinations of the relationship was made in a 1976 Washington criminal case.[3] In that case, a parolee contended that the trial court should not hear testimony from his parole officer concerning statements he made voluntarily during a telephone conversation. (Since there was no custodial interrogation, the parolee could not argue successfully that Miranda required suppression.) The defendant contended that the relationship between parole officer and parolee is a confidential one, that all communications between the two were thereby privileged, and that to hold otherwise would undermine the rehabilitation process envisioned by the parole system. The court disagreed:

> A parole officer's primary responsibility is to the court, secondly to the individual being supervised. To hold that each communication between the parolee and his parole officer is privileged would close the lips of the supervising personnel and allow the parolee to confess serious crimes with impunity.[4]

It must be noted that, in the criminal context, courts recognize a very high degree of need for relevant testimony. They are reluctant, therefore, to expand the concept of privilege beyond its traditional bounds -- lawyer-client, doctor-patient, priest-penitent, husband-wife. While the civil law context is different, there is no reason to expect the officer-client relationship to be treated as confidential.

In Fare v. Michael C.,[5] the request by a juvenile on probation, who was suspected of murder, to see his probation officer -- after having been given the Miranda warnings by the police -- was not considered by the U.S. Supreme Court as tantamount to his asking for a lawyer. Evidence voluntarily given by the juvenile, even after he expressed a desire to see his probation officer instead of a lawyer, was held admissible in a subsequent criminal trial. The Court also addressed the issue of confidentiality of information between probation officer and a juvenile probationer, saying:

-119-

A probation officer is not in the same posture with
regard to either the accused or the system of justice as
is [a lawyer]. Often he is not trained in the law, and
so is not in a position to advise the accused as to his
legal rights. Neither is he a trained advocate, skilled
in the representation of the interests of his client
before both police and courts. He does not assume the
power to act on behalf of his client by virtue of his
status as adviser, <u>nor are the communications of the
accused to the probation officer shielded by the
lawyer-client privilege. . . . In most cases, the
probation officer is duty bound to report wrongdoing by
the juvenile when it comes to his attention, even if by
communication from the juvenile himself.</u> (underscoring
supplied)[6]

Although the above case involved a juvenile probationer,
there are strong reasons to believe that the principles enunciated
apply to adult cases as well. Constitutionally, therefore,
probationers/parolees do not have a right against disclosure of
information given to probation/parole officers; however,
disclosure may be prohibited by state law or agency regulation.

Some states have laws or administrative policies concerning
public record access and disclosure. A relevant law or agency
policy would supersede the general principles discussed here.
Hence, the reader should determine whether there is an applicable
law that might give rise to civil, criminal, or administrative
liability if such information is disclosed.

## LIABILITY FOR FAILURE TO DISCLOSE CLIENT BACKGROUND INFORMATION TO THIRD PARTIES

Probation/parole officers may be liable in a narrow set of
circumstances when a third person is harmed by a client about whom
there was no disclosure of background information. The leading
cases from the probation and parole settings are discussed
separately below.

### Parole Officers

In <u>Johnson v. State</u>,[7] a case decided by the California
Supreme Court, a parolee was placed with a foster parent, the
plaintiff. Shortly thereafter, the parolee assaulted the
plaintiff, who then brought suit alleging that the parole officer
had negligently failed to warn her of the youth's homicidal
tendencies and a background of violence and cruelty. The state
argued that this was a discretionary act by the parole officer and
thus immune. The court found that the consideration involved in
deciding whether to disclose background information was at the
lowest to no immunity. The state also argued that it owed no duty
of care to the plaintiff. The court rejected this and held the
state liable, stating:

As the party placing the youth with Mrs. Johnson, the
state's relationship to the plaintiff was such that its
duty extended to warning of latent, dangerous qualities
suggested by the parolee's history or character. . . .
Accordingly, the state owed a duty to inform Mrs. Johnson
of any matter that its agents knew or should have known
that might endanger the Johnson family. At a minimum,
these facts certainly would have included homicidal
tendencies and a background of violence and cruelty, as
well as the youth's criminal record.[8]

The court concluded that if a state parole officer failed to
conscirusly consider the risk to the plaintiff in accepting a
16-year-old parolee in her home and consequently failed to warn
the plaintiff of a foreseeable, latent danger in accepting him,
and that failure led to the plaintiff's injury, the state would be
liable for such injuries.

In the similar case of <u>Georgen v. State</u>,[9] a state court found
liability against the New York Division of Parole for failure to
disclose the violent background of a parolee who was recommended
for employment to the plaintiff whom he later assaulted. The court
concluded that the plaintiff's reliance on the recommendation and
her complete ignorance of the danger posed by the parolee were
sufficient grounds to find a duty to disclose.

<u>Rieser v. District of Columbia</u>[10] is perhaps the best known
case involving a parole officer where liability was imposed. The
facts of the case and the decision are complex, but are briefly
summarized here.

The plaintiff's daughter, Rebecca Rieser, was raped and
murdered by a parolee, Thomas W. Whalen. He had been assisted by
the District of Columbia Department of Corrections in finding
employment at the apartment complex where the victim lived. The
parolee was a suspect in two rape-murder cases at the time of
parole and, during his employment in the apartment complex, became
a suspect in a third murder of a young girl. Parole was not
revoked, but the parole board did advise the parole officer to
supervise the parolee closely. No warning was given to the
employer by the parole officer of the potential risk posed by the
parolee's presence. The employer was later warned by the police
of the parolee's record and his status as a suspect in the three
murders, but the employer did not do anything. Shortly there-
after, the parolee entered the victim's room and raped and
strangled her. The United States District Court for the District
of Columbia entered judgment on the jury's verdict awarding
damages in the amount of $201,633 against the District of
Columbia. The decison was appealed. The United States Court of
Appeals for the District of Columbia affirmed the award, stating
that the parole officer had a duty to reveal the parolee's prior
history of violent sex-related crimes against women to the
management of the apartment complex, as the employer of the
parolee, in order to prevent a specific and unreasonable risk of

harm to the women tenants. The court stated that an actionable
duty is generally owed to reasonably foreseeable plaintiffs
subjected to an unreasonable risk of harm by the actor's (in this
case the parole officer's) negligent conduct.

> Abron's position as a parole officer vested in him a
> general duty to reveal to a potential employer Whalen's
> full prior history of violent sex-related crimes against
> women, and to ensure that adequate controls were placed
> on his work. Placement of Whalen at McLean Gardens put
> him in close proximity to the women tenants, with the
> opportunity to observe their habits, and gave him
> potential access to the keys to their apartments and
> dormitory rooms. . . . The jury could conclude that a
> breach of Abron's general duty would present a specific
> and unreasonable risk of harm to the women tenants of
> McLean Gardens therefore giving rise to a special duty
> toward them.[11]

## Probation Officers

In <u>Meyers v. Los Angeles County Probation Department</u>,[12]
the California Court of Appeals decided that the county probation
department and its employees were not liable for failing to warn
an employer that a probationer was a convicted embezzler, thus
enabling the probationer to embezzle funds from the employer. In
this case, the probation department did not place the probationer
with the employer or direct him in his employment activities and
had no other special relationship with the employer. It was
irrelevant that the probationer was to devote some of his earnings
to court-ordered restitution.

## The Liability Trigger -- Special Relationships

Every person walking the streets faces some risk of harm at
the hands of a parolee or probationer. But it is not -- and could
not be -- the rule that in every case of actual injury, the
pertinent government agency or probation or parole officer will be
liable to the party injured. The cases in this section point to
the factor that is most likely to lead to actual liability.

The common element, the key, seems to be the concept of
"special relationship." Unfortunately, this concept is the type
into which courts tend to pour meaning on a case-by-case basis.
Based on a study of all the relevant cases, the Federal Probation
Service's legal adviser has concluded that the central
requirement necessary to give rise to a "special relationship" <u>is
a reasonably foreseeable risk of harm to a particular person or
narrow class.</u> He explained this element as follows.

### Reasonably Foreseeable Risk

<u>The duty to warn arises when, based on the probationer's
(parolee's) criminal background and past conduct, the</u>

<u>officer can "reasonably foresee" a prospect of harm to a
specific third party.</u>

-- "reasonably foresee" means that the circumstances of
the relationship between the probationer (parolee) and
the third party, <u>e.g.</u>, employer and employee, suggest
that the probationer (parolee) may engage in a criminal
or anti-social manner <u>similar</u>, or <u>related</u> to, his past
conduct.

-- e.g.,  (1) a rapist in an apartment complex or T.V.
          repair job;
          (2) an embezzler in a bank or financial
          company;
          (3) a drug user in a pharmacy or hospital; BUT

          NOT

          (1) a <u>family</u> assaultist in an apartment
          complex. (This would be to members of his
          family, assuming he has not demonstrated a
          general violent disposition.)
          (2) financial scheme criminal who starts a
          "home security" business. (The risk is to
          burglarize homes or sell plans, which is not
          similar or related to his criminal conviction.
          Also, the clients would be general, <u>not</u>
          specific possible victims.)[13]

Another element which the above liability cases have in
common, aside from foreseeability, is reliance. In <u>Johnson</u>,
California officials prevailed upon the plaintiff to accept the
parolee as a foster child; in <u>Georgen</u>, the officers persuaded the
plaintiff to hire the parolee; and in <u>Rieser</u>, District of Columbia
officials found the parolee the job and permitted him to remain in
a position to prey on women even as evidence mounted that he was a
rapist. In all these cases, the injured parties had reasons to
believe that the clients were competent to do the work and not
prone to commit violent acts. It would seem, therefore, that
liability is slim in cases where reliance on the act or judgment
of a probation/parole officer is absent. An example would be the
<u>Myers</u> case where the California Court of Appeals decided that the
officers were not liable for failing to warn an employer that the
probationer was a convicted embezzler. This was because the
probation department did not place the probationer with the
employer nor direct him in his employment activities, nor have
any other special relationship with the employer.

While the above cases deal with failure to disclose, the act
of disclosure may lead to a probationer/parolee not getting the
job; hence the probationer/parolee may sue. Chances of liability
in these cases are slim because the disclosure may be justified
under the concept of "protection of society." A legally sound
policy for the department to adopt, however, is one which makes

disclosure or non-disclosure _optional_ in those cases where a probationer/parolee obtains a job on his own and without the help of the department. This protects the officer either way in that if he discloses the record, the policy protects him; conversely, if he does not disclose, there is no liability because such disclosure is optional.

There are departments that _require_ disclosure by the officer to the employer of the employee's record, even if the employee obtained employment on his own. This policy carries added risks for the officer because failure to disclose would then amount to negligence of duty or a violation of policy. The better policy is to make disclosure or non-disclosure optional, as recommended above.

## OTHER SUPERVISION ERRORS

Failure to warn where there is some duty to do so is not the only circumstance that could give rise to liability to third parties. Deficiencies in the whole range of a field officer's responsibilities are pregnant with possibilities. One of the best examples of this is _Semler v. Psychiatric Institute_,[14] decided by the Fourth Circuit Court of Appeals in 1976, which resulted in a finding of liability.

_Semler_ needs full discussion in view of its convoluted facts. The case was a negligence action under Virginia law. It was brought by Helen Semler to recover damages for the death of her daughter, who was killed by John Gilreath, a Virginia probationer. Gilreath had been prosecuted for abducting a young girl in 1971. Pending his trial, Gilreath entered the Psychiatric Institute of Washington, D.C., for treatment. The doctor said that he thought Gilreath could benefit from continued treatment and that he did not consider him to be a danger to himself or others as long as he was in a supervised, structured environment such as was furnished at the Psychiatric Institute. In August 1972, Gilreath pleaded guilty. His 20-year sentence was suspended, conditioned on Gilreath's continued treatment and confinement at the Institute.

A few months later, on the doctor's recommendation and the probation officer's request, the state judge allowed Gilreath to visit his family for Thanksgiving and Christmas. Subsequently, again on the recommendation of the doctor, the judge allowed additional passes, and early in 1973 he authorized the probation officer to grant _weekend_ passes at his discretion. In May 1973, the doctor recommended that Gilreath become a day care patient so that he could go to the hospital each morning and come each evening. The probation officer transmitted this recommendation to the judge, who approved it.

In July 1973, the probation officer gave Gilreath a 3-day pass to investigate the possibility of moving to Ohio. The probation officer later gave Gilreath a 14-day pass so he could

return to Ohio to prepare for a transfer of probation to that state. The officer approved each of these trips after discussing them with the doctor. _Neither pass was submitted to the state judge for approval._ On August 29, 1973, the doctor, assuming Gilreath would be accepted for probation in Ohio, wrote the probation officer that Gilreath had been discharged from the Institute.

The Ohio probation authorities, however, rejected Gilreath's application for transfer. Gilreath telephoned this news to his probation officer, who instructed him to return to Virginia. On September 19, 1973, Gilreath visited his doctor, who told him he should have additional therapy. The doctor did not restore Gilreath to day care status, enrolling him instead in a therapy group that met two nights a week. As an out-patient, Gilreath first lived at home and later alone, working as a bricklayer's helper. Gilreath told the probation officer about this arrangement, but the officer did not report it to the judge. In late September, the officer was promoted and a new probation officer was assigned to Gilreath on October 1. Gilreath killed the plaintiff's daughter on October 29, 1973.

In allowing the plaintiff's claim, the appeals court stressed that the requirement of confinement until release by the criminal court was to protect the public, particularly young girls, from a foreseeable risk of attack. The special relationship created by the probation order imposed a duty on the government and the probation officer to protect the public from the reasonably foreseeable risk of harm at Gilreath's hands that the state judge had already recognized. The plaintiff was awarded $25,000 in damages, with the probation officer liable for one-half.

The facts in the _Semler_ case are rather unique and, because of that, its applicability to other probation cases is doubtful. An old adage states that "hard facts make bad law." Nonetheless, it appears crucial in _Semler_ that the probation officer in effect changed the status of the probationer from that of a day care patient to an outpatient without authorization from the judge. The probation officer gave Gilreath more liberty than the judicial order allowed. The result in the case would most probably have been different had the actions of the probation officer and the doctor been in accord with a judicial order, even if the young girl died. The judge himself could not possibly be liable because of the absolute immunity defense. Carrying out the orders of the court is a valid defense in liability cases, unless those orders are patently illegal or unconstitutional.

Special note should be taken of the way in which _Semler_ differs from the cases in the preceding section. Unlike _Johnson_, _Georgen_, and _Rieser_, the plaintiff in _Semler_ did not allege that a risk of harm to her daughter was foreseeable. The decedent was simply a member of the general public. While the _Semler_ court used the term "special relationship," it used it in an entirely different way than in the other cases. The potential consequences

of the Semler precedent are significantly more worrisome as a result.

It should also be noted that the kind of conduct that might have defeated liability in Semler was quite different from the companion cases. The state court in Semler knew all of the facts concerning Gilreath's background. What was not communicated was his present treatment status, information the court might have used to keep the probationer in check. In Meyers and the other cases, it was the party injured who did not receive information.

Finally, in Semler there was a unique breach of orders factor. When the physician and probation officer ceased to involve the judge in making decisions about Gilreath, they arrogated to themselves power that was not theirs to exercise. They could not do this without also accepting the consequences of their actions.

## IS THERE AN ENFORCEABLE RIGHT TO SUPERVISION?

People v. Beckler[15] focused on the plight of a defendant who was rejectd by the treatment program to which the court assigned him. The court ruled that the defendant had a statutorily created interest in remaining under supervision. Consequent due process required notice, hearing, right to confront and cross-examine adverse witnesses, and disclosure of evidence against the defendant used by the agency in refusing him further treatment. The procedures were utilized to insure that the agency ruling had not arbitrarily disregarded the defendant's interest in supervision. Beckler merely suggests supervision may not be denied without due process where statutes so provide. While the case presently stands alone, its inherent logic constitutes a forceful argument for compliance by officers working under provisions of similar statutes. Beckler stands for a right to due process, not a right to supervision.

## SEARCH AND SEIZURE

Our survey of field officers revealed significant concern with parole and probation conditions requiring released offenders to waive fourth amendment protections concerning searches and seizures, and with searches in the absence of waiver conditions. This concern appears fully justified by the complexity of the law in this area and by the frequency with which a search problem may be encountered. These factors suggest a need to give consideration to applicable search law here; they also suggest that parole and probation agencies need to maintain surveillance of developments in this area and provide training on an on-going basis.

## History

By its terms, the fourth amendment appears to apply to probationers and parolees as fully as to other citizens. The amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

A 1976 law review commentary observed that "in the past, courts have relied on express waivers by paroleees or probationers, or have invoked the 'act of grace' and 'constructive custody' doctrines in order to strip released offenders of virtually all the fourth amendment guarantees afforded ordinary citizens."[16] In the last decade, courts began to re-appraise this tradition. As a result, some new doctrines have emerged and the entire field may be considered unsettled.

## Validity of Waiver Conditions

There is some authority for the proposition that a parole or probation condition waiving fourth amendment protections is illegal or worthless. In one case where a consent to search had been signed by a state parolee, it was thrown out by a federal court in a collateral challenge.[17] The court reasoned that since the prisoner could only secure his release on parole by accepting the condition, his consent was not voluntarily given. The prospect of eight years of additional confinement was coercive, the court said.

Even in the Ninth Circuit, where a waiver condition is recognized as valid, the terms of the condition must be narrowly drawn. The court of appeals there disapproved as overly broad a condition that appeared to extend the benefits of a federal probation condition to all "law enforcement officers."[18] This holding was also based on the coerciveness of the circumstances that give rise to a consent waiver. The condition that was approved provides: "A probationer must submit to a search of her person or property conducted in a reasonable manner at a reasonable time by a probation officer."[19] Such a condition, the court said, would meet the reasonableness requirement of the fourth amendment by properly balancing the relevant governmental and individual interests.

Sometimes, the relevant condition is one that authorizes unannounced visits by a probation/parole officer to the residence of an offender. Such a condition may be useful because, once lawfully on the premises, the officer may see (or detect through other senses) information that activates some exception to the warrant requirement of the fourth amendment. Such a situation arose in United States v. Bradley.[20] There, a Virginia parole officer received information sufficient to support a warrant that the parolee had a firearm in his possession. Some six hours later, acting under a visitation condition, she went to his residence and conducted a search, locating a weapon secreted in a

closet. This evidence was used to convict the parolee in a federal criminal trial. The Fourth Circuit Court of Appeals reversed, holding that the warrant requirement was a rigid one.

> We therefore hold that unless an established exception to the warrant requirement is applicable, a parole officer must secure a warrant prior to conducting a search of a parolee's place of residence even where, as a condition of parole, the parolee has consented to periodic and unannounced visits by the parole officer.[21]

In a follow-up case, the Fourth Circuit applied this rule to a probation revocation proceeding.[22] This accords with the weight of authority that search and seizure law does not apply differently in parole and probation cases.

## Warrantless Searches Absent Waiver Conditions

There are a number of competing views concerning the circumstances in which a probation/parole officer can search a client without a warrant. Several courts have created rationales for a reduced expectation of privacy by probationers and parolees.[23] Where a probation or parole officer has no probable cause upon which to obtain a warrant but requires the power to search as an integral part of his supervisory function, courts have analogized to administrative search warrants to uphold searches, with or without warrants.[24]

As to the role of law enforcement personnel, however, there is substantial unanimity. A law enforcement officer must fully comply with the fourth amendment before searching a parolee or probationer. Several Ninth Circuit decisions lay down supplemental rules, which appear to be generally sound. In the event that police seek to induce a probation officer to exercise his power to search, the probation officer may accommodate the request if he believes the search is necessary to the proper functioning of the probation system.[25] A probation/parole officer may enlist the aid of law enforcement personnel to expedite a search,[26] subject again to the limitation that the primary purpose is probation/parole-related and not a subterfuge for a more general law enforcement goal.

The decisions concerning warrantless probation/parole-related searches by probation/parole officers differ substantially.

**Fourth Amendment Fully Applicable.** This is the Fourth Circuit view. It was originally enunciated in a 1950 case[27] and was recently reaffirmed in Bradley (parole) and United States v. Workman[28] (probation). The Eighth Circuit, in 1984, found a parole officer may be liable for violation of a prisoner's civil rights where information leading to revocation of parole was obtained unconstitutionally.[29]

Among the states, Iowa[30] and Washington[31] courts have rendered decisions holding that fourth amendment protections

-128-

extend to released offenders involved in new criminal proceedings. The Washington court also held, however, that the fourth amendment had less force in a probation revocation proceeding; hence, it would permit that use of evidence suppressed from a criminal trial. The Iowa court specifically declined to indicate the rule it would follow in a parole revocation situation.

These cases must not be taken to mean that there is no difference between a probationer or parolee and the ordinary citizen. The Fourth Circuit and Washington specifically consider the individual's status as a releasee to be relevant to what constitutes the probable cause necessary to obtain a warrant. And, of course, saying that the fourth amendment applies means that exceptions to the warrant requirement apply and will legitimate searches of offenders whenever they would do so for a member of the general public.

**Probable Cause Not Required for Offender Search.** At the opposite end of the spectrum is the view exemplified in People v. Hernandez.[32] In that case, a California parolee was told that his status deprived him of the right to insist on fourth amendment guarantees with respect to personal and automobile searches initiated by correctional authorities. The case was decided in 1964. In light of its age and developments in probation and parole law since that time, it is open to question whether so stark a view could be adopted today, or could withstand review. Since Morrissey v. Brewer[33] and Gagnon v. Scarpelli,[34] it has been clear that parolees and probationers are not bereft of substantial constitutional rights.

**Some Reason, But Not Probable Cause, Required.** In companion cases[35] in 1975, the Ninth Circuit Court of Appeals gave full consideration to the search rights of probationers and parolees. In each instance, the court concluded that a test of reasonable necessity, relative to the enforcement of the probation and parole systems, which is explicitly below the "probable cause" threshold of certainty, was held justified by the diminished expectation of privacy -- the central value protected by the fourth amendment -- that inheres in the parole status. In a balancing process, the need for effective law enforcement is held to outweigh the probationer's interest.

**Reasonable Basis Variations.** Probably the most widely adopted view neither denies that the offender has fourth amendment rights nor treats him as virtually indistinguishable from members of the general public. This final view, rather, holds that a warrantless search is legitimate whenever a probation/parole officer has reasonable cause to believe that the parolee or probationer is violating, or is about to violate, a condition.[36] The exact words of the judicial test vary from state to state, but the result is the same. For example, in People v. Anderson,[37] a warrantless search was approved where the parole officer had "reasonable grounds" to believe there had been a violation. The language in

-129-

People v. Santos[38] was "reasonable suspicion."  In State v. Williams,[39] it was "sufficient information to arouse suspicion."

Slightly different language but similar reasoning was employed by the Pennsylvania Court in a 1982 case, Souders v. Kroboth.[40]  Here, the plaintiff was arrested by defendant parole board agents for failure to report regularly to his parole agent in violation of his Board-approved parole plan.  Defendants, after a pat-down search of the plaintiff, yielded a pipe with a "distinct odor of marijuana about it," placed the plaintiff in prison custody, and then proceeded to search the plaintiff's home, informing the plaintiff's wife, upon being queried by her, that they needed no search warrant because the plaintiff was a parolee.  The search discovered marijuana and drug paraphernalia. A revocation hearing was held and the board revoked the plaintiff's parole.

The court hearing the plaintiff's subsequent suit did not find it necessary to determine whether the exclusionary rule applied to revocation hearings because, it ruled, the officers, acting in good faith, were entitled to qualified immunity.  The court noted that, while several courts had found the exclusionary rule inapplicable to probation and parole revocation proceedings, other courts would have applied the rule.  "Good faith," therefore, seems, for the Souders court, to have become a form of reasonableness.

It is not surprising that reasonableness should be a popular argument.  After all, the fourth amendment does not proscribe all warrantless searches.  It only bars those that are unreasonable. The above tests seek safe haven by adopting the amendment's "reasonableness" rationale.  When a court concludes that the behavior under review is reasonable (no matter what other word it attaches), it is also saying it was constitutional.

When courts apply this approach, they often say that the totality of the circumstances must be considered, including the complaining party's status as a probationer or parolee.[41]  This means, of course, that the amount of information required before action can be taken is less than in the case of a member of the general public.

The reader should realize that the foregoing categorization is artificial.  It is more accurate to think of search and seizure law as a line along which various jurisdictions are arranged according to the relative amount of triggering information insisted upon by a reviewing court.  In order to act properly within his jurisdiction, the probation/parole officer will have to consult local authorities.

VIOLATIONS - REPORTING

This issue concerned almost all respondents although the law is fairly clear.  Generally, an officer has a duty to report

violations to the court or parole board.  He has the duty to maintain close contact with and supervision of the probationer/ parolee in the interests of rehabilitation and protection of the public.[42]  We found no cases in which liability arose from an officer's failure to report a violation and a subsequent crime or tort committed by a client.  However, see the discussion of Semler v. Psychiatric Institute in the preceding chapter for a case in which liability attached when a change in treatment status was not communicated.

For a discussion of violations as an aspect of revocation, see Chapter XII, infra.

COLLECTIONS - RESTITUTION

A probation officer generally cannot assess the amount of restitution.  If an amount is not specified in the order of probation, none may be collected.[43]  The court must provide the probationer with a specific amount to be paid as restitution.  It is improper to delegate that authority to the probation supervisor.[44]  The basic premise here is that the imposition of restitution, as with any other part of a sentence, is by statutory authority granted to the court and therefore the court must determine the amount.[45]  The imposition of probation conditions is the duty of the court and cannot be delegated.  Again, the only exception is if otherwise specifically provided for by law.[46]

Once restitution has been ordered, it becomes the responsibility of the probation officer or the department, depending upon organizational structure, to handle and disburse funds received from the probationer in a proper manner.  The order of the court will include the party to whom restitution is due, as well as the amount.  While in some cases the order may state something less than a specific name, such as a company, it is the duty of the officer to pay out the funds to the proper party.

No personal responsibility accrues unless the officer is given the duty of disbursing the funds.  In most cases, a separate office is maintained to handle payments by the probationer and disbursements, in which case the department, not the individual officer, is responsible.  If the officer is responsible, he may be held liable for improper disbursement.  No funds may be disbursed to anyone other than the party named in the order of the court. Thus, an officer was held liable for having paid restitution money to a relative of a court-ordered recipient.[47]  In this situation, restitution was to be paid through the probation office, but the supervising officer ordered the office to pay funds to the recipient's sister with whom the recipient was living.  The officer was found by the court to be exercising action outside the duties of his office.

If restitution is being paid directly by the probationer, the officer may be responsible for assuring payment, but only insofar as his supervision duties allow him to know the facts.  Therefore,

if the officer is not aware of the failure of the probationer to
make payments after exercising proper diligence, he will not be
liable.  If he is aware, there is a duty to report the matter to
the court as a violation of conditions, at which point there will
be no liability on the part of the officer.[48]

While the imposition of a fine or restitution by the court as
a condition of probation is obviously constitutional, the U.S.
Supreme Court has recently held in Bearden v. Georgia[49] that a
judge cannot properly revoke a defendant's probation for failure
to pay a fine and make restitution -- in the absence of evidence
and finding that the probationer was somehow responsible for the
failure, or that alternative forms of punishment were inadequate
to meet the state's interest in punishment and deterrence.  Simply
stated, if a probationer/parolee cannot pay a fine or restitution
because he is indigent, his probation/parole cannot be revoked
unless alternative forms of punishment are inadequate.  On the
other hand, if the probationer/parolee has the financial capacity
to pay, but refuses to pay, revocation is valid.

**GENERAL SUPERVISORY LIABILITY**

A 1984 case, Acevedo by Acevedo v. Pima City Adult
Probation,[50] explored supervisory liability in the context of
possible immunity.  The court noted that the primary reason for
judicial immunity from civil actions was to assure that judges
would exercise their function with independence and without fear
of consequence.  While the doctrine is not limited to judges, it
may not be extended to probation officers in its entirety:

> . . .[N]ot all activities of a probation officer in
> supervising a probationer are entitled to immunity.
> Much of the work of a probation officer is administrative
> and supervisory.  Such activities are not part of the
> judicial functon; they are administrative in char-
> acter. . . .
>
> A probation officer may not assert immunity unless
> the officer is acting pursuant to or in aid of the
> directions of the court.  In the instant case, evidence
> indicated probation officers acted contra court direc-
> tive. . . .  Sentencing court specifically prohibited the
> probationer from having any contact with minors.  Any
> possible claim to immunity ceased when officers ignored
> the specific direction of the court.

**SHOULD THE PROBATION OFFICER HAVE GIVEN PROBATIONER
THE MIRANDA WARNINGS WHEN ASKING QUESTIONS?**

The case of Minnesota v. Murphy, decided by the U.S. Supreme
Court in 1984 and discussed more extensively in Chapter XII on
Revocation, answers most of the concerns on this issue.  The
effect of the Murphy decision may be summarized as follows:

**SHOULD THE MIRANDA WARNINGS BE GIVEN BY THE PROBATION
OFFICER IF THE EVIDENCE OBTAINED IS TO BE ADMISSIBLE?**

|                | Revocation                  | Trial                                     |
| -------------- | --------------------------- | ----------------------------------------- |
| Not in custody | No                          | No, unless probationer asserts right      |
| In custody     | Depends upon state law      | Yes                                       |

The crucial question then is:  When is a probationer in the
custody of a probation officer?  This was not answered satis-
factorily in Murphy.  All the Court said was: "It is clear that
respondent was not 'in custody' for purposes of receiving Miranda
protection since there was no formal arrest or restraint on
freedom of movement of the degree associated with formal arrest."
It is therefore clear that a probationer who is under arrest is in
custody, but what about other instances?  From a study of court
cases, the rule appears to be:  If after the interrogation, the
officer intends to let the probationer leave, then the probationer
is not in custody.  Conversely, if the officer during the
interrogation had no intentions of allowing the probationer to
leave after the interrogation (either because of prior information
of the probationer's activities or because of answers during the
interrogation that convince the officer that the probationer
should be placed under custody), then the probationer is under
custody and therefore the rules as summarized above apply.

What about cases where initially an officer did not intend to
place the probationer in custody, but as the interview develops
the officer feels that the probationer, because of incriminating
response, should now be placed in custody?  In these cases, the
probationer is considered to be in custody at that point in time
when the officer decided that the probationer should not be
allowed to leave.  At that stage, the Miranda warnings must be
given if answers obtained are to be used during a subsequent
criminal trial.  Obviously, that determination is subjective.

There is a distinction therefore between supervisory
interrogation (where the Miranda warnings need not be given) and
custodial interrogation (where the Miranda warnings must be given
if the evidence is to be used in a criminal trial, or in a
revocation proceeding, if state law so provides).  The Murphy case
involved a probationer, but there are reasons to believe that the
principles should apply to parole cases as well.

## SUMMARY

This chapter deals with the issue of disclosure of a client's record, and also considers liability for improper supervision. In the area of searches, the constitutional issues are unsettled and great variation exists between jurisdictions. In the area of violations, the law is clear: the officer has a responsibility to inform the court, but considering the pragmatic need for discretion on this point, it was not surprising to find no decisions in this area. Monetary collections should be carefully handled by the field officer. Generally, an officer must give the Miranda warnings if the probationer is in custody and if the evidence obtained is to be used in a criminal trial.

## NOTES

## CHAPTER XI

1. J. Kutcher, The Legal Responsibility of Probation Officers in Supervision, 41 Fed. Prob. 35, 37-38 (1977).

2. Anderson v. Boyd, 714 F. 2d. 906 (9th Cir. 1983).

3. State v. Roberts, 14 Wash. App. 727, 544 P. 2d 754 (1976).

4. Id. at 730, 544 P. 2d at 757.

5. Fare v. Michael C., 442 U.S. 207 (1979).

6. Id. at 719-720.

7. Johnson v. State, 69 Cal. 2d 782, 447 P. 2d 352, 73 Cal. Rptr. 240 (1968).

8. Id. at 785, 447 P. 2d at 355, 73 Cal. Rptr. at 243.

9. 196 N.Y.S. 2d 455, 18 Misc. 2d 1085 (Ct. Cl. 1959).

10. 563 F. 2d 462 (D.C. Cir. 1977).

11. Id. at 479.

12. 78 Cal. App. 3d 309, 144 Cal. Rptr. 186 (1978).

13. Unpublished remarks of Judd D. Kutcher to the American Probation and Parole Association (Oct. 29, 1980).

14. 538 F. 2d 121 (4th Cir. 1976).

15. People v. Beckler, 459 N.E. 2d. 672 (Ill. App. Ct. 1984).

16. Note, Striking the Balance Between Privacy and Supervision: The Fourth Amendment and Parole and Probation Officer Searches of Parolees and Probationers, 51 N.Y.U. L. Rev. 800, 800 (1976).

17. United States ex rel Coleman v. Smith, 395 F. Supp. 1155 (W.D.N.Y. 1975). See, also, State v. Stephens, 47 Or. App. 305, 614 P. 2d. 1180 (1980), aff'd, 50 Or. App. 595, 623 P. 2d. 1076 (1981) (Search condition void; probation revocation reversed because based on illegal search based on void condition); Gomez v. Superior Ct., 132 Cal. App. 3d. 947, 183 Cal. Reptr. 577 (1982); Florida v. Royer, 103 S. Ct. 1319, 1324 (1983) (state has burden of proving that consent was "freely and voluntarily given").

18. United States v. Consuelo-Gonzalez, 521 F. 2d 259, 262 (9th Cir. 1975).

19. Id. at 263.

20. 571 F. 2d 787 (4th Cir. 1978).

21. Id. at 789.

22. United States v. Workman, 585 F. 2d 1205 (4th Cir. 1978).

23. See In re Martinez, 1 Cal. 3d. 641, 647 n 6, 463 P. 2d, 734, 738 n 6, 83 Cal. Rpts 382, 386 n 6 (1970); Seim v. State, 95 Nev. 89, 590 P. 2d. 1152 (1979); Macias v. State, 649 SW 2d. 150 (Tex. Ct. App. 1983).

24. See Grubbs v. State, 373 So. 2d. 905 (Fla. 1979); State v. Pinson, 104 Idaho 227, 657 P. 2d 1095 (1983). See, also, 47 Geo. Wash. L. Rev. 863 (1979) and Note, "Admissibility of Evidence in Probation/Parole Revocation Proceedings and in Criminal Prosecutions: Applying a Single Standard," 50 Fordham L Rev. 936 (1982) (advocating use of warrants with reduced probable cause requirements).

25. Ryan v. State, 580 F. 2d. 988 (9th Cir.), cert. denied, 440 United States 977 (1978).

26. Id.; United States v. Dally, 606 F. 2d 861 (9th Cir. 1979).

27. Martin v. United States, 183 F. 2d 436 (4th Cir.), cert. denied, 340 United States 904 (1950).

28. 585 F. 2d 1205 (4th Cir. 1978).

29. Duncan v. Clements, 744 F. 2d. 48 (8th Cir. 1984).

30. State v. Cullison, 173 N.W., 2d 533 (Iowa), cert. denied, 398 United States 938 (1970).

31. State v. Kuhn, 7 Wash. App. 190, 499 P. 2d 49 (1972).

32. People v. Hernandez, 229 Cal. App. 2d 143, 40 Cal. Rptr. 100 (1964), cert. denied, 381 U.S. 953 (1965).

33. 408 United States 471 (1972).

34. 411 United States 778 (1973).

35. Latta v. Fitzharris, 521 F. 2d 246 (9th Cir.), cert. denied, 423 United States 897 (1975); United States v. Consuelo-Gonzalez, 521 F. 2d 259 (9th Cir. 1975).

36. Hill, Rights of the Convicted Felon on Parole, 13 U. Rich. L. Rev. 370, 371 (1979). See, also, State v. Perbix, 331 NW 2d. 14 (ND 1983).

37. 189 Colo. 34, 536 P. 2d 302 (1975).

38. 82 Misc. 2d 184, 368 N.Y.S. 2d 130, (N.Y. County Sup. Ct. 1975).

39. 486 S.W. 2d 468 (Mo. 1972). See, also, People v. Anderson, 189 Colo 34, 536 P. 2d. 302 (1975); State v. Pinson, 104 Idaho 227, 657 P. 2d. 1095 (1983).

40. Souders v. Kroboth, 547 F. Supp. 187, (U.S.D. Pa. 1982).

41. Id.; Hunter v. State, 139 Ga. App. 676, 229 S.E. 2d 505 (1976); State v. Davies, 9 Or. App. 412, 496 P. 2d 923 (1972).

42. United States v. Glasgow, 389 F. Supp. 217 (D.D.C. 1975); Jones v. State, 360 So. 2d 1158 (Fla. Dist. Ct. App. 1978); State v. McCain, 150 N.J. Super. 497, 376 A. 2d 185 (Super. Ct. App. Div. 1977); State v. Marshall, 247 N.W. 2d 484 (S.D. 1976).

43. State v. Thieme, 89 Wisc. 2d 287, 278 N.W. 2d 274 (1979).

44. Cothron v. State, 377 So. 2d 255 (Fla. Dist. Ct. App. 1979).

45. People v. Julye, 64 A.D. 2d 614, 406 N.Y.S. 2d 529 (1978).

46. United States v. Crocker, 435 F. 2d 601 (1971).

47. Pouliot v. Hodgdon, 119 N.H. 437, 402 A. 2d 199 (1979).

48. McCrady v. Mahon, 119 N.H. 247, 400 A. 2d 1173 (1979).

49. Bearden v. Georgia, 33 CrL 3103 (1983).

50. Acevedo by Acevedo v. Pima City Adult Probation, 690 P. 2d. 79, (Ariz. Ct. App. 1984), 690 P. 2d. 38 (Ariz. Sp. Ct. 1984).

# CHAPTER XII

## REVOCATION

The release of an offender on probation or parole implies that, in the best judgment of the releasing authority, the releasee will thereafter respect and abide by the law and observe the conditions of release. Unfortunately, this expectation is not realized by about one fourth of the parolees and one·sixth of the probationers. Consequently, situations are frequently encountered that warrant consideration of revocation of probation or parole. All field officers need an awareness of the basic legal principles that govern revocation, as well as their agencies' detailed procedures.

The controlling judicial decision in this area is Morrissey v. Brewer,[1] a 1972 Supreme Court case. The following year, the Court said it did not perceive a difference between parole and probation revocations as far as the requirements of due process are concerned;[2] hence, the following discussion of Morrissey applies to both systems.

## MORRISSEY V. BREWER

### The Factual Setting

Morrissey was convicted of passing a bad check in Iowa in 1967. Upon a plea of guilty, he was sentenced to seven years in prison. He was paroled in June 1968. Seven months later, at the direction of his parole officer, he was arrested in his hometown as a parole violator and held in a local jail. A week later, after review of the officer's written report, the Iowa Board of Parole revoked Morrissey's parole, and he was returned to prison. Morrissey received no hearing prior to revocation.

Morrissey allegedly had violated the conditions of his parole by buying a car under an assumed name and operating it without the permission of his parole officer. He also gave a false address to the police and an insurance company after a minor traffic accident. Additionally, Morrissey obtained credit under an assumed name and failed to report his residence to his parole officer. According to the parole officer's report, Morrissey admitted certain of these technical violations of parole regulations.

After his parole was revoked, Morrissey exhausted his state remedies and filed a habeas corpus petition in federal district court. He charged it was a denial of due process to revoke his parole without a hearing. The district court and the Eighth Circuit Court of Appeals both denied the petition and the Supreme Court granted certiorari. It reversed.

### The Reasoning of the Court

The Court began by observing that parole has become an integral part of the correctional system and that it serves a number of useful purposes. The Court said it is implicit in the system that the parolee is entitled to retain his liberty as long as he substantially abides by the conditions of parole. The Court identified the components of the revocation process as, first, a wholly retrospective factual inquiry concerning whether parole terms were violated. Only when it is found that a violation has occurred is it necessary to decide whether to respond by revocation or another means.

Turning to a legal analysis of the case, the Court observed that revocation is not part of a criminal prosecution and "thus the full panoply of rights due a defendant in such a proceeding does not apply to parole revocation."[3] Revocation is the deprivation of conditional liberty, not the absolute liberty of the ordinary citizen. The Court then examined the nature of this limited liberty to determine whether it is within the ambit of the fourteenth amendment. It is.

> We see, therefore, that the liberty of the parolee, although indeterminate, includes many of the core values of unqualified liberty and its termination inflicts a "grievous loss" on the parolee and often on others. It is hardly useful any longer to try to deal with this problem in terms of whether the parolee's liberty is a "right" or a "privilege." By whatever name, the liberty is valuable and must be seen as within the protection of the fourteenth amendment. Its termination calls for some orderly process, however informal.[4]

Finally, the court assessed the governmental interest and found that it, too, would be served by an informal hearing process designed to develop the facts concerning the alleged violation and the equities involved in the sanction of revocation.

### The Holding of the Court

After thus concluding that some process was due, the Court turned its attention to deciding what procedures were required. The Court held that two hearings should be conducted.

Preliminary Hearing. A preliminary hearing is necessary, the Court said, because there will often be a substantial delay between the arrest of a parolee and the date of the revocation hearing; there may also be a substantial distance between the place of arrest and the final hearing.

> . . . [s]ome minimal inquiry should be conducted at or reasonably near the place of the alleged parole violation or arrest and as promptly as convenient after arrest while information is fresh and sources are available. . . . Such an inquiry should be seen as in the nature of a

"preliminary hearing" to determine whether there is probable cause or reasonable ground to believe that the arrested parolee has committed acts that would constitute a violation of parole conditions.[5]

The Court specified that the hearing officer at this inquiry should be someone who is not involved in the case (not necessarily a judicial officer), and that the parolee should be given notice of the hearing and of its purpose. On the request of the parolee, persons who have given adverse information on which parole violation is based are to be made available for questioning in the parolee's presence. However, confrontation and cross-examination can be denied if the hearing officer decides that the informant would be placed at risk if identified. Based upon the information presented (which he must summarize for the record), the hearing officer should determine if there is reason to warrant the parolee's continued detention. The hearing officer must state the reasons for his decision and the evidence relied on. The Court stated that the process could be informal.

Revocation Hearing. At the request of the parolee, the Court said, there must be a second hearing to lead to a final determination of any contested relevant facts and consideration of whether the facts warrant revocation.

In reference to the revocation hearing, the Court stated:

The parolee must have an opportunity to be heard and to show, if he can, that he did not violate the conditions, or, if he did, that circumstances in mitigation suggest the violation does not warrant revocation. The revocation hearing must be tendered within a reasonable time after the parolee is taken into custody. A lapse of two months, as the State suggests occurs in some cases, would not appear to be unreasonable.[6]

The Court went on to specify procedures to be observed in the revocation hearing. They include:

(a) written notice of the claimed violation of parole,
(b) disclosure to the parolee of evidence against him,
(c) opportunity to be heard in person and to present witnesses and documentary evidence,
(d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation),
(e) a "neutral and detached" hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers,
(f) a written statement by the fact finders as to the evidence relied on and reasons for revoking parole.[7]

The Court reserved the question whether the parolee could have the assistance of retained counsel, or appointed counsel if he is indigent. When this issue was reached in Gagnon v.

-140-

Scarpelli,[8] the Court held that decisions would have to be made on a case-by-case basis, with consideration given to the presence or absence of contested facts, any possibly mitigating circumstances to be considered in opposition to revocation, and the apparent ability of the probationer or parolee to present his case effectively. Gagnon v. Scarpelli also held that the above rights given to parolees must also be given to probationers in probation revocation proceedings.

## JUDICIAL GLOSS

Although Morrissey was unusually detailed, the facts of the case did not present the infinite variety of situations encountered in day-to-day administration of the probation and parole systems. In the decade since Morrissey was decided, there has been considerable litigation to hone its rules and define their parameters. This section presents the judicial gloss that has developed in a number of significant areas. Legislatures and administrative agencies have also sought to particularize the Morrissey rules for individual systems, but these refinements are not considered here.

## Preliminary Hearing Issues

Location. The only time a problem appears to arise here is when violations have occurred in different geographical jurisdictions. An Eighth Circuit Court of Appeals decision[9] appears to state the general rule. The "arrest" referred to by the Supreme Court in Morrissey refers to the probation or parole violation arrest. Hence, the requirement that the preliminary hearing be held "near" the place of arrest was not violated when a Nebraska probationer received a Nebraska hearing to consider alleged probation violations that occurred in Oklahoma.

Promptness. The jurisdictions vary considerably on this point. At one end, New York typifies a point of view that the determination of what constitutes a "reasonably prompt inquiry" must be made on a case-by-case basis.[10] California case law suggests the outside limit of promptness is four months, after which charges will be struck.[11] This seems reasonable, perhaps generous, because the period doesn't begin when cause to consider revocation is discovered; it only starts when the probationer or parolee is summoned or arrested.

Another perspective is typified by Arizona law, where the limits of promptness are not less than 7 nor more than 20 days after service of summons or warrant, unless the probationer requests otherwise.[12]

Some courts have held that it is possible to dispense with the preliminary hearing and retain the necessary due process. The Supreme Court held this to be the case in a 1976 decision[13] concerning a parolee who had been convicted of a new offense. The conviction conclusively establishes the necessary probable cause in such situations. Also, if the formal revocation hearing is

-141-

held within a reasonable time after the alleged violation, a single revocation hearing may be sufficient. This view is typified by Michigan and appears to be the preferred trend.[14] The constitutionality of this procedure was challenged in a Texas case, which went to the United States Supreme Court.[15] The Court, however, dismissed the appeal without authoritatively settling this issue.

Form of Notice. The general rule is typified by an Eighth Circuit ruling that requires written notice only with respect to the final hearing and not with respect to a preliminary hearing.[16]

Impartial Hearing Officer. The person conducting the hearing need not be a judicial officer or an attorney. He must only be impartial and detached, which appears to exclude only the parole officer who initiated the arrest. A different parole officer may conduct the hearing.[17]

Revocation Hearing Issues

Notice of Hearing. Morrissey requires that "written notice of the claimed violation of parole" be given. The states have shown considerable variation in determining the minimally acceptable form of notice. Most states have demanded reasonably complete notice to comply with standards of fairness. However, since Morrissey did not delineate any definite standards, states have been left to their own devices. For example, North Dakota found adequate a notice that did not mention the time and place of the hearing.[18] It is the majority rule that when notice is not given because the parolee makes himself unavailable, his failure to receive it does not violate his constitutional rights.[19] Although it is not always necessary that the parolee receive the notice, the mere affidavit of a hearing officer that he had directed that a violation report be sent to a probationer was not enough.[20] Presumably, the failure to receive notice must be through the fault of the parolee.

Disclosure of Evidence. The Morrissey requirement of disclosure of the evidence against the parolee at the revocation hearing may be met by a number of methods. In some jurisdictions mere verbal notice has sufficed, although written notice is generally preferable. Most jurisdictions allow the parolee access to pertinent official records and materials.[21] However, as long as the parolee is advised in some manner of the evidence against him, the parole officer need not reveal his report or notes to the parolee. A federal district court in New York upheld denial of a parolee's access to his parole officer's chronological entries of conversations with the parolee.[22]

Confrontation and Cross-Examination. In Morrissey, the Supreme Court said that at a revocation hearing a parolee should have the right to confront and cross-examine adverse witnesses, unless the hearing officer excuses confrontation for good cause. The Court also said that the revocation hearing was not the same as a criminal trial and, as a result, the process should be flexible

enough to permit consideration of material, such as letters, affidavits, etc., that would not be allowable in a trial. These statements by the Court are somewhat contradictory because the reason that such materials are usually excluded (when offered to prove a material fact) is that their consideration would deprive a defendant of his right of confrontation and cross-examination. What have the courts said on this issue?

Hearsay Admissibility. Whether an officer may present hearsay testimony at a revocation proceeding has received varied treatment. Hearsay has been held admissible in Florida[23] and New York.[24] In most other states, hearsay has been construed to violate the due process requirements of Morrissey. All states have since enacted statutes compelling the confrontation and cross-examination of witnesses unless good cause is shown for not allowing it.[25]

In practice, exclusion of hearsay evidence means that an officer's testimony that he has been informed of a violation of parole conditions, standing alone, will not be sufficient for revocation. In most cases, the person who witnessed the violation will be required to testify. In Colorado, revocation was not allowed based on a probation officer's testimony that the defendant had stolen 40 dollars from his employer because it was hearsay unsupported by evidence.[26] Due process was violated because there was no confrontation and cross-examination of the employer by the defendant. In Pennsylvania, testimony of a probation officer of what he was told by a hospital staff member was hearsay and not sufficient to revoke probation. Good cause was not shown for denying confrontation and cross-examination.[27] There is some support for the proposition that an officer must be sufficiently familiar with the facts of the defendant's case to testify. Even though hearsay is permitted in revocation proceedings in Florida, probation revocation based solely on the testimony of an officer who took the case after the violations occurred was not allowed.[28] In a similar vein, the testimony of a probation officer was not allowed at a criminal trial for armed robbery because the officer was not an intimate acquaintance of the defendant and he had not seen the probationer for seven months.[29] This could be construed in the parole revocation setting to mean that remoteness in time of contact with a parolee may have some bearing on the validity of an officer's testimony, especially testimony governing any general propensity on the part of the parolee to engage in particular forms of behavior.

The rule forbidding revocation on the basis of hearsay evidence cannot be avoided simply because the officer presents the evidence in a written report, rather than in verbal testimony at the hearing. An Oklahoma court stated, covering a hearsay statement, that the fact that the probation officer had written the statement into his report did not make the statement admissible under the "business records" exception to the hearsay rule.[30] Louisiana applied this same reasoning in a case in which a probation officer stated in his report that the defendant's

parents had information that the defendant was sniffing glue.[31] The requirement of confrontation and cross-examination of witnesses cannot be avoided by means of an affidavit for the same reasons. In Pennsylvania, an affidavit by a police officer that the defendant possessed narcotics was not sufficient for revocation.[32]

The majority of courts apparently require fairly strict compliance with the Morrissey requirements of confrontation and cross-examination of witnesses, so information contained in the officer's report will usually need to be corroborated by extrinsic evidence or testimony.

## OTHER ISSUES

For some issues Morrissey offers little assistance. For instance, must revocation be limited to violation of explicit conditions? Would not any illegal act violate the spirit of probation or parole statutes? Is, in the case of an arrest, the evidence of an illegal act conclusive? Is conviction a required pre-requisite to a finding that an illegal act occurred?

Although Morrissey was extensive and detailed enough to provide guidance on many issues, answers in other areas were not suggested directly. How much proof, for example, is needed to support the decision to revoke? The response of the courts to a number of these supplemental questions is presented in this section.

## Standard of Proof

The standard of proof required to support revocation will have an effect upon an officer's decision to submit the case to the authority entrusted with making the revocation decision. Where an officer is conducting the revocation hearing, a knowledge of the standard of proof required for revocation in that jurisdiction is essential. There is wide latitude among the states in determining the proper standard, and any formulation of a general rule would be of little help. For example, Georgia requires only "slight evidence" for revocation,[33] whereas Oklahoma requires that the decision be supported by a preponderance of evidence that could have been deemed more probably true than not.[34] Parole officers in each jurisdiction should consult legal counsel or departmental standards to determine the standard of proof required to revoke parole.

## Nature of Proof Required

Illinois has held that once a defendant has admitted the grounds for violation of probation, the admission eliminates the necessity of proof by the state.[35] Louisiana, on the other hand, has held revocation improper where the only evidence relied upon was the probationer's uncounseled guilty plea.[36] Florida has held that some overt act is required to revoke parole. The mere statement of the parolee that he intended to violate his parole

conditions was insufficient for revocation.[37] Often the testimony of the officer in charge of a probationer or parolee is crucial at a revocation proceeding. Whether the testimony of an officer -- unsupported by other evidence -- is sufficient to revoke parole varies in different states. In Texas, it was held that revocation cannot be based merely on the conclusionary statement of a probation officer that the probationer failed to report at least once a month as directed.[38] Oklahoma did not permit revocation based solely on an officer's testimony, without supporting evidence, that the defendant had moved to Missouri.[39] North Carolina reached the opposite result, holding that the uncontradicted testimony of a probation officer -- that the defendant had been fired from his job and had not made payment toward his probation costs -- was sufficient to support a revocation.[40] Similarly, in Georgia (where only "slight evidence" is needed) probation revocation was upheld based solely on the testimony of an arresting officer that in his opinion the probationer was driving while intoxicated.[41] (Even laymen usually are allowed to give an opinion on drunkenness.) It seems probable that similar reasoning would be applied to a parole officer in Georgia.

Courts probably will insist on detail in appropriate cases, rather than accept an officer's conclusions about an event. In an Oregon case,[42] a probation officer was required at a revocation hearing to testify to the precise relationship of the probationer with the four-year-old daughter of the woman with whom the probationer was living. A probation condition prohibited the probationer from associating with young girls. The court was unwilling to equate living in the same household with the proscribed "association"; the court wanted to draw its own conclusion from the facts observed by or known to the officer.

As the above cases demonstrate, there is no clear general rule on whether a parole officer's testimony unsupported by other evidence will be sufficient to revoke parole. But it must be noted that uncorroborated testimony concerning an observed event is admissible.

Probation/parole officers should also recognize that testimony that might be objectionable for one purpose may be received for another. On the issue of whether a probationer or parolee had a particular history of arrests, or had written certain bad checks, the officer might not be a qualified witness. A certified copy of a police record or the testimony of a bank officer might be deemed necessary to prove such matters. A different case, however, is that of the offender who places his character or credibility in issue by direct testimony that there were no prior arrests or no other bad checks. Such testimony might open the door and allow the officer to relate facts within his knowledge that suggest that the offender should not be believed, although the testimony could not prove the specifics of the prior history. The justification for this limited use is that more kinds of evidence may be relevant to an attempt to impeach a witness than to the proof of specific facts.

A West Virginia case illustrates the point.[43]  The defendant had been charged as an accessory to murder.  He took the stand in his own defense and, in the course of seeking to establish his good character, acknowledged that he had been previously convicted in Ohio, but claimed that he had observed the conditions of his parole.  The defendant violated a non-association parole condition.  Observance of parole conditions was clearly collateral to the murder prosecution; hence, the rules of evidence normally would bar the testimony because impeachment is not permitted on a collateral matter.  The court held, however, that the testimony could be received for the limited purpose of suggesting that the defendant did not always tell the truth; hence, his version of the facts in the murder case might not be credible.

## Limitations on Testimony

The cases do not tell the precise limits on the relevance of the testimony or other evidence that may be offered to support revocation.  One New York case,[44] however, shows that there are limits.  In that case, after the revocation hearing but before any decision was announced, an officer discovered that the parolee had written more bad checks than were considered at the hearing; he brought this information to the attention of the hearing officer.  In a summary opinion, which did not explain the court's reasoning, this was held to be improper and a new hearing before a different examiner was ordered.  A number of Morrissey rights arguably were interfered with.  There was no written notice about these additional "charges," and the parolee had no opportunity to refute or explain them.  Moreover, the additional information might have been viewed as tending to bias the hearing examiner.

## The Exclusionary Rule

The exclusionary rule keeps relevant and material evidence from being considered in a criminal trial.  It is not technically a rule of evidence such as those adopted to promote efficiency and further the search for truth.  Rather, the exclusionary rule is a device that courts have fashioned (1) to deter unlawful police conduct by denying the government the benefit of evidence obtained in violation of an individual's rights, and (2) to preserve the integrity of the judicial system.  While once of broad scope, in recent years the applicability of the exclusionary rule has been narrowed by the Supreme Court; this process is continuing.  As a result of this retrenchment, some use of "illegal" evidence is permitted in criminal trials (e.g., for impeachment purposes) and in collateral proceedings (e.g., before a grand jury).

At the present time, a defendant can prevent, by timely objection, the government's use of two types of evidence to prove the case in chief in a criminal trial: (1) that which was directly obtained in violation of the defendant's fourth, fifth, and sixth amendment rights, and (2) other evidence derived therefrom (fruit of the poisonous tree).

-146-

The exclusionary rule is of concern to probation/parole officers for several reasons.  First, in some jurisdictions the rule has been held applicable to revocation proceedings.  Probation officers may also have to consider the rule in connection with preparation of pre-sentence reports in cases where some evidence has been suppressed.  Finally, field officers may become, in the course of their duties, the first government agents with the opportunity to secure evidence of a crime.  By acting properly at that point, they can contribute to a successful law enforcement effort.  Conversely, misconduct could ultimately cause an objectively guilty person to escape proper sanction.

At the federal level, the courts of appeals are split on the applicability of the exclusionary rule to revocation proceedings.  Most of the courts that have considered the issue allow the use of evidence collected by the police that is subject to suppression at a trial.[45]  (Two of these courts, however, exclude the evidence in cases of police harassment.[46]  One does not permit the use of evidence if police knew the person was a probationer.[47])  These holdings appear consistent with the balancing test the Supreme Court seems to apply in deciding exclusionary rule cases.  That test essentially approves suppression only when the possible deterrent effect of applying the rule outweighs the social cost of preventing the consideration of probative evidence.  Nevertheless, the Fourth Circuit applies the exclusionary rule, the expected result in light of that Circuit's holdings concerning the role of the fourth amendment strictures on searches of probationers and parolees.[48]

State cases reflect the same uncertainty over how to properly balance individual and societal interests.  In a few states, full fourth amendment protection is provided, and the exclusionary rule has been applied to parole revocation proceedings.[49]  This may be the majority rule.  In New York, statements following an illegal search have been excluded because of the causal connection between the illegal search and subsequent admission.[50]

The majority rule is probably that a law enforcement officer must demonstrate that probable cause existed before the fruits of a warrantless search can be admitted.[51]  The standards for searches by or under the direction of a parole officer may be less stringent.  The standard enunciated by the Ninth Circuit is that a parole officer need not have probable cause to conduct a search, as with an arrest, but must have a reasonable basis to believe that a violation of the law has occurred, rather than simply a suspicion, before a search can be undertaken.[52]  Parole officers generally have no authority to issue search warrants.[53]  Some states have held that evidence seized under an invalid warrant (meaning without probable cause for the search) can be used, nevertheless, in revocation proceedings.[54]  Illinois has suggested that the exclusionary rule does not apply to revocation proceedings except in cases of police harrassment, which can be demonstrated by a showing that the police knew of the offender's probationary status.[55]

-147-

The wide range of opinions on the applicability of the rule necessitates that readers seek local guidance.

## RECENT SUPREME COURT DECISIONS

Three recent Supreme Court rulings have addressed issues related to probation revocation. In 1983, the Court decided Bearden v. Georgia[56] (whether an indigent's probation can be revoked for failure to pay a fine and make restitution); in 1984, the Court handed down a ruling in Minnesota v. Murphy[57] (involving the admissibility of evidence obtained from the probationer without the Miranda warnings); and in 1985, the Court decided Black v. Romano[58] (whether due process requires courts to consider alternatives to probation prior to revocation). These significant cases invite further details.

### Equal Protection and Revocation: Bearden v. Georgia

In Bearden, the petitioner pleaded guilty in a Georgia trial court to burglary and theft by receiving stolen property. The court did not enter a judgment of guilt; instead, in accordance with Georgia law, the court sentenced the petitioner to probation on condition that he pay a $500 fine and $250 in restitution, with $100 payable that day, $100 the next day, and the $550 balance within four months. The probationer borrowed money and paid the first $200, but a month later he was laid off from work, and despite repeated effort, was unable to find other work. Shortly before the $550 balance became due, he notified the probation office that his payment was going to be late. Thereafter, the State filed a petition to revoke probation because the probationer had not paid the balance. The trial court, after a hearing, revoked probation, entered a conviction, and sentenced the probationer to prison. The record of the hearing disclosed that the probationer had been unable to find employment and had no assets or income.

On appeal, the United States Supreme Court held that a sentencing court cannot properly revoke a defendant's probation for failure to pay a fine and make restitution, absent evidence and findings that he was somehow responsible for the failure or that alternative forms of punishment were inadequate to meet the State's interest in punishment and deterrence. Said the Court:

> Over a quarter-century ago, Justice Black declared that "there can be no equal justice where the kind of trial a man gets depends on the amount of money he has. . . ." There is no doubt that the State has treated the petitioner differently from a person who did not fail to pay the imposed fine and therefore did not violate probation. To determine whether this differential treatment violates the Equal Protection Clause, one must determine whether and under what circumstances, a defendant's indigent status may be considered in the decision whether to revoke probation.[59]

The Bearden decision is consistent with Williams v. Illinois,[60] decided in 1970, where the Court said that a State cannot subject a certain class of convicted defendants to a period of imprisonment beyond the statutory maximum solely because they are too poor to pay the fine. In many jurisdictions, however, indigency is an affirmative defense to a revocation petition for failure to pay monetary obligations -- hence avoiding a constitutional challenge similar to Bearden. The burden of proving indigency is usually with the probationer. In jurisdictions that do not provide for indigency as a bar to revocation, the Bearden case becomes important as a defense to incarceration. It is evident from Bearden, however, that a distinction must be made between failure to pay because of indigency, thus foreclosing revocation, and refusal to pay, where revocation or a possible contempt proceeding is a valid option for the court to take.

### Interrogations and Miranda:  Prior to Minnesota v. Murphy

When the evidence a defendant seeks to exclude from a criminal trial is his own statement, the outcome is governed by Miranda v. Arizona[61] and its progeny. That case holds, basically, that any statement made during custodial interrogation conducted in violation of the Miranda rules is inadmissible. Miranda requires that the following warnings be given:

- The suspect has a right to remain silent.

- Any statement made may be used against the suspect in court.

- The suspect has a right to the presence of an attorney before and during any questioning.

- If the suspect cannot afford to hire an attorney, one will be provided by the state.

- Interrogation will be terminated any time the suspect desires.

The Miranda decision squarely affects only the admissibility of evidence at trial. It does not directly apply to probation or parole revocation, but circumstances frequently arise where the investigation indicates the occurrence of a new offense. When this occurs, the officer must be careful not to cross the line between supervision -- his proper role -- and the law enforcement function of obtaining information concerning the new act. If the line is crossed, and perhaps even if it is approached closely, Miranda warnings should be given.

In cases of doubt, the probation/parole officer might well ask himself whether the circumstances amount to custodial interrogation. An affirmative answer will indicate that the officer is involved in an investigation of some act or circumstance that might be construed as being of an independent nature -- that is,

separate from the supervision function. The courts consider whether the suspect was "deprived of freedom of action in any significant way" in determining if questioning is custodial in nature. The defendant need not have been in actual custody. The suspect need only have held a reasonable belief that he was deprived of freedom in any significant way. The most commonly considered factors are:

- Nature of the questions.

- Status of the suspect.

- Time and place of questioning.

- Nature of the interrogation.

- Progress of the investigation at the time of the interrogation.

It could be argued that a parolee is always in custody; however, the Supreme Court has ruled against this view. In an Oregon case, a parolee was asked by his parole officer to meet to discuss a burglary. They met at a police station as a convenient place and the suspect confessed. The Court held this was not a custodial interrogation, as he was in fact free to leave.[62]

If the parolee is in custody on a new charge, the officer is required to give the Miranda warnings.[63] What actually constitutes custodial interrogation is determined on a case-by-case basis, and jurisdictions vary considerably as to what is construed as custodial. A Kansas case held that when a parole officer went with the police to the parolee's home, took the parolee to the parole office, and questioned him there, the interrogation was custodial.[64] The court suggested that any questioning by the parole officer related to a new offense requires Miranda warnings. However, the Oregon case referred to above holds otherwise.

Courts have held the following not to be custodial interrogations, obviating the need for Miranda warnings.

1. Where questioning by a parole officer occurred during a ride to the parole office and at the office, but the investigation had not yet become accusatory. Once the parole officer has probable cause to make an arrest, Miranda must be given effect.[65]

2. Where a parolee was confined at a state hospital and confessed to a crime on his own initiative. The court mentioned as significant the facts that the parolee was not handcuffed, was free to leave the interviewing area, and third parties were present in the interviewing area.[66]

3. In a New York case, although the probationer was not free to leave the interviewing room, Miranda was not applied, as the coerciveness involved did not exceed that inherent in the probation or parole relationship. (Often the client has agreed to answer questions as part of the release agreement.) The liberality of this view stands in contrast to the stricter view of the Kansas authority.[67]

## Interrogations and Miranda: The Effect of Minnesota v. Murphy

In 1984, the U.S. Supreme Court decided Minnesota v. Murphy,[68] which gives some answers as to whether or not evidence obtained by a probation officer may be admissible in evidence in the absence of the Miranda warnings. In that case, Murphy pleaded guilty to a sex-related charge and was given a suspended sentence and placed on probation. The terms of probation required him to participate in a treatment program for sexual offenders, to report to his probation officer periodically, and to be truthful with the officer "in all matters." During the course of a meeting with his probation officer, who had previously received information from a treatment counselor that the respondent had admitted to a 1974 rape and murder, the respondent, upon questioning, admitted that he had committed the rape and murder. After being indicted for first-degree murder, the respondent sought to suppress the confession made to the probation officer on the ground that it was obtained in violation of the fifth and fourteenth amendments. The case went to the U.S. Supreme Court. The Court held that the fifth and fourteenth amendments did not prohibit the introduction into evidence of the respondent's admissions to the probation officer in the subsequent murder prosecution. In general, the obligation to appear before his probation officer and answer questions truthfully did not in itself convert an otherwise voluntary statement into a compelled one. A witness confronted with questions that the government should reasonably expect to elicit incriminating evidence ordinarily must assert the fifth amendment privilege rather than answer if he desires not to incriminate himself. If he chooses to answer rather than assert the privilege, his choice is considered to be voluntary since he was free to claim the privilege.

A number of questions arise as a result of Murphy. For example, had the probationer objected to answering the questions asked by the probation officer, but was forced to do so, would the evidence have been admissible? The answer appears to be in the negative. When is a probationer considered to be in custody such that the Miranda warnings must be given if the evidence is to be used in a criminal trial? The Court does not answer that in Murphy, other than saying that "It is clear that respondent was not 'in custody' for purposes of receiving Miranda protection since there was no formal arrest or restraint on freedom of movement of the degree associated with formal arrest." Does Murphy apply to parole cases? This was not decided by the court, but there are reasons to believe that it should.

The effect of the Murphy decision may be summarized as follows:

**SHOULD THE MIRANDA WARNINGS BE GIVEN BY THE PROBATION OFFICER IF THE EVIDENCE OBTAINED IS TO BE ADMISSIBLE?**

|              | Revocation                | Trial                                      |
| ------------ | ------------------------- | ------------------------------------------ |
| Not in custody | No                      | No unless probationer asserts rights       |
| In custody   | Depends upon state law    | Yes                                        |

## Due Process and Probation Revocation: Black v. Romano

In Black v. Romano,[69] decided on May 20, 1985, the Supreme Court addressed the issue of whether provision of the Constitution requires a judge to consider alternatives to incarceration before revoking probation. In that case, a certain Nicholas Romano pleaded guilty in a Missouri state court to several controlled substance offenses, was placed on probation and given suspended prison sentences. Two months later, he was arrested for and subsequently charged with leaving the scene of an automobile accident, a felony under Missouri law. After a hearing, the judge who had sentenced the respondent revoked his probation and ordered the execution of the previously imposed sentences. Romano filed a habeas corpus petition in Federal District Court alleging that the state judge had violated due process requirements by revoking probation without considering alternatives to incarceration. The District Court agreed and ordered Romano released from custody. The Court of Appeals affirmed that decision. On appeal, the Supreme Court held that the due process clause of the fourteenth amendment does not generally require a sentencing court to indicate that it has considered alternatives to incarceration before revoking probation. The procedures for revocation of probation, first laid out in Morrissey v. Brewer and then applied to probation cases in Gagnon v. Scarpelli, do not include an express statement by the fact finder that alternatives to incarceration were considered and rejected. The court reiterated that the procedures specified in Morrissey adequately protect the probationer against revocation of probation in a constitutionally unfair manner.

Addressing specific facts in the case, the Court went on to say that the procedures required by the due process clause were afforded in this case, even though the state judge did not explain on the record his consideration and rejection of alternatives to incarceration. The revocation of probation did not violate due

process simply because the offense of leaving the scene of an accident was unrelated to the offense for which the respondent was previously convicted or because, after the revocation proceeding, the charges arising from the automobile accident were reduced to the misdemeanor of reckless and careless driving. The Romano case, therefore, reiterates that Morrissey is still the yardstick by which revocation due process challenges are measured. The Court has shown unwillingness to expand the meaning of due process beyond that laid out in Morrissey.

## Recent Judicial Findings of Liability

In Hall v. Schaffer[70] a district court ruled on a civil rights action brought by a former probationer against a probation officer. The court found that the defendant, in filing a petition seeking the arrest of the plaintiff, was performing a discretionary function pursuant to her official law enforcement duties as a probation officer. She was, therefore, entitled to quasi-judicial immunity.

The Fifth Circuit[71] examined a civil rights suit against a probation officer who mistakenly caused arrest of a plaintiff probationer due to the erroneous assumption that a person with the same name as the plaintiff was, in fact, the plaintiff. The court found the officer could be subjected to suit only where his conduct clearly violated an established statutory or constitutional right or which a reasonable person would have known. The rationale offered for this standard was a clear need to vindicate constitutional guarantees without dampening the ardor of public officials and the discharge of their duties. Specifically, the court ruled:

The officer was not performing an adjudicatory function and was not entitled to judicially-derived immunity.

The Ninth Circuit, however, in the same year,[72] heard a suit brought by a plaintiff claiming repeated arrests and consequent nonbail parole holds pending investigation of baseless charges of parole violations. This court found the decision to arrest directly related to the decision to revoke parole and, therefore, protected by absolute immunity.

Jones v. Eagleville Hospital and Rehabilitation Center[73] suggests other bases for liability. Here suit was brought after a parole revocation for refusal to remove a skull cap with religious significance to the plaintiff. Although the court found no liability, that decision appears to be the result of Section 1983 limiting a proper defendant to a "person." Defendant in this case was the Parole Board and not a "person."

**EXTRADITION** (Interstate Rendition)

In this mobile society, a parolee or probationer often is wanted by the authorities of one state while he is physically present in another state. The process for transferring the person

is known as extradition. The outline of the process is found in the Constitution.

> A person charged in any state with treason, felony, or other crime, who shall flee from justice, and be found in another state, shall on demand of the executive authority of the state from which he fled, be delivered up, to be removed to the state having jurisdiction of the crime.

A number of questions have arisen over the years concerning this process, including the circumstances under which extradition may be refused, the behavior that makes one a fugitive from justice, and the authority of federal courts to require extradition. The only issue addressed here, probably the only one in which probation/parole officers are involved, is the adequacy of the papers and documentation on which the extradition demand is based.

Exactly what documentary evidence must be assembled to support a governor's request to extradite a suspected violator varies considerably from state to state. Colorado does not require a certificate of judgment, conviction, and the sentence imposed; a certified record of the defendant's plea, suspended sentence, and probation is sufficient.[74] The same logic might be applied to parole, but it seems likely that at least a judgment of conviction would be required. In another Colorado case, it was held that a judgment of conviction and a statement from the governor that the person violated the terms of his probation were sufficient.[75] New Hampshire allowed the court to infer a probable probation violation even though it was omitted from the extradition papers, because the conditions of probation included that the defendant not leave the state without permission.[76]

Probation/parole officers should consult with departmental legal counsel whenever a question involving the necessary documentation required for successful extradition arises.

At various times since 1934, multi-state agreements or compacts have been proposed that contain detailed procedures for moving offenders from one state to another. These include the "Agreement on Detainers" and the "Uniform Rendition of Prisoners as Witnesses in Criminal Proceedings Act." When these or other compacts apply, they may simplify the process. Readers should determine from local authorities whether a particular compact is relevant, whether the rendering and demanding state are parties to the compact, and what procedures must be followed.

A simplified version of extradition is provided by the Interstate Compact for the supervision of parolees and probationers when only a sending state and a receiving state are involved. Therefore, where the probationer or parolee is found in a third state and not supervised there under the interstate compact, formal extradition is required. Probationers or parolees

often, validly, waive extradition procedures and permit informal retaking.

## SUMMARY

This chapter examines the area of revocation, focusing on the leading case of Morrissey v. Brewer which lays out clear guidelines for revocation. Probation and parole revocations are now governed by similar rules because the rules in Morrissey were extended by the Court a year later, in Gagnon v. Scarpelli, to probation revocation cases. Morrissey mandates a two-stage process comprised of a preliminary hearing and a final hearing. The preliminary hearing can be dispensed with under certain circumstances.

Morrissey gave rise to a host of legal issues that were left unaddressed in that case. Among these are: preliminary hearing issues (including location, promptness, form of notice, and impartial hearing officer); revocation hearing issues (including notice of hearing, disclosure of evidence, and confrontation and cross-examination); and hearsay admissibility. Other issues related to revocation which are discussed in this Chapter are: standard of proof, nature of proof required, limitations on testimony, and the exclusionary rule as applied to probation/parole cases.

The application of the Miranda decision is addressed in accordance with a 1984 Supreme Court decision. Whether the Miranda warnings must be given depends on the nature of the questioning. If it is a custodial interrogation, Miranda does apply if the evidence is to be used in a subsequent criminal trial. Its admissibility for use in a subsequent probation revocation proceeding is determined by state law or judicial decisions. Some states require that the Miranda warnings must be given for the evidence to be admissible; others do not. In Black v. Romano, the court refused to expond the due process guarantees in Morrissey, saying that the due process clause does not generally require a sentencing court to indicate that it has considered alternatives to incarceration before revoking probation.

The Chapter ends with a discussion of the extradition process and the adequacy of the papers and documentation on which the extradition demand is based. The rules vary considerably from state to state; hence probation/parole officers are advised to consult their legal counsel whenever questions concerning extradition documentation arise.

## NOTES

### CHAPTER XII

1. 408 United States 471 (1972).

2. Gagnon v. Scarpelli, 411 United States 778 (1973).

3. Morrissey v. Brewer, 408 United States 471, 480 (1972).

4. _Id._ at 482.

5. _Id._ at 485.

6. _Id._ at 488.

7. _Id._ at 488-489.

8. Gagnon v. Scarpelli, 411 United States 778, 790-91 (1972).

9. Kartman v. Parratt, 535 F. 2d 450 (8th Cir. 1976). Read closely, _Gagnon_ requires counsel at the preliminary hearing as well as the final hearing in most instances. _See_, _e.g._, Van Ermen v. Percy, 489 F. Supp. 791 (E.D. Wis. 1980); Cresci v. Schmidt, 419 F. Supp. 1279 (E.D. Wis. 1976); Kemp v. Spradlin, 250 Ga. 829, 301 S.E. 2d. 874 (1983).

10. McLucas v. Oswald, 40 A.D. 2d 311, 339 N.Y.S. 2d 760 (1973).

11. _In re_ La Croix, 32 Cal. App. 3d 319, 108 Cal. Rptr. 93 (1973).

12. State v. Settle, 20 Ariz. App. 283, 512 p. 2d 46 (1973).

13. Moody v. Daggett, 429 United States 78 (1976).

14. People v. Hardenbrook, 68 Mich. App. 640, 243 N.W. 2d 705 (1976).

15. Vincent v. Texas, 586 S.W. 2d 880 (Crim. App. 1979), _appeal dismissed_, 449 United States 199 (1980).

16. United States v. Pattman, 535 F. 2d 1062 (8th Cir. 1976).

17. _In re_ Ricks, 31 Cal. App. 3d 1006, 107 Cal. Rptr. 786 (1973); People _ex rel_ Warren v. Mancusi, 40 A.D. 2d 279, 339 N.Y.S. 2d 882 (1973); Parker v. Coldwell, 320 Ohio App. 2d 193, 289 N.E. 2d 382 (1972); _Ex parte_ Ates, 487 S.W. 2d 353 (Tex. Crim. App. 1972).

18. State v. Hass, 264 N.W. 2d 464 (N.D. 1978).

19. State v. Nungesser, 269 N.W. 2d 449 (Iowa 1978).

20. Abel v. Wyrick, 574 S.W. 2d 411 (Mo. 1978).

21. V. O'Leary and K. Hanrahan, _Parole Systems in the United States_, 57 (3d ed. 1976).

22. Augello v. Warden, Met. Corr. Ctr., 470 F. Supp. 1230 (E.D.N.Y. 1979).

23. Reeves v. State, 366 So. 2d 1229 (Fla. Dist. Ct. App. 1979).

24. Kaufman v. Henderson, 64 A.D. 2d 849, 407 N.Y.S. 2d 340 (1978). _See_, _e.g._, U.S. v. McCallum, 677 F. 2d. 1024 (4th Cir. 1982); State _ex rel_ Thompson v. Riveland, 109 Wis. 2d. 580, 326 NW 2d. 768 (1982); State v. Virgil, 97 NM 749, 643 P. 2d. 618 (Ct. App. 1982); Jones v. State, 423 So. 2d. 513 (Fla. Dist. Ct. App. 1982).

25. _E.g._, State v. Fraley, 258 S.E. 2d 129 (W. Va. 1979).

26. People v. Thomas, 42 Colo. App. 441, 599 P. 2d 957 (1979).

27. Commonwealth v. Maye, - Pa. Super. Ct. - 411 A. 2d 783 (1979).

28. Reeves v. State, 366 So. 2d 1229 (Fla. Dist. Ct. App. 1979).

29. State v. Fowler, 37 Or. App. 299, 587 P. 2d 104 (1978).

30. Meyer v. State, 596 P. 2d 1270 (Okla. Crim. App. 1979).

31. State v. Sussman, 374 So. 2d 1256 (La. 1979).

32. Jones v. Commonwealth, 47 Pa. Commw. Ct. 438, 408 A. 2d 156 (1979).

33. Dickerson v. State, 136 Ga. App. 885, 222 S.E. 2d 649 (1975).

34. Cooper v. State, 599 P. 2d 419 (Okla. Crim. App. 1979).

35. People v. Felton, 69 Ill. App. 3d 684, 387 N.E. 2d 1094 (1979).

36. State v. Varnado, 384 So. 2d 440 (La. 1980). _See_, also, State v. McGlothin, 427 So. 2d 280 (Fla. Dist. Ct. App. 1983).

37. Kish v. Florida Parole and Prob. Comm., 369 So. 2d 87 (Dist. Ct. App. 1979). But, _see_, _e.g._, Strickland v. State, 649 SW 2d. 817 (Tex. Ct. App. 1983).

38. Herrington v. State, 534 S.W. 2d 311 (Tex. Crim. App. 1976).

39. Meyer v. State, 596 P. 2d 1270 (Okla. Crim. App. 1979).

40.  State v. Dement, 42 N.C. App. 254, 255 S.E. 2d 793 (1979).

41.  Gilbert v. State, 150 Ga. App. 339, 258 S.E. 2d 27 (1979).

42.  State v. Winters, 40 Or. App. 9, 605 P. 2d 293 (1980).

43.  State v. Grimmer, 251 S.E. 2d 780 (W. Va. 1979), overruled on other grounds, State v. Petry, 273 S.E. 2d 346 (W. Va. 1980).

44.  People ex rel Thiel v. Dillon, 70 A.D. 2d 778, 417 N.Y.S. 2d 534 (1979).

45.  United States v. Frederickson, 581 F. 2d 711 (8th Cir. 1978); United States v. Wiygul, 578 F. 2d 577 (5th Cir. 1978); United States v. Vandemark, 522 F. 2d 1019 (9th Cir. 1975); United States v. Farmer, 512 F. 2d 160 (6th Cir. 1975).

46.  United States v. Wiygul, 578 F. 2d 577, 578 (5th Cir. 1978); United States v. Farmer, 512 F. 2d 160, 162 (6th Cir. 1975).

47.  United States v. Vandemark, 522 F. 2d 1019, 1020-21 (9th Cir. 1975).

48.  United States v. Workman, 585 F. 2d 1205 (4th Cir. 1978).

49.  E.g., People ex rel Picarillo v. New York State Bd. of Parole, 48 N.Y. 2d 76, 394 N.E. 2d 354, 421 N.Y.S. 2d 842 (1979).

50.  People ex rel Jones v. New York State Bd. of Parole, 70 A.D. 2d 782, 429 N.Y.S. 2d 14 (1980).

51.  E.g., Davis v. State, 576 S.W. 2d 378 (Tex. Crim. App. 1978).  See, also, Hughes v. Gwinn, 299 SE 2d. 5 (W. Va. 1981); Dabney v. State, 278 Ark 375, 646 SW 2d. 4 (1983); State v. Dodd, 419 So. 2d 333 (Fla. 1982).

52.  Latta v. Fitzharris, 521 F. 2d 246 (9th Cir.), cert. denied 423 United States 897 (1975).

53.  E.g., People v. Alesi, 89 Cal. App. 3d 537, 152 Cal. Rptr. 623 (1979).

54.  E.g., State v. Ray, 41 Or. App. 763, 598 P. 2d 1293 (1979).

55.  People v. Watson, 69 Ill. App. 3d 487, 387 N.E. 2d 849 (1979).

56.  Bearden v. Georgia, 51 LW 4616 (1983).

57.  Minnesota v. Murphy, 104 S. Ct. 1136 (1984).

58.  Black v. Romano, 37 Crt. 3060 (1985).

59.  Supra note 56, at 4617.

60.  Williams v. Illinois, 399 U.S. 235 (1970).

61.  Miranda v. Arizona, 384 U.S. 436 (1966).

62.  Oregon v. Mathiason, 429 United States 492 (1977).

63.  State v. Davis, 67 N.J. 222, 337 A. 2d 33 (1975).

64.  State v. Lekas, 201 Kan. 579, 442 P. 2d 11 (1968).

65.  In re Richard T., 79 Cal. App. 3d 382, 144 Cal. Rptr. 856 (1978).

66.  People v. Lipsky, 102 Misc. 2d 19, 423 N.Y.S. 2d 599 (Monroe Co. Ct. 1979).

67.  People v. Ronald W., 24 N.Y. 2d. 732, 249 N.E. 2d. 882, 302 N.Y.S. 2d. 260 (1969).

68.  Minnesota v. Murphy, 104 S. Ct. 1136 (1984).

69.  Black v. Romano, 37 Crt. 3060 (1985).

70.  Hall v. Schaeffer, 556 F. Supp 539 (U.S.D. Pa. 1983).

71.  Galvan v. Garmon, 710 F. 2d 214 (5th Circuit 1983).

72.  Anderson v. Boyd, 714 F. 2d 906 (9th Cir. 1983).

73.  Jones v. Eagleville Hospital and Rehabilitation Center, 588 F. Supp. 53 (U.S.D. Pa. 1984).

74.  Miller v. Cronin, 197 Colo. 391, 593 P. 2d 706 (1979).

75.  Morgan v. Miller, 197 Colo. 341, 593 P. 2d 357 (1979).

76.  Martel v. Knight, 119 N.H. 190, 400 A. 2d 478 (1979).

## CHAPTER XIII

### LIABILITIES OF AGENCY SUPERVISORS*

In simplest terms, a supervisor is one who has another employee working for or with him in a subordinate capacity. At the apex of the supervisory hierarchy are administrators who have the ultimate responsibility for the operation and management of the agency. The term supervisor is used generically in this discussion to include corrections heads and administrators.

Although most lawsuits against corrections officers are directed mainly at field personnel, be they prison guards, probation, or parole officers, plaintiffs have become more inclined to include supervisory officials and the agency as parties-defendant. The move is based on the theory that the officer acts for the agency and therefore what he does is reflective of agency policy and practice. As a matter of legal strategy, it benefits plaintiffs to include supervisors and agencies in a liability lawsuit. Lower level officers may not have the financial resources to satisfy a judgment, nor are they in a position to prevent similar future violations by other officers or the agency. Moreover, chances of financial recovery are enhanced if supervisory personnel, by virtue of their position, are included in the lawsuit. The higher the position of the employee, the closer the plaintiff gets to the deep pocket of the county or state agency. Inclusion of the supervisor and agency may also create dissonance in the legal strategy for the defense, based on a conflict of interest, hence strengthening the plaintiff's claim against one or some of the defendants.

In Brandon v. Holt,[1] a 1985 decision, the United States Supreme Court ruled that a money judgment against a public officer "in his official capacity" imposes liability upon the public entity that employs him, regardless of whether or not the agency was named as a defendant in the suit. In this case, the plaintiff alleged that although the director of the police department had no actual notice of the police officer's violent behavior because of administrative policies, he should have known. The Court said that although the director could be shielded with qualified immunity, the city could be held liable. Speaking in dissent, Justice Rehnquist opined that the Court's opinion supports the proposition that in suing a public official under 42 U.S.C. Section 1983, a money judgment against the public official "in his official capacity" is collectible against the public that employs the official.

_____

*This Chapter is a modified version of an article which was first published in Federal Probation, September 1984, p. 52-56.

### CATEGORIES OF SUPERVISORY LAWSUITS

Lawsuits may be categorized in various ways, each with varying implications. First, they may be brought under state or Federal laws, or under both. Most cases are in fact brought under tort law in state courts and title 42 U.S.C. Section 1983 in Federal courts. Both are civil cases and enjoy advantages in terms of a lower quantum of proof needed to win (compared with criminal cases) and probable financial benefit in the form of damages awarded. Section 1983 cases have the added advantage of the plaintiff being able to recover attorney's fees from the defendant, by judicial order, if he prevails in any of the allegations, or even if the case results in a consent decree.

Secondly, liability lawsuits may be classified as emanating from two possible sources, namely: from clients (inmates, probationers, parolees, or the general public), and from subordinates. In either case, the usual allegation is that the supervisor is liable for injury caused by action or inaction. While most cases filed thus far have stemmed from clients' liability claims, an increasing number of cases have arisen from subordinates for acts done or injuries suffered in the course of employment that could have been obviated had the supervisor performed his job properly.

Thirdly, supervisory liability cases may be classified into direct liability and vicarious liability. Direct liability means that a supervisor is held liable for what he does, whereas vicarious liability holds a supervisor liable for what his subordinates do.

Finally, liability lawsuits may be filed against the supervisor as a private individual or in his capacity as a public officer. Liability as a private individual arises when the supervisor acts on his own and outside the scope of duty. In these cases, chances are that the agency will not undertake his defense or pay for damages if held liable. The initial determination whether the officer acted within the scope of duty is made by the agency. Unless provided otherwise by statute or agency regulation, such determination is not appealable to any court or higher administrative agency. Most lawsuits, however, are brought against a supervisor in his official capacity, regardless of the nature of the act. Plaintiffs prefer to hold both the officer and the agency liable so as to broaden the financial base for recovery.

### LIABILITY UNDER STATE LAW

#### Negligence of Supervisors - Liability to Clients

Vicarious liability stemming from negligence of a supervisor is one of the most frequently litigated areas of liability and therefore merits extended discussion. Most decided cases in this area of supervisory liability are police or prison cases, but

their principles should apply to probation and parole supervisors
as well.

Negligent Failure to Train. This has generated a spate of law-
suits in the law enforcement and corrections areas of criminal
justice. As early as 1955, a state court entertained tort actions
for monetary damages resulting from improper or negligent train-
ing.[2] The usual allegation in these cases is that the employee
has not been instructed or trained by the supervisor or agency to
a point where he possesses sufficient skills, knowledge, or
activities required of him in the job. The rule is that admini-
strative agencies and supervisors have a duty to train employees
and that failure to discharge this obligation subjects the super-
visor and agency to liability if it can be proved that such
violation was the result of failure to train or improper
training.[3]

Many cases have categorically mandated jail and prison
administrators to train their staffs or to improve their training
programs. In Owens v. Haas,[4] the plaintiff argued that lack of
training for personnel in a local jail resulted in the violation
of his constitutional rights stemming from the use of force
against him. The Second Circuit held that while a county may not
be liable for mere failure to train employees, it could be liable
if its failure was so severe as to reach the level of gross
negligence or deliberate indifference. The court added that a
municipality is fairly considered to have actual or imputed
knowledge of the foreseeable consequences that could arise from
nonexistent or grossly inadequate training.

In McClelland v. Facteau,[5] the Tenth Circuit held that a
police chief may be held liable for civil rights violation for
failure to train or supervise employees who commit an unconsti-
tutional act. The plaintiff was booked by the New Mexico State
Police at a local jail facility, and while there was beaten by the
officers as well as denied use of the telephone and access to an
attorney. In holding the officers liable, the court said that in
order for liability to attach, there must be a breach of an
affirmative duty owed to the plaintiff, and the action must be the
proximate cause of the injury. In this case, it was well known
that instances of constitutional violations were occurring in the
department because they had been thoroughly aired by the press.
Additionally, the jail itself was under lawsuit in two instances
of wrongful death.

The question arises: Will a single act by a subordinate
suffice to establish liability under failure to train? Most cases
hold that a pattern must be proved and established. The Owens
case indicates that a single brutal incident may be sufficient to
constitute a link between failure to train and violation. Owens
considered solely the degree of violation to determine liability
instead of waiting for a pattern to develop based on a series of
violations. The United States Supreme Court has just answered
this question in the negative. On June 3, 1985, the Court ruled

CONTINUED

2 OF 3

that an isolated act of police misconduct cannot ordinarily make a
city subject to a damage suit for violating an individual's civil
rights.[6]  By a seven to one vote, the Court in Oklahoma City v.
Tuttle overturned a $1.5 million damage award against Oklahoma
City, won by a widow of a man whom an Oklahoma City police officer
had shot to death in the process of investigating a reported
robbery.  The plaintiff in this case argued that the city's
inadequate training of its police force constituted an official
"policy" for which the city should be held liable.  The Court of
Appeals for the Tenth Circuit accepted the plaintiff's theory and
ruled that the officer's action was so plainly and grossly
negligent as to provide the necessary link between the policy and
the injury.

     The United States Supreme Court reversed that decision.
Writing for four of the seven justices in the majority, Justice
Rehnquist said that the notion of inadequate training as a policy
was too nebulous and remote from the charge of unconstitutional
deprivation of life as to form a basis for municipal liability.
Justice Rehnquist added that a single incident can give rise to
municipal liability only if the incident was actually caused by
an existing, unconstitutional municipal policy (as in the case of
the required unpaid sick leave without pay in the Monell case
discussed in Chapter IV), that can be attributed to a municipal
policymaker.  But where the policy relied upon is not itself
unconstitutional (as in the case of the training policy in
Tuttle), considerably more proof than the single incident will be
necessary in every case to establish both the requisite fault on
the part of the municipality and the causal connection between the
policy and the constitutional deprivation.  In a somewhat broader
approach, Justice Brennan, writing for the three others in the
majority, said that the city's liability could be established by
proof of a "municipal policy or custom independent of the police
officer's misconduct," which, Justice Brennan said, was lacking in
this case.  He added that the policy itself need not be
unconstitutional as long as it "would foreseeably and unavoidably
cause" a deprivation of a constitutional right.[7]

     Despite the strict standard used, what these cases indicate
is that adequate and proper training is a must if supervisory
liability is to be avoided.  The clarion call for better training
is not new, neither is it limited to initiatives by the judiciary
in litigated cases.  In 1930, the American Prison Congress, in its
Declaration of Principles, stated that "the development of schools
for the training of prison executives and guards . . . should be
promoted throughout the United States."  In 1967, the President's
Commission on Law Enforcement and Administration concluded that
"perhaps the most striking finding was that more than half of the
respondent agencies had no training program at all."  Despite
substantial funds allocated for training by Federal agencies in
the early seventies, corrections training left much to be
desired.  A 1973 government report stated that many training
programs were of poor quality.[8]

The fact is that corrections lamentably lags way behind the other subsystems, particularly law enforcement, in the quality and quantity of training programs. No major national organization, other than the National Institute and the National Academy of Corrections, is engaged in a sustained and massive effort to train corrections personnel. This cannot be said of law enforcement where its biggest and most influential organization, the International Association of Chiefs of Police, is involved in a series of well-coordinated training programs, supplemented by efforts of private organizations like the Association for Effective Law Enforcement. It is also significant, and doubtless speaks of the relative importance attached to ongoing efforts, that training programs in law enforcement are mandated by statute in practically all states. This is not true in corrections where training, if specified by law or by agency regulation, is recommended but not required.

Training should focus on the essentials of the corrections job, be it running a jail or a prison, or supervising probationers, parolees, or other community based corrections clients. There is a need to acquaint officers with basic constitutional rights. This is more easily done in jails and prisons, since the law on prisoners' rights is better developed, than it is in community based corrections programs where jurisprudence precedents are sparse. Other areas where training is needed in jails, prisons, and detention facilities include use of weapons, identification of serious medical needs and emergency medical treatment, search and seizure, and record keeping.[9]

Lawsuits against supervisors and agencies for failure to train emanate from two sources, namely: a client whose rights have been violated by an officer who has not been properly trained, and a subordinate who suffers injury in the course of duty because he has not been trained adequately. The obvious defense in these cases is proper training, but training may in fact be deficient due to circumstances beyond a supervisor's control, such as lack of funds and a dearth of expertise. <u>Will the supervisor be liable if no resources have been allocated to provide the desired level of training?</u> Budgetary constraints generally have not been considered a valid defense[10] by the courts and, therefore, place the supervisor in a difficult position. With proper documentation, however, the supervisor should be able to establish good faith if he repeatedly calls the attention of those who hold the pursestrings to the need for training. Even if financial resources are available, unstructured training alone may not be sufficient. The nature, scope, and quality of the training program must be properly documented and its relevance to job performance identified. There is a need to document training sessions with detailed outlines to substantiate course content. Attendance sheets are necessary for defense purposes in lawsuits brought by one's own subordinates.

To summarize, negligent failure to train has resulted in judgments against supervisors and is perhaps currently the most

frequently litigated area in the field of supervisory liability. Supervisors must be cognizant of the need for proper training on the essentials of the various phases of job performance. The need to undertake proper training, on pain of supervisory and agency liability, must be brought to the attention of policymakers and budget planners who, themselves, may be liable for damages if injury results. For defense purposes, training programs need to be tailored to meet job needs and must be properly documented.

<u>Negligent Hiring</u>. Negligent hiring stresses the importance of proper background investigation before employing anyone to perform a job. Liability ensues when an employee is unfit for appointment, when this unfitness was known to the employer or when the employer should have known about it through background investigation, and when the act is foreseeable.[11] In one case,[12] the department hired a police officer despite a record a of preemployment assault conviction, a negative recommendation from a previous employer, and a falsified police application. The officer later assaulted a number of individuals in separate incidents. He and the supervisor were sued and held liable. In another case,[13] the court held a city liable for the actions of a police officer who was hired despite a felony record and who appeared to have been involved in many street brawls. Liability was based on the complete failure of the agency to conduct a background check prior to the hiring of the applicant.

Minor acts of negligence on the part of the supervisor do not lead to liability. Only gross negligence is actionable, meaning the failure to use even slight care. To protect against liability from negligent hiring, an agency must perform a good background investigation. This is undertaken in a number of ways, depending upon the resources of the agency. Regardless of the method used, it must have an adequate procedure whereby unfit applicants may be identified and eliminated.

<u>Negligent Assignment</u>. Negligent assignment means assigning an employee to a job without ascertaining whether or not he is adequately prepared for it, or keeping an employee on a job after he is known to be unfit. Examples would be a reckless driver assigned to drive a government motor vehicle or leaving an officer who has had a history of child molestation in a juvenile detention center. The rule is that a supervisor has an affirmative duty not to assign or leave a subordinate in a position for which he is unfit. In <u>Moon v. Winfield</u>,[14] liability was imposed on the police superintendent for failure to suspend or transfer an errant police officer to a nonsensitive assignment after numerous disciplinary reports had been brought to the supervisor's attention. In that case, the superintendent had five separate misconduct reports before him within a two-week period, and also a warning that the officer had been involved in a series of acts indicating mental instability. The court held that supervisory liability ensued because the supervisor had authority to assign or suspend the officer, but failed to do so.

As a legal defense measure, supervisors need to pay careful attention to complaints and adverse reports against subordinates. These must be investigated and the investigation properly documented. This also implies that the supervisor must generally be aware of the weaknesses and competencies of his subordinates and not assign them to perform tasks in which they are wanting in skill or competence.

Negligent Failure to Supervise. Failure to supervise means negligent abdication of the responsibility to oversee employee activity properly. Examples are tolerating a pattern of physical abuse of inmates, racial discrimination, and pervasive deprivation of inmate rights and privileges. One court has gone so far as to say that failure on the part of the supervisor to establish adequate policy gives rise to legal action.[15] Tolerating unlawful activities in an agency might constitute deliberate indifference to which liability attaches. The usual test is: Does the supervisor know of a pattern of behavior, but has he failed to act on it?[16] A corollary question is: What constitutes knowledge of a pattern of behavior? Some courts hold that actual knowledge is required, which may be difficult for a plaintiff to prove, while others have ruled that knowledge can be inferred if a history of violation is established and the official had direct and close supervisory control over the subordinates who committed the violations.

In Marusa v. District of Columbia,[17] allegations were that the defendant chief of police failed to adequately supervise an off-duty officer who shot the plaintiff. In Thomas v. Johnson,[18] the police chief allegedly failed to supervise an officer against whom numerous complaints had been filed, resulting in an assault, battery, negligence, and violation of the plaintiff's civil rights. In both cases, the courts noted possible liability for negligent failure to supervise. In London v.Ryan,[19] one Lt. Weaver was the senior officer at the scene of a crime that resulted in two young officers firing their weapons and injuring an innocent person. Although he arrived in his patrol car at the same time as the two responding officers, Lt. Weaver failed to exit his vehicle and take command. The Louisiana court said that Lt. Weaver's failure to provide proper supervision in a situation involving firearms created a grave risk of serious bodily injury to innocent parties at the scene of the crime. In failing to provide supervision, Weaver breached a duty he owed the plaintiff and other parties present; hence he was obliged to repair it.

The current law on liability for negligent failure to supervise is best summarized as follows:

> To be liable for a pattern of constitutional
> violations, the supervisor must have known of the pattern
> and failed to correct or end it . . . Courts hold that a
> supervisor must be "causally linked" to the pattern by
> showing that he had knowledge of it and that his failure
> to act amounted to approval and hence tacit encouragement
> that the pattern continue.[20]

A writer gives this succinct advice: "The importance of this principle is that supervisors cannot shut their eyes and avoid responsibility for the acts of their associates if they are in a position to take remedial action and do nothing."[21]

Negligent Failure to Direct. Failure to direct means not sufficiently telling the employee of the specific requirements and proper limits of the job to be performed. Examples would be failure on the part of the supervisor to inform an employee in a prison mail room of the proper limits of mail censorship or to advise prison guards as to the extent of preserved rights of access to court and counsel. In one case,[22] the court refused to dismiss an action for illegal entry, stating that it could be the duty of a police chief to issue written directives specifying the conditions under which field officers can make warrantless entries into residential places. The court held that the supervisor's failure to establish policies and guidelines concerning the procurement of search warrants and the execution of various departmental operations made him vicariously liable for the accidental shooting death of a young girl by a police officer. In another case,[23] the failure to direct involved the chief's negligence in establishing procedures for the jail concerning diabetic diagnosis and treatment. The case involved incarceration for public drunkenness. The arrestee experienced a diabetic reaction that resulted in a diabetic coma, a stroke, and brain damage. The jailer did not recognize this condition and therefore failed to provide for the proper medical care, resulting in death. Liability was assessed.

The best defense against negligent failure to direct is a written manual of policies and procedures for departmental operations. The manual must be accurate and legally updated, and it must form the basis for agency operations in theory and practice. It must cover all the necessary and important aspects of the job an employee is to undertake. It is also necessary that employees be required to read and be familiar with the manual as part of their orientation to the agency. A signed statement by the employee to the effect that he has read and understood the manual will go a long way towards exculpating a supervisor from liability based on failure to direct.

Negligent Entrustment. Negligent entrustment refers to the failure of a supervisor to supervise or control properly an employee's custody, use, or supervision of equipment or facilities entrusted to him on the job. Examples are improper use of vehicles and firearms that result in death or serious injury. In Roberts v. Williams,[24] an untrained trusty guard was given a shotgun and the task of guarding a work crew by a convict farm superintendent. The shotgun discharged accidentally, seriously wounding an inmate. The court held the warden liable based on negligence in permitting an untrained person to use a dangerous weapon. In McAndrews v. Mularchuck,[25] a periodically employed reserve patrolman was entrusted with a firearm without adequate training. He fired a warning shot that killed a boisterous youth

who was not armed. The city was held liable in a wrongful death suit. Courts have also held that supervisors have a duty to supervise errant off-duty officers where an officer had property, gun, or nightstick belonging to a government agency.

The test of liability is deliberate indifference. The plaintiff must be able to prove that the officer was incompetent, inexperienced, or reckless, and that the supervisor knew or had reason to know of the officer's incompetence.[26] The supervisor's defense in these cases is that proper supervision concerning use and custody of equipment was exercised, but that the act occurred anyway despite adequate precautions.

Negligent Retention. Negligent retention means the failure to take action against an employee in the form of suspension, transfer, or terminations, when such employee has demonstrated unsuitability for the job to a dangerous degree. The test is: Was the employee unfit to be retained and did the supervisor know or should he have known of the unfitness?[27]

The rule is that a supervisor has an affirmative duty to take all the necessary and proper steps to discipline and/or terminate a subordinate who is obviously unfit for service. This can be determined either from acts of prior gross misconduct or from a series of prior acts of lesser misconduct indicating a pattern of unfitness. Such knowledge can be actual or presumed. In Branncon v. Chapman,[28] the court held a police director liable in damages to a couple who had been assaulted by a police officer. The judge said that the officer's reputation for using excessive force and for having mental problems was well known among the police officers in his precinct; hence the director ought to have known of the officer's dangerous propensities and to have fired him before he assaulted the plaintiffs. This unjustified inaction was held to be the cause of the injuries to the couple for which they could be compensable. In McCrink v. City of New York,[29] a police commissioner who personally interviewed an errant officer, and yet retained him after a third offense of intoxication while on duty, was deemed to have actual knowledge. Presumed knowledge arises where the supervisor should have known or, by exercising reasonable diligence, could have known the unfitness of the officer. No supervisory liability arises where the prior acts of misconduct were minor or unforeseeable, based on the prior conduct of the officer.

The defense against negligent retention is for the supervisor to prove that proper action was taken against the employee and that the supervisor did all he could to prevent the damage or injury. This suggests that a supervisor must know what is going on in his department and must be careful to investigate complaints and document those investigations.

In summary, supervisory liability under state law arises under a variety of circumstances, all based on negligence. While most courts impose supervisory liability only when the negligence

-168-

is gross or amounts to deliberate indifference, other courts go with a lower standard. Regardless of the standard used, the determination of negligence is ultimately subjective with the trier of fact, be it a judge or jury, and so the distinction may not be all that significant. It is evident that the seven possible sources of liability discussed above are not mutually exclusive and do in fact overlap. For example, negligent failure to direct or assign may also mean failure to supervise, and vice versa. The plaintiff's complaint may, therefore, cover more than one area of potential liability even if allegations are anchored on a single act.

Negligence of Supervisors - Liability to Subordinates

Direct Liability. Direct liability of supervisors under state law for acts affecting subordinates arises from varied sources and in a number of ways. Responsibilities attach in the hiring, termination, demotion, suspension, or reassignment phases of a supervisor's work. There are usually two issues involved in supervisor-subordinate cases. The first has to do with the causes for which an employee may be terminated, suspended, or reassigned. The second looks at the procedure that must be followed, if any, before an employee may be terminated, demoted, suspended, or reassigned.

Both cause and procedure for supervisory action are primarily governed by:

a. The contract with the employee, if any. In some states, employees are unionized, and so conditions are governed by provisions of the collective bargaining agreement;

b. Agency rules, regulations, and guidelines, if any exist;

c. State law specifically governing employment, or generic statutes such as state civil service laws, if there are such laws;

d. In the absence of, or supplementary to, any of the above, basic constitutional rights of the employees, such as the freedom of speech, association, press, due process, equal protection, and privacy.

These sources of rights are not mutually exclusive and in fact interface in many cases. For example, an employee contract may be supplemented by prevailing state laws; moreover, basic constitutional rights overlay individual contracts or agency regulations. Unconstitutional provisions in contracts or agency guidelines may be challenged in court. The waiver of a basic constitutional right as a condition for employment has found increasing disapproval in public employment litigation.[30]

-169-

In the absence of specifics, an employee is entitled to rights, substantively and procedurally, in the following instances:[31]

1. When the employee is terminated or disciplined for exercising constitutional rights, such as suing his superior or department, criticizing the department, exercising freedom of religion, or choosing a nonconventional lifestyle.

2. When the termination takes away an employee's property rights under the Fourteenth Amendment due process provision. The general rule is that an employee acquires property rights to his job when he passes the probationary status, the length of which is governed by state law.

3. When the termination takes away an employee's liberty, such as (a) when it seriously damages an employee's standing and association in the community; or (b) when the action imposes a stigma or other disability that forecloses an employee's freedom for other employment.

General Basis for Discipline. As a general rule, an employee may be disciplined if the supervisor is able to prove that what the employee did impairs his efficiency in the department,[32] or demonstrably affects job performance.[33] For example, criticisms, which ordinarily fall under the exercise of free speech, must have an adverse effect, or affect the efficiency of the department before adverse action against the employee can be taken. In Pickering v. Board of Education,[34] the United States Supreme Court said that the right to speak cannot be curtailed absent proof of false statements knowingly and recklessly made, or a statement that disrupts the harmony of the department.

Homosexual Activities of Employees. The general rule concerning homosexual activities appears to be that sufficient nexus must exist between homosexuality and job performance to justify dismissal.[35] In one case, the court held that a homosexual junior high school teacher could not be dismissed or transferred simply because he was a homosexual. Some showing must be made of his homosexual behavior with students or teachers, or that his homosexuality, in general, was notorious.[36] In another case,[37] the court held that civil servants could not be discharged for homosexuality unless their homosexuality was rationally related to job performance.

In other sexual activity cases, the general rule is that an employee's private sexual conduct is within the zone of privacy and is therefore shielded from government intrusion. Most disciplinary actions by supervisors have not been sustained because these are areas of an employee's life over which the government has no legitimate interest. An exception is where the sexual activities of an employee are open and notorious, or if such activities take place in a small town where impact on the

department may be easily demonstrable. In these cases, the supervisor might very well have an interest in investigating such activities and terminating the employee.[38]

Political Activities of Employees. Mere membership in a political party cannot be proscribed or used as a basis for disciplinary action, but participation in partisan politics can be prohibited because of possible conflict of interest and potential abuse of the prerogatives of one's office.[39]

Sexual Harassment of Employees. The Civil Rights Act of 1964[40] and Equal Employment Opportunity regulations promulgated by the Equal Employment Opportunity Commission prohibit discrimination on the basis of sex. This includes harassment cases. What is meant by sexual harassment? A partial list of the type of activities that have been held to be proscribed under the Civil Rights Act are:[41]

1. Touching

2. "Off color" jokes

3. Unwanted, unwelcomed, and unsolicited propositions

4. Use of language

5. Holding up to ridicule

6. Leaving sexually explicit books, magazines, etc., in places where female employees can find them

7. Notes either signed or anonymous placed on bulletin boards, in lockers, in desks, etc.

8. The required wearing of particular type of clothing

9. Transfer, demotion, dismissal, etc., after refusing or resisting sexual advances

10. Requesting and/or ordering employees of one sex to perform tasks traditionally viewed as "women's work," such as: making coffee, going out to get lunch, or doing personal shopping for male supervisors

11. Demeaning comments or actions

12. Unwanted, unwarranted, and unsolicited "off duty" telephone calls, contacts, etc.

The above list is illustrative, not exhaustive, of harassing activities.

Sexual harassment can take place in two ways: (1) harassment of subordinates by supervisors, and (2) harassment of employees by co-employees who are not their superior. The general rule is that

harassment of subordinates by supervisors leads to agency liability, while harassment of employees by co-employees leads to supervisory liability only if the supervisor knew or should have known about it and could have stopped it but did not.

Must there be reprisal by the supervisor before harassment becomes unlawful? What if the supervisor propositions a subordinate but does not take any adverse action whatsoever when rebuffed? The answer is that sexual harassment, whether physical or verbal, may be unlawful even if there is no immediate employment reprisal. Under a 1980 EEOC regulation, sexual harassment is present if the unwelcome sexual advance has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment.[42] There is, therefore, no need for adverse action from the supervisor for sexual harassment to take place.

Vicarious Liability. Vicarious liability of supervisor to subordinates under state or Federal law is a legal route not often used because the employee can always sue on the basis of direct liability. There may be instances, however, when a low level supervisor violates the rights of a subordinate and such violation is directly traceable to the negligent act of a higher supervisor in the hierarchical scale, but there is insufficient jurisprudence to justify an extended discussion.

LIABILITY UNDER FEDERAL LAW

To Clients

Direct Liability. The law most often invoked in liability actions in Federal jurisdiction is Title 42 section 1983. As discussed more extensively in Chapter IV, this law, first enacted in 1871, has two basic elements. The first is that the officer must have been "acting under color of state law."[43] This is normally met if a person is clothed with the authority of the state and purports to act thereunder. It is sufficient if the act appeared to be lawful even if it was not in fact authorized by law. The second element is that the violation must be of a constitutional or of a Federally-protected right.[44] Rights given by state law are not protected under Section 1983. In essence, elements under Section 1983 are similar to state tort, but a distinction lies in that some defenses available under tort law, such as a statutory grant of immunity, may not be available in Federal cases.[45]

Intentional acts have long been held actionable, but for some time it was not clear whether negligence could be the basis of liability under section 1983. That issue is now settled in that a supervisor can now be held liable under section 1983 for his own personal negligent conduct that was the proximate cause of a subordinate's actionable behavior.[46] Courts have been consistent in holding that simple negligence will not support an action under section 1983, but that gross or willful negligence can lead to liability.

-172-

Vicarious Liability. Controversy surrounds the issue of whether or not vicarious liability applied under section 1983.[47] Some circuit courts reject vicarious liability under section 1983, while others apply it in the same manner as under state tort law, meaning on the basis of negligent hiring, training, or supervision of subordinates, or on specific state law.[48]

Most cases rejecting vicarious liability refer to Adams v. Pate,[49] decided by the Seventh Circuit in 1971. In that case, a penitentiary inmate complained that his civil rights were violated, in that he was beaten by inmate-nurses on orders of prison guards, and that his confinement in the segregation unit either for minor rule infractions or without cause constituted cruel and unusual punishment. The court held that the complaint failed to state a cause of action against the warden in that it did not allege any overt acts or infractions made by the warden or with his knowledge and consent. Ten years later, however, the same court held that the administrator of a prison hospital bears responsibility for insuring that prison inmates receive adequate medical care, and that such responsibility is sufficient basis from which to infer the administrator's personal involvement, in the denial of such care, at least where the denial is gross.[50] The court acknowledged that its decision departed from a strict application of Pate, but concluded that "it is a departure which we believe is justified by the nature of the claims presented."[51]

In Johnson v. Glick,[52] a prison warden was exonerated from liability for a guard's violation of a prisoner's civil rights. The guard was accused of an unprovoked attack and beating of the prisoner. The complaint alleged only that the warden was in charge of all corrections officers employed at the house of detention, but did not allege that the warden had authorized the officer's conduct or even that there had been a history of previous incidents requiring the warden to take action. The Second Circuit stated that in this case a showing of some personal responsibility on the part of the supervisor was required before liability could attach. In Hampton v. Holmesburg Prison Officials,[53] the Third Circuit held that a prison warden could not be liable for alleged violations by prison guards of a prisoner's civil rights under section 1983 because there was not the slightest evidence to show that the warden had actual knowledge of the circumstances alleged, or that he acquiesced or participated in any violation of the prisoner's civil rights. In Vinnedge v. Gibbs,[54] the Fourth Circuit decided that the state superintendent of jails was not liable for alleged civil rights violations by prison guards where no personal connection between the superintendent and the violation was even alleged by the plaintiff.

The common theme in the above cases is the insistence by several appellate courts of personal involvement in the form of participation, ratification, direction, or acquiescence by the supervisor before liability arises. Mere negligence or inaction, whether it be slight or gross, was deemed insufficient to establish liability.

-173-

In contrast, a long line of cases indicate that vicarious liability can be the basis for damages in a section 1983 suit. As early as 1964, a Federal district court held a superintendent liable for injuries inflicted by a subordinate who had not been properly trained and supervised in the use of firearms.[55] Since then, other courts have addressed the same issue with similar results. In Hirst v. Gertzen,[56] the Ninth Circuit decided that a sheriff could be held liable for the actions of his deputy in a case brought by the survivors of a jail prisoner who committed suicide because of supervisory negligence. The court indicated that simple negligence might be all that is needed for liability in this instance to ensue. In Sims v. Adams,[57] the Fifth Circuit opined that what is needed for liability under section 1983 is merely a causal connection between the supervisor's actions and a deprivation of the plaintiff's constitutional right. The court said:

> The language of Section 1983 requires a degree of causation as an element of individual liability, but it does not specifically require "personal participation." The proper question is therefore whether the complaint adequately alleges the requisite causal connection between the supervisory defendants' actions and the deprivation of plaintiff's constitutional rights. "Personal participation" is only one of several theories which can be used to establish causation.[58]

A study of the above cases indicates that the confusion generated by the conflicting decisions can perhaps be reconciled by making a clear distinction between the legal concepts of vicarious liability and respondeat superior. While both are susceptible to imprecise definitions, and in most cases have in fact been loosely defined, vicarious liability is a much broader term than respondeat superior, which is a subset of vicarious liability. Respondeat superior is a form of vicarious liability, but is certainly not the only form. Most cases rejecting supervisory liability under section 1983 were decided under the narrow concept of respondeat superior, while cases that have found liability were decided on the broader doctrine of vicarious liability other than respondeat superior. As one court has categorically stated: "The doctrine of respondeat superior does not apply to claims under 42 U.S.C. Section 1983."[59] It might be added, however, that liability may nonetheless arise under the broader doctrine of vicarious liability.

### To Subordinates

Direct Liability. Direct liability of supervisors to subordinates under Federal law is governed by several statutes, notably the following:

    1.  Title VII of the Equal Employment Opportunity Act of 1964, which prohibits discrimination in employment on the basis of race, sex, religion, color, or national origin.

Under this law, employment discrimination is prohibited in such areas as recruitment, testing, hiring or firing, transfer, promotion, layoff, and training;[60]

    2.  The Age Discrimination In Employment Act, which protects workers, aged 40-70, from age discrimination in hiring, discharge, pay, promotions, fringe benefits, and other aspects of employment. It applies to all Federal, state, and local governments. The law does not apply if an age requirement or limit is a bona fide job qualification, a part of a bona fide seniority system, or is based on reasonable factors other than age;[61]

    3.  The Equal Pay Act, which protects women and men against pay discrimination based on sex, if performing substantially equal work in the same establishment. The law does not apply to pay differences based on factors other than sex, such as seniority, merit, or a system that rewards worker productivity.[62]

Unlike section 1983, the above Federal statutes do not directly impose personal liability on the supervisor, and their means of enforcement vary. Remedies for violations of Title VII of the Equal Employment Opportunity Act may involve reinstatement, reassignment, promotion, training, backpay, and other compensation benefits. Penalities for violations of the Age Discrimination in Employment Act may take the form of payment of damages, interest, attorney's fees, and court costs; infringements of the Equal Pay Act call for such sanctions as the payment of back wages, interest, attorney's fees, liquidated damages, and court costs. Nonetheless, the supervisor is ultimately responsible administratively for violations that lead to costly measures against the agency.

Moreover, supervisory liability for violations of any of the above laws may in fact arise under section 1983. All that is needed is that the supervisor was acting under color of state law and that, in addition to violating statutory provisions, there is a violation of a constitutional right.[63]

Vicarious Liability. Although no cases have directly addressed this issue, it appears reasonable to assume that liability may also arise under section 1983 as long as the two other requirements of acting under color of state law and violation of a constitutional right are present. Most Federal laws granting rights to employees and prohibiting discriminatory practices are enforced directly through sanctions other than a section 1983 lawsuit, making the vicarious liability route only a secondary source of legal remedy.

## AGENCY REPRESENTATION AND LIABILITY FOR
## ACTS OF SUPERVISORS

As a general rule, a supervisor is personally liable if he acts outside the scope of employment. An employee's act is within the scope of employment if the following are present: the act is of the kind he is employed to perform; it occurs within the authorized time and space limits; and it is performed, at least in part, with the intent of serving the employer.[64] In short, there is no governmental liability unless the act performed is at least incidental to employment and a part of the employee's duties.

In an earlier case, Monroe v. Pape,[65] the United States Supreme Court decided that the plaintiff could not recover from the municipality under section 1983, saying that "the response of the Congress to make municipalities liable for certain actions . . . was so antagonistic that we cannot believe that the word 'person' was used in this particular context to include them." All that changed in 1978, when in Monell v. Department of Social Services,[66] the court reversed itself, holding that municipalities and other local government units are "persons" that can be sued directly under section 1983 for monetary, declaratory, or injunctive relief. In Quern v. Jordan,[67] the Court reiterated that the Eleventh Amendment immunity barred suits against states for damages, thus reaffirming the doctrine of sovereign immunity. As a result, only natural persons, municipalities, cities, and other local units of government can be sued for damages without consent. State immunity is alive and well, unless waived by legislation, which many states have done in varying degrees, or in court decisions. Even in states where sovereign immunity still applies en toto, nothing bars the state from indemnifying its own supervisors for liability incurred while acting in the course of duty.

If a supervisor acts outside the scope of employment and is sued in his individual capacity, chances are that the agency will refuse to provide legal defense, nor will the agency indemnify if the officer is held liable. The matter of legal representation should be a justifiable cause of concern among supervisors because of its unstructured status. While some states provide representation as a matter of right, surveys have shown that legal representation in many states is largely uninstitutionalized.[68] In some states and agencies, an informal and unwritten understanding allows the state attorney general to defend the supervisor if, in his judgment, the case is meritorious. In municipal agencies, the practice is even more uncertain, with no designated legal counsel to undertake the defense and no official legal representation policy.

To compound the uncertainty, most jurisdictions would represent only if the employee acted within the scope of duty. That may sound reasonable and consistent with public policy, except that the term "scope of duty" is subjective and eludes precise definition. An agreed and viable working definition goes

a long way towards protecting the rights of officers and alleviating anxiety. Additionally, it is necessary that there be an understanding that a trial court's finding that the officer acted outside the scope of duty, and, hence, is liable, not be made binding on the state or local agency for purposes of indemnification or representation on appeal.[69] An independent judgment must be given to the agency, based on circumstances as determined by that agency. Ideally, only gross and glaring cases of abuse should be denied representation or indemnification. Without this understanding, agency legal assurances of indemnification may only be a mirage because, as current case law stands, acts done by a supervisor in good faith and within the scope of employment are likely to be exempt from liability anyway, so there is nothing to indemnify.

Supervisory lawsuits can lead to a possible conflict of interest in a number of ways. If the supervisor is sued in both an official and individual capacity, the agency might assert that the supervisor acted outside his scope of duty and hence should be personally liable. In the absence of mandated representation, the supervisor will most likely have to provide his own defense. This creates a financial burden and places the supervisor at a disadvantage because of the inevitable implication that in the judgment of the agency the act was unauthorized. A second source of conflict of interest comes from the supervisor's relationship with his subordinate. A supervisor, when sued for what his subordinate has done, may want to dissociate himself from the act, claiming either that the subordinate acted on his own or in defiance of agency policy, particularly when the violation is gross or blatant. In these instances, the supervisor's defense will be inconsistent with that of the subordinate. Determination will have to be made by the agency as to the party it will defend and whom to indemnify if held liable. Chances are that the agency will decide for the supervisor, but that is a decision to be made by policy makers on a case-by-case basis.

### SUMMARY

Although supervisory liability is a new and developing area of law, it has become a fertile source of civil litigation against corrections officials in the last decade. Indications are that the number of lawsuits filed against supervisors will escalate as the courts continue to probe into direct and vicarious liabilities of higher officials, and as the public becomes more cognizant of developing law and the advantages to be derived from the inclusion of supervisors and agencies in state or Federal liability lawsuits. It is therefore important for supervisors to be knowledgeable about the nature and scope of legal liabilities to which they may be exposed in the course of task performance.

The developing case law in this field strongly suggests the need for supervisors to know the legal limits of their job and be more aware of what goes on among, and the competencies of, subordinates in their department. An area that deserves immediate

attention, because of increasing court litigation, is negligent failure to train. All indications are that training is a neglected area in corrections. This is deplorable because corrections is a field that, because of low pay and unattractive job status, needs training even more than the other subsystems in criminal justice if the quality of personnel is to be upgraded. Problems arise for supervisors because of financial constraints occasioned by the reluctance of political decision-makers to commit financial resources to training, despite perceived need. Such neglect carries serious legal implications for the supervisor and decision-makers, and, hence, must be given proper and immediate attention.

The days of unfettered discretion among supervisors in corrections are gone, and supervisors need to shun intransigence and adapt accordingly. Judicial scrutiny can be irritating and sometimes frustrating for a corrections supervisor, yet it can also lead to a more effective and equitable administration, something that the public desires and deserves. Judicial intervention and supervisory liability may be a mixed blessing, but they are realities with which corrections supervisors must learn to live and cope.

## NOTES

## CHAPTER XIII

1.  Brandon v. Holt, 105 S. Ct. 873 (1985).

2.  Meistinsky v. City of New York, 140 N.Y.S. 2d 212 (1955).

3.  Owens v. Haas, 601 F. 2d 1242 (2nd Cir. 1979), cert. denied, 100 S. Ct. 483; Jones v. Wittenberg, 330 F. Supp. 770 (1971); Gates v. Collier, 390 F. Supp. 482 (1975); Miller v. Carlson, 401 F. Supp. 835 (1975). See, in general, M. Rice, "Corrections and Training Liability: Federal, State Cases Illustrate Need to Reduce Risks," 1, Training Aids Digest, December 1983.

4.  601 F. 2d 1242 (2nd Cir. 1979), cert. denied, 100 S. Ct. 483.

5.  610 F. 2d 693 (10th Cir. 1979).

6.  Oklahoma City v. Tuttle, 37 CrL 3077 (1985).

7.  The New York Times, June 4, 1985, p. 9, Col. 5. See, also, Hays v. Jefferson County, Kentucky, 668 F. 2d 869 (1982) where the Sixth Circuit said that where a constitutional violation is not a pattern of past misconduct, a supervisory official or municipality may be liable "only where there is essentially a complete failure to train . . . or training was so reckless or grossly negligent that future misconduct is almost inevitable or would properly be characterized as substantially certain to result."

8.  See R. DeLong, Jr., A Summary of Liability of Corrections Administrators for Failure to Train or Failure to Super-vise Training, 2-4, (1980)(unpublished manuscript). The report referred to is that of the National Advisory Commission on Criminal Justice Standards and Goals (1973).

9.  See M. Rice, supra note 3, at 8.

10. Alberti v. Sheriff of Harris County, 460 F. Supp. 649 (S.D. Tex., 1975).

11. See AELE SPECIAL REPORT, The AELE Workshop on Police and Liability and the Defense of Misconduct Complaints (Americans for Effective Law Enforcement, 1982), p. 12-1.

12. Moon v. Winfield, 383 F. Supp. 31 (N.D. Ill. 1974).

13. Peters v. Bellinger, 159 N.E. 2d 528 (Ill. App. 1959).

14. 383 F. Supp. 31 (N.D. Ill. 1974).

15. Ford v. Brier, 383 F. Supp. 505 (E.D. Wis. 1974).

16. Moon v. Winfield, 383 F. Supp. 31 (N.D. Ill. 1974).

17. 484 F. 2d 828 (D.C. Cir. 1973).

18. 295 F. Supp. 1025 (D.D.C. 1968).

19. 349 So. 2d 1334 (La. App. 1977).

20. Hardy & Weeks, Personal Liability of Public Officials Under Federal Law 7 (1980).

21. J. Palmer, Civil Liability of Correctional Workers 24 (1980).

22. Ford v. Brier, 383 F. Supp. 505 (E.D. Wis. 1974).

23. Dewell v. Lawson, 489 F. 2d 877 (10th Cir. 1974).

24. 302 F. Supp. 1972 (N.D. Mass. 1969).

25. 162 A. 2d 820 (N.J. 1960).

26. Moon v. Winfield, 383 F. Supp. 31 (N.D. Ill. 1974).

27. See AELE SPECIAL REPORT, supra note 11, at 12-2.

28. LR #10509 (W.D. Tennessee 1981).

29. 71 N.E. 2d 419 (Ct. App. N.Y. 1974).

30. Garrity v. New Jersey, 365 U.S. 493 (1967).

31. See, in general, G. Brancato & E. Polebaum, The Rights of Police Officers 125-26 (1981).

32. See Pickering v. Board of Education, 391 U.S. 563 (1968).

33. See New York v. Onofre, 48 U.S.L.W. 2520 (N.Y. App. Div. January 24, 1980).

34. 391 U.S. 563 (1968).

35. Safransky v. State Personnel Board, 215 N.W. 2d 379 (1974).

36. Acanfora v. Board of Education, 359 F. Supp. 843 (D. Md., 1973).

37. Norton v. Macy, 417 F. 2d 1161 (D.C. Cir., 1969).

38. Shuman v. City of Philadelphia, 470 F. Supp. 449 (E.D. Pa. 1979).

39. There are Federal and state laws restricting the political activities of certain public officers.  See in general BRANCATO, supra note 31, at 78.

40. Civil Rights Act of 1964, Title VII; 42 U.S.C. Sec. 1981, 1983 (1976).

41. See Americans for Effective Law Enforcement, Legal Defense Manual, 1982, p. 49.

42. See G. Brancato and E.P. Polebaum, The Rights of Police Officers, (New York:  Avon Books), 1980, pp. 58-59.

43. Monroe v. Pape, 365 U.S. 167 (1961).

44. Procunier v. Martinez, 416 U.S. 396 (1974).

45. Martinez v. California, 444 U.S. 277 (1980).

46. Dewell v. Larsen, 498 F. 2d 988 (10th Cir. 1979).

47. See, in general, Donaldson, Vicarious Liability of Superior Under USCS Section 1983 for Subordinate's Acts in Deprivation of Civil Rights,  51 ALR Fed. 285.

48. Id. at 291 & 301.

49. Adams v. Pate, 445 F. 2d 105 (7th Cir. 1971).

50. Duncan v. Duckworth, 644 F. 2d 653 (7th Cir. 1981).

51. Id. at 656.

52. 481 F. 2d 1028 (2nd Cir. 1973), cert. denied 414 U.S. 1033.

53. 546 F. 2d 1077 (3rd Cir. 1976).

54. 550 F. 2d 926 (4th Cir. 1977).

55. Robert v. Williams, 302 F. Supp. 974 (1964).

56. 676 F. 2d 1252 (9th Cir. 1982).

57. 537 F. 2d 829 (5th Cir. 1976).

58. Id. at 831.

59. Pearl v. Dobbs, 649 F. 2d 608 (8th Cir. 1981).

60. 42 United States Code, Sections 2000e-2000e-17 (1976).

61. 42 United States Code, Section 2000e (1976).

62.  29 United States Code, Section 206 (1976).

63.  Meredith v. Allen County War Memorial Hospital Commission, 397 F. 2d 33 (6th Cir. 1968).

64.  See AELE SPECIAL REPORT, supra note 11, at 14-1.

65.  365 U.S. 167 (1961).

66.  436 U.S. 658 (1978).

67.  440 U.S. 332 (1979).

68.  See, in general, R. del Carmen, Legal Responsibilities of Probation and Parole Officers; A Manual, 246-266 (NIC Grant Award #BZ-5, Final Report).  See, also, R. Crane & G. Roberts, Legal Representation and Financial Indemnification for State Employees:  A Study.

69.  See R. del Carmen, "Legal Responsibilities of Probation and Parole Officers; Trends, General Advice, and Questions, Federal Probation 45, No. 3 (Sept. 1981).

-182-

## CHAPTER XIV

### LIABILITY FOR PRIVATE PROGRAMS AND COMMUNITY SERVICE WORK*

Distinct from supervisory liability within probation/parole settings is agency liability for other community corrections programs that are run and managed by private agencies on contractual or other types of relationship with probation/parole departments.  Should government personnel or agencies, such as probation/parole departments, be liable for what private persons or agencies do?

### LIABILITY UNDER SECTION 1983 OF PRIVATE PROGRAMS

While only a few cases have been decided by the courts on this topic, some issues deserve attention.  Foremost is whether or not the proprietor or personnel of private programs can be liable in a civil rights (section 1983) lawsuit.  The issue arises because one of the essential elements of a civil rights case is that the person or agency sued must be "acting under color of law."  Public officials are presumably "acting under color of law," but private individuals do not ordinarily fall into this category.  Most courts have decided that a contractual relationship with the state may subject private agencies or individuals to liability for acting under color of law.[1]  The rationale is that there is government involvement in these cases to justify the exposure of private individuals to section 1983 cases.

An example is Milonas v. Williams,[2] which involved a section 1983 action against the owners and operators of a private school for youths with behavior problems.  Former students brought a class-action suit for deprivation of civil rights incurred by the school's use of a polygraph machine, monitoring and censoring of student mail, use of isolation rooms, and use of excessive physical force.  Students were placed at the school involuntarily by juvenile courts and other state agencies, generally at the insistence of parents.

The Tenth Circuit, in deciding Milonas, found the school to be acting under color of state law.  Significant public funding in the form of tuition, extensive state regulation of the school program, and contracts drawn by public school administrators placing youths at the school indicated the presence of "under color of state law" pre-requisite to a section 1983 action.

*This Chapter is an expanded portion of an article, "Legal Issues and Liabilities in Community Corrections," published in L. Travis, Probation, Parole, and Community Corrections, Prospect Heights, Ill.:  Waveland Press, Inc., 1985.

-183-

## OTHER LIABILITY ISSUES

Another issue is whether or not a private agency can compel a client to do what government officials otherwise cannot compel him to do because of limitations in the Bill of Rights. An example is a half-way house, owned and managed by a private agency, requiring all its residents to attend religious instruction and services as part of its rehabilitation program. The Constitution prohibits required religious instruction if imposed by government officials, but private individuals do not normally come under the constraints of the Bill of Rights. Similar issues would arise if private agencies restrict programs on the basis of race, color, or national origin.

Another important issue goes into the liability of a government agency for what a private person or agency does, with whom it has a contractual relationship. For example, will a probation/parole agency be liable if the proprietor or personnel of a private halfway house grossly violate the rights of a client?

There are no clear laws or court decisions in probation/parole addressing the above issues. However, these are the same issues raised in the current move towards corrections privatization. The literature on these issues is just now starting to develop.[3] The consensus is that the government cannot escape liability for what private parties or agencies do, whether the services be provided in the form of remunerative contract or not, as long as the government has some degree of involvement in what is done.

### Government Liability and Responsibility Tests

Government liability and responsibility arise under several tests.

The first is the public function test. This holds that if a private entity or person is engaged in the exercise of what are traditionally government functions, their activities are subject to constitutional limitation. The state cannot be rid of constitutional restraints in the operation of its traditional functions by contracting or delegating responsibility to a private party. Conversely, the private party, in assuming the role of the state by performing the public function, is subject to the same limitation as the state itself.

The case of Medina v. O'Neill[4] illustrates the public function concept. In Medina, decided by a federal district court in 1984, private security guards, under contract with a private vendor operating an Immigration and Naturalization Service detention facility, shot and killed a prisoner during an escape attempt. Suit was brought against the INS. The court found state action on the part of all the defendants, stating: "The public function concept provides that state action exists when the state delegates to private parties a power 'traditionally exclusively

reserved to the state."[5] The Supreme Court suggests, in Rendell-Baker v. Kohn,[6] a limitation of the concept: "The relevant question is not simply whether a private group is serving a public function . . . the question is whether the function performed has been traditionally the exclusive prerogative of the state."

Medina offers only rough and uncertain guidelines. It suggests that agencies will not be able to escape liability by arguing that contracted services are the acts of private parties. Another 1984 case, Woodall v. Partilla,[7] is much closer to a community corrections setting. Here, the court ruled that by compelling an inmate at Joliet Correctional Center to work in a private food service, the private company actions with respect to that inmate had become an exercise of state power. Said the court: "When private individuals or groups are endowed by the state with powers or functions governmental in nature, they become agencies of the state and subject to its constitutional limitations."

Another pertinent case concerns a private mental health facility. The court found that "where a private corporation undertakes to perform duties which have been largely within the province of the state, and wherein it receives substantial sums of money from the state for performance of such duties, there exists a sufficient relationship between it and the state to make it a suable entity under 42 U.S.C. section 1983."[8]

In a corrections situation, the issue becomes: are the services given by probation/parole agencies considered a public function prerogative of the state? Because an affirmative answer to this query would be expected, given the history of the U.S. criminal justice system, Section 1983 liability may be expected to follow contracts providing rehabilitative services for the state. Where tradition has assigned a function exclusively to the government in the past, a person or agency performing that function now may well be considered engaging in a state action.

A second test for state action is the nexus test. Under this test, the court looks for a close nexus or link between he actions of public officials and private individuals or agencies. For example, in Milonas v. Williams,[9] the court found that a private secondary school for delinquent and emotionally disturbed boys was acting under color of state law because there was a sufficiently close nexus between the action of the state in sending the boys to that school and the conduct of school authorities.[10]

A third test for state action is the state compulsion test. Where a state is compelled by statute or duty to provide a service and contracts for that service, state liability cannot be avoided.[11] Therefore, a community agency chartered and substantially funded by the state to provide rehabilitative programs will probably be viewed by courts as carrying out duties of the state and, as such, will be subject to constitutional prohibitions against depriving clients of their civil rights.

Examples would be the state's obligation to provide medical care for the mentally retarded or a school for delinquent boys. In probation/parole, the question is whether or not the state has a clear duty to provide these services. Although no constitutional right to probation/parole has been declared (both are still considered a privilege which may be granted or denied), the establishment of both functions by law inevitably carries with it an obligation by the state to provide certain types of services, hence the nexus test could well be established in probation/parole.

A fourth test to determine governmental liability for private acts is the joint action test. In some cases, courts have held private defendants liable as state actor's because they were joint participants with state officials.[12]

The four tests discussed above strongly indicate that government officials and agencies may be held liable for what private agencies do in corrections.[13] Although the public function test has been used predominately by many courts, the above tests are not mutually exclusive, and any test can be used by any court as a handle to bring private agencies under the umbrella of state action. This has the twofold consequence of holding public agencies possibly liable for what private agencies do and also imposing constitutional limitations on the actions of private individuals or agencies.

In most cases, private agencies provide services to the probation/parole agency by contract wherein the forms of service given are specified in return for money paid. Can the probation/parole agency escape liability by specifying in the contract that the private party agree to shoulder absolute liability in cases brought by clients? Such provision may be included in the contract, but chances are that it will not exculpate the public agency from liability because state action can still easily be established under the above four tests. The contractual provision does not bind a third person (the injured client who brings the case) because he was not a party to the contract. Regardless of provisions in the contract, the injured party will most likely include the government in the lawsuit because the chances of recovery against a public agency (which can always tax the public, hence the "deep pocket" theory) are higher than against private agencies with limited resources.

Liability of Officer Or Agency For Use of
Community Volunteers

Many community corrections agencies are able to function effectively only by utilizing community volunteers. What if a Junior League volunteer, for example, injures a probationer/parolee or deprives a client of civil rights? Obviously, private individuals would be liable personally for their acts, but would the supervising officer or agency incur liability?

No case law exists on these issues, but general legal principles can offer guidelines. The general rule is that agencies cannot escape liability for what volunteers do because their involvement is such that what volunteers do can be categorized as state action under the four tests discussed above. The nature of the liability would vary according to what the agency did or failed to do. If, for example, the volunteer's act were in violation of in-service training required of all volunteers, the supervising officer would have a lesser likelihood of liability than if he neglected to train the volunteer according to or acquaint the volunteer with agency policies. Once again, written procedural and policy manuals and proper training and explanation of policy would help mitigate supervisory or agency liability. Unless there is fault with the agency, the liability would likely be personal with the volunteer.

If volunteers act outside the scope of their duties, officers and agencies might not be found liable. However, if acting outside the scope of duties as defined by agency policy is common and a supervisor superficially or rarely corrects the practice, then that supervisor may have effectively changed the custom or policy. In such a case, the supervisor's chances of being held liable for the volunteer's act would be increased.

OFFICER OR AGENCY LIABILITY FOR INJURIES CAUSED
BY PAROLEES OR PROBATIONERS ENGAGED IN
COMMUNITY SERVICE WORK

Community service work is often required as a rehabilitative measure. The offender personally engages in paying his debt to society. What if the probationer volunteering in or assigned to work in a center causes illness through negligent food preparation or breaks an expensive piece of woodworking equipment in the craft room? What if the probationer inflicts physical injury to a resident of a nursing home? Aside from the offender's potential personal liability, could the officer or agency supervising the offender suffer liability?

Again, no case law exists on this specific issue. Officer and agency statutory authority, administrative policies, and procedural manuals would be central to determination of liability. The reader is referred to Chapter XI of this manual (Supervision) for a discussion on officer liability for what a probationer parolee does. That discussion in Chapter XI essentially says that chances are that liability on the part of the officer would arise only if there is reasonably foreseeable risk and reliance. In the context of community service work, the officer must be careful not to place a probation/parolee in a type of work that is related to his previous offense. Obvious examples would be requiring a person placed on probation for drug use to work as a helper in a hospital pharmacy, or requiring a parolee who was convicted of child abuse to work as a helper in a community nursery.

Aside from foreseeability, the courts also look for the presence of _reliance_. Essentially, this means that the injured party relies upon representations made by the officer implying that the person who is to do the work is sufficiently competent and reliable to be able to do the job safely. This is easily met in community corrections programs if the volunteer work is done with the knowledge or upon recommendation of the officer or judge. If the volunteer work is obtained by the probationer/parolee on his own, then there is no reliance. Nonetheless, liability might still ensue if agency policy requires the officer to disclose the client's record (particularly where there is foreseeability that a similar offense might be committed), and the officer fails to do that. In these cases, the better policy for the agency to adopt is one that formally gives the officer the option to disclose or not to disclose the client's record, even if there is foreseeability, if the client obtained the work on his own. An agency policy requiring the officer to disclose carries the seeds of a possible lawsuit emanating from the injured third party or the probationer/parolee, in case he does not get the job because of the disclosure.

A slightly different but related concern is agency liability to clients or community volunteers in the course of performing community work. An example is a probationer who is injured while working as a volunteer or a paid or unpaid helper in a public park as part of his probation condition. These injuries are usually covered by state tort law or by worker's compensation laws. In the absence of coverage under local law, liability insurance to cover these contingencies might be considered by the agency.[14]

## SUMMARY

Liability for and of private programs and community service work raises a number of legal issues for which there are no authoritative answers, primarily because only a few cases have addressed these issues. High on the list is whether or not private parties can be held liable in section 1983 cases. Court decisions answer this in the affirmative, holding that private agencies can be considered as acting "under color of law" when they are involved with public agencies. Similarly, private parties are bound to respect constitutional guarantees under the Bill of Rights when performing probation/parole functions. Despite disclaimer of liability in a contract, a government agency may be held liable for the acts of a private party or agency under four possible tests that the courts can use to bring the acts under the umbrella of state action. The same rationale holds in the use of community volunteers to do probation/parole work in case damage ensues from what they do. Conversely, the agency may be liable for damages arising from community work by probationers/parolees in some instances, specifically when foreseeability and reliance are present.

---

## NOTES

### CHAPTER XIV

1.  See _U.S. v. Price_, 383 U.S. 787 (1966); _Williams v. U.S._, 341 U.S. 97 (1951).

2.  691 F. 2d 931 (10th Cir. 1982).

3.  Some of the more recent materials on this issue are: I. Robbins, "Corrections and the Private Sector: Legal Issues and concerns," (Unpublished Manuscript, Preliminary Draft Only, 1984), and A.J. Bronstein, "The Legal Implications of Privatization" (The National Prison Project Journal Number 2, Winter, 1984) pp. 1&2.

4.  _Medina v. O'Neill_, U.S.D.C., S.D. Texas, Houston Division, C.A. 11812928 (1984).

5.  The _Medina_ court cited as authority: _Flagg Brothers v. Brooks_, 436 U.S. 149, 175 (1948); _Jackson v. Metropolitan Edison Co._, 419 U.S. 345, 352 (1974); _Dobyns v. E-Systems, Inc._, 667 F. 2d 1219, 1222 (5th Cir. 1982).

6.  457 U.S. 830, at 842 (1982).

7.  581 F. Supp. 1066, 1076 (N.D. Ill. 1984).

8.  _Kentucky Assn. for Retarded Citizens_. 510 F. Supp. 1233, (D. Ky. 1980), aff'd 674 F. 2d 582 (6th Cir. 1982), _cert. denied_, 459 U.S. 1041 (1982).

9.  691 F. 2d 931 (10th Cir. 1982).

10.  Robbins, _supra_ note 3, at 35.

11.  See, e.g., _Lombard v. Shriver Center for Mental Retardation_, 556 F. Supp. 677 (O. Mass. 1980).

12.  _Luger v. Edmondson Oil Co._, 102 S. Ct. 2744 (1982).

13.  For a more detailed discussion of these four tests, see the articles by I. Robbins and A.J. Bronstein, _supra_, note 3.

14.  For a more extensive discussion of this question, see H.P. Cohen and James J. Gobert, _The Law of Probation and Parole_, (New York: Shepard's McGraw-Hill, 1984) at 274-75. For the types of insurance recommended for specific community corrections programs, _see_ "Liability in Community Corrections Programs," Virginia Department of Criminal Justice Services, _Criminal Justice Journal_ (July 1984), at 7 & 8.

PART FOUR — CONCLUSION


CHAPTER XV  —  TRENDS, GENERAL ADVICE, AND QUESTIONS

CHAPTER XV

TRENDS, GENERAL ADVICE, AND QUESTIONS

**TRENDS**

Court decisions continue to widen the net and add to the category of officials who may now be held legally responsible for acts done while in office. What started as sporadic liability lawsuits directed primarily at prison personnel have now evolved into a nationwide pattern of greater liability for all public officials.

The trend is spreading to the private sector. Professionals and practitioners in the fields of medicine, clinical psychology, education, law, and religion have been sued in increasing number under state law. Court congestion has become a serious concern and liability suits have certainly aggravated the problem.

Given this trend, probation/parole officers must be careful and properly informed. As public officers, they are vested with varying degrees of authority essential for effective task performance. With this authority comes an obligation to act responsibly. Moreover, the general public now demands accountability in all phases of public service. This is particularly true in the criminal justice system where life and personal liberty are at stake. This accountability takes the form of possible civil or criminal liabilities for breach of duty. The courts have long abandoned their "hands-off" policy in favor of the "open door" era vis-a-vis citizen complaints. Accountability, court scrutiny, and greater visibility are realities with which probation parole officers will have to learn to live and cope.

**GENERAL ADVICE**

The questionnaire sent by the project staff to all offices of Attorneys General in the United States included the following question:

What three most important bits of legal advice would you give probation and parole officers to help them avoid or lessen possible legal liability in connection with their work?

Ranked in the order of response frequency, the top five answers were as follows:

- Document your activities. Keep good records. (40%)

- Know and follow departmental rules and regulations and your state statutes. (35%)

- Arrange for legal counsel and seek legal advice whenever questions arise. (27%)

-190-

- Act within the scope of your duties, and in good faith. (20%)

- Get approval from your supervisor if you have questions about what you are doing. (18%)

Other bits of advice (in descending order) were:

- Keep up with developments in your field, (e.g., relevant legal developments, statutes, new departmental regulations). Ignorance of the law or regulations excuses no one.

- Use common sense.

- Review important decisions with supervisors.

- Undertake thorough investigations before making recommendations.

- Report the violations of clients.

- Notify your supervisor immediately if you suspect that legal action is being seriously contemplated.

- Have clear and comprehensive policies in your department.

- Perform duties on time.

- Take out insurance.

- Stick to the facts in all dealings with clients.

- Do not get personally involved with clients.

- Be familiar with revocation procedures.

- Keep out of politics.

- Advise officers on ethical practices.

- Do not act as a police officer.

- Avoid transporting clients when possible.

- Ensure safeguards for client property.

It behooves probation/parole officers to note these words of advice from the professionals in the field in the face of mounting civil rights and state tort cases. On the other hand, a word of caution is in order. Knowledge of legal responsibilities and awareness of possible liabilities could lead an officer to over-caution amounting to inaction. This should be avoided because,

-191-

in many case, reluctance or failure to perform duties can be more harmful than acting incorrectly. Knowledgeable caution is a valuable characteristic of a competent professional.

## SPECIFIC CONCERNS

### Legal Representation

Legal representation should rank as a major concern of probation/parole officers. In some states, an informal and unwritten understanding exists that allows the state attorney general to undertake the defense of a public officer if, in the attorney general's judgment, the case is meritorious. This uninstitutionalized practice creates uncertainty and allows denial of representation based on extraneous considerations. As discussed in Chapter VI, states use various guidelines in deciding the kinds of acts they will defend. While all of the states surveyed stated that they provide legal representation at least some of the time, a substantial number indicated that they will not defend in all civil suits. The same survey shows that one-half of the states will not undertake the defense of an officer accused of a crime. Creation of a state statute making such defense by the state obligatory should be explored, if no such statute exists. Legal representation can be undertaken by the office of the attorney general, the city or county legal officers, or through a system similar to medical insurance where an employee has the option to choose his own lawyer.

Legal representation on the local government level is much less reassuring than representation for state officers. This is significant because while parole agencies in a great majority of states are administered and funded by the states, probation offices are predominantly controlled on the local level, either by local judicial districts, judges, or political agencies. Each agency determines the type of legal representation it gives to local public officers. Arrangements vary from allowing local officials to get their own lawyer at county's expense, to having the county or district attorney represent the officer. Whatever the arrangement, it is important that the policy on representation and indemnification be clarified and formalized. An unarticulated and informal policy ("Don't worry, we will take care of you if a lawsuit is filed") should be avoided because it can be implemented selectively, and, hence, is not much of a guarantee.

### Indemnification

Closely related to representation is the issue of indemnification, if and when the officer is adjudged liable. A majority of the states provide indemnification for the civil liabilities of their public employees, albeit in varying amounts. The conditions under which the state will pay also vary and are sometimes unclear. Moreover, although most states provide for some form of indemnification, states often do not automatically indemnify. In a majority of states and local agencies, employees

can expect the state to help pay the judgment only if the act on which the finding of liability is based was within the scope of employment and done in good faith. The definitions of the terms "within the scope of employment" and "good faith" vary from state to state.

Probation/parole officers would be well advised to look into their specific state statutes covering legal representation and indemnification. If no such statute exists, the possibility of formulating one ought to be reexamined to ensure maximum protection for the officers. Part of the lack of protection comes from a definitional problem. While it is difficult, if not impossible, to spell out very specific guidelines that further refine the phrases "acting within the scope of duty" and "good faith," working definitions of these terms go a long way toward alleviating anxiety and minimizing arbitrariness. Such definitions are not found in a number of current statutes.

Additionally, for purposes of maximum protection, it is important that there be an understanding that a trial court's finding that the officer acted outside his scope of duty and in the absence of good faith not be made binding on the state or local agency, particularly for purposes of indemnification. An independent determination must be allowed the representing or indemnifying state authority (usually the attorney general's office for state officers and the district attorney or county attorney for local officers), based on circumstances as perceived by that agency. Only cases that are grossly and obviously outside the scope of employment and clearly done in bad faith should be denied legal representation and indemnification. Without this understanding, a state's legal representation and indemnification law can be ineffective because, as current case law stands, acts that are done by probation/parole officers in good faith and within the scope of their employment are exempt from liability anyway. So, because of the prerequisite of the "good faith" and "acting within the scope of employment" provisions of most state laws, an officer who acts in good faith has no liability (and therefore needs no indemnification), whereas one who is adjudged liable (and therefore needs indemnification) cannot be indemnified under most state laws because he acted in bad faith and/or outside the scope of employment.

### Professional Insurance

Professional insurance should be given serious study along with the issues of legal representation and indemnification. According to the project survey, only a minority of states (30 percent) have insurance protection for probation/parole officers. Insurance is particularly desirable in states where legal representation or indemnification is either absent or uncertain. This is because insurance companies may provide both legal counsel and damage compensation. In states where insurance is not provided, the enactment of a law or the issuance of an administrative policy should be explored and, wherever feasible,

recommended.  Otherwise, personal purchase of insurance should be considered.

## Immunity Statute.

Another possible source of protection that should be explored by probation/parole officers requires action by state legislatures.  The United States Supreme Court in Martinez v. California (discussed in Chapter V) held that California's immunity statute was constitutional when applied to defeat a tort claim arising under state law.  That section of the California law (section 845.8(a) of the California Government Code) provides as follows:

> Neither a public entity nor a public employee is liable for:  (a) Any injury resulting from determining whether to parole or release a prisoner or from determining the conditions of his parole or release or from determining whether to revoke his parole or release.

A similar statute may be enacted by other states at the initiative of probation/parole officers.  It may be necessary, however, to keep an avenue open for meritorious claims.  This can be done by creating a state administrative body or a court of claims where reasonably deserving cases may be adjudicated.

Although the applicability of a state immunity statute is limited to state tort litigations and does not affect Section 1983 cases, such a law does extend a measure of protection to public officers.  Moreover, although the California statute specifically limits its coverage to parole cases, there appears to be no legal impediment to extending that coverage to include probation officers, particularly on such matters as the setting of conditions and the revocation of probation.

## Source of Authoritative Information

Probation/parole officers in each state need a source to which they can refer for authoritative information on the topics addressed here.  It is suggested that, at the very least, each state develop a manual, perhaps along the lines covered in this document.  Some states have already done this, focusing on certain specific areas of concern.  The state manual need not be lengthy, but it must contain information specific to that state.  The topics addressed in this manual, as well as the series of questions posed in the following pages, should be valuable starting points.  Authors should remember, however, that this manual gives generic information that may not apply to each state or jurisdiction.  Moreover, this manual will be outdated by new decisions and statutory developments.  Each state should update its manual constantly, perhaps through the probation/parole or corrections association's newsletter or occasional memoranda from the probation/parole agency or the office of the attorney general.

## IMPORTANT QUESTIONS

For better protection and greater awareness, the following is a list of important questions that probation/parole officers should ask and for which they should obtain answers from their employers and legal advisors.  These questions highlight several vital issues addressed in this manual and help apply these legal concerns to individual states or jurisdictions.  It would be in the interest of probation/parole officers to arrange a seminar or workshop with their employers, legal advisors, or other knowledgeable persons who can give authoritative answers to the following questions:

1.  If I am sued in a criminal, tort, or civil rights action in state or federal court, will my agency or employer provide a lawyer to represent me?

2.  If a parolee, probationer, or anyone else is contemplating suit against the agency, agency personnel, or me, and I am contacted by their lawyer, what should I do?

3.  What specifically should I do if and when I am served with legal papers and/or court documents indicating that a lawsuit has been filed against me?

4.  If there is a conflict between me and a co-defendant, or me and my agency, will the government appoint a different attorney for me?

5.  Are there any special defenses available to me as a state probation/parole officer in a tort suit in which I am the defendant?

6.  Are there any specific criminal laws in my jurisdiction of which I must be aware that apply specifically to probation and/or parole officers or public officials/employees?

7.  Are there any decided cases in my state where a probation/parole officer has been held liable under state tort law either to the client or to a third party?

8.  What type of immunity, if any, do I enjoy as a probation/parole officer under my state's law?

9.  Does our state have laws that would indemnify me if I am found liable in a state tort or a federal civil rights action?  If so, how do these laws apply to me?  Is the coverage mandatory or optional?

10.  What do I have to do to enhance my chances of indemnification in the event I am sued?  What procedures must I follow?

11. What is the best way, consistent with the laws of my state, to protect my personal assets from seizure and execution for satisfaction of a judgment against me?

12. Is there any kind of liability insurance available to me individually or as a member of a group through the government or privately?

13. Does our state have a state civil rights law that might affect me in my work? If so, what and how?

14. Does our state have a law covering the issue of disclosure of information about my client to others, for example: privacy laws, laws on confidentiality of criminal offender record information, and laws on the confidentiality of mental health, education, and vocational information? If so, how does it apply to me and what are the penalties and procedures for violations?

15. Does our state have a state law that gives my client, his lawyer, his designate, or others access to information in my file or in my reports? If so, what are the specific requirements and what are the penalties and procedures for noncompliance?

16. Does our state have an Administrative Procedures Act that applies to me? If so, how?

17. As a parole officer, what should I do if, at a revocation hearing, I feel that the hearing officer is denying the parolee his/her rights to due process under Morrissey?

18. Is there a compilation of regulations, policies, and directives that govern my conduct as an employee and relate specifically as to my work with clients?

19. Who is my legal advisor? Is there any public official to whom I can turn who is obligated to advise me in legal matters and upon whose advice I am entitled to rely?

20. Am I a peace officer? What are my law enforcement powers vis-a-vis arrest, search, seizure, and ability to assist and be assisted by law enforcement officers? Am I ompowered to carry a weapon?

21. Does my court or agency have any guidelines on arrest and search or frisk of clients and their homes and property?

22. Are there specific laws in our state that relate to my responsibilities and duties as a public employee and as

a probation/parole officer in particular? What are they?

23. Are there specific laws in our jurisdiction that set out the rights and duties of my clients?

24. Do we have a written policy on assessment of restitution that will give the probationer access to a judicial determination in the event he disagrees with the amount claimed by the victim or assessed preliminarily by me?

25. According to state law or court decisions in this state, can a judge or parole board delegate the imposition of conditions or the setting of the restitution amount to me? If these cannot be delegated, but judges or boards do it anyway, what is my best defense under state law against liability?

26. Do we have a written policy on my imposing or modifying conditions of probation or parole that will give the client immediate access to the judge or board if he contests my action?

27. What should I do about transporting clients (prisoners) in my private vehicle? What responsibility will my employer assume in the event of an auto accident?

28. Should I warn third persons if I believe the client presents a possible danger to them? If so, under what circumstances? If it is a close call, whom should I contact for advice?

29. Do you want me to advise clients on procedures and on how to put their best foot forward when appearing before the court or board?

30. Do you want every violation reported to the court or board?

31. What do the terms "good faith" and "negligence" mean in our state?

32. How can I be sure that I am informed on an up-to-date basis regarding administrative rules, regulations, and decided cases affecting me?

A final word. Law suits are a burden. They cause anxiety, drain time and money, and take a heavy toll on all parties concerned. There is always the possibility of a counter-suit by the officer in retaliation, but that merely compounds the problem and increases expenses. Avoidance of suits through proper task performance and other precautionary measures is the better option for probation/parole officers as they continue to discharge their duties and responsibilities in a time of challenge and change.

# APPENDIX

## GLOSSARY

**Abuse of Discretion:**  No clear standard exists but, generally, (1) no reasonable person would take the view adopted by the decision-maker, or (2) the decision was made for some arbitrary reason wholly unrelated to the statutory standard, or (3) the decision was made in contradiction of applicable policy or statutes.

**Absolute Immunity:**  The exemption enjoyed by certain government officials from liability in a lawsuit by virtue of the position they occupy.  This means that if a civil suit is brought, it will be dismissed by the court without going into the merits of the plaintiff's claim.  Legislators, judges, and prosecutors enjoy absolute immunity for the decisions they make in the performance of their jobs.

**Administrative Law:**  Rules and regulations promulgated by governmental agencies instead of by legislative bodies.  Once promulgated, these rules and regulations have the force and effect of law and are binding on that agency, its officers, and those who deal with them, unless declared illegal or unconstitutional by the courts.  Examples are rules and regulations issued by probation and parole agencies.

**Civil Cases:**  Cases brought to recover some civil right or to obtain redress for some wrong.  Tort actions are examples of civil cases.  All non-criminal cases are civil cases.

**Civil Rights Attorney's Fees Awards Act of 1976:**  A federal law (sometimes known as Section 1988) that allows the court to award attorney's fees to the prevailing party in some types of federal suits, particularly Section 1983 cases.

**Civil Rights Cases:**  Another name given to Section 1983 cases.  Refer to Section 1983, below, for a more extended definition.

**Color of State Law:**  Actions taken under "color of state law" have the appearance but not the reality of being legally justified.  The term suggests the misuse of power possessed by virtue of state law, and that the misuse is possible only because the alleged wrongdoer is clothed with the apparent authority of the state.  The term includes conduct actually authorized.  Generally, anything a probation/parole officer does in the performance of assigned duties, whether or not actually authorized, is done under color of state law.

**Damages:**  Pecuniary compensation to the person who suffers loss or harm from an injury; a sum recoverable as amends for a wrong to a person, his property, or his rights.  Damages (nominal, compensatory, or punitive) may be awarded to the plaintiff in state tort or Section 1983 cases.

**Defendant:**  The party against whom an action is brought; the party denying, opposing, resisting, or contesting the action brought by the plaintiff or the state.  Probation/parole officers may become defendants in several kinds of cases arising out of improper task performance.

**De Novo:**  The hearing of a case anew, afresh, a second time.

**Discretionary Acts:**  Acts that require personal choice and judgment, such as deciding on policies and practices.  In general, the consequences of discretionary acts cannot result in liability, unlike mandatory or ministerial acts.

**Double Jeopardy:**  A defense, of constitutional origin, in a criminal prosecution; the claim that the defendant is being placed on trial for a second time for the same offense for which he has previously been tried.  The double jeopardy defense, however, does not apply where one case is a criminal prosecution and the other is for monetary damages for the same act, or where the criminal prosecution is made successively under state and federal jurisdiction, or vice versa.

**Dual Court System:**  The court system in the United States where there is one court system for federal cases and separate systems for state cases.

**Due Process:**  A course of legal proceedings according to those rules and principles established in our system of justice for the enforcement and protection of private rights.  In the most simple of terms, fundamental fairness.

**Exclusionary Rule:**  A rule of substantive law that prohibits the use in adversary criminal proceedings of evidence of any nature that was obtained in violation of law.  The rule has been extended to include any evidence subsequently discovered solely as the result of the illegally obtained evidence.

**Good Faith:**  The condition that exists when an officer acts with honest intentions, under the law, and in the absence of fraud, deceit, collusion, or gross negligence.  A defense against liability, good faith has a subjective and an objective component.  Both elements must be present for the defense to succeed:  (1) the person must have acted sincerely and with the belief that what he did was lawful; and (2) the judge or jury must determine that such belief was reasonable.

**Governmental Immunity:**  Exemption of government agencies or entities from liability for their governmental, but not their proprietary, functions.

**"Hands Off" Doctrine:**  The doctrine adopted by the courts since the mid-1960s to entertain cases filed by prisoners and others in the criminal justice process seeking redress of grievances or monetary liability against government officials.  The "hands on"

doctrine has led to the "Open Door" era in corrections and the whole field of criminal justice litigation.

**Immunity:** A general term referring to exemption from tort liability or other forms of lawsuits. Immunity can be governmental or official; absolute, qualified, or quasi-judicial.

**Indemnification:** To make good the loss of another; in the case of a public employee who is sued, indemnificaiton refers to payments to the officer from the government to fully or partially pay the damages assessed against him.

**Jurisdiction:** The authority of a court to hear and decide a case.

**Legal Liabilities:** Refers to the various civil and criminal proceedings to which a probation/parole officer may be exposed if he breaches any of his legal responsibilities through malfeasance (the commission of some unlawful act), misfeasance (the improper performance of some lawful act), or nonfeasance (the nonperformance of an act that should be performed).

**Legal Responsibilities:** Duties and obligations imposed on probation/parole officers by the United States Constitution, the state constitution, federal laws, state laws, court decisions, administrative rules, and agency guidelines that, if breached, give rise to legal liabilities.

**Ministerial Act:** An act that consists of the performance of a duty, in which the officer has no choice but to carry out the act (e.g., the duty to provide a probationer/parolee a revocation hearing before revoking probation/parole). Nonperformance of a ministerial act, unless in good faith, can lead to liability.

**Negligence:** The doing of that which a reasonably prudent person would not have done, or the failure to do that which a reasonably prudent person would have done in like or similar circumstances; failure to exercise that degree of care and prudence that reasonably prudent persons would have exercised in similar circumstances. Negligence can lead to liability under state tort law or Section 1983.

**Official Immunity:** Exemption of certain classes of officials from tort liability or law suits because of the functions they perform.

**Plaintiff:** The person who initiates a civil lawsuit. In a state tort or a Section 1983 action, this is the person who alleges that he has been injured in some way or has rights violated by the actions of the probation/parole officer.

**Preponderance of Evidence:** That evidence which, in the judgment of the jurors or judge, is entitled to the greatest weight, appears to be more credible, has greater force, and overcomes the opposing evidence. The side with the preponderance of evidence wins a civil case. Preponderance denotes more than quantity.

**Probable Cause:** That amount of evidence, supported by circumstances, that is sufficiently strong to warrant a cautious person to believe that an accused is guilty of the offense with which he is charged.

**Qualified Immunity:** Exemption from liability under some circumstances. An official's act may be immune from liability if discretionary, but not if ministerial. Also, an officer may not be liable even if the act was ministerial, if it was done in good faith.

**Quasi-Judicial Immunity:** Exemption from liability under some circumstances. Officials who have some functions of a judicial character and some executive duties may be immune from liabililty for the former duties, but not for the latter.

**Respondeat Superior:** Refers to the responsibility of an employer for the acts or negligence of his employees or agents. Generally not applicable when the government is the employer.

**Section 1983 Case:** A suit based on a federal law enacted in 1871 seeking various remedies (among them monetary damages) from a government officer on the grounds that the plaintiff's federal or constitutional rights have been violated. Also referred to as civil rights cases, they are usually tried in federal courts.

**Special Condition:** A condition of probation or parole that is not imposed as a matter of course on all probationers or parolees, but is designed to meet a special rehabilitative need.

**Stare Decisis:** A doctrine of law which states that when a court decides an issue of law, that decision will be followed by that court and by the courts under it in subsequent cases presenting similar circumstances.

**Statutory Law:** Laws passed by legislatures instead of by other bodies or agencies.

**Tort:** A wrong in which the action of one person causes injury to the person or property of another in violation of legal duty imposed by law.

**Tortfeasor:** A person who commits a tort, a wrongdoer.

**United States Courts of Appeals:** The courts to which cases from the federal district courts are appealed. There are twelve courts of appeals, each serving a designated "circuit" of several states (except for the District of Columbia Circuit). From the courts of appeals, cases are appealed to the United States Supreme Court.

<u>United States District Courts</u>:  The lowest courts in the hierarchy of general jurisdiction federal courts.  This is where federal cases, including Section 1983 cases, are tried.  There is a minimum of one district court per state.

<u>United States Supreme Court</u>:  The highest court in the United States, to which appeals from federal or state courts may be taken.  Composed of one Chief Justice and eight associate justices who are appointed for life, its decisions are binding on both state and federal courts throughout the country.

<u>Venue</u>:  The place where the case is to be heard.

☆ U.S. GOVERNMENT PRINTING OFFICE: 1986—491 - 515/20002

